JUDGE NATHAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

**14 CV      4394**

Civil Action No.

ROYAL PARK INVESTMENTS SA/NV,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiff,

    vs.

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,

                    Defendant.

------------------------------------------------x

CLASS ACTION COMPLAINT AND
VERIFIED DERIVATIVE ACTION FOR
BREACH OF THE TRUST INDENTURE
ACT, BREACH OF CONTRACT, AND
BREACH OF TRUST

RECEIVED
JUN 18 2014
U.S.D.C. S.D.N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ACTION .................................................................1

II.    JURISDICTION AND VENUE .......................................................14

III.    PARTIES ........................................................................14

IV.    FACTUAL ALLEGATIONS .............................................................16

    A.    The Securitization Process for the Mortgage Loans ...............................16

    B.    Deutsche Bank's Duties as Trustee for the Covered Trusts ...................................19

        1.    Deutsche Bank's Duty to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans that Breached Their R&Ws..............................................................20

        2.    Deutsche Bank's Duties upon the Occurrence of an Event of Default..................................................................23

        3.    Deutsche Bank's Heightened Duty to Prudently Protect Plaintiff's and the Class's Interests as Though They Were Deutsche Bank's Own Interests During an Event of Default ................................................27

        4.    Deutsche Bank's Duty of Trust to Avoid Conflicts of Interest with Plaintiff and the Class ..................................................28

        5.    Deutsche Bank's Duties and Obligations Under the TIA .........................28

    C.    The Covered Trusts Suffer from Serious Defects Because Deutsche Bank Failed to Perform the Duties Required of It Under the Governing Agreements, the TIA and Common Law ...............................................30

        1.    Deutsche Bank Discovered No Later than April 2011 that the Covered Trusts' Warrantors Breached Their R&Ws, Thus Triggering Deutsche Bank's Duty to Enforce the R&W Claims..............30

            a.    Prior to April 2011, Deutsche Bank Knew that the Warrantors' R&Ws Were False ......................................35

            b.    By April 13, 2011, Deutsche Bank Absolutely Knew that the Warrantors Had Breached Their Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts..............................................................38

**Page**

c.      Specific Claims Made About the Mortgage Loans in the Covered Trusts Caused Deutsche Bank to Discover Breaches of the Warrantors' R&Ws ...............................................54

d.      Deutsche Bank Also Learned of the Warrantors' R&W Breaches from Borrowers' Bankruptcies........................................57

e.      Deutsche Bank Learned from Its Sister Companies that There Were Systemic Breaches of R&Ws by the Covered Trusts' Warrantors ........................................................................65

2.      Deutsche Bank Had Actual Knowledge of Events of Default No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the Governing Agreements and the TIA ....................................................68

a.      Shortly After the Covered Trusts Were Formed Deutsche Bank Became Aware of Widespread Loan Servicing Events of Default that Likely Affected the Covered Trusts ....................71

b.      Deutsche Bank Knew of Specific Events of Default that Were Occurring with Respect to the Specific Mortgage Loans in the Specific Covered Trusts ............................................83

c.      By October 2010, Deutsche Bank Knew the Master Servicers/Servicers Were Committing Events of Default with Respect to the Mortgage Loans in the Covered Trusts..........91

d.      By April 13, 2011, Deutsche Bank Absolutely Knew that the Covered Trusts' Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts .........................................................96

e.      After April 2011 Deutsche Bank Also Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit the Same and New Events of Default with Respect to the Mortgage Loans in the Covered Trusts.............................................................................103

f.      Deutsche Bank Also Knew that Successor Master Servicer/Servicer Ocwen Was Also Committing Events of Default............................................................................................104

3.     Deutsche Bank Has Conflicts of Interest with Plaintiff and the Class and Has Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself .................................................. 108

D.     Deutsche Bank Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA, and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA and Common Law ..................................................................................... 110

1.     Deutsche Bank Failed to Enforce the Warrantors' Obligations to Cure, Substitute, or Repurchase Defective, Breaching Mortgage Loans as Required by the Governing Agreements and the TIA ............. 110

2.     Deutsche Bank Failed to Perform Its Duties with Respect to Events of Default as Required by the Governing Agreements and the TIA ........ 112

3.     Deutsche Bank Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements and the TIA ............................ 114

4.     Deutsche Bank Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class ...................................................... 115

E.     Plaintiff and the Class Have Suffered Significant Damages Due to Deutsche Bank's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA ................................................................... 115

F.     Plaintiff May Sue Deutsche Bank as Trustee ...................................................... 117

V.     CLASS ACTION ALLEGATIONS ................................................................... 118

VI.    DERIVATIVE ACTION ALLEGATIONS ....................................................... 120

COUNT I ....................................................................................................................... 122

Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq.* ...................... 122

COUNT II ...................................................................................................................... 124

Breach of Contract .................................................................................................... 124

COUNT III ..................................................................................................................... 126

Breach of Trust ......................................................................................................... 126

**Page**

PRAYER FOR RELIEF ..............................................................................................................127

JURY DEMAND .......................................................................................................................128

1.     Plaintiff Royal Park Investments SA/NV ("plaintiff" or "RPI") alleges the following based on information and belief upon the investigation of plaintiff's counsel (except as to the allegations pertaining to plaintiff, which are based on personal knowledge), which included an investigation and review of information concerning defendant Deutsche Bank National Trust Company ("Deutsche Bank" or "defendant"), a review and analysis of information and data concerning the "Covered Trusts" at issue herein, the "Mortgage Loans" within the Covered Trusts at issue herein, the "Warrantors" and originators of the Mortgage Loans, and the "Master Servicers" and "Servicers" of the Mortgage Loans, as well as interviews and consultations with experts, consultants and others knowledgeable in the field of "residential mortgage-backed securities" ("RMBS").  Plaintiff and plaintiff's counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

2.     Plaintiff brings this action on its own behalf and on behalf of a class of all RMBS investors in the following 10 substantially similar RMBS trusts for which defendant Deutsche Bank serves as Trustee (collectively, the "Covered Trusts"):

| Covered Trust Name | Hereinafter Referred to as: |
|---|---|
| 1.   First Franklin Mortgage Loan Trust 2006-FF9 | FFML 2006-FF9 |
| 2.   GSR Mortgage Loan Trust 2007-AR2 | GSR 2007-AR2 |
| 3.   HSI Asset Securitization Corporation Trust 2007-WF1 | HASC 2007-WF1 |
| 4.   HarborView Mortgage Loan Trust 2006-8 | HVMLT 2006-8 |
| 5.   Morgan Stanley ABS Capital I Inc. Trust 2007-NC2 | MSAC 2007-NC2 |
| 6.   Morgan Stanley ABS Capital I Inc. Trust 2007-NC3 | MSAC 2007-NC3 |
| 7.   Morgan Stanley IXIS Real Estate Capital Trust 2006-1 | MSIX 2006-1 |
| 8.   NovaStar Mortgage Funding Trust, Series 2006-4 | NHEL 2006-4 |
| 9.   Saxon Asset Securities Trust 2006-2 | SAST 2006-2 |
| 10.  Soundview Home Loan Trust 2007-NS1 | SVHE 2007-NS1 |

3.     Alternatively, plaintiff brings this action derivatively in the right and for the benefit of the Covered Trusts against defendant Deutsche Bank.

- 1 -

4.     Plaintiff sues Deutsche Bank for violating the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §77aaa, *et seq*., and for breach of contract and breach of trust, in connection with the Covered Trusts.  Plaintiff and the class are beneficiaries of the Covered Trusts, which hold residential "Mortgage Loans."[1]  Plaintiff and the class own RMBS "certificates" in the Covered Trusts, which are essentially bonds granting plaintiff and the class the right to receive monthly principal and interest payments generated by the Mortgage Loans.

5.     As the Trustee for the Covered Trusts, Deutsche Bank owed plaintiff and the class certain contractual duties and obligations, and similar statutory duties imposed on it by the TIA. Deutsche Bank also owed plaintiff and the class the duty to avoid conflicts of interest under common law.  Deutsche Bank's contractual duties and obligations are contained within the Covered Trusts' "Governing Agreements," called "Pooling and Servicing Agreements" ("PSAs").  A copy of one of the Governing Agreements, the PSA for the FFML 2006-FF9 Covered Trust (the "FFML 2006-FF9 PSA"), is attached hereto as Exhibit A.  All of the Governing Agreements for the other Covered Trusts are substantially similar to the Governing Agreement for the FFML 2006-FF9 Covered Trust, and are incorporated herein by reference as if set forth fully herein.

6.     The purpose of having Trustees, such as Deutsche Bank, for the Covered Trusts is to ensure that there is at least one independent party to the Governing Agreements that – unlike plaintiff and the class – does not face collective action, informational, or other limitations, thereby allowing the Trustee to effectively protect the interests of plaintiff and the class, and administer the Covered Trusts for their benefit.

---

[1]   Each of the Covered Trusts held thousands of residential mortgage loans that were transferred to them.  These mortgage loans transferred to the Covered Trusts are referred to herein as the "Mortgage Loans."

7.      The Governing Agreements, as modified by the TIA and common law, effectuate this purpose by imposing certain rights, obligations and duties on Deutsche Bank as Trustee.  For example, the Governing Agreements contain or reference representations and warranties ("R&Ws") from certain entities that aggregated the Mortgage Loans that were ultimately transferred to the Covered Trusts.  The transferring entities were: (1) the "Sellers" or "Sponsors" of the Mortgage Loans and the Covered Trust securitizations (the "Loan Sellers/Sponsors");[2] and/or (2) the Mortgage Loans' originators or other entities that aggregated and sold Mortgage Loans that were ultimately transferred to the Covered Trusts ("Other Transferors") (the Loan Sellers/Sponsors and Other Transferors are collectively referred to herein as the "Warrantors").  The Warrantors' R&Ws attested to the credit quality and characteristics of the Mortgage Loans.[3]  If it turned out that any Mortgage Loan was in breach of the Warrantors' R&Ws, the offending Warrantor was required to cure the breach, or substitute or repurchase the defective Mortgage Loan.

8.      Both the Governing Agreements and the TIA require Deutsche Bank – upon discovery of a breach of any R&W – to promptly provide notice of the breach to the offending Warrantor and the other parties to the Governing Agreements.  And if the breach is not timely cured, the Governing Agreements further require Deutsche Bank to enforce the breaching Warrantor's obligation to either substitute or repurchase any defective Mortgage Loans.

---

[2]    Typically, the Loan Sellers/Sponsors aggregated the Mortgage Loans and sold them to the Covered Trusts' "Depositors" for ultimate transfer to Deutsche Bank and the Covered Trusts.

[3]    As discussed more fully *infra*, the Warrantors' R&Ws attested to the credit characteristics of the Mortgage Loans and vouched for the accuracy of the data they provided about the Mortgage Loans. Among other things, these R&Ws promised that the Mortgage Loans were originated pursuant to all applicable laws, were further originated in accordance with specific underwriting guidelines, were free of fraud and misrepresentation, and were otherwise as represented in the offering documents used to sell the Covered Trusts' RMBS to investors.

9.     The veracity and accuracy of the R&Ws by the Warrantors were extremely important to both investors and the credit rating agencies because they conveyed information concerning the credit quality of the Mortgage Loans, and thus the level of risk of investing in the Covered Trusts' RMBS.  The credit rating agencies relied on and assessed the quality of the Covered Trusts' Mortgage Loans and RMBS and issued the RMBS credit ratings – nearly all of which were high, "investment grade" credit ratings – based on the Warrantors' R&Ws about the Mortgage Loans.  In fact, the credit rating agencies *required* that such R&Ws be made by the Warrantors as a pre-condition to providing credit ratings for the RMBS.  Given the critical importance of the Warrantors' R&Ws, the Governing Agreements obligated the Warrantors to timely cure, substitute, or repurchase any Mortgage Loan that materially breached any of their R&Ws.  In other words, the R&Ws served as insurance to plaintiff, the class and the Covered Trusts that the Mortgage Loans would be as the Warrantors represented.  Importantly, if they were not, Deutsche Bank was required by the Governing Agreements to make them so, by enforcing the Warrantors' obligations to cure any breaches or substitute new, non-breaching loans for defective Mortgage Loans, or repurchase the defective Mortgage Loans.

10.     As alleged more fully below, by no later than April 13, 2011, if not before, Deutsche Bank "discovered," as that term is used in the Governing Agreements, that the Warrantors had breached their R&Ws as to thousands of Mortgage Loans within the Covered Trusts.  However, despite Deutsche Bank's discovery, Deutsche Bank failed to notify the breaching Warrantors and other parties to the Governing Agreements of the breaches.  Nor did Deutsche Bank enforce the Warrantors' obligations to cure, substitute or repurchase the breaching Mortgage Loans, including many Mortgage Loans that were so obviously defective that they had already been foreclosed on, liquidated and written off as losses long before April 2011.  Deutsche Bank's failure to comply with

its duties under the Governing Agreements to enforce the Warrantors' obligations to remedy defective Mortgage Loans has resulted in billions of dollars of damages to the plaintiff, the class and the Covered Trusts. Moreover, Deutsche Bank engaged in multiple, additional breaches of its continuing duties to enforce the Warrantor's obligations under the Governing Agreements by continuing to refuse to act after learning of the breaches, as well as new breaches, causing the claims against the Warrantors to be lost to the statutes of limitations in 2012 and 2013. Deutsche Bank's failure to act also violated the TIA, as the TIA required Deutsche Bank to perform the foregoing duties mandated by the Governing Agreements. Moreover, under the TIA, Deutsche Bank was further required to give plaintiff and the class notice of the Warrantors' defaults/breaches, which Deutsche Bank also failed to do.

11. In addition to Deutsche Bank's obligations to enforce the R&W claims against the Warrantors, Deutsche Bank also owed other critical duties to plaintiff, the class and the Covered Trusts under the Governing Agreements and the TIA. The Governing Agreements require Deutsche Bank to take steps to protect plaintiff, the class and the Covered Trusts whenever it became aware of uncured loan servicing failures by the Covered Trusts' "Master Servicers" or "Servicers" that amounted to "Master Servicer Events of Default," or "Events of Default," as defined by the Governing Agreements. To explain, the Governing Agreements designated certain entities to be the Master Servicers and/or Servicers of the Mortgage Loans within the Covered Trusts (these Master Servicers and Servicers are sometimes collectively referred to herein as "Master Servicers/Servicers"). The Master Servicers/Servicers are responsible under the Governing Agreements to ensure that the Mortgage Loans within the Covered Trusts are being properly and

legally serviced for the benefit of plaintiff and the class.[4]  A "Master Servicer Event of Default" or an "Event of Default" (these will be collectively referred to hereinafter as "Event of Default" unless otherwise noted), occurs under the Governing Agreements whenever a Master Servicer or Servicer (as applicable) fails to ensure the legal and proper servicing of the Mortgage Loans.  The Master Servicers/Servicers also commit an Event of Default whenever they discover breaches of the Warrantors' R&Ws and fail to promptly give notice of those breaches to Deutsche Bank.

12.     Under the Governing Agreements and the TIA, Deutsche Bank is required to act whenever it becomes aware of an Event of Default by the Master Servicers/Servicers.  First, Deutsche Bank is required to notify the offending Master Servicer or Servicer of its Event of Default.  Moreover, Deutsche Bank is also required to demand that the offending Master Servicer or Servicer cure its Event of Default within a prescribed period of time.  In addition, Deutsche Bank is also required to promptly give notice of Events of Default to plaintiff and the class.  Finally, Deutsche Bank is allowed to take additional steps to protect plaintiff and the class if an Event of Default is not cured, including legal action, terminating the offending Master Servicer or Servicer, or taking over the Master Servicer's or Servicer's duties.

13.     Importantly, under both the Governing Agreements and the TIA, the occurrence of an Event of Default which is known to Deutsche Bank dramatically increases its duties to plaintiff and

---

[4]     This included, *inter alia*, ensuring the prompt collection of payments from borrowers and remittance of the same to the Covered Trusts; ensuring the proper and legal sending of statements and delinquency and other notices to borrowers who were late on their payments; ensuring the proper maintenance and reporting of accurate information regarding the Mortgage Loans; ensuring the proper and legal modification of Mortgage Loans when permitted and as necessary; ensuring the proper and legal institution and prosecution of foreclosure proceedings, when and as necessary, on behalf of Deutsche Bank as Trustee; and properly maintaining the Covered Trusts' "REO" properties (properties the Covered Trusts owned).  In short, the Governing Agreements require the Master Servicers/Servicers to do whatever a prudent Master Servicer/Servicer would customarily do to ensure the proper servicing and administration of the Mortgage Loans in accordance with law, for the benefit of plaintiff and the class.

the class.  The occurrence of any Event of Default *requires Deutsche Bank to protect plaintiff and the class by exercising all of the rights and powers vested in Deutsche Bank by the Governing Agreements, as a reasonably prudent person would under the circumstances, and to act as if Deutsche Bank is protecting its own interests*.  Essentially, when an Event of Default occurs, Deutsche Bank is required to act as a quasi-fiduciary for plaintiff and the class and protect them as if Deutsche Bank is protecting its own interests.

14.     It was critically important that Deutsche Bank act when it became aware of Events of Default because the proper servicing of the Mortgage Loans and the reporting of Warrantor R&W breaches to Deutsche Bank was vital to: (1) the ongoing financial viability of the Covered Trusts; (2) ensuring the Covered Trusts had sufficient cash flows to pay expenses and to fund payments to plaintiff and the class; (3) avoiding and minimizing any losses to plaintiff, the class and the Covered Trusts from defaults, delinquencies or foreclosures of the Mortgage Loans or Warrantor R&W breaches; and (4) maintaining the credit ratings and market values of plaintiff's and the class's RMBS.  Because of this, the Governing Agreements require Deutsche Bank to act as essentially a fiduciary for plaintiff and the class whenever it becomes aware of an Event of Default by a Master Servicer or Servicer.

15.     As alleged more fully below, Deutsche Bank obtained actual knowledge of widespread, rampant Events of Default by the Covered Trusts' Master Servicers and Servicers no later than April 13, 2011, if not earlier.  By April 2011, there was no doubt that Deutsche Bank had actual knowledge that the Master Servicers and Servicers were engaging in numerous, widespread, improper and/or illegal foreclosure practices with respect to the Mortgage Loans in the Covered Trusts that were multiple Events of Default.  In fact, Deutsche Bank even appears to have actively participated in the misconduct, including the making of false statements, the filing of false and

illegal affidavits in foreclosure actions, and engaging in other improper or illegal loan servicing misconduct with the Master Servicers/Servicers, all of which were Events of Default.  In addition, Deutsche Bank also had actual knowledge that the Master Servicers/Servicers knew of widespread breaches of the Warrantors' R&Ws but had not reported those to Deutsche Bank, which were also Events of Default.  These Events of Default triggered Deutsche Bank's fiduciary-like duties under the Governing Agreements and the TIA to take action and protect plaintiff and the class as a prudent person would.  However, Deutsche Bank failed to do the things required of it by the Governing Agreements and the TIA, and further allowed the Events of Default to go on unchecked, thereby engaging in multiple, additional breaches of its continuing duties under the Governing Agreements and TIA.  In fact, despite its knowledge of these Events of Default, and numerous additional Events of Default, that have occurred repeatedly and continuously *after* April 2011, Deutsche Bank has continued to fail to act, let alone act prudently, and thus has engaged in multiple, additional breaches of its duties under the Governing Agreements and the TIA, as the Covered Trusts continue to suffer from pervasive Events of Default.

16.     Deutsche Bank's multiple breaches and failures to act have resulted in defective Mortgage Loans that breached their R&Ws not being replaced or repurchased by the Warrantors, and also Mortgage Loans being improperly and illegally serviced, causing massive damages to plaintiff, the class and the Covered Trusts.  Deutsche Bank's failures to properly act with respect to the Master Servicers' and Servicers' Events of Default have resulted in, *inter alia*: (1) failures to have Mortgage Loans in breach of the Warrantors' R&Ws replaced or repurchased; (2) numerous foreclosures of the Mortgage Loans being denied, invalidated and/or improperly delayed, substantially driving up the Covered Trusts' expenses and losses; (3) numerous Mortgage Loan delinquencies being allowed to stretch on interminably without payments being remitted to the Covered Trusts, while the Master

Servicers and Servicers continuously add improper and excessive fees and charges to such Mortgage Loans, which are paid to the Master Servicers and Servicers by the Covered Trusts first, before the Covered Trusts receive anything when the mortgages are eventually foreclosed; (4) numerous Mortgage Loans being modified or foreclosed, or not being modified or foreclosed, in a manner that financially benefitted the Master Servicers'/Servicers' financial interests but not plaintiff's and the class's financial interests, in violation of the Governing Agreements; (5) the Master Servicers and Servicers entering into numerous settlements with governmental regulatory authorities because of their Events of Default wherein the Master Servicers and Servicers were required to reduce the Covered Trusts' Mortgage Loan balances and provide other borrower concessions, which caused additional losses to plaintiff, the class and the Covered Trusts; and (6) various and numerous other illegal and improper servicing misconduct alleged herein amounting to Events of Default that caused millions of dollars in damages to plaintiff, the class and the Covered Trusts.

17.     As previously alleged, these uncured Events of Default require Deutsche Bank to use a heightened, "prudent person" duty of care akin to that of a fiduciary, and to exercise all of its rights and powers under the Governing Agreements for the benefit of the plaintiff and the class. ***This heightened duty of care does not apply only to the Master Servicers'/Servicers' Events of Default, however; it also applies to all of the Warrantors that had breached their R&Ws***. Thus, Deutsche Bank is and was also required to enforce the R&W claims against the Warrantors as a prudent person would, and seek to fully recover for those claims as though Deutsche Bank was seeking to recover for itself.

18.     Deutsche Bank, however, ignored these duties and obligations owed to plaintiff, the class and the Covered Trusts under the Governing Agreements and the TIA, and did not exercise its rights and powers under the Governing Agreements, or exercise the degree of care and skill required

of a prudent person in the conduct of his/her own affairs.  As a result, Deutsche Bank breached the Governing Agreements and violated the TIA, and caused plaintiff, the class and the Covered Trusts to suffer billions of dollars in damages from the loss and non-prosecution of the R&W claims against the Warrantors (which are now time barred), and have further caused millions of dollars in additional damages resulting from the Master Servicers'/Servicers' uncured loan servicing Events of Default, which continue unabated.  Plaintiff, the class and the Covered Trusts are entitled to recover damages caused by these breaches of the Governing Agreements by Deutsche Bank, and for its violations of the TIA.

19.     Deutsche Bank's failure to act also breached its common law "duty of trust" owed to plaintiff and the class.  Under this duty, Deutsche Bank was required to avoid conflicts of interest with plaintiff and the class.  Deutsche Bank's failure to act as required under the Governing Agreements was a result of the fact that Deutsche Bank had multiple and fundamental conflicts of interest with plaintiff and the class.

20.     First, Deutsche Bank had ongoing and prospective business relationships with the loan originators, Warrantors, Master Servicers and Servicers to the Covered Trusts (and the entities related to them).  These were the decision-makers that selected RMBS trustees for RMBS trusts, and they had selected Deutsche Bank to be the Trustee of the Covered Trusts, as well as the Trustee for hundreds, if not thousands, of other RMBS trusts.  Deutsche Bank derived significant RMBS trustee business from such relationships, and it desired to continue profiting therefrom.  Thus, Deutsche Bank did not want to disrupt its business relationships with these entities, or anger them, by seeking to enforce R&W claims against the Warrantors or declaring Events of Default against the Master Servicers/Servicers as it would endanger Deutsche Bank's RMBS trustee business and the income therefrom, as well as future prospects for such financial gain.

21.    Second, Deutsche Bank's related sister companies, such as DB Structured Products, Inc. ("DBSP"), DB Home (which had acquired lender Chapel Mortgage Corporation ("Chapel")) and MortgageIT, Inc. ("MortgageIT"), were loan originators and loan seller/sponsors to RMBS trusts.[5]  These "Deutsche Bank" sister companies had warranted tens of thousands of loans that they sold to the Covered Trusts' Warrantors and Master Servicers/Servicers, and their related companies, for inclusion into RMBS trusts.  Deutsche Bank knew that its sister companies' loans were awful and breached their R&Ws.  *See infra* ¶¶111-115.  Deutsche Bank further knew that if it attempted to enforce the plaintiff's, the class's and the Covered Trusts' R&W rights against the Warrantors to the Covered Trusts, those Warrantors (and their related companies) would retaliate by making similar claims against Deutsche Bank's sister companies for hundreds of millions if not billions of dollars in R&W claims for other trusts.  Similarly, Deutsche Bank knew that if it declared Events of Default, or took other steps against the Covered Trusts' Master Servicers/Servicers, those Master Servicers and Servicers would also make retaliatory R&W claims against Deutsche Bank's sister companies.

22.    Third, for at least two of the Covered Trusts, the HVMLT 2006-8 and MSIX 2006-1 Covered Trusts, Deutsche Bank faced an extremely obvious conflict of interest.  ***One of the Warrantors to the HVMLT 2006-8 Covered Trust was Deutsche Bank's sister company, MortgageIT, and one of the loan originators to the MSIX 2006-1 Covered Trust was another of Deutsche Bank's sister companies, Chapel***.  Deutsche Bank was not going to make R&W claims against its sister companies or claim that the loans of its own sister companies were defective.

23.    Fourth, in eight of the 10 Covered Trusts, Deutsche Bank's Trustee fees to manage the Covered Trusts are paid by either the Master Servicers or Servicers.  *See, e.g.*, FFML 2006-FF9 PSA §8.05 ("[T]he Trustee shall be paid its fee by the Master Servicer from the Master Servicer's

---

[5]    Deutsche Bank, DBSP, DB Home, Chapel and MortgageIT were all ultimately owned and controlled by their common parent company, German investment banking giant Deutsche Bank AG.

own funds pursuant to a separate agreement."). Given that Deutsche Bank's fees are paid by these entities, Deutsche Bank was not going to "bite the hand that fed it" and put this income in jeopardy by declaring Events of Default against those Master Servicers and Servicers.

24.     Because of these conflicts of interest between Deutsche Bank, plaintiff and the class, Deutsche Bank decided to refrain from discharging its duties under the Governing Agreements and TIA, and therefore refused to protect the Covered Trusts or plaintiff's and the class's interests therein. Instead, Deutsche Bank protected and advanced its own economic interests at the expense of plaintiff and the class by refusing to act.

25.     By deliberately refusing to act as required by the Governing Agreements and the TIA, Deutsche Bank put its own interests ahead of plaintiff's and the class's and benefitted therefrom, breaching its common law duty of trust to plaintiff and the class. Moreover, Deutsche Bank has engaged in multiple, additional breaches of its duty of trust by continuing to put its interests ahead of those of plaintiff and the class to the present by continuing to refuse to perform its duties under the Governing Agreements.

26.     Numerous media reports and RMBS experts have confirmed these conflicts of interest. For example, in December 2010, law professor Kurt Eggert appeared before the U.S. Senate's Banking, Housing and Urban Affairs Committee and testified that ***RMBS trustees like Deutsche Bank were not likely to be of "much help for investors," because "a trustee may derive much of its income from" those that set up the trusts and appoint the trustees***. In addition, an article in the *Yale Journal of Regulation* stated: "***there is often a very close relationship between the servicer and the trustee; many originators and servicers have a 'pet' or 'pocket' trustee that they use for most of their deals***." Moreover, *The New York Times* reported on June 16, 2013, that

> ***when mortgages soured, trustees declined to pursue available remedies for investors, such as pushing a [Warrantor] to buy back loans that did not meet***

*quality standards . . . because trustees are hired by the big banks that package and sell the securities[.] [Therefore] their allegiances are divided.  Sure, investors are paying the fees, but if a trustee wants to be hired by sellers of securities in the future, being combative on problematic loan pools may be unwise*.

The article concluded that "***they [the RMBS trustees] are a dog that could have barked but didn't***."

27.     As a result of Deutsche Bank's failures to enforce the R&W claims (and the Master Servicers/Servicers Events of Default by failing to notify Deutsche Bank of Warrantor R&W breaches), the Covered Trusts are full of defective Mortgage Loans and have therefore experienced historically unprecedented numbers of defaults, delinquencies, foreclosures, liquidations and losses. As a further result of Deutsche Bank's failures to act with respect to Master Servicer/Servicer loan servicing Events of Default, the Mortgage Loans have also experienced numerous illegal, invalid and improper foreclosures and lengthy and expensive delays in foreclosure proceedings, extremely long delinquencies, the imposition of excessive and improper Master Servicer/Servicer fees, and the disposition of Mortgage Loans that financially benefitted the Master Servicers/Servicers, but negatively impacted the interests of plaintiff and the class.  Deutsche Bank's failures to act as required by the Governing Agreements and the TIA have caused plaintiff, the class and the Covered Trusts to suffer billions of dollars in damages, caused failures and shortages in the payment of principal and interest to plaintiff and the class, and caused steep declines in the values plaintiff's and the class's RMBS.  Indeed, due to Deutsche Bank's inaction, *the Covered Trusts have incurred losses that currently exceed $3.1 billion, and all of RPI's RMBS in the Covered Trusts are now completely worthless*.  Accordingly, Deutsche Bank is liable to plaintiff and the class for damages caused by its breaches of the Governing Agreements and duty of trust, and its violations of the TIA.

## II.    JURISDICTION AND VENUE

28.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 for violations of the TIA and supplemental jurisdiction over the breach of contract and breach of trust claims.  The Court also has jurisdiction pursuant to 28 U.S.C. §1332(a).

29.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b).  Indeed, in at least two of the Governing Agreements, the PSAs for the NHEL 2006-4 and SVHE 2007-NS1 Covered Trusts, Deutsche Bank consented to litigating matters arising out of such PSAs in this District.

## III.    PARTIES

30.    Plaintiff RPI is a limited liability company incorporated under the laws of Belgium, with its principal place of business in Brussels, Belgium.  RPI acquired RMBS in each of the Covered Trusts on or about the dates indicated below, and has continuously held such RMBS since then:

| Covered Trusts | Tranche/Class | Initial Face Amount of Certificate | Date Acquired |
|---|---|---|---|
| FFML 2006-FF9 | M4 | $ 4,113,000 | February 12, 2010 |
| GSR 2007-AR2 | 1A2 | $ 24,143,000 | May 12, 2009 |
| HASC 2007-WF1 | M4 | $ 7,690,000 | May 12, 2009 |
| | M5 | $ 7,049,000 | May 12, 2009 |
| | M6 | $ 4,806,000 | May 12, 2009 |
| HVMLT 2006-8 | B1 | $ 7,575,000 | February 12, 2010 |
| MSAC 2007-NC2 | M4 | $ 4,500,000 | May 6, 2010 |
| | M5 | $ 4,806,000 | May 6, 2010 |
| MSAC 2007-NC3 | M2 | $ 9,000,000 | May 12, 2009 |
| MSIX 2006-1 | M2 | $ 25,000,000 | February 12, 2010 |
| NHEL 2006-4 | M4 | $ 7,500,000 | February 12, 2010 |
| SAST 2006-2 | M6 | $ 5,000,000 | February 12, 2010 |
| SVHE 2007-NS1 | M4 | $ 5,000,000 | May 6, 2010 |

- 14 -

31.     Because of Deutsche Bank's failures to act as alleged herein, each of the foregoing RMBS are now total losses, having been completely written down to the point that they are worthless.

32.     With respect to the above RMBS which RPI acquired on or about May 12, 2009, RPI acquired such RMBS from the initial purchasers of such RMBS, and the initial purchasers acquired such RMBS at or about the time the RMBS were offered to the investing public in 2006 and 2007. These initial purchasers, when they transferred such RMBS to RPI on or about May 12, 2009, also transferred all right, title and interest in such RMBS to RPI, including all litigation rights and claims the initial purchasers had, such as the initial purchasers' claims against Deutsche Bank asserted in this action.  As to the remaining RMBS that were acquired by RPI in 2010, these RMBS were originally included within collateralized debt obligations ("CDOs") in which RPI acquired interests on or about May 12, 2009 from the initial purchasers.  RPI was assigned all right, title and interest (including litigation and claim rights) the initial purchasers had in the interests in these CDOs at that time.  Subsequently, the CDOs were liquidated in 2010 and RPI acquired the RMBS within the CDOs along with all rights, title and interest in such RMBS.  Given that the CDOs were *liquidated in full*, and thus the CDOs were selling *all* rights and interests in the RMBS within them, RPI also obtained all litigation rights and claims that the CDOs and initial purchasers had in the RMBS. Furthermore, pursuant to New York General Obligations Law §13-107, RPI obtained all rights and causes of action of all previous holders against Deutsche Bank.

33.     Defendant Deutsche Bank is a national banking association organized and existing under the laws of the United States with its principal place of business in California.  Deutsche Bank is one of the market leaders in the RMBS trustee business, as it serves as trustee for hundreds, if not

thousands, of RMBS trusts, including the Covered Trusts.  Deutsche Bank has served as the Trustee for the Covered Trusts since they were formed in 2006 and 2007.

IV.    **FACTUAL ALLEGATIONS**

      A.    **The Securitization Process for the Mortgage Loans**

34.    The Warrantors that sold the Mortgage Loans transferred into the Covered Trusts engaged in a nearly identical securitization process that was repeated thousands of times by them and others during 2006 and 2007, the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  Investor demand for RMBS was skyrocketing during this period and the Warrantors and other RMBS securitizers were hard pressed to meet that demand. RMBS securitizations proliferated during 2006 and 2007 and were extremely profitable for all involved in their sale.  Hundreds of billions of dollars of RMBS were packaged and sold to the investing public during this period and billions of dollars in profit were pocketed by the Warrantors, Master Servicers/Servicers and other securitizers.  Deutsche Bank also profited handsomely, and continues to profit, from the explosion in RMBS trusts caused by the skyrocketing sales, as it is an RMBS Trustee to hundreds, if not thousands, of RMBS trusts, including the Covered Trusts.

35.    RMBS securitizations involve the conversion of thousands of illiquid residential mortgage loans into bond-like instruments – the RMBS certificates at issue herein – which trade over the counter in capital markets.

36.    The first step in creating RMBS is the "origination" of mortgage loans, that is, the lending of money to borrowers to purchase residences.  The Mortgage Loans that were ultimately transferred to the Covered Trusts were usually originated by lenders and then were purchased by the Loan Sellers/Sponsors, or originated by the Loan Sellers/Sponsors themselves, or originated or purchased by the Other Transferors.

37.     Typically, after aggregating the Mortgage Loans, the Loan Sellers/Sponsors and Other Transferors then grouped the Mortgage Loans into large pools, which they then transferred and sold to the Covered Trusts' "Depositors" for ultimate transfer to the Covered Trusts and Deutsche Bank as Trustee.  Usually, the Depositors were shell companies related to the Loan Sellers/Sponsors.  These sales from the Loan Sellers/Sponsors to the Depositors were typically accomplished via agreements called "Mortgage Loan Purchase Agreements," "Mortgage Loan Sale Agreements," or similarly titled agreements (collectively, the "MLPAs").  In the case of the Other Transferors, they entered into similar agreements with either the Loan Sellers/Sponsors or the Depositors and the Mortgage Loans were ultimately transferred to the Covered Trusts (the "Other Transfer Agreements").

38.     The Governing Agreements refer to and incorporate the MLPAs and, when relevant, the Other Transfer Agreements.  Generally, in the PSAs, the MLPAs and the Other Transfer Agreements, the respective Loan Sellers/Sponsors and Other Transferors: (i) make numerous R&Ws concerning the credit quality and characteristics of the Mortgage Loans and vouch for the accuracy of all data they provide about the Mortgage Loans; (ii) promise to cure, substitute or repurchase Mortgage Loans that do not comply with those R&Ws; and (iii) usually expressly state that the Trustee will ultimately have the right to enforce the R&Ws against the Loan Sellers/Sponsors and Other Transferors.  The R&Ws by the Loan Sellers/Sponsors and Other Transferors (together, the "Warrantors"), and the remedies for breaches thereof, are referenced in the Governing Agreements' PSAs.  The rights to enforce those R&Ws are assigned to the Trustee for the benefit of the RMBS investors, *i.e.*, plaintiff and the class.

39.     After the Mortgage Loans are sold and transferred from the Warrantors to the Covered Trusts' Depositors, the Depositors then transfer the Mortgage Loans, along with the rights

to enforce the Warrantors' R&Ws, to the Trustee for the benefit of plaintiff and the class, and, in exchange, the Trustee transfers the RMBS – which are typically called RMBS "certificates" – to the Depositors.

40.    The Depositors then sell the RMBS certificates to securities underwriters, typically another entity related to the Loan Sellers/Sponsors and Depositors.  The Depositors remit the money from those underwriter sales to the Loan Sellers/Sponsors.  Meanwhile, the securities underwriter markets and sells the RMBS certificates to investors such as plaintiff and the class and retains a portion of the purchase price as its fee.

41.    After the Covered Trusts' RMBS are sold to investors, the Mortgage Loans must be serviced.  Thus, the Governing Agreements designate certain entities to be the Master Servicers and/or Servicers of the Mortgage Loans, and require that they service the Mortgage Loans in accordance with law and pursuant to certain standards, usually the customary servicing practices of "***prudent***" loan servicers or the "***customary and usual standards of practice***" they use when they service their own loan portfolios.  Whenever a Master Servicer/Servicer fails to ensure the service of the Mortgage Loans pursuant to these standards, an Event of Default occurs, and the Trustee is required to take certain actions to protect plaintiff and the class when it becomes aware of the default.

42.    Plaintiff's and the class's RMBS certificates entitle them to the cash flows generated by the Mortgage Loans.  The Covered Trusts, as with other RMBS trusts, are structured such that the risk of loss is divided among different "classes" or "tranches" of RMBS in each Covered Trust. Each class or tranche of the Covered Trusts has a different level of credit risk and reward (the interest or yield), including different levels and types of credit enhancement or protection, and different priorities to payment from the cash flows generated by the Mortgage Loans (the payment

priority and distribution is called the payment "waterfall").  Because the classes/tranches have different credit enhancements and different priorities of claim to the cash flow, they are assigned different credit ratings by the credit rating agencies and they sell at different yields or coupons. However, most of the classes/tranches of the RMBS are required to be rated as "investment grade" securities before they can be sold.  As previously alleged, the credit ratings agencies require that the Warrantors make R&Ws and base their credit ratings of the RMBS on such R&Ws.

43.     All of the classes/tranches of the RMBS, the plaintiff, the class, and all of the Covered Trusts, are dependent on the Trustee to act as required under the Governing Agreements in order to ensure that the Covered Trusts perform as designed and are profitable.  Thus, the Trustee must act promptly and properly discharge its duties and obligations under the Governing Agreements.  Here, Deutsche Bank breached important duties it agreed to undertake in the Governing Agreements and which were mandated by the TIA, and thereby breached those agreements and violated the TIA, thus entitling plaintiff and the class to damages.

### B.     Deutsche Bank's Duties as Trustee for the Covered Trusts

44.     The Governing Agreements set forth Deutsche Bank's rights and its duties and obligations to plaintiff and the class.  All of the Covered Trusts are governed by PSAs (Pooling and Service Agreements),[6] and certain related agreements such as the MLPAs (Mortgage Loan Purchase Agreements) and/or Servicing Agreements ("SAs"), which the PSAs reference and incorporate when relevant.  Each of the Governing Agreements for the Covered Trusts is substantially similar to and imposes substantially similar duties on Deutsche Bank.  Accordingly, the FFML 2006-FF9 PSA (Exhibit A hereto), and its related MLPA (Exhibit B hereto), are incorporated herein by reference,

---

[6]     The GSR 2007-AR2 Covered Trust's Governing Agreement is called a "Master Servicing and Trust Agreement" as opposed to a PSA, yet serves the same function as the other Covered Trusts' PSAs.

and are used as representative examples of all of the Governing Agreements (and their related agreements) for all of the Covered Trusts.

45.     While the Governing Agreements set forth certain rights and responsibilities of Deutsche Bank, the TIA supplements those agreements.  The TIA was enacted in 1939 because Congress recognized that previous abuses by trustees had adversely affected investors and the national interest.  In enacting the TIA, Congress desired to ensure that there were certain minimum federal protections available to investors, which are deemed to be incorporated into the Governing Agreements.  Those minimum protections are discussed *infra* at ¶¶62-65.

46.     When the Covered Trusts were formed, the Covered Trusts' Depositors transferred to Deutsche Bank "all the right, title and interest . . . to the Trust Fund," *i.e.*, the Mortgage Loans in each Covered Trust, and their attendant rights, "***for the benefit of the Certificateholders***," *i.e.*, plaintiff and the class.  FFML 2006-FF9 PSA §2.01.  Furthermore, ***Deutsche Bank "agree[d] to hold the Trust Fund and exercise the rights [conferred by the Governing Agreements] for the Holders of the Certificates***."  FFML 2006-FF9 PSA §2.04.  Indeed, in a memo written by Deutsche Bank to its loan servicers (including the Covered Trusts' Master Servicers and Servicers) on August 30, 2007, Deutsche Bank admitted that it is "***our legal duty to protect the interests of securities investors***" in the Covered Trusts.

### 1.     Deutsche Bank's Duty to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans that Breached Their R&Ws

47.     The PSAs (and/or the related MLPAs and Other Transfer Agreements) contained numerous R&Ws about the Mortgage Loans in the Covered Trusts made by the Warrantors.  The R&Ws by the Warrantors attested to the credit quality of the Mortgage Loans conveyed to the Covered Trusts and warranted the accuracy of the data the Warrantors conveyed about such Mortgage Loans.  The Warrantors also attested to other characteristics of the Mortgage Loans and

their origination.  The following is an example of the R&Ws the Warrantors made: (1) that the data and other information the Warrantors conveyed concerning the Mortgage Loans in mortgage loan schedules, exhibits, and other compilations of data in connection with the transfer of the Mortgage Loans to the Covered Trusts was "complete, true and correct"; (2) that the Mortgage Loans complied with and were originated and serviced in compliance with all federal, state and local laws; (3) that the Mortgage Loans were not "high cost," "high-risk," "predatory" or "abusive" loans as defined by law; (4) that the appraisals of the properties securing the Mortgage Loans, and the appraisers who conducted them, complied with certain uniform standards and requirements and/or complied with the lender's underwriting guidelines; (5) that the Mortgage Loans were originated in accordance with the lender's underwriting guidelines; (6) that the Mortgage Loan borrowers were evaluated to confirm that they had a reasonable ability to afford the Mortgage Loans; and (7) that there was no fraud, error, omission, misrepresentation, or negligence by any person involved in the origination of the Mortgage Loans.  *See, e.g.*, FFML 2006-FF9 PSA §2.03(b) and "Schedule IV" thereto at §§(1), (8), (21), (24), (26), (34), (43), (48), (56), (60), (63)-(66), (69)-(71) (Ex. A hereto); *see also* FFML 2006-FF9 MLPA §§4(a)(2), (14)-(16), 4(b)(7)-(9) (Ex. B hereto).  The Warrantors made numerous other R&Ws concerning the Mortgage Loans in the Covered Trusts.  *See generally* FFML 2006-FF9 PSA "Schedules III and IV"; FFML 2006-FF9 MLPA §4.

48.  The Warrantors' R&Ws are specifically referenced in the Governing Agreements, along with the Warrantors' obligations to cure, substitute, and/or repurchase any defective Mortgage Loans.  *See* FFML 2006-FF9 PSA §2.03.

49.  Importantly, the Governing Agreements also provide that whenever Deutsche Bank discovers a breach of a Warrantor's R&Ws that materially affect plaintiff and the class, Deutsche Bank "***shall give prompt written notice to***" the breaching Warrantor and the other parties to the PSA.

- 21 -

FFML 2006-FF9 PSA §2.03(c), (k).  Thereafter, the breaching Warrantor has a brief period of time within which to cure, substitute or repurchase the breaching Mortgage Loans.  *Id*. §2.03(c) (60 days); *id*. §2.03(k) (30 days).  If the Warrantor fails to cure the breach, then the Trustee is to "***enforce***" that breaching Warrantor's obligations to substitute or repurchase the defective Mortgage Loans.  *Id*. §2.01 (Deutsche Bank "to enforce the [Loan Seller's/Sponsor's] obligation to repurchase or substitute defective Mortgage Loans"); *id*. §2.04 (Deutsche Bank "agrees to . . . exercise the [breach of R&W] rights referred to above [in §2.03 against the Warrantors] for the benefit of all present and future Holders of the Certificates.").[7]

50.     Deutsche Bank's duties are embodied in §§2.01, 2.03 and 2.04 of the FFML 2006-FF9 PSA.  First, §2.03(c) and (d) provide:

> ***Upon discovery by the . . . Trustee . . . of a breach of any of the foregoing representations and warranties [by Warrantor First Franklin Financial Corporation ("First Franklin")], the party discovering such breach shall give prompt written notice to the others[, including First Franklin]***.

> *            *            *

> ***[W]ithin 60 days of . . . notice to [First Franklin] of any breach of a representation or warranty . . . that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, [First Franklin] shall use its best efforts to. . . cure such breach in all material respects and, if such . . . breach cannot be remedied, [First Franklin] shall . . . (i) . . . remove such Mortgage Loan . . . from the Trust Fund and substitute in its place a Substitute Mortgage Loan, . . . or (ii) repurchase such Mortgage Loan*** . . . .

Further, in §2.04, ***Deutsche Bank "agree[d] to . . . exercise the rights referred to above for the benefit of all present and future Holders of the Certificates***."

---

[7]     The GSR 2007-AR2 Covered Trust required Deutsche Bank to enforce certain Warrantors' breaches while that Covered Trust's "Securities Administrator" was responsible for others.  *See* Exhibit C hereto (GSR 2007-AR2 "Standard Terms to Master Servicing and Trust Agreement" ("GSR Standard Terms")) §2.03.  Ultimately, however, ***Deutsche Bank was assigned all of "the rights and remedies with respect to the enforcement of any and all representations, warranties and covenants under***" that Covered Trust's Governing Agreements.  *Id*. at §2.01.

51.     Second, with respect to the other Warrantor to the FFML 2006-FF9 Covered Trust, Loan Seller/Sponsor HSBC Bank USA, National Association ("HSBC"), the PSA similarly provides:

> **Upon the discovery by . . . the Trustee . . . of a breach of any of [HSBC's] representations and warranties set forth in Section 4 of the [MLPA], the party discovering the breach shall give prompt written notice to the others[, including HSBC]. Within 30 days of . . . notice to [HSBC] of any breach of any of the foregoing representations or warranties that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, [HSBC] shall use its best efforts to cure such breach in all material respects and, if such defect or breach cannot be remedied, [HSBC] shall . . . (i) . . . remove such Mortgage Loan from the Trust Fund and substitute in its place a Substitute Mortgage Loan . . . or (ii) repurchase such Mortgage Loan** . . . .

*Id.* §2.03(k). **Deutsche Bank "agree[d] to . . . exercise the rights," id. §2.04, "to enforce [HSBC's] obligation to repurchase or substitute defective Mortgage Loans under . . . the [MLPA]."** *Id.* §2.01.

### 2.     Deutsche Bank's Duties upon the Occurrence of an Event of Default

52.     Deutsche Bank also had obligations under the Governing Agreements and TIA whenever it learned of a "Master Servicer Event of Default" by a Master Servicer, or where there was no Master Servicer, whenever it learned of an "Event of Default" by a Servicer.[8]  The Governing Agreements provide that the Master Servicers "shall monitor the performance of" the Servicers and use "reasonable good faith efforts to cause [them] to duly and punctually perform

---

[8]     In eight of the 10 Covered Trusts, the Governing Agreements designate a "Master Servicer" and one or more "Servicers."  In the other two Covered Trusts, there was no Master Servicer designated – instead a single Servicer was designated.  In the eight Covered Trusts having Master Servicers, the Master Servicers are required to monitor the Servicers and ensure that they properly and legally service and administer the Mortgage Loans for the benefit of plaintiff and the class, and if the Master Servicer does not, a "Master Servicer Event of Default" occurs.  In the two Covered Trusts without Master Servicers, the Servicers themselves are required to ensure the proper and legal service and administration of the Mortgage Loans for the benefit of plaintiff and the class, and if they do not, an "Event of Default" occurs.  Unless otherwise specified herein, both "Master Servicer Events of Default" and "Events of Default" are collectively referred to herein as "Events of Default."

[their] duties and obligations" under the Governing Agreements.  FFML 2006-FF9 PSA §9.01. Under the Governing Agreements, this means that the Master Servicers are required to ensure that the Servicers are legally, properly and prudently servicing the Mortgage Loans.  In the two Covered Trusts where there is no Master Servicer designated under the Governing Agreements, the Servicer is required to ensure the legal, proper and prudent servicing of the Mortgage Loans.  Either way, the Master Servicers and Servicers, and any sub-servicers they use, have the same duties under the Governing Agreements – to ensure that the Mortgage Loans are properly and prudently serviced in accordance with customary and usual loan servicing practices, and in accordance with all applicable laws.

53.     The Master Servicers'/Servicers' loan servicing duties include: ensuring that the payments by borrowers are timely and properly collected and submitted to the Covered Trusts; ensuring timely, appropriate and legal statements and notices are sent to borrowers; ensuring appropriate insurance is in place when required; ensuring accurate information about the Mortgage Loans is maintained; ensuring that the Covered Trusts' "REO" properties[9] are properly and legally maintained; and otherwise doing whatever is needed to ensure that the Mortgage Loans are properly serviced.  The Master Servicers/Servicers are also responsible to ensure that, when necessary or required, the Mortgage Loans are legally and properly modified or foreclosed, for the benefit of plaintiff and the class.

54.     To this end, the FFML 2006-FF9 PSA provides that:

> **For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and . . . in accordance with Accepted Servicing Practices** . . . .

---

[9]   "REO" properties are "real estate owned" by the Covered Trusts.  These properties typically have been vacated or abandoned and foreclosed on or otherwise taken back from defaulted borrowers.

FFML 2006-FF9 PSA §3.01(a).  "*Accepted Servicing Practices*" are defined in the PSA as follows:

> With respect to any Mortgage Loan and the Servicer, *the servicing and administration of such Mortgage Loan (i) in the same manner in which, and with the same care, skill, prudence and diligence with which the Servicer generally services and administers similar mortgage loans with similar mortgagors (A) for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional residential mortgage lenders servicing their own mortgage loans or (B) held in the Servicer's own portfolio, whichever standard is higher, and (ii) in accordance with applicable local, state and federal laws, rules and regulations*.

*Id.* Art. I (definition of "Accepted Servicing Practices").

55.    Since the FFML 2006-FF9 Covered Trust had a Master Servicer (as do eight of the 10 Covered Trusts), the PSA further provides:

> *The Master Servicer, on behalf of the Trustee . . . and the Certificateholders, shall monitor the performance of the obligations of the Servicer under this Agreement, and . . . shall use its reasonable good faith efforts to cause the Servicer to duly and punctually perform its duties and obligations hereunder.  Upon the occurrence of [a breach by the Servicer of any of its duties under the PSA, including a breach of Accepted Servicing Practices] of which . . . the Master Servicer has actual knowledge, the Master Servicer shall promptly notify the . . . the Trustee and shall specify in such notice the action, if any, the Master Servicer plans to take in respect of such default*.

*Id*. §9.01.

56.    Under the Governing Agreements, a Master Servicer commits a "Master Servicer Event of Default" whenever the Master Servicer fails to "*observe or perform, in any material respect, any . . . covenants, obligations or agreements of the Master Servicer as set forth in this Agreement.*" *Id.* §9.06(b).  In those two Covered Trusts where there is no Master Servicer, the Servicer commits an "Event of Default" under virtually identical circumstances – whenever it fails to "*observe or perform in any material respect any . . . covenants or agreements of the Servicer set forth in this Agreement*."  NHEL 2006-4 PSA §7.01(a)(ii) (attached as Exhibit D hereto).  Thus, Servicers commit an Event of Default whenever they fail to service the Mortgage Loans in accordance with Accepted Servicing Practices, and Master Servicers similarly commit a Master

Servicer Event of Default whenever they fail to take reasonable good faith efforts to ensure that Servicers do so.  The Master Servicers also commit a "Master Servicer Event of Default" whenever they fail to notify Deutsche Bank of any Servicer Events of Default known to the Master Servicers and fail to specify what actions the Master Servicers plan to take regarding those defaults.  FFML 2006-FF9 PSA §9.01.

57.     Master Servicers and Servicers also commit an Event of Default whenever they discover breaches of the Warrantors' R&Ws but fail to promptly notify Deutsche Bank.  *See id.* §2.03(c) ("Upon discovery by . . . the Trustee, *the Master Servicer or the Servicer* of a breach of any . . . representations and warranties [by a Warrantor], *the party discovering such breach shall give prompt written notice to the others*."); *id.* §2.03(k) (same).

58.     Because breaches of the Warrantors' R&Ws or the failure to properly service the Mortgage Loans are so harmful to plaintiff, the class and the Covered Trusts, when Deutsche Bank becomes aware of an Event of Default it is required by the Governing Agreements to act quickly.  Upon becoming aware of an Event of Default, Deutsche Bank is required by the Governing Agreements and TIA: (1) to notify and demand that the offending Master Servicer or Servicer cure its Event of Default promptly (FFML 2006-FF9 PSA §9.06(b) (requiring cure  within 30 days));[10] and (2) to give notice of uncured Events of Default to plaintiff and the class.  *See* HVLMT 2006-8 PSA §7.04(b); NHEL 2006-4 PSA §7.04(b); SAST 2006-2 PSA §7.2(b); SVHE 2007-NS1 PSA

---

[10]   The Governing Agreement for the GSR 2007-AR2 Covered Trust requires Wells Fargo, as Securities Administrator, to notify and demand of itself to cure the default since Wells Fargo is also the Master Servicer and Servicer to that Covered Trust, as opposed to Deutsche Bank doing so. Nonetheless, the Governing Agreement for the GSR 2007-AR2 Covered Trust gives Deutsche Bank (and not Wells Fargo) ultimate responsibility "*with respect to the enforcement of any and all . . . covenants under" the Governing Agreements*.  GSR Standard Terms §2.01 (attached as Exhibit C hereto).  Given Wells Fargo's obvious conflict of interest in requiring it to notify itself and demand that it cure its own Events of Default, as well as Deutsche Bank's quasi-fiduciary duty during Events of Default (*see infra* ¶¶59-60, 65), Deutsche Bank was required to ensure the notice and demand for a cure occurred (which it did not in this case).

§7.05(b); *see also* 15 U.S.C. §77ooo(b).[11]  In addition, if the offending Master Servicer or Servicer does not timely cure its Event of Default, the Governing Agreements give Deutsche Bank the power to institute legal action, terminate the offending Master Servicer or Servicer, or take over its servicing duties.  FFML 2006-FF9 PSA §§9.06, 9.08.

### 3.   Deutsche Bank's Heightened Duty to Prudently Protect Plaintiff's and the Class's Interests as Though They Were Deutsche Bank's Own Interests During an Event of Default

59.   Once Deutsche Bank becomes aware that a Master Servicer or a Servicer has committed an Event of Default, Deutsche Bank's duty of care to plaintiff and the class under both the Governing Agreements and the TIA is significantly increased.  In the case of a known, uncured Event of Default, the Governing Agreements mandate that Deutsche Bank "*shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs*."  FFML 2006-FF9 PSA §8.01.[12]  In other words, when Deutsche Bank learns of an Event of Default it must act like a quasi-fiduciary for plaintiff and the class and "*shall exercise" all* of Deutsche Bank's rights and powers as Trustee under the Governing Agreements to prudently protect plaintiff's and the class's interests as though those interests were Deutsche Bank's very own.  *Id.*

60.   Moreover, this heightened duty is not limited or applied only to Master Servicers'/Servicers' Events of Default.  Instead, under the Governing Agreements, once an Event of

---

[11]   While the Governing Agreement for the GSR 2007-AR2 Covered Trust makes the Securities Administrator (*i.e.*, Wells Fargo, which is also a Master Servicer and Servicer) responsible for giving plaintiff and the class notice of Events of Default, as opposed to Deutsche Bank, and several Covered Trust PSAs are silent concerning who gives notice, the TIA specifically requires that Deutsche Bank as Trustee give plaintiff and the class notice of Events of Defaults.  *See infra* ¶64.

[12]   As discussed *infra*, the TIA also requires the same heightened, prudent person standard of care when a default of any kind occurs.  *See* 15 U.S.C. §77ooo(c).

Default exists, "*[Deutsche Bank] shall exercise" <u>all</u>* of the "*rights and powers vested in it by th[e] [Governing] Agreement[s]*," not just those pertaining to the Master Servicers/Servicers. *Id.* **Thus, Deutsche Bank's heightened duty of care also requires it to enforce the R&W claims against the Warrantors as though it is seeking to protect its own interests**.

**4.     Deutsche Bank's Duty of Trust to Avoid Conflicts of Interest with Plaintiff and the Class**

61.     Deutsche Bank also has a common law "duty of trust" to plaintiff and the class. Deutsche Bank, as '"the trustee[,] *is at all times obligated to avoid conflicts of interest with the beneficiaries [of the Covered Trusts, i.e., plaintiff and the class*]."' *Knights of Columbus v. The Bank of New York Mellon*, No. 651442/2011, slip op. at 15 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 26, 2013) (order granting in part and denying in part motion to dismiss) (quoting *AMBAC Indem. Corp. v. Bankers Trust Co.*, 573 N.Y.S. 2d 204, 206-08 (Sup. Ct. 1991)).  Under this duty to avoid conflicts of interest, Deutsche Bank is prohibited from advancing its own interests at the expense of plaintiff and the class, or benefitting from such actions at any time, including **before, during and after any default**. *Id.*

**5.     Deutsche Bank's Duties and Obligations Under the TIA**

62.     The TIA imputes certain terms into the Governing Agreements to protect investors. The TIA imposes two sets of duties and obligations on Deutsche Bank – one set "prior to default," and the other set "in case of default," much like the Governing Agreements.

63.     Prior to a default, under the TIA, a Trustee must perform "such duties as are specifically set out in" the Governing Agreements.  15 U.S.C. §77ooo(a)(1).  This requirement reflects the Governing Agreements' pre-default provisions that Deutsche Bank "perform such duties and only such duties as are specifically set forth in this Agreement."  *E.g.*, FFML 2006-FF9 PSA

- 28 -

§8.01.  Thus, the TIA requires Deutsche Bank to perform the duties assigned to it by the Governing Agreements.

64.     In addition, under the TIA, a Trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Thus, Deutsche Bank is required to inform plaintiff and the class of any Master Servicer Events of Default or Servicer Events of Default **and any other "defaults," i.e., the Warrantors' breaches of their R&Ws, within 90 days**.

65.     Moreover, whenever Deutsche Bank is aware of a default, it is required under the TIA (like the Governing Agreements) to exercise a fiduciary-like duty of care toward plaintiff and the class:  ***Deutsche Bank is required to exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs***."  15 U.S.C. §77ooo(c).  Thus, upon the occurrence of the Master Servicer and Servicer Events of Default or the Warrantors' R&W defaults alleged herein, Deutsche Bank is obligated to exercise this quasi-fiduciary, "prudent person" standard of care to protect plaintiff and the class and exercise **all** of the "rights and powers vested in it by" the Governing Agreements as though Deutsche Bank is protecting its own interests.

66.     As set forth herein, Deutsche Bank is liable to plaintiff and the class for failing to discharge the duties required of it by the Governing Agreements and the TIA.  All of Deutsche Bank's duties mandated by the Governing Agreements, the common law, and the TIA, as alleged herein, were continuing in nature, and required Deutsche Bank to continuously discharge such duties as long as Deutsche Bank was Trustee of the Covered Trusts.  When Deutsche Bank discovered R&W breaches by the Warrantors, and learned of Events of Default by the Master Servicers/Servicers, as alleged herein, Deutsche Bank was required to act prudently and

continuously to protect plaintiff and the class.  Deutsche Bank utterly failed to act as required,

thereby breaching the Governing Agreements and violating the TIA, and causing plaintiff, the class

and the Covered Trusts to suffer damages.

    **C.**    **The Covered Trusts Suffer from Serious Defects Because Deutsche Bank Failed to Perform the Duties Required of It Under the Governing Agreements, the TIA and Common Law**

        **1.**    **Deutsche Bank Discovered No Later than April 2011 that the Covered Trusts' Warrantors Breached Their R&Ws, Thus Triggering Deutsche Bank's Duty to Enforce the R&W Claims**

67.     The Warrantors (and loan originators) to the Covered Trusts are set forth below:

**Covered Trusts' Warrantors**

| | Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|---|
| | | Loan Seller/Sponsor | Other Transferors | |
| 1. | FFML 2006-FF9 | ▪ HSBC | ▪ First Franklin | ▪ First Franklin |
| 2. | GSR 2007-AR2 | ▪ Goldman Sachs Mortgage Company ("Goldman Sachs") | ▪ Countrywide Home Loans Inc. ("Countrywide")<br>▪ IndyMac Bank, FSB ("IndyMac")<br>▪ PHH Mortgage Corporation ("PHH")<br>▪ Wells Fargo Bank, N.A. ("Wells Fargo") | ▪ Countrywide<br>▪ IndyMac<br>▪ PHH<br>▪ Wells Fargo |
| 3. | HASC 2007-WF1 | ▪ HSBC | ▪ Wells Fargo | ▪ Wells Fargo |
| 4. | HVMLT 2006-8 | ▪ Greenwich Capital Financial Products, Inc. ("Greenwich") | ▪ BankUnited FSB ("BankUnited")<br>▪ Paul Financial, LLC ("Paul Financial")<br>▪ First Federal Bank of California ("First Federal")<br>▪ Residential Mortgage Capital ("RSC")<br>▪ Home Savings Mortgage<br>▪ Belvedere Trust Finance Corporation<br>▪ ComUnity Lending Inc.<br>▪ E-Loan, Inc.<br>▪ Gateway Funding Diversified Mortgage Services, LP<br>▪ Homefield Financial, Inc.<br>▪ Just Mortgage, Inc.<br>▪ Loan Center of California, Inc.<br>▪ Loan Link Financial Services<br>▪ Luxury Mortgage Corp. | ▪ BankUnited<br>▪ Paul Financial<br>▪ First Federal<br>▪ RSC<br>▪ Washington Mutual Bank ("WaMu") |

| | Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|---|
| | | Loan Seller/Sponsor | Other Transferors | |
| | | | ▪ Metrocities Mortgage LLC<br>▪ MortgageIT (acquired by Deutsche Bank's related sister company, DBSP in January 2007)<br>▪ NetBank<br>▪ Plaza Home Mortgage, Inc.<br>▪ PMC Bankcorp<br>▪ NL Inc. dba Residential Pacific Mortgage<br>▪ SCME Mortgage Bankers, Inc.<br>▪ Secured Bankers Mortgage Company<br>▪ Sierra Pacific Mortgage Co., Inc. | |
| 5. | MSAC 2007-NC2 | ▪ Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley") | ▪ Morgan Stanley ABS Capital I Inc. (also "Morgan Stanley") | ▪ NC Capital Corp. and/or New Century Mortgage ("New Century") |
| 6. | MSAC 2007-NC3 | ▪ Morgan Stanley | ▪ Morgan Stanley | ▪ New Century |
| 7. | MSIX 2006-1 | ▪ Morgan Stanley<br>▪ ISIX Real Estate Capital | ▪ Morgan Stanley<br>▪ First NLC Financial Services, LLC ("First NLC")<br>▪ WMC Mortgage Corp. ("WMC")<br>▪ Decision One Mortgage Company LLC ("Decision One") | ▪ Accredited Home Lenders (Accredited")<br>▪ Aegis Mortgage Corporation ("Aegis")<br>▪ AIG Federal Savings Bank ("AIG Federal")<br>▪ Chapel (acquired by Deutsche Bank's sister company, DB Home, in 2006) |

| | Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|---|
| | | Loan Seller/Sponsor | Other Transferors | |
| | | | | <ul><li>Decision One</li><li>Encore Credit Corp. ("Encore")</li><li>First Bank Mortgage, Inc.</li><li>First Horizon Home Loan Corporation ("First Horizon")</li><li>First NLC</li><li>FlexPoint Funding Corporation</li><li>Fremont Investment & Loan ("Fremont")</li><li>Funding America Mortgage Warehouse Trust, a Delaware statutory trust and a wholly owned subsidiary of Funding America, LLC</li><li>Lenders Direct Capital Corp.</li><li>Lime Financial Services, Ltd.</li><li>Mandalay Mortgage, LLC</li><li>Master Financial, Inc.</li><li>Meritage Mortgage Corporation</li></ul> |

|  | Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|---|
|  |  | **Loan Seller/Sponsor** | **Other Transferors** |  |
|  |  |  |  | ("Meritage")<br>▪ New Century<br>▪ Quick Loan Funding Inc.<br>▪ Rose Mortgage, Inc.<br>▪ WMC |
| 8. | NHEL 2006-4 | ▪ NovaStar Mortgage, Inc. ("NovaStar") | ▪ None | ▪ NovaStar |
| 9. | SAST 2006-2 | ▪ Saxon Mortgage, Inc. ("Saxon") (Saxon was acquired by Morgan Stanley in 2006) | ▪ None | ▪ Saxon |
| 10. | SVHE 2007-NS1 | ▪ Greenwich | ▪ Nationstar Mortgage, LLC ("Nationstar") | ▪ Nationstar |

68.     After the Covered Trusts were formed and settled in 2006 and 2007, the global financial collapse occurred.  Later, most blamed the collapse on the residential lending industry, claiming that it had corrupted its lending standards and caused pervasive lending misconduct to occur because of Wall Street's insatiable demand for mortgage loans to securitize.  ***The former Chairman of the Federal Reserve, Alan Greenspan, told Congress in October 2008 that "'[t]he evidence strongly suggests'" that "'excess demand from [Wall Street] securitizers'" and "'subprime mortgage originations'" were "'undeniably the original source of the [global financial] crisis.'"***  Facts then began to publicly emerge revealing endemic misconduct within the lending industry at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  Many of the revelations disclosed that the Warrantors and loan originators to the Covered Trusts were involved in conduct which would have rendered their R&Ws concerning the Mortgage Loans in the Covered Trusts highly suspect.

### a.   Prior to April 2011, Deutsche Bank Knew that the Warrantors' R&Ws Were False

69.     During the period from 2007 through 2008, numerous news stories, lawsuits, governmental actions, and congressional testimony became public and revealed that many of the Warrantors to the Covered Trusts routinely engaged in lending practices that would have likely rendered their R&Ws false.  A summary of the events are set forth in Appendix 1 to this Complaint. They illustrate that many, if not most, of the Warrantors to the Covered Trusts had engaged in, or were accused of engaging in, widespread lending misconduct, such as making loans to borrowers who obviously could not afford them, not following underwriting guidelines that were supposed to be followed, making highly questionable or potentially predatory loans, charging excessive fees, using inflated appraisals, using inflated borrower incomes and understated debts, engaging in potentially illegal discriminatory lending practices, using suspect documentation to qualify borrowers for loans they otherwise would not have qualified for, and other misconduct.  *See* Appendix 1.

70.     By the beginning of 2009, it was clear that many of the Covered Trust Warrantors and loan originators had engaged in conduct that would have rendered at least several R&Ws by the Warrantors false, including their R&Ws: (1) that the Mortgage Loans did not involve any fraud or misrepresentation; (2) that the Mortgage Loans were originated in conformance with the lender's underwriting guidelines; (3) that the borrowers were evaluated to confirm that they had a reasonable ability to repay the Mortgage Loans; (4) that the Mortgage Loans were lawfully originated; and (5) that all of the data provided about the Mortgage Loans was complete, true and correct.

71.     By the beginning of 2009, the misconduct described above, when coupled with the extremely poor performance of the Mortgage Loans in the Covered Trusts, revealed that the Covered Trusts' Warrantors had breached their R&Ws concerning the Mortgage Loans, thus causing

Deutsche Bank to have actual knowledge such breaches.  Indeed, by January 2009, the Covered Trusts had shockingly high Mortgage Loan default rates.[13]  These historically unprecedented default rates caused Deutsche Bank to have actual knowledge that the Warrantors' R&Ws were false.  After all, if the R&Ws were accurate, the Mortgage Loans would not have defaulted at such astounding rates.  All of the Covered Trusts had double-digit Mortgage Loan default rates – much, much higher than historical averages.  ***All of the Covered Trusts except one had Mortgage Loan default rates <u>in excess of 38%</u>, with four of the Covered Trusts having default rates <u>in excess of 50%</u>, and at least three Covered Trusts having ridiculously high Mortgage Loan <u>default rates approaching 60%</u>***.  The Covered Trusts had also sustained extraordinarily heavy losses by January 2009 – ***over $545 million in just a few years*** – another indicator that the Warrantors' R&Ws were breached, because if the R&Ws were true, such heavy, unprecedented losses would not have occurred.  Deutsche Bank was aware of  all this information because it had access to it.  The chart below sets forth the Mortgage Loan default rates and the cumulative realized losses for each Covered Trust reported in January 2009:

---

[13]   The term "default rates," as used in this Complaint, refers to the percentage of the Mortgage Loans' aggregate principal balance for each Covered Trust that is delinquent, in bankruptcy, in foreclosure or "real estate owned" ("REO") at a particular point in time.

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in January 2009 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| FFML 2006-FF9 | 45.16% | $113,917,690.90 |
| GSR 2007-AR2 | 10.58% | $2,225,999.56 |
| HASC 2007-WF1 | 38.20% | $13,325,679.66 |
| HVMLT 2006-8 | 42.23% | $27,297,946.11 |
| MSAC 2007-NC2 | 59.35% | $55,556,754.06 |
| MSAC 2007-NC3 | 51.94% | $58,217,494.57 |
| MSIX 2006-1 | 59.48% | $152,267,941.43 |
| NHEL 2006-4 | 58.80% | $56,311,225.87 |
| SAST 2006-2 | 45.36% | $46,021,008.17 |
| SVHE 2007-NS1 | 42.24% | $20,754,143.20 |
| **Covered Trusts' Total Realized Losses:** | | **$545,895,883.53** |

72.     Thus, by January 2009, Deutsche Bank knew there were massive breaches of the Warrantors' R&Ws.  Even so, additional events occurred during 2009 and 2010, repeatedly re-alerting Deutsche Bank to the fact that the Warrantors' R&Ws concerning the Mortgage Loans in the Covered Trusts were breached.  Those events are set forth in Appendix 2 hereto, and they revealed that many of the Warrantors to the Covered Trusts had engaged in or had been accused of engaging in, *inter alia*, the use of unlicensed loan officers in violation of law, the failure to evaluate whether borrowers could afford to repay their loans, the making of loans to borrowers who could not afford them, the use of falsified borrower incomes, the use of inflated appraisals, the massive breaching of their R&Ws, and the securitization of illegally made loans with inflated appraisals and borrower incomes which did not conform to the lender's underwriting guidelines.  *See* Appendix 2 hereto. These additional events caused Deutsche Bank to know that the Warrantors to the Covered Trusts had breached their R&Ws concerning the Mortgage Loans.

b.  **By April 13, 2011, Deutsche Bank Absolutely Knew that the Warrantors Had Breached Their Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts**

73.  By the beginning of 2011 there was little doubt that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts. And by April 2011, Deutsche Bank absolutely **_knew_** without doubt that the Warrantors had breached their R&Ws. This is so primarily because of two Government-issued reports that were released in January and April 2011, respectively – the "FCIC Report" and the "Senate Report." First, on January 27, 2011, the 633-page FCIC Report[14] was made available to the public, and between February 11 and 13, 2011, the FCIC also made public nearly 2,000 pages of supporting documentary evidence and more than 300 witness interviews. The FCIC Report was supported by voluminous evidence and confirmed in detail most if not all of the previous news accounts and events indicating that there was widespread lending

---

[14]  The FCIC Report was authored by the Financial Crisis Inquiry Commission ("FCIC"). The FCIC was created to "examine the causes, domestic and global, of the . . . financial and economic crisis in the United States" that began in 2008. The FCIC was established as part of the Fraud Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the President in May 2009. The FCIC was composed of private citizens with experience in areas such as housing, economics, finance, market regulation, banking and consumer protection. The FCIC's statutory mandate set out 22 specific topics for inquiry and called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the government. These topics included, *inter alia*:

- fraud and abuse in the financial sector, including fraud and abuse toward consumers in the mortgage sector;
- federal and state financial regulators, including the extent to which they enforced, or failed to enforce statutory, regulatory, or supervisory requirements;
- credit rating agencies in the financial system, including reliance on credit ratings by financial institutions and federal financial regulators, the use of credit ratings in financial regulation, and the use of credit ratings in the securitization markets;
- lending practices and securitization, including the "originate-to-distribute" model for extending credit and transferring risk;
- the legal and regulatory structure of the United States housing market;
- the legal and regulatory structure governing investor and mortgagor protection; and
- the quality of due diligence undertaken by financial institutions.

abuses, as well as the fact that nearly all of the Covered Trust Warrantors had breached their R&Ws regarding the Mortgage Loans.

74.     The FCIC Report confirmed the systemic breakdown in residential loan underwriting standards during the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  The FCIC Report described in detail the lending abuses that emerged and that were virtually universal during that time.  Significantly, ***for the first time, the FCIC Report also revealed that pervasive, deliberate and intentional <u>fraud</u> was being committed by RMBS securitizers with respect to RMBS trusts and the mortgage loans underlying them.  <u>The FCIC Report specifically identified many of the Covered Trusts' Warrantors and loan originators as being active participants in this fraud.  The conclusion from the FCIC Report was that most of the Warrantors to the Covered Trusts had systematically breached their R&Ws concerning the Mortgage Loans in the Covered Trusts</u>***.

75.     First, the FCIC confirmed the extraordinary numbers of R&W breaches that had occurred with respect to mortgage loans that were originated at the same time the Covered Trusts' Mortgage Loans were originated.  The FCIC found, in light of the pervasive lending abuses that occurred during the period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts (2005-2007), that "***in the years [thereafter], [loan] representations and warranties would prove to be inaccurate***."  FCIC Report at 77.

76.     The FCIC Report supported its findings by citing to evidence of massive R&W breaches by many of the very Warrantors to the Covered Trusts.  The FCIC reported that these Warrantors had breached their R&Ws concerning billions of dollars of mortgage loans they sold to government-sponsored entities Fannie Mae and Freddie Mac (sometimes collectively referred to herein as the "GSEs").  The FCIC Report stated that "during the three years and eight months ending

August 31, 2010, *Freddie [Mac] and Fannie [Mae] required sellers to repurchase 167,000 loans totaling $34.8 billion*." *Id.* at 224.  This included Bank of America – which by this time included its wholly-owned Warrantor First Franklin – which was facing *over $7.3 billion in repurchase claims* from Freddie Mac and Fannie Mae due to its and First Franklin's massive R&W breaches.  *Id.* at 225.[15]  (First Franklin was a Warrantor for the FFML 2006-FF9 Covered Trust).  In addition, Wells Fargo, a Warrantor for the GSR 2007-AR2 and HASC 2007-WF1 Covered Trusts, faced *$3.5 billion in repurchase claims from Freddie Mac and Fannie Mae because of Wells Fargo's pervasive R&W breaches*.  *Id.* at 224-25.  Countrywide – a Warrantor for the GSR 2007-AR2 Covered Trust – *was facing R&W claims of $1.9 billion from Freddie Mac alone*.  *Id.*  The sheer magnitude of these repurchase claims reported by the FCIC indicated that these Warrantors routinely issued false R&Ws in the normal course of their businesses at the same time they warranted the Mortgage Loans.  Indeed, the FCIC Report reported that "[a]s of mid-2010, *court actions embroiled almost all major loan originators and underwriters [and] there were more than 400 lawsuits related to breaches of representations and warranties*." *Id.* at 225.  Given the pervasive falsity of the R&Ws by these Warrantors, Deutsche Bank knew that Mortgage Loans in the Covered Trusts they warranted were similarly affected and that there were thousands of R&W breaches by such Warrantors.[16]

77.     The FCIC Report also specifically noted that RMBS trustees, such as Deutsche Bank, and servicers, like the Covered Trusts' Master Servicers/Servicers, were essentially assisting warrantors in defending R&W claims by refusing to provide information to investors from which the

---

[15]    Bank of America subsequently paid $2.5 billion to settle these claims.  *Id.*

[16]    The FCIC Report further revealed that "private mortgage insurance" ("PMI") companies – which insured lenders against defaults by borrowers – were finding extensive breaches of R&Ws concerning mortgage loans they had insured.  *Id.* at 225.  The FCIC reported that, "[a]s of October 2010, the seven largest PMI companies, which share 98% of the market, had rejected about 25% of the claims (or $6 billion of $24 billion) brought to them, *because of violations of origination guidelines, improper employment and income reporting, and issues with property valuation.*" *Id.*

breaches could be established.  *Id.*  The FCIC Report pointed to the situation of the GSEs and stated: *"Frustrated with the lack of information from the securities' servicers and trustees, in many cases large banks, on July 12, 2010, the GSEs through their regulator, the Federal Housing Finance Agency, issued 64 subpoenas to various trustees and servicers in transactions in which the GSEs lost money."*  *Id.*  Given the large number of subpoenas issued and the limited number of RMBS trustees and servicers, plaintiff alleges on information and belief that Deutsche Bank was among the RMBS trustees subpoenaed for refusing to provide information to the GSEs.  Of course, if Deutsche Bank was uncooperative, it was acting against the best interests of RMBS holders, *i.e.*, the GSEs, contrary to its mandate under RMBS governing agreements.

78.     *The FCIC also "conclude[d] that there was untrammeled growth in risky mortgages [and] [u]nsustainable, toxic loans polluted the financial system and fueled the housing bubble,"* while government regulators *"failed to . . . establish and maintain prudent mortgage lending standards and to protect against predatory lending*."  FCIC Report at 101.  The FCIC Report confirmed that "*[l]ending standards collapsed, and there was a significant failure of accountability and responsibility throughout each level of the lending system*."  *Id.* at 125.  In addition, testimony released in connection with the FCIC Report confirmed "*systemic*" misconduct which led to uniformly false loan R&Ws at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  In testimony given to the FCIC, former Clayton Holdings, Inc. ("Clayton") executive D. Keith Johnson testified that he had previously worked at Covered Trust loan originator WaMu as well as at WaMu's subsidiary, Long Beach Mortgage Company ("Long Beach"), prior to working for Clayton.  When Johnson moved to Clayton, he was exposed to the lending practices of nearly all lenders in the mortgage loan industry because Clayton was hired by Wall Street investment banks, *including all or nearly all of the Loan Sellers/Sponsors to the*

*Covered Trusts*, to sample and test mortgage loans the loan sellers/sponsors were purchasing from numerous lenders throughout the nation and then re-selling and transferring to RMBS trusts, including the Covered Trusts.  WaMu and Long Beach routinely engaged in egregiously fraudulent lending practices, as documented in the Senate Report discussed *infra*.  Johnson testified in an interview with the FCIC on September 2, 2010, concerning the lending practices he observed both before and after he worked at WaMu/Long Beach and Clayton, that:

> *I had a really unique perspective working in an environment that turned out bad loans, Long Beach, right?  <u>Then I go to Clayton and I'm dealing with the top factories in the world.  And you know what?  They're just like Long Beach. There's no difference.  I mean, this was not a one-off situation; it was systemic.</u> And <u>all of them</u> – a lot of them had quality control departments internal, but eventually <u>all of those internal quality control departments became compromised</u>*.

79.     The FCIC Report confirmed that many of the Warrantors and loan originators to the Covered Trusts were deeply involved in lending abuses which resulted in breaches of R&Ws made about their loans.  For example, Covered Trust Warrantor Countrywide was singled out by the FCIC for its rampant lending abuses:

> *Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop*.

FCIC Report at xxii.

80.     The FCIC Report also found that Covered Trust Warrantors Countrywide and HSBC *"originated vast numbers of high-risk, nontraditional mortgages that were in some cases deceptive, in many cases confusing, and <u>often beyond borrowers' ability to repay</u>."*  FCIC Report at 418 ("Dissenting Statement").

81.     Darcy Parmer, a former quality assurance and fraud analyst for Wells Fargo, another Warrantor to the Covered Trusts at issue herein, reported to the FCIC that she was aware of "'***hundreds and hundreds and hundreds of fraud cases***'" in Wells Fargo's home equity loan division.  FCIC Report at 162.  She also told the FCIC that "***at least half the loans she flagged for fraud were nevertheless funded, over her objections***."  *Id*.  This obviously led to "hundreds and hundreds and hundreds" of false loan R&Ws by Wells Fargo.

82.     The FCIC also found that loan originator New Century "ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence."  FCIC Report at 157.  The FCIC reported that New Century's Quality Assurance staff "had found severe underwriting errors," while New Century's Internal Audit department "identified numerous deficiencies in loan files," with ***seven out of nine reviews of the company's loan production department resulting in "'unsatisfactory'" ratings***.  *Id.*  New Century's senior management's reaction to this information establishing that New Century's R&Ws were false was not what one would expect.  Instead of making efforts designed to bring the company into compliance with its underwriting guidelines and R&Ws, New Century's management directed that the negative results be removed from the company's loan performance tracking system, that the Quality Assurance department be dissolved, and that the Internal Audit department's budget be cut.  *Id.*  In addition, Patricia Lindsay ("Lindsay"), a former fraud specialist for New Century, told the FCIC that New Century's definition of a "good" loan changed over time: "'The definition of a good loan changed from "one that pays" to "one that could be sold."'"  *Id*. at 105.  The import of this statement was that New Century was not following its stated underwriting guidelines (and thus breaching its R&Ws) because it knew it could sell the loans to RMBS securitizers regardless.  Lindsay also confirmed to the FCIC that New Century's appraisers "fear[ed]" for their "livelihoods,"

- 43 -

and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." Testimony of Patricia Lindsay for the FCIC Hearing (Apr. 7, 2010), http://fcic.law.stanford.edu/hearings/testimony/subprime-lending-and-securitization-and-enterprises. The FCIC Report confirmed that New Century's fraudulent business practices guaranteed that R&Ws about its loans would be false.

83.     ***Most Importantly, the FCIC Report also specifically revealed for the first time that the customary and regular business practices of all but one of the Loan Sellers/Sponsors to the Covered Trusts, and many of the other Warrantors and loan originators, was to deliberately transfer thousands of mortgage loans that did not comply with the applicable laws or underwriting guidelines (and therefore breached the R&Ws made about them) into RMBS trusts offered and sold to investors.***  *This widespread intentionally fraudulent practice occurred during the exact same time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts*. This startling revelation – that the Covered Trusts' Warrantors' regular business practices included *deliberately filling RMBS trusts with loans that breached their R&Ws* – was based on Clayton's "Trending Reports," which were provided to the FCIC. As previously alleged, Clayton was hired by virtually every RMBS securitizer – *including nearly all of the Loan Sellers/Sponsors to the Covered Trusts* – during 2006 and 2007 to perform due diligence on mortgage loans that were being securitized, warranted and transferred to RMBS trusts. Clayton tested samples of the loans during the period from January 2006 through June 2007 to determine whether the loans complied with the applicable lending laws and underwriting guidelines (laws and guidelines that were designed to prevent the making of loans to borrowers who could not afford them), or were otherwise defective. Clayton's Trending Reports revealed that large percentages of the sampled loans *for nearly every Loan Seller/Sponsor to the Covered Trusts* did not comply with

lending laws or the applicable underwriting guidelines, or were otherwise defective, *i.e.*, the loans were in breach of R&Ws made about them. ***Incredibly, even after being informed of the specific defective loans, the Loan Sellers/Sponsors to the Covered Trusts did not remove all of the defective loans, but rather, "waived" a large portion of them, i.e., transferred the breaching loans into the RMBS trusts, warranted them as being fine and then sold them to investors!*** These same Loan Sellers/Sponsors also did no further testing of the remaining loans in the pool even though it was highly probable from a statistical standpoint that they would have the same defect rates as the sampled loans. Instead, they bought the unsampled loans sight unseen, falsely warranted that the loans were free of defects, and dumped them into the RMBS trusts they were selling to investors like plaintiff and the class. Based on the Clayton Trending Reports, the FCIC Report specifically identified ***<u>all</u> of the very Loan Sellers/Sponsors to the Covered Trusts except one (NovaStar) and <u>many</u> of the other Warrantors and loan originators to the Covered Trusts, and revealed that they deliberately and intentionally transferred mortgage loans that breached their R&Ws into trusts just like the Covered Trusts, while deliberately and falsely warranting that the loans were fine***. The following chart summarizes the FCIC's findings concerning the Covered Trusts' Loan Sellers/Sponsors, Warrantors and loan originators and their deliberate inclusion of defective loans breaching their R&Ws into RMBS trusts:

| Covered Trust Loan Seller/Sponsor or Other Warrantor Identified by FCIC Report | Covered Trusts Involving Identified Loan Seller/Sponsor or Other Warrantor | Percentage of Loans in Test Samples that Breached R&Ws | Percentage of Loans that Breached R&Ws but Were "Waived" into the RMBS Trusts and Sold to Investors |
|---|---|---|---|
| Countrywide | GSR 2007-AR2 | 26% | 12% |
| Goldman Sachs | GSR 2007-AR2 | 23% | 29% |
| Greenwich | HVMLT 2006-8 SVHE 2007-NS1 | 18% | 53% |
| HSBC (includes wholly owned Warrantor Decision One) | FFML 2006-FF9 HASC 2007-WF1 MSIX 2006-1 | 27% | 62% |
| First Franklin (through its then parent company Merrill Lynch) | FFML 2006-FF9 | 23% | 32% |
| Morgan Stanley (which includes wholly-owned Loan Seller/Sponsor Saxon) | MSAC 2007-NC2 MSAC 2007-NC3 MSIX 2006-1 SAST 2006-2 | 37% | 56% |
| WaMu (loan originator whose Mortgage Loans were warranted by Greenwich) | HVMLT 2006-8 | 27% | 29% |

84.    These Loan Sellers/Sponsors and other Warrantors identified by the FCIC made R&Ws about Mortgage Loans in *nine of the 10 Covered Trusts at issue herein*.  Thus, given the fact that these Loan Sellers/Sponsors and Warrantors had engaged in this deliberate practice regularly and systematically, it was certain that they had also transferred breaching Mortgage Loans into the Covered Trusts.  Indeed, given the extremely high Mortgage Loan default rates and losses for the Covered Trusts around this time (*see infra* ¶96 (chart)), there was no doubt they had breached their R&Ws.  This conclusion was further made certain by the fact that all of the transfers of these defective loans identified by Clayton and the FCIC had occurred during 2006 and 2007, *the same*

*time period when the Warrantor's made their R&Ws and the Mortgage Loans were transferred to the Covered Trusts*.

85.      The FCIC Report, via the Clayton Trending Reports, also specifically identified other Warrantors and loan originators to the Covered Trusts, including New Century, Fremont and Decision One,[17] and established that they also had transferred large numbers of mortgage loans that breached their R&Ws into RMBS trusts at the same time the Covered Trusts received defective Mortgage Loans.  Finally, the FCIC Report, again through the Clayton Trending Reports, made it clear that the inclusion of defective, breaching mortgage loans into RMBS trusts was not limited only to those Warrantors and loan originators specifically identified in the FCIC Report.  Rather the FCIC Report made clear that this fraud was ubiquitous.  Clayton's Trending Reports included information about "*All Others*" that originated loans for RMBS trusts, or in other words, those lenders and warrantors that had not been specifically identified in Clayton's reports.  Such information showed that all the other unidentified loan originators and warrantors had also deliberately transferred defective mortgage loans into RMBS trusts.  On information and belief, plaintiff alleges that Covered Trust Warrantor Nationstar was among these unidentified warrantors. The FCIC Report therefore established that false loan R&Ws were ubiquitous from at least January 2006 through June of 2007, the same time period the Covered Trusts had defective Mortgage Loans warranted and transferred to them.  Indeed, the FCIC Report revealed that false R&Ws affected virtually every RMBS trust created during this time period.  Thus, Deutsche Bank learned from the FCIC Report that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the

---

[17]   As previously noted, Decision One was owned by Loan Seller/Sponsor HSBC.  As alleged above, 27% of HSBC's loans breached its R&Ws, yet HSBC intentionally waived *62%* of the defective loans into its RMBS trusts.

Covered Trusts, particularly after comparing the soaring default rates of the Mortgage Loans in the Covered Trusts to historical averages, and the Covered Trusts' obscene losses (*see infra* ¶96 (chart)).

86.     Then, on April 13, 2011, the Senate Report[18] was publicly released.  The Senate Report confirmed again for Deutsche Bank that the Warrantors to the Covered Trusts had uniformly breached their R&Ws.  The 635-page Senate Report was supported by thousands of pages of documentary evidence and the testimony of numerous witnesses subpoenaed by the Senate Subcommittee on Investigations.  The Senate Report not only confirmed the FCIC Report's findings but also provided amplified additional evidence that the Warrantors had breached their R&Ws.  The Senate Report also provided an inside look at a lending industry run amok during the period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, exposing an industry that uniformly churned out thousands of defective mortgage loans in breach of the R&Ws made about them, leading to the inescapable conclusion that the Mortgage Loans in the Covered Trusts suffered from extensive breaches of the Warrantors' R&Ws.  The Senate Report also provided "case studies" on Covered Trust loan originator WaMu and its subsidiary Long Beach, as well as Loan Seller/Sponsor Goldman Sachs and the "Deutsche Bank" family of companies, demonstrating they all engaged in misconduct that resulted in false R&Ws.

87.     First, the Senate Report re-confirmed that "***[l]enders introduced new levels of risk into the U.S. financial system by selling . . . home loans with . . . poor underwriting***," and that "***<u>a</u>***

---

[18]    The Senate Report was issued by U.S. Senators Carl Levin and Tom Coburn for the United States Senate Permanent Subcommittee on Investigations concerning their inquiry into key causes of the financial crisis.  The Senate Report examined four aspects of the financial crisis: (1) high-risk mortgage lending; (2) regulatory inaction; (3) inflated credit ratings that misled investors; and (4) the role played by investment banks creating and selling structured finance products such as RMBS that foisted billions of dollars of losses on investors, while the banks profited from betting against the mortgage market.

***host of financial institutions . . . knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans***."  Senate Report at 12, 50.

88.     The Senate Report identified many of these abusive lenders that made loans that breached their R&Ws.  Not surprisingly, the Senate Report singled out Covered Trust Warrantors and/or loan originators WaMu (through its subsidiary Long Beach), Countrywide, IndyMac, New Century and Fremont, and reported the following about them:

> ***The fact is that each of these lenders issued billions of dollars in high risk, poor quality home loans.  By allowing these lenders, for years, to sell and securitize billions of dollars in poor quality, high risk home loans, regulators permitted them to contaminate the secondary market and introduce systemic risk throughout the U.S. financial system***.

Senate Report at 239.  The Senate Report also confirmed that Covered Trust loan originators WaMu (and its subsidiary Long Beach), New Century and Fremont "***were known for issuing poor quality subprime loans," but "[d]espite their reputations for poor quality loans, leading investment banks [such as the Loan Sellers/Sponsors] continued to do business with them and helped them sell or securitize hundreds of billions of dollars in home mortgages***."  Senate Report at 21.[19]

89.     With respect to WaMu and its subsidiary Long Beach, the Senate Report made it clear that they were prolific issuers of billions of dollars of defective mortgage loans which breached their R&Ws:  "***WaMu and . . . Long Beach . . . used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors***."  Senate Report at 50.  The U.S. Senate subcommittee investigation further found that "***WaMu and Long Beach too often steered borrowers into home loans they could not afford***," *id*. at 51, ***and also "securitized not just***

---

[19]   The Senate Report also established that Covered Trust Warrantors First Franklin and Countrywide, and Covered Trust loan originators New Century, Accredited, Fremont and WaMu (through its subsidiary Long Beach), were facing massive loan repurchase requests due to breaches of their R&Ws.  *See* Senate Report at 487 & nn.2051-55.

*poor quality loans, but also loans that its own personnel had flagged as containing fraudulent*

*information.  That fraudulent information included, for example, misrepresentations of the*

*borrower's income and of the appraised value of the mortgaged property*." *Id*. at 125.  The Senate

Report detailed **numerous instances** where WaMu and Long Beach ignored their underwriting

guidelines and engaged in outright lending fraud.  Senate Report at 48-160.  This clearly established

that any R&Ws about WaMu loans were false.

90. The Senate also reported extensively on WaMu's/Long Beach's problems with their

"early payment default," or "EPD" loans – loans that breached WaMu's and Long Beach's R&Ws.

**By early 2005, the Senate Report noted that**

> *a number of Long Beach loans experienced "early payment defaults," meaning*
> *that the borrower failed to make a payment on the loan within three months of the*
> *loan being sold to investors.  That a loan would default so soon after origination*
> *typically indicates that there was a problem in the underwriting process.  <u>Investors*
> *who bought EPD loans often demanded that Long Beach repurchase them,*
> *invoking the representations and warranties clause in the loan sales agreements</u>*.

Senate Report at 77.

91. WaMu's and Long Beach's breaching EPD loans continued throughout 2006 and

2007, the time period when the Mortgage Loans were originated and transferred to the Covered

Trusts.  The Senate Report revealed that

> "*[d]uring 2006, more than 5,200 [Long Beach] loans were repurchased, totaling*
> *$875.3 million."  Even though, in January 2006, the bank had ceased executing*
> *whole loan sales which allowed an automatic repurchase in the event of an EPD,*
> *46% of the repurchase volume was as a result of EPDs.  Further, 43% of the*
> *repurchase volume resulted from first payment defaults (FPDs) in which the*
> *borrower missed making the first payment on the loan after it was sold.  Another*
> *10% of the repurchases resulted from violations related to representation and*
> *warranties (R&W) not included in the EPD or FPD numbers . . . .*

Senate Report at 81 (footnotes omitted).

92. According to the Senate Report, "**R&W repurchase requests and loss reserves**

**continued to be an issue at Long Beach.  The fourth quarter of 2006 saw another spike in R&W**

*repurchase requests, and in December the required amount of R&W loss reserves jumped from $18 million to $76 million*."  Senate Report at 81.  The Senate Report revealed that 2007 was no better for WaMu and Long Beach, as EPD repurchases due to breaches of Long Beach's R&Ws continued to climb.  *Id*. at 82-83.  In fact, in 2007 WaMu was considering how to dispose of $433 million in second lien loans.  One suggestion was to securitize them, which was quickly shot down by a WaMu employee due to concerns the defective loans would only lead to massive R&W claims against WaMu:

> "*Investors are suffering greater than expected losses from subprime in general as well as subprime 2nd lien transactions. As you know, they are challenging our underwriting representations and warrant[ie]s*."

*Id*. at 83.

93.      **The Senate Report concluded that, as a result of the massive number of loan "repurchase claims" due to Long Beach's repeated breaches of its R&Ws, the claims "damaged its parent corporation's [i.e., WaMu's] financial results**."  Senate Report at 75.  This clearly put Deutsche Bank on notice of breaches of R&Ws concerning WaMu loans.

94.      The Senate Report also revealed that Covered Trust Loan Seller/Sponsor Goldman Sachs' **and Deutsche Bank's** respective families of companies (in this paragraph, all of Goldman Sachs' and Deutsche Bank's various respective affiliates and parent companies will be referred to collectively as "Goldman Sachs" or "Deutsche Bank," as applicable) were involved in all aspects of the RMBS securitization industry, including the intentional sale, warranting and transfer of scores of defective mortgage loans into RMBS trusts and "CDOs" (CDOs were collections of RMBS).  *See generally* Senate Report at 318-635.  Indeed, the Senate Report revealed that Goldman Sachs and Deutsche Bank were acutely aware that the mortgage loans being sold, warranted and transferred to RMBS trusts were pervasively defective during the time period the Mortgage Loans in the Covered Trusts were sold, warranted and transferred.  The Senate Report also pointed out that Goldman Sachs

- 51 -

and Deutsche Bank capitalized on this inside information and profited obscenely – each making billions of dollars in profits – by shorting RMBS at the same time they sold RMBS to their clients while falsely claiming the RMBS were "investment grade" securities and providing bogus R&Ws about the loans.  *Id.*  The Senate Report condemned Goldman Sachs' and Deutsche Bank's egregious misconduct:

> *Both Goldman Sachs and Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world. They also enabled the lenders to acquire new funds to originate still more high risk, poor quality loans.  Both sold CDO securities [and RMBS] without full disclosure of the negative views of some of their employees regarding the underlying assets and, in the case of Goldman, without full disclosure that it was shorting the very CDO securities [and RMBS] it was marketing, raising questions about whether Goldman complied with its obligations to issue suitable investment recommendations and disclose material adverse interests*.

Senate Report at 11.[20]  Thus, the Senate Report revealed to Deutsche Bank that Goldman Sachs' regular business practices guaranteed that any R&Ws made about the loans it sponsored and sold to RMBS trusts were false, including the GSR 2007-AR2 Covered Trust.

95.     Therefore, by April 13, 2011, the date of the Senate Report's release, and based on a tsunami of prior information that had become publicly available, including the FCIC and Senate Reports and the volumes of evidence they disclosed, Deutsche Bank "discovered," indeed, had "actual knowledge," as those terms are used in the Governing Agreements, that there were pervasive breaches of the Warrantors' R&Ws concerning thousands of Mortgage Loans in the Covered Trusts. Once Deutsche Bank became aware of the FCIC and Senate Reports, there was *no doubt* that it knew the Warrantors were in breach.  This is so because the FCIC and Senate Reports identified *most of the very same Warrantors that originated, sold and/or warranted the Mortgage Loans in*

---

[20]   The FCIC Report similarly reported that Goldman Sachs had inside information that RMBS would fail, and that it profited to the tune of billions of dollars by shorting RMBS.  FCIC Report at 236.

*the Covered Trusts as the main participants in the wholesale abandonment of loan origination guidelines, systematic fraudulent lending, and falsification of real estate appraisals, loan-to-value ("LTV") ratios, debt-to-income ("DTI") ratios, FICO scores, owner occupancy data, borrower incomes, assets and debts, and other loan data. These Warrantors' customary business practices, as set forth in the FCIC and Senate Reports, established that they uniformly made millions of deliberately false R&Ws and were the main players in the intentional transfer and deliberate concealment of such defective mortgage loans into thousands of RMBS trusts, including the Covered Trusts.*

96.     Further supporting the conclusion that Deutsche Bank had discovered by April 2011 that thousands of Mortgage Loans in the Covered Trusts breached the Warrantors' R&Ws, is the fact that, by April 2011, the Mortgage Loans in the Covered Trusts had continued to default at historically unprecedented rates, and the Covered Trusts' losses were skyrocketing to levels never seen before, due to the numerous defective, breaching Mortgage Loans that remained in the trusts or which had already been liquidated at huge losses. By April 2011, the Covered Trusts' Mortgage Loan default rates ranged from 22.58% to a high of over 55%. All of the Covered Trusts except one had default rates in excess of 36% and four had default rates in excess of 50%.[21]  In addition, the Covered Trusts' losses had mushroomed from approximately $545 million in January 2009 (*see supra* ¶71) , to **over $2 billion by April 2011**, because of Deutsche Bank's failure to enforce the

---

[21]   It should be noted that the foregoing default rates actually **understate the aggregate default rates for all of the Mortgage Loans that were originally within the Covered Trusts**. To explain, the foregoing default rates are derived from the monthly Covered Trust reports which disclose the default rates **for only those Mortgage Loans still remaining within the Covered Trusts**. In other words, these default rates **do not include all those Mortgage Loans that were originally within the Covered Trusts that had been in default and were already liquidated and therefore removed from the Covered Trusts before the specific report was issued**. Thus, the actual aggregate default rates for all of the Mortgage Loans that were originally in the Covered Trusts is actually **much, much higher**.

Warrantors' R&W obligations.  These default and loss rates were known to Deutsche Bank because it had access to this information.  The Covered Trusts' default rates and losses reported in April 2011 were as follows:[22]

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in April 2011 | | |
|---|---|---|
| Covered Trust | Mortgage Loan Default Rates | Cumulative Realized Losses |
| FFML 2006-FF9 | 51.13% | $311,325,575.86 |
| GSR 2007-AR2 | 22.58% | $58,428,780.09 |
| HASC 2007-WF1 | 39.07% | $95,750,069.60 |
| HVMLT 2006-8 | 45.27% | $213,649,221.40 |
| MSAC 2007-NC2 | 55.58% | $262,111,957.43 |
| MSAC 2007-NC3 | 42.53% | $326,804,442.94 |
| MSIX 2006-1 | 53.63% | $359,501,227.33 |
| NHEL 2006-4 | 52.21% | $198,374,535.20 |
| SAST 2006-2 | 37.89% | $139,845,739.24 |
| SVHE 2007-NS1 | 36.97% | $115,091,649.11 |
| Covered Trusts' Total Realized Losses: | | $2,080,883,198.20 |

c.    **Specific Claims Made About the Mortgage Loans in the Covered Trusts Caused Deutsche Bank to Discover Breaches of the Warrantors' R&Ws**

97.    In addition to the foregoing, numerous lawsuits were also filed by purchasers of the RMBS in the Covered Trusts, and others, alleging that numerous misrepresentations were made about the ***specific Mortgage Loans in the specific Covered Trusts***.  These lawsuits also informed Deutsche Bank that there were numerous defective Mortgage Loans in the Covered Trusts that breached the Warrantors' R&Ws.  For example:

- **May 2008**: The NHEL 2006-4 Covered Trust was sued in a class action by purchasers of RMBS alleging violations of the federal securities laws.  *See* Amended Complaint, *New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc., et al.*, No.

---

[22]    Even after April 2011, there were hundreds of additional events that occurred which publicly and repeatedly informed Deutsche Bank that the Warrantors had systematically breached their R&Ws concerning the Mortgage Loans in the Covered Trusts.  These events are far too numerous to list in this Complaint but they all corroborated that the Warrantors breached their R&Ws concerning the Mortgage Loans in the Covered Trusts.

08-CV-5310 (S.D.N.Y. June 16, 2009) (originally filed in N.Y. Sup. Ct. in May 2008, removed to S.D.N.Y.).  The amended complaint alleged that defendants *falsely represented that the Mortgage Loans in the NHEL 2006-4 Covered Trust were originated in conformity with NovaStar's underwriting guidelines, which would have been a breach of Warrantor NovaStar's R&Ws*.

- **May 20, 2011:** Massachusetts Mutual Life Insurance Company ("Mass Mutual") sued Covered Trust Warrantor HSBC alleging that numerous misrepresentations had been made about the Mortgage Loans in the HASC 2007-WF1 Covered Trust.  *See* Complaint, *Mass Mutual Life Ins. Co. v. HSBC Bank USA, N.A., et al.*, No. 11-CV-30141 (D. Mass. May 20, 2011).  Mass Mutual alleged that it had conducted a forensic review of the Mortgage Loans in that Covered Trust and found that the *LTV ratios and owner occupancy data concerning the Mortgage Loans had been misrepresented, which would have been a breach of the Warrantors' R&Ws*.

- **August 8, 2011:** American International Group, Inc. companies ("AIG") sued Warrantor First Franklin and others.  *See* Complaint, *American Int'l Group, Inc., et al. v. Bank of America Corp., et al.*, No. 652199/2011 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 8, 2011).  AIG alleged that defendants had *(1) misrepresented that the Mortgage Loans in the FFML 2006-FF9 and SAST 2006-2 Covered Trusts were originated in conformance with the loan originators' underwriting guidelines; (2) misrepresented that the borrowers had been evaluated to determine whether they could afford the Mortgage Loans; and (3) misrepresented the Mortgage Loans' credit characteristics, such as the Mortgage Loans' LTV ratios, occupancy data and DTI ratios, all breaches of the Warrantors' R&Ws*.  With respect to First Franklin and the FFML 2006-FF9 Covered Trust, AIG alleged the following:

  - *A former First Franklin underwriter, from 2005 to 2007, stated that lending practices at First Franklin were "'basically criminal'"; that the company required underwriters to depart from First Franklin's stated underwriting guidelines in order to keep their jobs; that managers pressured appraisers if they did not get the appraisal number they wanted and did so until a satisfactory number was returned; and that she and another former underwriter were fired by First Franklin after they "'spoke out'" about the company's problematic lending practices*.  *Id.*, ¶20.

  - *A former First Franklin senior underwriter stated that her branch manager overrode her rejections of non-compliant loans because her branch manager thought that it was unlikely the defective loans would be identified by audits; that her branch manager routinely overrode the senior underwriter's rejections of loans with obviously falsely inflated incomes; and that her branch manager approved obviously defective appraisals, instructing appraisers to omit material information that would have resulted in a lower appraisal value and using appraisers that were known to generate inflated appraisals*.  *Id.*, ¶302.

- 55 -

- • *Another former First Franklin underwriter stated that fellow underwriters '"would approve anything'" because their compensation was designed to incentivize the making of loans that did not comply with the underwriting guidelines; that if underwriters rejected loans because they did not meet the underwriting guidelines, her manager would redirect the loan applications to a certain loan processor who would approve the loans anyway; and that when she found an obviously fraudulent loan application which she took to her manager, her manager approved the loan anyway. Id.*, ¶304.

- • **September 2, 2011:** The Federal Housing Finance Agency ("FHFA") filed over a dozen actions against RMBS securitizers, *including Covered Trust Warrantors Goldman Sachs, HSBC and Morgan Stanley, alleging they had made numerous misrepresentations concerning the Mortgage Loans in the following Covered Trusts: FFML 2006-FF9, GSR 2007-AR2, HASC 2007-WF1, HVMLT 2006-8 and SAST 2006-2. See* complaints in *FHFA v. HSBC N. Amer. Holdings, Inc., et al.*, No. 11-CV-6189 (S.D.N.Y. Sept. 2, 2011) (HSBC sued regarding FFML 2006-FF9 and HASC 2007-WF1 Covered Trusts); *FHFA v. Goldman Sachs & Co., et al.*, No. 11-CV-6198 (S.D.N.Y. Sept. 2, 2011) (Goldman Sachs sued regarding GSR 2007-AR2 Covered Trust); *FHFA v. The Royal Bank of Scotland Group PLC, et al.*, No. 11-CV-1383 (D. Conn. Sept. 2, 2011) (Greenwich sued regarding HVMLT 2006-8 Covered Trust); *FHFA v. Morgan Stanley, et al.*, No. 652440/2011 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 2, 2011) (Morgan Stanley sued regarding SAST 2006-2 Covered Trust). The FHFA alleged that Covered Trust Warrantors Goldman Sachs, HSBC and Morgan Stanley had: *(1) falsely represented that the Mortgage Loans in the Covered Trusts had been originated pursuant to the lenders' underwriting guidelines; and (2) misrepresented the Mortgage Loans' LTV ratios and owner occupancy data, all breaches of the Warrantors' R&Ws.*[23]

- • **January 31, 2012**: A law firm representing RMBS investors in the MSAC 2007-NC2, MSAC 2007-NC3 and MSIX 2006-1 Covered Trusts directed Deutsche Bank "*to open investigations of ineligible mortgages in pools securing" those Covered Trusts and others. "Ineligible mortgages" in these trusts would have breached the Warrantors' R&Ws*.

98.    The foregoing lawsuits and investor directions involving the *specific* Covered Trusts, and the *specific* Mortgage Loans in them, caused Deutsche Bank to discover that the Warrantors had breached their R&Ws as to the Mortgage Loans in the Covered Trusts.

---

[23]    Morgan Stanley subsequently paid *$1.25 billion* to settle the FHFA's claims.

### d.   Deutsche Bank Also Learned of the Warrantors' R&W Breaches from Borrowers' Bankruptcies

99.     In addition to all of the foregoing information that Deutsche Bank was aware of, Deutsche Bank was also aware of additional ***specific information about the specific Mortgage Loans in the specific Covered Trusts*** from the bankruptcies of the Mortgage Loans' borrowers, which also indicated that the Warrantors had breached their R&Ws.  This information indicated that fraud or misrepresentations had occurred in connection with the origination of the Mortgage Loans, that borrowers were given Mortgage Loans they could not afford, that that lenders' underwriting guidelines were ignored, and that the Mortgage Loans were not legally originated, as either predatory lending or mortgage fraud had occurred.  Plaintiff's counsel has obtained information concerning Mortgage Loans within the Covered Trusts from bankruptcy filings by the borrowers. Deutsche Bank was aware of this information since it made appearances in, monitored, and/or made claims or filed or defended actions in the bankruptcies by or against the Mortgage Loans' borrowers. This information from the bankruptcies, as set forth below, shows that the Warrantors breached their R&Ws:

### (i)   FFML 2006-FF9 Covered Trust

100.     Two borrowers obtained a Mortgage Loan for $695,000 in 2006 from Warrantor First Franklin, which was contained within the FFML 2006-FF9 Covered Trust.  The borrowers had joint income of $4,000 per month in 2006 according to the borrowers' sworn bankruptcy filings. ***However, the borrowers' monthly debt payments were at least $11,612, far in excess of the borrowers' monthly income***.  The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, these borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated under any lender's underwriting guidelines for such a loan,

contrary to the Warrantor's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrowers clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrowers' income and/or debts that occurred to "qualify" the borrowers for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data they provided was true and correct. The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrowers declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (ii)    GSR 2007-AR2 Covered Trust

101.    Two borrowers obtained a Mortgage Loan for $467,000 in 2007 from Warrantor Countrywide, which was contained within the GSR 2007-AR2 Covered Trust. ***The borrowers had joint income of $0 per month in 2007 according to the borrowers' sworn bankruptcy filings. However, the borrowers' monthly debt payments were at least $2,612, far in excess of the borrowers' monthly income***. The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, these borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrowers clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrowers' income and/or debts that occurred to "qualify" the borrowers for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of the Warrantor's R&Ws

occurred is corroborated by the fact that the borrowers declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (iii)       HASC 2007-WF1 Covered Trust

102.     A borrower obtained a Mortgage Loan for $619,489 in 2007 from Warrantor Wells Fargo, which was contained within the HASC 2007-WF1 Covered Trust.  The borrower had income of $6,300 per month in 2007 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $13,867, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct.  The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (iv)       HVMLT 2006-8 Covered Trust

103.     A borrower obtained a Mortgage Loan for $650,000 in 2005 from Warrantor Metrocities Mortgage, LLC, which was contained within the HVMLT 2006-8 Covered Trust.  The borrower had income of $0 to $100 per month in 2005 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $5,802, far in***

*excess of the borrower's monthly income*. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (v)       MSAC 2007-NC2 Covered Trust

104.    A borrower obtained a Mortgage Loan for $630,000 in 2006 from loan originator New Century, which was contained within the MSAC 2007-NC2 Covered Trust. The borrower had income of $1,214 per month in 2006 according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $5,453, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts that must

have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct.   The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (vi)        MSAC 2007-NC3 Covered Trust

105.    Two borrowers obtained a Mortgage Loan for $930,000 in 2007 from loan originator New Century, which was contained within the MSAC 2007-NC3 Covered Trust.  The borrowers had joint income of $1,189 per month in 2007 according to the borrowers' sworn bankruptcy filings. *However, the borrowers' monthly debt payments were at least $6,554, far in excess of the borrowers' monthly income*.   The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.   Clearly, these borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws.   The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrowers clearly could not afford the Mortgage Loan.   In addition, the apparent misrepresentation of the borrowers' income and/or debts that must have occurred to "qualify" the borrowers for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct.   The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrowers declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (vii)        MSIX 2006-1 Covered Trust

106.    A borrower obtained a Mortgage Loan for $603,000 in 2006 from loan originator Master Financial, Inc., which was contained within the MSIX 2006-1 Covered Trust.  The borrower had income of $2,711 per month in 2006 according to the borrower's sworn bankruptcy filings. *However, the borrower's monthly debt payments were at least $5,005, far in excess of the borrower's monthly income*.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct.  The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2006.

### (viii)        NHEL 2006-4 Covered Trust

107.    Two borrowers obtained a Mortgage Loan for $690,000 in 2006 from Warrantor and loan originator NovaStar, which was contained within the NHEL 2006-4 Covered Trust.  The borrowers had joint income of $2,474 per month in 2006 according to the borrowers' sworn bankruptcy filings. *However, the borrowers' monthly debt payments were at least $12,716, far in excess of the borrowers' monthly income*.  The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care,

transportation, and the like.  Clearly, these borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrowers clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrowers' income and/or debts that must have occurred to "qualify" the borrowers for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct.  The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrowers declared separate bankruptcies shortly after obtaining the Mortgage Loan at issue, in 2007 and 2008.

**(ix)      SAST 2006-2 Covered Trust**

108.     A borrower obtained a Mortgage Loan for $352,750 in 2006 from a loan originator that sold the Mortgage Loan to Warrantor Saxon, which was contained within the SAST 2006-2 Covered Trust.  The borrower had income of $3,057 per month in 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $3,303, in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan

data it provided was true and correct. The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (x)        SVHE 2007-NS1 Covered Trust

109.    A borrower obtained a Mortgage Loan for $463,992 in 2006 from a loan originator sold the Mortgage Loan to Warrantor Nationstar, which was contained within the SVHE 2007-NS1 Covered Trust. The borrower had income of $4,921 per month in 2006 according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $7,132, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to the Warrantor's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantor's representations that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of the Warrantor's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

110.    As the foregoing demonstrates, Mortgage Loans in the Covered Trusts were extended to borrowers who, in light of their extremely heavy pre-existing debt loads, clearly had no ability to repay the Mortgage Loans. The foregoing information also reveals that: (1) the Mortgage Loans were obtained by providing falsified information; (2) lenders ignored their stated underwriting

guidelines; and (3) mortgage fraud and or predatory lending in violation of the law by either lenders or borrowers, or both, had occurred.  The foregoing examples are not isolated or extreme, or aberrations or outliers.  In fact, there were large numbers of Mortgage Loan borrowers that went bankrupt under similar circumstances, and Deutsche Bank learned of widespread breaches of the Warrantors' R&Ws through such bankruptcies.

> **e.      Deutsche Bank Learned from Its Sister Companies that There Were Systemic Breaches of R&Ws by the Covered Trusts' Warrantors**

111.    Deutsche Bank's sister companies – DBSP, MortgageIT, DB Home and Chapel – originated, purchased and/or warranted hundreds of thousands of  mortgage loans that were transferred to RMBS trusts, including to two of the Covered Trusts – the HVMLT 2006-8 Covered Trust, for which MortgageIT originated and warranted Mortgage Loans, and the MSIX 2006-1 Covered Trust, for which Chapel originated Mortgage Loans.  All of these "Deutsche Bank" companies were owned and controlled by their parent company, Deutsche Bank AG, which also owned and controlled defendant Deutsche Bank.  On information and belief, each of these "Deutsche Bank" companies freely communicated with one another about each other's businesses to coordinate their activities and create inter-company synergies to maximize their and their parent company's profits.

112.    Based on their common ownership and control, and their open communications with each other, defendant Deutsche Bank learned from DBSP, MortgageIT, DB Home and Chapel that lenders and RMBS securitizers were engaged in the making of systemically false R&Ws.  Indeed, Deutsche Bank learned that DBSP, MortgageIT, DB Home and Chapel *were engaging in the very same practices* in order to stay competitive with the industry.  The Senate Report summarized the overwhelming evidence that Deutsche Bank's sister companies did not make accurate R&Ws in their rush to securitize mortgage loans:  "***Deutsche Bank underwrote securities using loans from***

*subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world.  They also enabled the lenders to acquire new funds to originate still more high risk, poor quality loans*."  Senate Report at 11.

113.    That Deutsche Bank's sister companies engaged in the sale of systematically defective mortgage loans that breached their R&Ws is demonstrated by the many lawsuits filed against them.[24]  In addition, Deutsche Bank also learned of systemic R&W breaches from "Deutsche Bank's" proprietary traders.  Deutsche Bank learned from the traders that numerous RMBS and the

---

[24]    *See e.g. ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE4 by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 13-cv-2828 (S.D.N.Y. Apr. 29, 2013) (DBSP sued for breach of R&Ws); *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM2 by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 13-cv-2053 (S.D.N.Y. Mar. 27, 2013) (same); *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Products, Inc.*, No. 13-cv-1869 (S.D.N.Y. Mar. 20, 2013) (same); *Assured Guar. Corp. v. DB Structured Products, Inc., et al.*, No. 651824/2010 (N.Y. Sup. Ct. N.Y. Cnty. Oct. 25, 2010) (DBSP and affiliated company ACE Securities Corp. sued by insurer for breach of R&Ws); *ACE Sec. Corp. Home Equity Loan Trust, Series 2006-SL2, by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 650980/2012 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 13, 2012) (DBSP sued for breach of R&Ws by RMBS Trustee); *FHFA v. DB Structured Products, Inc.*, No. 651414/2012 (N.Y. Sup. Ct. N.Y. Cnty. Oct. 3, 2012); *ACE Sec. Corp. Home Equity Loan Trust, Series 2006 HE-3 by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 652231/2012 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 21, 2012); *ACE Sec. Corp. Home Equity Loan Trust, Series 2006-FM1, by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 652978/2012 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 28, 2013); *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE1 by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 650327/2013 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 29, 2013); *HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 650312/2013 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 29, 2013); *Deutsche Alt-A Sec. Mortg. Loan Trust, Series-Oa1 v. DB Structured Products, Inc.*, No. 12-cv-8594 (S.D.N.Y. Nov. 12, 2012); *Deutsche Alt-A Sec. Mortg. Loan Trust Series 2007-Oa4 by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 13-cv-3685 (S.D.N.Y. May 31, 2013); *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2007-Oa3 v. DB Structured Products, Inc.*, No. 13-cv-2888 (S.D.N.Y. Apr. 30, 2013); *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP1 by HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 650949/2013 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 1, 2013); *HSBC Bank USA, N.A. v. DB Structured Products, Inc.*, No. 651936/2013 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 4, 2013); *Assured Guar. Mun. Corp. v. DB Structured Products, Inc., et al.*, No. 650705/2010 (N.Y. Sup. Ct. N.Y. Cnty. June 23, 2010); *cf. In the Matter of DB Structured Products, Inc.*, No. A-13-690144-B (Nev. Dist. Ct. Clark Cnty. Oct. 14, 2013) (Nevada Attorney General enters into settlement with DBSP; DBSP pays $11.5 million to resolve investigation into whether DBSP assisted lenders, including sister company Mortgage IT, in making predatory loans and deceiving borrowers, and then buying and securitizing loans); *FHFA v. Deutsche Bank AG, et al.*, No. 11-CV-6192 (S.D.N.Y. Sept. 2, 2011).

mortgage loans underlying them ***were awful***, as "Deutsche Bank" traders referred amongst themselves (and with a few select clients) to such investments as ***"crap and "pig[s]."*** Senate Report at 338-40.[25]

114.   This knowledge obtained by Deutsche Bank, coupled with all of the previously alleged information it learned, also caused Deutsche Bank to discover systemic breaches of the Warrantors' R&Ws as to the Mortgage Loans in the Covered Trusts.

115.   However, despite Deutsche Bank's discovery of systemic R&W breaches by the Warrantors, Deutsche Bank did not act as required by the Governing Agreements and the TIA, and did not enforce the Warrantors' obligations to cure, substitute or repurchase thousands of defective

---

[25]   The Senate Report set forth several examples of "Deutsche Bank's" institutional knowledge that numerous mortgage loans underlying RMBS were defective, as illustrated by "Deutsche Bank's" traders' following comments about various RMBS and CDOs:

- ***"this bond blows"***
- ***"half of these are crap"***
- ***"weak"***
- ***"bad"***
- ***"pig"***
- ***"I can probably short this name to some . . . fool."***
- ***"This kind of stuff rarely trades in the synthetic market and will be tough for us to cover i.e. short to a . . . fool.  That said if u gave us an order at 260 we would take it and try to dupe someone."***
- ***"crap bond"***
- ***"crap we shorted"***
- ***"this bond sucks"***
- ***"generally horrible"***
- ***"u have picked some crap"***
- ***"this is an absolute pig"***
- ***"crap deal"***
- ***"deal is a pig!"***

Senate Report at 338-40.  "Deutsche Bank" took advantage of this inside information, as it ***bet that RMBS (and their underlying loans) would fail***.  According to the Senate Report, "Deutsche Bank" made a massive $5 billion "short" bet on RMBS, from which it derived the largest profit ever made on a single position in "Deutsche Bank's" history, when the mortgage loans ultimately failed as "Deutsche Bank" predicted and the RMBS collapsed.  *Id.* at 10.

Mortgage Loans.[26]  Moreover, Deutsche Bank's continuing failure to act, after learning of the

breaches, and of new breaches, has resulted in Deutsche Bank engaging in numerous additional

breaches of its continuing duties under the Governing Agreements and the TIA to enforce the R&W

claims after 2011, and has caused the loss of billions of dollars in meritorious R&W claims which

are now barred by the statute of limitations.  By these failures, Deutsche Bank breached, and then

repeatedly re-breached, the Governing Agreements and the TIA, thereby causing plaintiff, the class

and the Covered Trusts to suffer massive damages.

      **2.**      **Deutsche Bank Had Actual Knowledge of Events of Default No
Later than April 13, 2011, Thus Triggering Its Duties to Act
Under the Governing Agreements and the TIA**

116.    Deutsche Bank was also required by the Governing Agreements and the TIA to act as

a quasi-fiduciary whenever it became aware of Events of Default by the Covered Trusts' Master

Servicers or Servicers.  That is, whenever the Master Servicers/Servicers failed to ensure that the

Mortgage Loans in the Covered Trusts were being serviced in accordance with law and as "prudent"

master servicers or servicers using "customary and usual standards" of loan servicing practice, an

Event of Default occurred.  In addition, an Event of Default occurred whenever Deutsche Bank

learned that the Master Servicers/Servicers knew of Warrantor R&W breaches but did not report

them to Deutsche Bank.  When Deutsche Bank learned of these Events of Default, it was required to

notify the offending Master Servicer or Servicer and require a cure of the default, and also notify

plaintiff and the class if the default was not cured, and take other actions if necessary.  Most

---

[26]   For some of the Covered Trusts, Deutsche Bank did obtain some *de minimus* Mortgage Loan
repurchases.  However, these were very small, in almost all cases either much less than or barely
over 1% of the Mortgage Loans' original aggregate loan balances.  However, in five of the 10
Covered Trusts, Deutsche Bank has obtained Warrantor repurchases on ***none*** of the Mortgage Loans.
In any event, even where it obtained the small loan repurchases, Deutsche Bank was well aware that
there were still thousands of other Mortgage Loans that breached the Warrantors' R&Ws, yet it did
not enforce the Warrantors' obligations to repurchase or substitute.

importantly, Deutsche Bank was required to exercise all of its powers and duties under the Governing Agreements as a "prudent person" would, and as though it was seeking to protect plaintiff's and the class's interests as if they were Deutsche Bank's very own interests.  Deutsche Bank's powers included taking legal action against, or terminating or taking over, the offending Master Servicers'/Servicers' responsibilities.  However, as alleged more fully below, even though Deutsche Bank obtained actual knowledge of rampant Master Servicer/Servicer Events of Default with respect to the Mortgage Loans in the Covered Trusts by no later than April 2011 (if not sooner), Deutsche Bank breached the Governing Agreements and violated the TIA by failing to take any of the actions required of it or allowed by the Governing Agreements or the TIA.  Moreover, even though numerous new and existing Events of Default have continued after 2011, Deutsche Bank has continued to fail to act, and thus has committed numerous, additional breaches of its continuing duties under the Governing Agreements and the TIA after April 2011.

117.   The Master Servicers and Servicers to the Covered Trusts as designated in the Governing Agreements, and their successors, if any, are set forth in the chart below.  To plaintiff's knowledge, none of these Master Servicers or Servicers have been terminated or replaced by Deutsche Bank due to any of the  Events of Default alleged herein, nor has Deutsche Bank notified plaintiff and the class of such Events of Default:

**Covered Trusts' Master Servicers and Servicers**

| Covered Trust | Original Master Servicers | Original Servicers and Successor Servicers |
|---|---|---|
| FFML 2006-FF9 | ▪ **Wells Fargo** | ▪ **National City Home Loan Services, Inc.** ("**National City**") (National City was acquired by Merrill Lynch in 2006; Merrill Lynch was acquired by Bank of America in 2009 and Bank of America succeeded National City at that time; Bank of America transferred servicing to Specialized Loan Servicing LLC in Dec. 2013) |
| GSR 2007-AR2 | ▪ **Wells Fargo** | ▪ **Countrywide Home Loans Servicing** |

| Covered Trust | Original Master Servicers | Original Servicers and Successor Servicers |
|---|---|---|
| | | **LP** (changed name to "BAC Home Loans Servicing LP" after being acquired by Bank of America in 2009) (**hereinafter "CHLS/BACHLS"**)<br>▪ **National City**<br>▪ **PHH**<br>▪ **Wells Fargo**<br>▪ **IndyMac** (acquired by OneWest Bank in 2009; OneWest transferred servicing to Ocwen Financial Corporation ("Ocwen") in 2013) |
| **HASC 2007-WF1** | ▪ **Wells Fargo** | ▪ **Wells Fargo** |
| **HVMLT 2006-8** | ▪ **Wells Fargo** | ▪ **GMAC Mortgage Corporation ("GMAC")** (GMAC transferred servicing to Ocwen in 2013)<br>▪ **IndyMac** (transferred servicing to Ocwen in 2013)<br>▪ **Paul Financial**<br>▪ **WaMu** (acquired by JPMorgan in 2008) |
| **MSAC 2007-NC2** | ▪ **Wells Fargo** | ▪ **Saxon Mortgage Services, Inc.** (**"Saxon Mortgage Services"**) (Saxon Mortgage Services was acquired by Morgan Stanley in 2006; Ocwen acquired Saxon Mortgage Services from Morgan Stanley in 2012)<br>▪ **CHLS/BACHLS** |
| **MSAC 2007-NC3** | ▪ **Wells Fargo** | ▪ **Saxon Mortgage Services** (acquired by Ocwen in 2012)<br>▪ **CHLS/BACHLS** |
| **MSIX 2006-1** | ▪ **Wells Fargo** | ▪ **Wells Fargo**<br>▪ **Saxon Mortgage Services** (acquired by Ocwen in 2012)<br>▪ **JPMorgan Chase Bank, N.A.** ("**JPMorgan Chase**")<br>▪ **HomEq Servicing Corporation ("HomEq")** (acquired by Ocwen in 2010) |
| **NHEL 2006-4** | ▪ None | ▪ **NovaStar** (replaced by Saxon Mortgage Services in November 2007; Saxon Mortgage Services was acquired by Ocwen in 2012) |
| **SAST 2006-2** | ▪ **Saxon** (acquired by Morgan Stanley in | ▪ **Saxon Mortgage Services** (acquired by Ocwen in 2012) |

| Covered Trust | Original Master Servicers | Original Servicers and Successor Servicers |
|---|---|---|
| | 2006) | |
| **SVHE 2007-NS1** | ▪  None | ▪  **Nationstar** |

118.    Due to the large number of defective Mortgage Loans in breach of the Warrantors' R&Ws that remained in the Covered Trusts due to Deutsche Bank's failures to act as alleged above, a flood of defaults started occurring in late 2007 and early 2008, which in turn led to a flood of subsequent foreclosure proceedings.    Under the Governing Agreements, the Master Servicers/Servicers were responsible for instituting and prosecuting foreclosures on behalf of Deutsche Bank and were required to conduct the foreclosures *legally*, and pursuant to "prudent" and/or "customary and usual" loan servicing standards, as though the Master Servicers/Servicers were servicing their own portfolios of loans.  *E.g.*, FFML 2006-FF9 PSA §§3.01(a), 3.15 (Servicers to use "Accepted Servicing Practices"); *id*. Art. I ("Accepted Servicing Practices" means using "pruden[t]," "customary and usual standards of practice" and servicing Mortgage Loans "in accordance with . . . law[]").  Indeed, Deutsche Bank admitted in a memo sent to the Covered Trusts' Master Servicers and Servicers in August 2007 that it was "*our [i.e., Deutsche Bank's and the Master Servicers'/Servicers'] legal duty to protect the interests of*" plaintiff and the class when servicing the Mortgage Loans.

> **a.      Shortly After the Covered Trusts Were Formed Deutsche Bank Became Aware of Widespread Loan Servicing Events of Default that Likely Affected the Covered Trusts**

119.    Beginning as early as the summer of 2008, Deutsche Bank became aware of several widespread loan servicing issues involving several of the Covered Trust Master Servicers/Servicers. For example, Covered Trust Servicer Saxon Mortgage Services was charged with violating the laws of New Hampshire and Maryland in June and December 2008, respectively.  Saxon Mortgage Services was a Servicer for five of the 10 Covered Trusts in 2008.  In New Hampshire, Saxon

Mortgage Services was charged with violating several state laws and regulations by failing to designate a person with sufficient authority to facilitate foreclosure avoidance procedures, failing to communicate with borrowers, and failing to respond to the New Hampshire Banking Department's inquiries.  Saxon Mortgage Services entered into a consent order with New Hampshire and paid a fine.  Subsequently, in December 2008, Saxon Mortgage Services was charged with servicing loans in the state of Maryland without a proper license, also a violation of law.  Again, it quickly entered into a consent order, agreeing to comply with the law and paying a fine.  Violations of law were Events of Default under the Governing Agreements.

120.    Because of its concerns, in July 2008 Deutsche Bank sent a memo to all of its master servicers and servicers, including all of the Covered Trusts' Master Servicers and Servicers, identifying "certain issues relating to servicing practices that ha[d] come to" Deutsche Bank's "attention."  In the memo, Deutsche Bank stated that the "performance of securitization parties," *i.e.*, the "performance" of the Master Servicers and Servicers, was "being scrutinized carefully by various constituencies," *i.e.*, courts, law enforcement agencies and various state and federal governments.  Deutsche Bank directed that all of its loan servicers be "particularly mindful" to avoid errors they were making related to proving Deutsche Bank owned the mortgage loans at the time they were being foreclosed, and further reminded the servicers to comply with ***"all"*** legal requirements.  (Emphasis in original.)  Deutsche Bank also cautioned its loan servicers to be careful to ***not "mislead third parties, including courts***."  In addition, Deutsche Bank told its loan servicers – which were also responsible for maintaining the RMBS trusts' "REO" properties – that Deutsche Bank was receiving complaints from governments, community groups, law enforcement and courts about the physical condition of REO properties.  Deutsche Bank instructed its loan servicers to properly maintain REO properties as required under the Governing Agreements.  This memo indicated that

Deutsche Bank was aware of potential misconduct by its master servicers and servicers, including the Covered Trusts' Master Servicers and Servicers, as early as July 2008.

121.   In 2008 and 2009, all RMBS trustees, not just Deutsche Bank, were experiencing major difficulties foreclosing on defaulted mortgage loans because of widespread loan servicing errors and misconduct.   Courts were denying, delaying, halting, and even invalidating many foreclosures because of grossly negligent, deceptive and/or fraudulent conduct by the loan servicers. Because of these erroneous and improper servicing practices, RMBS trustees were having difficulty establishing that they owned the mortgages at the time they filed suit or foreclosed, as was required by law.   In addition, trustees were facing long delays in foreclosing caused by faulty or false mortgage documentation filed by the master servicers and servicers, as well as their frequent assertion of grossly erroneous or false facts.   Loan servicers, including the Covered Trusts' Master Servicers and Servicers, were filing false affidavits and assignment documents.   Some were also creating bogus mortgage and note assignments, as well as causing the filing of complaints and other court documents that contained false allegations.   Such loan servicing practices were clearly not legal, "customary and usual," or "prudent," as required by the Governing Agreements.

122.   In fact, in late 2007, Deutsche Bank received a preview of the tsunami of loan servicing misconduct that was to come.   In late 2007, the U.S. District Courts for the Northern and Southern Districts of Ohio dismissed without prejudice, or threatened to dismiss, numerous foreclosure actions, including many by Deutsche Bank, due to gross errors, misrepresentations, or other misconduct by loan servicers.[27]   These events portended the massive Events of Default that were to come.

---

[27]   *See, e.g.*, *In re Foreclosure Cases*, 521 F. Supp. 2d 650 (S.D. Ohio 2007) (court orders that 26 foreclosure cases, including at least four of Deutsche Bank's, will be dismissed unless Deutsche Bank and others comply with court's "General Order 07-03" and file proper documentation); *In re*

123.    Indeed, beginning shortly thereafter, and continuing to the present, Deutsche Bank

has experienced hundreds, if not thousands, of denials, dismissals or undue delays of its foreclosure

actions filed by its servicers, and numerous motions for relief from bankruptcy stays being denied or

delayed, because of rampant, grossly negligent, deceptive or fraudulent misconduct by its loan

servicers.  Deutsche Bank's loan servicers committed grossly negligent errors, were deceptive, made

misrepresentations, and engaged in outright fraud and/or violations of law, all Events of Default.[28]

---

*Foreclosure Actions*, No. 1:07CV1007, 2007 U.S. Dist. LEXIS 97763 (N.D. Ohio Nov. 14, 2007) (court dismisses 32 foreclosure cases, including more than 20 of Deutsche Bank's, because of improper documentation filed by servicers); *In re Foreclosure Cases*, No. 1:07CV2282, 2007 U.S. Dist. LEXIS 84011 (N.D. Ohio Oct. 31, 2007) (court dismisses 14 foreclosure actions, including 13 by Deutsche Bank, because of defective paperwork filed by servicers); *Deutsche Bank Nat'l Trust Co. v. McCarthy, et al.*, No. 1:07CV3071, slip op. at 2 (N.D. Ohio Oct. 30, 2007) (***court dismisses foreclosure action by Deutsche Bank because it "made a false statement to the Court"***); *In re Foreclosure Cases*, No. 1:07CV2282, 1:07CV2313, 1:07CV2532, 1:07CV2560, 1:07CV2565, 1:07CV2602, 1:07CV2631, 1:07CV2638, 1:07CV2681, 1:07CV2695, 1:07CV2920, 1:07CV2930, 1:07CV2943, 1:07CV2949, 1:07CV2950, 1:07CV3000, 1:07CV3029, slip op. at 2 (N.D. Ohio Oct. 10, 2007) (court threatens to dismiss 13 foreclosure actions, including 10 by Deutsche Bank, unless it "file[d] a copy of the executed assignment demonstrating [Deutsche Bank] was the holder and owner of the Note and Mortgage ***as of the date the Complaint was filed***") (emphasis in original).

[28]    *See, e.g.*, *Deutsche Bank Nat'l Trust Co. v. Alemany*, No. 0011677-2007 (N.Y. Sup. Ct. Suffolk Cnty. Jan. 7, 2008) (*ex parte* application by Deutsche Bank for order of reference in mortgage foreclosure action denied because servicer failed to file proper affidavit, failed to provide proof of Deutsche Bank's standing to commence action, and failed to provide proof of compliance with New York Real Property Actions and Proceedings Law); *Deutsche Bank Nat'l Trust Co. v. Henry, et al.*, No. 0015375/2007 (N.Y. Sup. Ct. Kings Cnty. Jan. 8, 2008) (Deutsche Bank's application for order of reference denied because servicer filed defective affidavit); *Deutsche Bank Nat'l Trust Co. v. Harris, et al.*, No. 0035549/2007, slip op. at 3 (N.Y. Sup. Ct. Kings Cnty. Feb. 5, 2008) (Deutsche Bank's application for order of reference denied because of defective affidavit; "***Court is perplexed***" about discrepancies in affidavit and assignment of loan); *Deutsche Bank Nat'l Trust Co. v. Grant, et al.*, No. 0039192/2007 (N.Y. Sup. Ct. Kings Cnty. Apr. 25, 2008) (Deutsche Bank's application for order of reference denied because of defective affidavit); *Deutsche Bank Nat'l Trust Co. v. Nicholls, et al.*, No. 0002248/2007 (N.Y. Sup. Ct. Kings Cnty. May 21, 2008) (Deutsche Bank's unopposed application for judgment of foreclosure and sale denied; court also dismisses action *sua sponte* because action was prematurely commenced via ***improper "retroactively assign[ed]" mortgage***); *Deutsche Bank Nat'l Trust Co. v. Cruz, et al.*, No. 0002085/2007 (N.Y. Sup. Ct. Kings Cnty. May 21, 2008) (same); *Deutsche Bank Nat'l Trust Co. v. Cruz, et al.*, No. 0031645/2006 (N.Y. Sup. Ct. Kings Cnty. May 21, 2008) (same); *Deutsche Bank Nat'l Trust Co. v. Auguste, et al.*, No. 0027299/2007 (N.Y. Sup. Ct. Kings Cnty. July 17, 2008) (Deutsche Bank's application for order of reference denied because servicer filed defective affidavit); *Deutsche Bank Nat'l Trust Co. v. Mark*

*Dill Plumbing Co., et al.*, No. 87A01-0807-CV-307, slip op. at 6, 8 (Ind. Ct. App. Mar. 25, 2009) (Deutsche Bank improperly foreclosed on mortgage without joining junior lienholders; Deutsche Bank then sued to remove lienholders, and lienholders counterclaimed to foreclose their liens; trial court denied Deutsche Bank's summary judgment motion to remove lienholders and granted lienholders countermotion for foreclosure and satisfaction of their liens; appeals court affirms trial court's decision, holding that ***Deutsche Bank's failure to join lienholders in foreclosure "resulted from the negligence of Deutsche Bank or its agent," i.e., its servicer, because "Deutsche Bank acknowledge[d] [the] liens were properly recorded" and therefore "Deutsche Bank should have known about [the] liens"***); *Deutsche Bank Nat'l Trust Co. v. Marche, et al.*, No. 009156/2007 (N.Y. Sup. Ct. Kings Cnty. May 21, 2009) (court issues ***order to show cause why judgment of foreclosure and Deutsche Bank's action should not be dismissed because Deutsche Bank "has misrepresented itself by alleging it is the owner and holder of the mortgage in order to fraudulently commence this action when in fact no valid assignment has been made to [Deutsche Bank]," and "the assignment at issue is champertous in violation of Section 489 of the New York State Judiciary Law because the sole purpose of the defective assignment was to facilitate the fraudulent litigation begun by [Deutsche Bank] prior to the assignment's execution"***); *In re Hayes*, No. 07-13967-JNF, Memorandum at 16 (Bankr. D. Mass. Aug. 19, 2008) (Deutsche Bank's motion for relief from bankruptcy stay denied by court after two-day trial; court holds that evidence put on by Deutsche Bank's servicer was insufficient; ***court holds that "[g]iven the tangle of inconsistent and incomplete documents introduced into evidence purporting to establish Deutsche Bank as the holder of the Debtor's mortgage, . . . sanctions may be appropriate"***); *Deutsche Bank Nat'l Trust Co. v. Lippi, et al.*, No. CA08-127, slip op. at 3-4 (Fla. Cir. Ct. Feb. 11, 2011) (court grants borrower's motion to dismiss Deutsche Bank's foreclosure action with prejudice; court holds that Deutsche Bank (or its servicer) and counsel engaged in multiple instances of misconduct, such as ***"willfully violat[ing] the Court's Orders," filing documents that have "hindered the administration of this case," filing papers that "are replete with even more examples of contumacious actions," "frustrat[ing] the fair administration of justice," and failing to serve defendants' counsel***), *rev'd* No. 5D10-946 (Fla. Dist. Ct. App. Jan. 12, 2012); *Deutsche Bank Nat'l Trust Co. v. Stevens*, No. 0015862/2008, slip op. at 2 (N.Y. Sup. Ct. Kings Cnty. May 18, 2010) (Deutsche Bank's summary judgment motion denied and action dismissed because it was commenced "prior to the date of the mortgage assignment, and the record contains no proof demonstrating that there was a physical delivery of the mortgage [to Deutsche Bank] prior to" commencement); *In re Foreclosure of a Deed of Trust Executed by Hannia M. Adams & H. Clayton Adams*, 693 S.E.2d 705 (N.C. Ct. App. June 1, 2010) (appeals court reverses order authorizing Deutsche Bank to foreclose because affidavits on behalf of Deutsche Bank were insufficient to establish note was transferred to Deutsche Bank); *In re Tarantola*, No. 4:09-bk-09703-EWH, slip op. at 14 (Bankr. D. Az. July 29, 2010) (court denies Deutsche Bank's motion for relief from bankruptcy stay because of ***"the deficient and misleading nature of Deutsche's filings"; court also "seriously considered" issuing order to show cause why sanctions should not be imposed "on Deutsche, its servicer, and its lawyers"***); *Mortg. Elec. Registration Sys, Inc. v. Saunders, et al.*, 2 A.3d 289 (Me. 2010) (court vacates order granting Deutsche Bank summary judgment, holding that summary judgment was inappropriate because Deutsche Bank filed motion that was procedurally and substantively defective); *Deutsche Bank Nat'l Trust Co. v. Parisella, et al.*, No. S0758-09 CnC (Vt. Sup. Ct. Oct. 25, 2010) (Deutsche Bank's foreclosure complaint is dismissed because "***there is no evidence in the record indicating that Deutsche Bank was the assignee of the note when it filed its***

*complaint on June 15, 2009.  Nor is there even an allegation to that effect*."); *Augenstein v. Deutsche Bank Nat'l Trust Co., et al.*, No. 2009-CA-000058-MR, slip op. at 4 (Ky. Ct. App. Feb. 18, 2011) (summary judgment in favor of Deutsche Bank vacated and remanded; court notes that Deutsche Bank failed to timely file an appeal brief and holds that "Deutsche Bank did not have standing to commence this action when it did"); *Deutsche Bank Nat'l Trust Co. v. Francis, et al.*, 926 N.Y.S. 2d 343 (Sup. Ct. Mar. 25, 2011) (court dismisses Deutsche Bank's foreclosure action *sua sponte* because it "*discovered that there is no record of plaintiff DEUTSCHE BANK ever owning the subject mortgage and note*.  Therefore, with plaintiff DEUTSCHE BANK lacking standing, the instant action is dismissed with prejudice and the notice of pendency cancelled"); *Turner v. Deutsche Bank Nat'l Trust Co.*, 65 So.3d 336 (Miss. Ct. App. June 14, 2011) (default judgment against borrower reversed because Deutsche Bank failed to comply with Rules of Civil Procedure); *Valencia v. Deutsche Bank Nat'l Trust Co.*, 67 So.3d 325, 326 (Fla. Ct. App. June 22, 2011) (summary judgment for Deutsche Bank reversed; "genuine issue of a material fact" existed because Deutsche Bank produced two different "possible" versions of mandatory notice that should have been sent to borrower before foreclosure, while borrowers produced original notice which was different from Deutsche Bank's two versions); *Deutsche Bank Nat'l Trust Co. v. Pelletier*, 31 A.3d 1235, 1237 (Maine Sup. Ct. Aug. 9, 2011) (revised Nov. 15, 2011) (affirming summary judgment of rescission in favor of borrowers and against Deutsche Bank; court notes that *Deutsche Bank "submitted an incomplete, unsigned affidavit containing blank spaces for the affiant's name and title, and the date," "did not file an opposing statement of material facts pursuant to M.R. Civ. P.56(h)(2)," and never "file[d] a completed affidavit*"); *Deutsche Bank Nat'l Trust Co. v. Byrams*, 275 P.3d 129 (Okla. Sup. Ct. Jan. 17, 2012) (reversing and remanding summary judgment in favor of Deutsche Bank; court holds that Deutsche Bank failed to prove it was "'entitled to enforce'" the note "*prior* to the filing of the foreclosure proceeding" in December 2009 because "there [wa]s no evidence . . . supporting it [wa]s a holder of the note") (emphasis in original); *In re Miller v. Deutsche Bank Nat'l Trust Co.*, 666 F.3d 1255, 1264 (10th Cir. 2012) (reversing order granting Deutsche Bank relief from bankruptcy stay; court held that Deutsche Bank failed to prove it "in fact obtained physical possession of the original Note" as required by law); *Deutsche Bank Nat'l Trust Co. v. Matthews*, 273 P.3d 43, 44, 47 (Okla. Sup. Ct. Feb. 28, 2012) (reversing and remanding summary judgment in favor of Deutsche Bank; court notes that Deutsche Bank first falsely "claimed . . . to hold the note and mortgage" when it filed the action in 2009, but later, "by its own admission," conceded that "it acquired its interest in the note and mortgage subsequent to the filing of the action," *i.e.*, "six months after the action was commenced"); *Deutsche Bank Nat'l Trust Co. v. Williams*, No. 11-00632 JMS/RLP, 2012 U.S. Dist. LEXIS 43968, at *9, *11 (D. Haw. Mar. 29, 2012) (dismissing Deutsche Bank's foreclosure action; court holds that dismissal was warranted because assignment of mortgage and note to Deutsche Bank was purportedly executed on January 13, 2009 by "Home 123," long after Home 123 had been liquidated in bankruptcy; court holds "that Home 123 *could not* have validly assigned the Mortgage and Note to [Deutsche Bank] on January 13, 2009," and therefore the "assignment is a nullity," and Deutsche Bank's "assertion that [Deutsche Bank] obtained the Mortgage and Note from Home 123 *is untrue*") (emphasis in original); *Gonzalez v. Deutsche Bank Nat'l Trust Co., et al.*, No. 2D10-5561, slip op. at 6 (Fla. Dist. Ct. App. Apr. 20, 2012) (reversing summary judgment in Deutsche Bank's favor; court holds that assignment of note "[wa]s not dated" and therefore "Deutsche Bank failed to establish its standing by showing it possessed the note when it filed the lawsuit" in 2009); *Finnegan v. Deutsche Bank Nat'l Trust Co.*, No. 4D11-939, slip op. at 2 (Fla. Dist. Ct. App. Sept. 5, 2012) (reversing summary judgment in Deutsche Bank's favor; court

In many cases, the Covered Trusts' Master Servicers and Servicers were involved.[29]

---

holds that Deutsche Bank's summary judgment affidavit failed to even address the most important issue of fact concerning whether borrower received proper notice of default; court also holds that Deutsche Bank attempted to use documents that "were not sworn and could not be considered on a motion for summary judgment"); *Deutsche Bank Nat'l Trust Co. v. Cuesta*, No. 0003998-2011, 2012 N.Y. Misc. LEXIS 4848 (N.Y. Sup. Ct. Suffolk Cnty. Sept. 11, 2012) (unopposed motion for summary judgment by Deutsche Bank denied because of failure to file proper affidavits that comply with law); *Deutsche Bank Nat'l Trust Co. v. Gilbert, et al.*, No. 08-CH-955, slip op. at 9 (Ill. App. Ct. 2d Dist. Sept. 25, 2012) (summary judgment in favor of Deutsche Bank reversed because servicer's affidavit was inadmissible, lacking in foundation, and did not comply with Illinois Supreme Court Rule 191(a); court also holds that note and mortgage attached to Deutsche Bank's complaint "***contradicted Deutsche Bank's allegation that it did own the loan when it filed suit***"); *Deutsche Bank Nat'l Trust Co. v. Heinrich, et al.,* No. 2011-CP-10-1060, slip op. at 2 (S.Car. Ct. Com. Pleas, 9th Jud. Cir. July 31, 2013) (borrowers' motion to dismiss Deutsche Bank's foreclosure action granted; court holds that Deutsche Bank "failed to show that it owned the Mortgage at the time the Complaint was filed" in February 2011 as required by law); *Harris v. Deutsche Bank Nat'l Trust Co.*, No. 1110054, slip op. at 22 (Ala. Sup. Ct. Sept. 13, 2013) (summary judgment in favor of Deutsche Bank in action filed in 2009 to eject foreclosed borrowers is vacated and remanded; court holds that ***Deutsche Bank "in fact concedes that summary judgment was inappropriate in this case*** and that on the state of the current record there is a genuine issue of material fact as to whether [Deutsche Bank] received an assignment of the note so as to have entitled it to execute the power of sale in its own name"); *Deutsche Bank Nat'l Trust Co. v. Huber, et al.,* No. 4D12-3696, slip op. at 2 (Fla. Dist. Ct. App. Apr. 23, 2014) (court of appeal upholds involuntary dismissal of Deutsche Bank's action because Deutsche Bank failed to move the original note into evidence as required by law or "offer a satisfactory explanation as to its failure to do so").

[29]   *See, e.g.*, *Deutsche Bank Nat'l Trust Co. v. Maraj*, 856 N.Y.S. 2d 497 (N.Y. Sup. Ct. Kings Cnty. Jan. 31, 2008) (Deutsche Bank's application for order of reference denied because ***employee of Covered Trust Servicer IndyMac and Deutsche Bank filed what appeared to be a defective loan assignment and affidavit***; court holds that it ***"is concerned that there may be fraud on the part of plaintiff DEUTSCHE BANK, or at least malfeasance," and that "DEUTSCHE BANK appear[ed] to be engaged in possible fraudulent activity"; court further "wonders if the instant foreclosure action is a corporate 'Kansas City Shuffle,' a complex confidence game***"); Memorandum of Law of the U.S. Trustee in Support of Sanctions at 2, *In re Neur*, No. 08-14106(REG) (Bankr. S.D.N.Y. Jan. 4, 2010) (U.S. Trustee – a part of the U.S. Department of Justice – files a motion for sanctions in case where Deutsche Bank is trustee; ***Covered Trust Servicer JPMorgan Chase is servicer and the subject of sanctions motion***; U.S. Trustee states: "***[JPMorgan] Chase . . . produce[d] documents that were confusing and contradictory . . . [and] appear to be false or misleading***"; U.S. Trustee cites three other cases in the District where ***JPMorgan Chase engaged in similar misconduct and was either sanctioned or agreed to pay the other side for making improper court filings***); *Deutsche Bank Nat'l Trust Co. v. Triplett*, No. 94924 (Ohio Ct. App. Feb. 3, 2011) (summary judgment in favor of Deutsche Bank reversed based on undisputed fact that assignment of mortgage to Deutsche Bank occurred three weeks *after* complaint was filed and Deutsche was required by law to be assignee of mortgage ***at the time foreclosure action was commenced***; court further rejects ***false affidavit by Covered Trust Servicer CHLS/BACHLS claiming otherwise***);

124. Two poignant examples of the repetitive types of Events of Default committed by loan servicers on Deutsche Bank's behalf are found in a decision by the Ohio Court of Appeal in *Deutsche Bank Nat'l Trust Co. v. Holden, et al.,* No. 26970 (Ohio Ct. App. Mar. 31, 2014) (the "Ohio Action"), and in a Michigan action that was filed against Deutsche Bank, *see Rought, et al. v. Deutsche Bank Nat'l Trust Co., et al.*, No. 1:10-CV-403 (D. Mich. May 6, 2010) (the "Michigan Action"). First, in the Ohio Action, a foreclosure case was filed by Deutsche Bank in 2011 in Ohio state court. Attached to the complaint was a purportedly "'***true and accurate copy of the <u>original</u>***'" promissory note, ***which contained no indorsements***. After the completion of discovery, Deutsche Bank moved for summary judgment, seeking a judgment of foreclosure. In connection with Deutsche Bank's summary judgment motion, a JPMorgan Chase employee, Megan Theodoro, filed an affidavit in support of Deutsche Bank's motion. JPMorgan Chase was the servicer of the loan at issue therein (and ***JPMorgan Chase is also a Servicer to the MSIX 2006-1 Covered Trust***). Attached to Theodoro's affidavit was another purported copy of the promissory note, ***which Theodoro "stated was a copy of the '<u>original</u> Note*.'"** However, this copy of the note differed from the one attached to the complaint because the note Theodoro introduced into evidence ***contained a***

---

*Deutsche Bank Nat'l Trust Co. v. Mitchell*, No. A-4925-09T3 (N.J. Sup. Ct. App. Div. Aug. 9, 2011) (judgment for Deutsche Bank reversed; court holds that Deutsche Bank filed action before it was assigned mortgage and therefore lacked standing; ***court also holds that affidavit by Covered Trust Servicer JPMorgan Chase was defective***); *Deutsche Bank v. Brumbaugh*, 270 P.3d 151, 152, 154 (Okla. Sup. Ct. Jan. 17, 2012) (reversing and remanding summary judgment in favor of Deutsche Bank; court holds that "there is a question of fact" because Deutsche Bank was required to prove it was holder of note ***prior*** to filing action, and ***affidavit by Covered Trust Servicer JPMorgan Chase made "no mention of when [Deutsche Bank] became the holder"***); *Deutsche Bank Nat'l Trust Co. v. Wilk*, 76 A.3d 363, 367-68 (Me. Sup. Ct. Sept. 12, 2013) (judgment of foreclosure in favor of Deutsche Bank vacated and remanded for entry of judgment denying foreclosure; court holds that "the trial evidence does not support a finding that Deutsche Bank received the mortgage by assignment" because "***OneWest Bank [Covered Trust Servicer IndyMac's successor] . . . assign[ed] its interest in the mortgage to Deutsche Bank two weeks before OneWest Bank acquired the mortgage***"; ***court further holds that Deutsche Bank's complaint filed in July 2010 attached a completely different assignment that contradicted the evidence presented at trial and that "Deutsche Bank offers no explanation for this conflicting set of assignments"***).

**blank indorsement from the original lender, NovaStar, to Deutsche Bank, unlike the one attached to the complaint**.  While the Ohio appeals court took the "high road," and did not accuse anyone of fraud, the obvious inference was that someone – most likely someone from Covered Trust Servicer JPMorgan Chase – had falsely altered the note attached to the Theodoro affidavit and added the indorsement after-the-fact in order to assist Deutsche Bank in obtaining summary judgment. Notwithstanding these obvious discrepancies, the trial court below erroneously granted Deutsche Bank's summary judgment motion.  On appeal, the Ohio Court of Appeal reversed, holding that summary judgment was inappropriate because of the two different, conflicting, obviously inconsistent versions of the original note.  The Ohio appellate court held:

> **Thus, Deutsche Bank has filed two different copies of the same note – one with and one without an indorsement.  Both copies purport to be true and accurate copies of the original note.  Ms. Theodoro's affidavit fails to explain why the copy of the note attached to her affidavit differs from the one attached to the complaint when, from her averments, the note, while in [JPMorgan] Chase's possession, had always contained a blank indorsement from NovaStar to Deutsche Bank**.

While JPMorgan Chase meritlessly tried to explain how there were two different versions of the same "original" note in its possession, the Court of Appeal rejected those explanations as speculative opinions not based on personal knowledge, and held that:

> **Deutsche Bank has failed to explain why [JPMorgan] Chase would have an unindorsed copy of the note in its possession since it was the only servicer for Deutsche Bank . . . .  This creates a genuine issue of material fact since Ms. Theodoro averred that the note in [JPMorgan] Chase's possession had always contained a blank indorsement from NovaStar to Deutsche Bank.**

> \*       \*       \*

> **Due to the inconsistencies between the copies of the note and the lack of an explanation based on personal knowledge as to how Deutsche Bank came to offer two different copies of the note into the record, this Court concludes that there is a genuine issue of material fact as to whether Deutsche Bank was the holder of the note at the time the complaint was filed.  Accordingly, the trial court erred in granting Deutsche Bank's motion for summary judgment on its foreclosure complaint**.

The facts in this case are very similar to numerous other cases involving Deutsche Bank.  That is, the cases consistently involve negligently untrue or blatantly false allegations made in complaints and other documents; false, inconsistent or contradictory averments of facts in affidavits, often inadmissible or made without personal knowledge; defective or altered note and mortgage assignments; and/or patently insufficient evidence.  *See e.g., supra* nn. 27-29, *see also infra* n.31.[30] This misconduct by loan servicers was certainly not prudent, or in line with customary and usual loan servicing practices.  In fact, such misconduct was an Event of Default under the Governing Agreements.

125.    Second, with respect to the aforementioned Michigan Action, the loan servicer's misconduct was criminal.  The plaintiffs in the Michigan Action were Ricky and Hannah Rought, father and daughter, and they sued Deutsche Bank, its servicer American Home Mortgage Servicing,

---

[30]    *See also Deutsche Bank Nat'l Trust Co. v. Wilk,* 79 A.3d at 368 (Deutsche Bank introduced "***conflicting information***"); *Deutsche Bank Nat'l Trust Co. v. Gilbert,* No. 08-CH-955, slip op. at 7, 9 (documents filed on behalf of Deutsche Bank "***contradicted" Deutsche Bank's allegations; "[in]admissible***" affidavit "***unsupported by any foundation***" was filed; "***Deutsche Bank produced no competent evidence***"; "***Deutsche Bank wisely abandons that argument [] which finds no support in the [evidence]***"); *Gonzalez v. Deutsche Bank Nat'l Trust Co.,* No. 2D10-5561, slip op. at 3 (appeals court reverses summary judgment for Deutsche Bank; borrower argues that Deutsche Bank's allegations were "'***inconsistent***'" with the exhibits it filed); *Deutsche Bank Nat'l Trust Co. v. Barnett,* 88 A.D.3d 636, 638 (N.Y. App. Div. 2d Dept. Oct. 4, 2011) (reversing summary judgment in favor of Deutsche Bank, finding that there were numerous "***inconsistencies***," as Deutsche Bank "submitted copies of ***two different versions of an undated allonge which was purportedly affixed to the original note***" that "***conflict[ed] with the copy of the note***," and another document submitted by Deutsche Bank to purportedly "establish the authority" of the person signing the mortgage assignment to so sign it, ***was dated "after the subject assignment and, thus, cannot establish . . . such authority"***); *Herrera v. Deutsche Bank Nat'l Trust Co.,* 127 Cal. Rptr. 3d 362, 370-72 (3d Dist. 2011) (affidavit in support of Deutsche Bank "***does not affirmatively show that [the affiant] can competently testify*** . . . as to" facts; affidavit ***lacked foundation***, was "***confusing***" and "***failed to provide admissible evidence***"); *In re Doble*, No. 10-11296, 2011 Bankr. LEXIS 1449, at *18 (Bankr. S.D. Cal. Apr. 14, 2011) ("***The most disconcerting misrepresentation to the Court was [Deutsche Bank's and its servicer's] submission of multiple 'true and correct' copies of the Note under penalty of perjury*** . . . ."); *Deutsche Bank Nat'l Trust Co. v. Pope*, No. 16-2007-CA-008285-XXXX-MA, slip op. at ¶5 (Fla. Cir. Ct. Duval Cnty. Mar. 7, 2008) (Deutsche Bank's foreclosure action dismissed because its "***exhibits are inconsistent with [its] allegations" and "only act[] to cloud"*** the issues in the case*).

Inc. ("American Home"), and Field Asset Services, Inc. (Field Asset Services was American Home's

property manager) in April 2010.  The Roughts claimed that Deutsche Bank wrongfully foreclosed

on their home when it had absolutely no right to do so, and that Deutsche Bank and the other

defendants thereafter illegally trespassed on their property, stole their belongings, and trashed their

house.  The introductory paragraph of the amended complaint in the Michigan Action, filed in May

2010, succinctly set forth the egregious misconduct by Deutsche Bank's servicer:

> ***On January 27, 2009, Ricky J. Rought, along with his twenty-two year old daughter Hannah Rought, bought a home in Brohman, Michigan from the defendant Deutsche Bank National Trust Company for cash.  After the sale, the Roughts began fixing-up the house and property with the intention of it becoming Hannah's first home.  On or about August 30, 2009, seven months <u>after</u> buying the house, Deutsche Bank, which no longer had any legal right, title, or interest in the property, "foreclosed" on the Roughts new home with the help of its servicer, Defendant American Home Mortgage Servicing, Inc., and its property preservation company, Defendant Field Asset Services, Inc.  Field Asset Services trespassed onto the property, forcibly broke into the house, changed the locks on the doors and trashed-out all the Roughts' personal possessions that were in the house and on the property.  After being reported to the Michigan State Police and being informed that the bank had no right to enter the property, the Defendants broke into the house again and "winterized" it.  After a second report to the Michigan State Police and further notice, the Defendants trespassed a third time and removed its lock box which it had placed on the front door of the Rought's new home***.

(Emphasis added and in original.)

126.    According to the complaint, in an obvious attempt to deflect blame from itself,

"Deutsche Bank … indicated that defendant American Home the servicer [was] responsible for [the

wrongful] foreclosure[]" and other misconduct.  Of course, this illustrates that loan servicers are the

entities that primarily drove foreclosure proceedings for Deutsche Bank.  Deutsche Bank and the

other defendants quickly settled this case.  The illegal conduct in the Michigan Action was a clear

Event of Default.

127.    The foregoing cases and others also illustrate that not only was Deutsche Bank

acutely aware of its loan servicers' Events of Default, ***it appears that Deutsche Bank was even***

*acquiescing in or actively participating in such misconduct*, as Deutsche Bank itself was accused

of, or found to have engaged in, fraud, illegal activity, sanctionable misconduct, contempt, or other

Events of Default in connection with its foreclosures.[31]

---

[31]    *See, e.g.*, *Maraj*, 852 N.Y.S. 2d 497 ("***DEUTSCHE BANK appears to be engaged in possible fraudulent activity***"); *Deutsche Bank Nat'l Trust Co. v. Marche*, No. 0009156/2007, slip op. at 2 (N.Y. Sup. Ct. Kings Cnty. May 21, 2009) (***Deutsche Bank "has misrepresented itself"; "the assignment at issue is champertous in violation of Section 489 of the New York State Judiciary Law because the sole purpose of the defective assignment was to facilitate the fraudulent litigation begun by [Deutsche Bank]"***); *In re Hayes*, No. 07-13967 JNF, Memorandum at 16 ("***sanctions may be appropriate" against Deutsche Bank***); *Deutsche Bank Nat'l Trust Co. v. Lippi*, No. CA08-0127, slip op. at 3 (***Deutsche Bank sanctioned for "frustrat[ing] the fair administration of justice"***); *In re Tarantola*, No. 4:09-bk-09703-EWH, slip op. at 14 (Bankr. D. Ariz. July 29, 2010) ("***Given the deficient and misleading nature of Deutsche's filings, the court seriously considered issuing an order to show cause as to why sanctions should not be imposed on Deutsche, its servicer, and its lawyers, especially in light of the fact that sanctions were entered by another court, involving Deutsche, [the same servicer] and counsel, for conduct similar to the facts of this case.  See In re Lee, 408 B.R. 893 (Bankr. C.D. Cal. 2009)***"); *In re Doble*, 2011 Bankr. LEXIS 1449, at \*8, \*46 (court notes ***"Defendants' pervasive misconduct" and "orders that Defendants appear and show cause why they should not pay Doble's attorney's fees for their conduct in this action***"); *Deutsche Bank Nat'l Trust Co. v. Castellanos*, No. 277/07 (N.Y. Sup. Ct. Kings Cnty. Jan. 14, 2008) ("***The Court is concerned that there may be fraud on the part of Deutsche Bank, . . . or at least malfeasance***."); *In re Kritharakis*, No. 10-51328 (AHWS), U.S. Trustee's Motion for Rule 2004 Examination at 2 (Bankr. D. Conn. Jan. 26, 2011) (U.S. Department of Justice's United States Trustee files motion for examination of Deutsche Bank in order to investigate potentially false or fraudulent documents filed in bankruptcy case: ***"[t]he United States Trustee has reviewed documents filed by Deutsche in this case and has concerns about the integrity of those documents"***); *In re Phillips*, No. 02-66299, 2011 Bankr. LEXIS 3780 (Bankr. N.D. Ohio Sept. 29, 2011) (***Deutsche Bank and its servicer are found in contempt for violating discharge injunction***); *Deutsche Bank Nat'l Trust Co. v. Cagigas, et al.*, No. 3D11-1744 (Fla. Dist. Ct. App. Apr. 18, 2012) (court reverses dismissal of Deutsche Bank's complaint with prejudice as a sanction for misconduct, but ***does not disturb trial court's holding that Deutsche Bank engaged in sanctionable misconduct***); *Deutsche Bank Nat'l Trust Co. v. LGC as Trustee, et al.*, No. 2D12-863 (Fla. Dist. Ct. App. Feb. 13, 2013) (court reverses dismissal of Deutsche Bank's complaint with prejudice as a sanction for noncompliance with court order, but ***does not disturb trial court's holding that Deutsche Bank engaged in sanctionable conduct and holds that "Deutsche Bank conceded at oral argument that the failure to comply with the order was a sanctionable violation"***); *Deutsche Bank Nat'l Trust Co. v. Sela*, No. 4D11-3093 (Fla. Dist. Ct. App. Apr. 10, 2013) (court reverses dismissal of Deutsche Bank's action as a sanction for its misconduct, but ***does not disturb trial court's holding that Deutsche Bank engaged in sanctionable conduct***); *Deutsche Bank Nat'l Trust Co. v. Izraelov, et al.*, No. 5357/09 (N.Y. Sup. Ct. Kings Cnty. Sept. 10, 2013) (***Deutsche Bank "violated its obligation to negotiate in good faith pursuant to CPLR 3408(f)"***).

128.    Deutsche Bank also knew that these improper loan servicing practices, amounting to Events of Default, were pervasive and therefore the Covered Trusts were similarly affected.  This is so because RMBS trustees across the nation were having the same issues.  For example, Deutsche Bank was aware that, in October and November 2010, a New York state court had issued scores of orders delaying foreclosures by Deutsche Bank and many other RMBS trustees and loan servicers because of these very same loan servicing issues.  *See* Exhibit E hereto (numerous orders from Justice Tanenbaum of the Supreme Court of New York).[32]

### b.    Deutsche Bank Knew of Specific Events of Default that Were Occurring with Respect to the Specific Mortgage Loans in the Specific Covered Trusts

129.    Deutsche Bank was also experiencing Events of Default as to the very Mortgage Loans in the Covered Trusts.  For example, on April 27, 2007, Deutsche Bank, through either Wells Fargo, the Master Servicer, or one of the other Servicers for the MSIX 2006-1 Covered Trust, filed a foreclosure action in Florida against Mortgage Loan borrowers Charles and Tina McCrea.  *See McCrea, et al. v. Deutsche Bank Nat'l Trust Co.*, 993 So. 2d 1057 (Fla. Dist. Ct. App. 2008).[33]  The Servicer filed a complaint on Deutsche Bank's behalf which attached a copy of the note and mortgage but failed to attach an assignment of the note or mortgage to Deutsche Bank.  Nor did the complaint attach a notice of acceleration, which was required by the terms of the note.  The McCreas filed a motion to dismiss because Deutsche Bank, through its Servicer, had failed to attach a copy of the notice of acceleration to the complaint.  The trial court granted the McCreas' motion and ordered

---

[32]    Similarly, the *Mortgage Daily* reported in 2011 that New York Supreme Court Justice F. Dana Winslow "***dismissed or froze*** 20 percent of his [foreclosure] cases [in 2010] due to evidence disputes."

[33]    The court files do not identify which Master Servicer or Servicer was involved.  However, it would have been Wells Fargo, Saxon Mortgage Services, JPMorgan Chase or HomEq, all designated Master Servicers or Servicers to the MSIX 2006-1 Covered Trust at that time.

Deutsche Bank to file an amended complaint with a copy of the acceleration notice attached within 20 days. Deutsche Bank's Servicer then failed to follow the court's order and failed to file an amended complaint. Accordingly, the McCreas filed a motion for final dismissal. The court held a hearing at which it granted the McCreas' motion. An order dismissing Deutsche Bank's case **with prejudice** was rendered on July 25, 2007 (the "Final Order").

130.    After (1) the Servicer's failure to attach the acceleration notice to the original complaint; (2) yet another failure to file an amended complaint attaching the notice within 20 days as directed by the court; and (3) also failing to move for rehearing on the Final Order within 10 days as required by the Florida Rules of Civil Procedure, the Servicer, through Deutsche Bank's attorney,[34] then (4) improperly contacted the court *ex parte*; (5) 11 days after the Final Order was entered, or in other words, late – after the 10-day period to contest the Final Order had expired; and (6) faxed the court an unsigned letter and order which stated "'[a]s per your instructions today, please find attached an Order Vacating the Order Granting Defendants' McCrea's [sic] Motion for Final Dismissal.'" *McCrea*, 993 So. 2d at 1058. The court signed the new order submitted by Deutsche Bank the same day and it was filed the next day (the "New Order"). The same day the New Order was filed, the McCreas' attorney responded to Deutsche Bank's faxed letter of the previous day and requested a hearing with the court, but it was too late, as the New Order had already been signed and filed. *Id*.

131.    The McCreas appealed, contending that the trial court lacked jurisdiction to vacate the Final Order and enter the New Order because Deutsche Bank (through its Servicer) had failed to timely move for rehearing of the Final Order within 10 days as required by Florida's Rules of Civil

---

[34]   Deutsche Bank's law firm in this case was the infamous Law Offices of David J. Stern, P.A. That firm's principal, David J. Stern, was disbarred by the Florida Supreme Court in 2014 for his misconduct related to robo-signing and improper foreclosures.

Procedure.  The court of appeal agreed, and held that "[t]here is no dispute that Deutsche Bank did not file a motion for rehearing," let alone a timely one.  *Id*.  Deutsche Bank nonetheless argued that the New Order was simply the product of the trial court correcting its "mistaken" Final Order dismissing the case with prejudice, under Florida Rule of Civil Procedure 1.540(b), which allows a court to correct a mistaken judgment on its own under certain circumstances.  The court of appeal rejected Deutsche Bank's argument and reversed the New Order, holding that it was impossible to tell why the trial court had entered the New Order or whether it had done so under Rule 1.540(b).  *Id*. at 1058-59.  The appeals court thus remanded the case to the trial court for further proceedings.  The court of appeal further held that Deutsche Bank's *ex parte* contact with the trial court improperly precluded the McCreas from having an opportunity to oppose the entry of the New Order.  *Id*. at 1059.

132.    On remand, the trial court noted that at the hearing when the motion for the Final Order was originally granted, the Deutsche Bank attorney assigned to the case failed to appear and instead another attorney completely unfamiliar with the case appeared telephonically.  The trial court further noted concerning Deutsche Bank's previous improper *ex parte* contact with the court, that it "doubts that [Deutsche Bank's] attorney was [ever] instructed [by the court] to provide [the New O]rder [V]acating" the Final Order, a reference to the improper *ex parte* fax and proposed order sent by Deutsche Bank's attorney (at the Servicer's obvious direction).  Order Reinstating the Order of July 25, 2007 Dismissing with Prejudice at ¶6, *Deutsche Bank Nat'l Trust Co. v. McCrea, et al.*, No. 2007-CA-2726 (Fla. Cir. Ct. Manatee Cnty. July 11, 2008).  The trial court therefore reinstated the Final Order dismissing Deutsche Bank's action **with prejudice**, holding that the Final Order was not a "mistake" under Florida Rule of Civil Procedure 1.540(b).  *Id.*, ¶7.  Subsequently, the trial court also granted the McCreas' motion for appellate attorneys' fees and costs.

133.     The foregoing demonstrates the grossly negligent, improper and likely deceptive conduct by the Servicer in botching the foreclosure of a Mortgage Loan in the MSIX 2006-1 Covered Trust, leading to a dismissal of Deutsche Bank's foreclosure action with prejudice – *twice*. The Servicer first failed to file the required acceleration notice with the complaint, and then failed to abide by the court's order to file an amended complaint attaching the notice within 20 days, which caused the court to dismiss the foreclosure action with prejudice the first time.  The Servicer also failed to follow the Florida Rules of Civil Procedure and timely move for rehearing of the Final Order within 10 days, and instead made an improper and untimely *ex parte* contact with the trial court 11 days after the Final Order, and impermissibly deprived the McCreas of their procedural right to oppose the entry of the New Order.  Moreover, given the trial court's "doubts" that it even asked for the New Order to be submitted to it, it appears the Servicer compounded the improper *ex parte* contact with the submission of a bogus New Order.  Due to the Servicer's incompetence, ethically improper conduct, and probable deception of the court, additional costs were incurred to oppose the borrowers' appeal.  Then, after remand, the action was again dismissed with prejudice and it was revealed that the Servicer had engaged in additional inexcusable conduct by failing to cause Deutsche Bank's attorney assigned to the case to appear at the hearing of the original motion for the Final Order, and compounded that with the improper faxing of the bogus New Order to the court, causing additional expense and delay to the Covered Trust and the loss of foreclosure proceeds.  The Covered Trust was also required to pay for the McCreas' appellate attorney's fees and costs because of the Servicer's incompetence, misconduct and deceit.  This grossly negligent, improper and deceitful behavior by the Servicer resulted in the action being dismissed, extinguished the foreclosure, and caused excessive delay and expense from the appeal, and ultimately resulted in a return to the trial court, only to be dismissed with prejudice again, adding yet more delay and cost to

the Covered Trust.  The Servicer's grossly negligent conduct, improper *ex parte* contact and deceitful actions caused a huge delay, excessive costs, and the loss of the ability to foreclose on the Mortgage Loan.  This conduct was hardly in the best interests of plaintiff and the class, and was also not the conduct of a "prudent" loan servicer that was engaging in the "customary and usual" servicing practices used to service its own portfolio.  Such conduct was a clear Event of Default as to a Mortgage Loan in the MSIX 2006-1 Covered Trust, and Deutsche Bank had actual knowledge of it.

134.    Deutsche Bank also had actual knowledge of Events of Default with respect to the MSAC 2007-NC3 Covered Trust.  In 2009, Deutsche Bank and Saxon Mortgage Services – one of the Servicers for that Covered Trust – were sued by the bankrupt borrowers of a Mortgage Loan in that trust in a bankruptcy adversary proceeding in California.  *See In re Caporale*, Adv. No. 09-05050 (N.D. Cal. Bankr. Feb. 23, 2009).  Loan originator New Century had extended the borrowers a $930,000 Mortgage Loan in 2007, despite the fact that the borrowers had a combined income of **only $1,189 per month and monthly debts of at least $6,554** (this should have immediately tipped off Deutsche Bank that there was a breach of the R&Ws concerning this Mortgage Loan, as the borrowers obviously could not afford to repay it).  Understandably, the borrowers went bankrupt the same year they took out the Mortgage Loan, in 2007.

135.    ***During the pendency of the borrowers' bankruptcy and the adversary proceeding, Saxon Mortgage Services committed numerous Events of Default.  First, given that Saxon Mortgage Services was prosecuting the foreclosure and was listed as a creditor in the borrowers' bankruptcy case, it learned of the breach of the R&Ws discussed immediately above, and was required by the MSAC 2007-NC3 PSA to notify Deutsche Bank of such breach, but failed to do so, resulting in an Event of Default.  Thereafter, Saxon Mortgage Services engaged in a number of***

*additional Events of Default. Saxon Mortgage Services: (1) violated the automatic bankruptcy stay by taking steps to foreclose on the borrowers while their bankruptcy was pending without seeking or obtaining relief from the stay; (2) violated a preliminary injunction enjoining a foreclosure just days after the court had extended the preliminary injunction, by improperly foreclosing on the borrowers; (3) improperly delivered a foreclosure and eviction notice to the borrowers at their home in violation of the preliminary injunction; (4) failed to comply with California Civil Code §2923.5, which required it to follow certain procedures before foreclosing; (5) inexplicably failed to produce evidence of Deutsche Bank's right to foreclose for months on end despite being told by the court what evidence was needed; (6) delayed the foreclosure interminably for no good reason; (7) inexplicably failed to produce the original of the note despite numerous requests to do so; and (8) failed numerous times to produce sufficient evidence of the chain of assignments of the Mortgage Loan from lender New Century to Deutsche Bank, taking years to finally do so.*

136.    While Saxon Mortgage Services was ultimately able to convince the court to lift the preliminary injunction to allow the foreclosure to go forward, Saxon Mortgage Services' gross negligence, violations of the automatic stay and preliminary injunction, and other misconduct amounting to Events of Default resulted in the foreclosure being *delayed for nearly five years!* All of the delays caused the expenditure of substantial and unnecessary amounts of money on lawyers, unnecessary motions, endless court proceedings, constant re-dos of prior hearings and motions, and two aborted foreclosures, all of which was charged to the Covered Trust.  In addition, Saxon Mortgage Services would be paid first for these expenses from the much-delayed foreclosure, thereby diminishing what was ultimately remitted to the Covered Trust.  Deutsche Bank was aware

of all these Events of Default because it used the same lawyers as Saxon Mortgage Services in the proceedings.

137.    With respect to the FFML 2006-FF9 and MSIX 2006-1 Covered Trusts, Deutsche Bank obtained actual knowledge on May 4, 2011, that the Master Servicers and Servicers of those trusts were committing Events of Default.  On that date, the State of California and City of Los Angeles sued Deutsche Bank for illegally and improperly failing to maintain numerous REO properties in RMBS trusts (the "Los Angeles Action").[35]  The Los Angeles Action specifically alleged that REO properties in the FFML 2006-FF9 and MSIX 2006-1 Covered Trusts were not properly maintained in violation of multiple federal, state and municipal laws, and that such properties had "unpermitted plumbing," "exposed wiring," "unpermitted and unapproved construction," "illegal occupancy," and "broken and missing window glass," among other violations. Deutsche Bank knew that, under the Governing Agreements, the Master Servicers/Servicers of those Covered Trusts were required to properly maintain the REO properties for the benefit of plaintiff and the class.  *See, e.g.,* FFML 2006-FF9 PSA §3.17(b) ("Servicer shall manage, conserve, protect and operate each REO Property . . . .").  Given the charges in the Los Angeles Action, Deutsche Bank knew that the Master Servicers and Servicers for the FFML 2006-FF9 and MSIX 2006-1 Covered

---

[35]    *See* Complaint to Abate Public Nuisance, *The People of the State of California, et al. v. Deutsche Bank Nat'l Trust Co., et al.,* No. BC 460878 (Cal. Super. Ct. Los Angeles Cnty. May 4, 2011); *see also* First Amended Complaint, filed July 9, 2012.  The Los Angeles Action alleged that Deutsche Bank and its sister trust company ***"have become two of the largest, if not the largest, slumlords in the City of Los Angeles," because they "have disregarded virtually every one of their legal duties and responsibilities as property owners, resulting in the creation and maintenance of an unprecedented number of vacant nuisance properties and substandard occupied housing units." The Los Angeles Action further alleged that Deutsche Bank "caused or permitted the buildings to fall into disrepair," illegally "evict[ed] tenants" in violation of city and federal laws, "failed to maintain the buildings," "failed to bring these Foreclosed Properties into compliance with applicable state and municipal laws," and "failed to comply with their legal duties … to maintain the buildings in compliance with state and city Building, Electrical, Mechanical and Health and Safety Code requirements***."

Trusts were not fulfilling their duties under the Governing Agreements and therefore were committing Events of Default.  Deutsche Bank ultimately settled the Los Angeles Action by agreeing to an injunction prohibiting additional illegal conduct and by paying $10 million to the City of Los Angeles.

138.    Deutsche Bank also obtained actual knowledge of Events of Default on January 31, 2012, when a group of RMBS investors in the MSAC 2007-NC2, MSAC 2007-NC3, and MSIX 2006-1 Covered Trusts publicly announced that they had instructed Deutsche Bank to investigate defective loan servicing in those Covered Trusts.  The investors' lawyer stated: "***Our clients continue to seek a comprehensive solution to the problems of ineligible mortgages in RMBS pools and deficient servicing of those loans.***  Today's action is another step toward achieving that goal."

139.    On September 19, 2012, Deutsche Bank was again given information causing it to have actual knowledge of Events of Default as to the MSAC 2007-NC2, MSAC 2007-NC3, MSIX 2006-1 and SAST 2006-2 Covered Trusts.  The same RMBS investors issued a public notice concerning these four Covered Trusts and announced that they had

> ***sent a Notice of Non-Performance (Notice) to Morgan Stanley and Wells Fargo, as Servicer or Master Servicer, identifying specific covenants in Pooling and Servicing Agreements (PSAs) that the [investors] allege Morgan Stanley and Wells Fargo have failed to perform***. . . .
>
> ***The [investors'] Notice alleges that each of these failures has materially affected the rights of the Certificateholders and constitutes an ongoing Event of Default in the Servicer's performance under the relevant PSAs***.

140.    This announcement by the RMBS investors unambiguously caused Deutsche Bank to know that there were Events of Default by Master Servicers/Servicers Wells Fargo, Saxon and Saxon Mortgage Services (which were owned by Morgan Stanley) occurring with respect to the Mortgage Loans in the MSAC 2007-NC2, MSAC 2007-NC3, MSIX 2006-1 and SAST 2006-2 Covered Trusts.

141.     The foregoing events show that **Deutsche Bank had actual knowledge of specific Events of Default by specific Master Servicers and specific Servicers concerning the specific Mortgage Loans in the specific Covered Trusts**.

> **c.     By October 2010, Deutsche Bank Knew the Master Servicers/Servicers Were Committing Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

142.     In 2010, a flood of news stories and other events began publicly revealing these illegal, improper and abusive practices (and others) by the Covered Trust Master Servicers/Servicers. *See* Appendix 3 hereto for a sample of some of the stories/events occurring from June 2010 through October 2010.  By October 2010, the public was aware of what was called the "robo-signing" scandal, which involved the mass signing and filing of false affidavits and other documents in foreclosure proceedings by either fictitious persons or persons without personal knowledge of the facts asserted in the affidavits, and which were also improperly and illegally notarized.  Robo-signing also included the filing of fraudulently altered note and mortgage assignments.  These public revelations also showed that many of the Covered Trust Master Servicers and Servicers were engaged in the robo-signing scandal, and that they were also engaged in the improper charging of fees, the filing of false bankruptcy claims and affidavits, the commission of frauds on courts, and were also being investigated by multiple federal and state governmental agencies for loan servicing misconduct.  Some were also forced to halt or delay foreclosures because of their robo-signing misconduct.  *See generally* Appendix 3.

143.     The upshot of these public revelations, when they were coupled with Deutsche Bank's firsthand experience with its servicers, including with the very Mortgage Loans in the Covered Trusts serviced by the Master Servicers/Servicers, and the dismal performance of the Mortgage Loans, was that Deutsche Bank had actual knowledge that the Master Servicers and

Servicers were engaged in widespread Events of Default concerning the Mortgage Loans in the Covered Trusts by October 2010. Indeed, by October 2010, the effect of the Master Servicers'/Servicers' Events of Default were reflected in the Covered Trusts' extremely large losses. The Covered Trusts' cumulative realized losses by October 2010 *exceeded $1.8 billion*, as the chart below sets forth:

| Covered Trusts' Cumulative Realized Losses Reported in October 2010 | |
| --- | --- |
| **Covered Trust** | **Cumulative Realized Losses** |
| FFML 2006-FF9 | $297,696,522.29 |
| GSR 2007-AR2 | $40,826,651.72 |
| HASC 2007-WF1 | $82,060,605.23 |
| HVMLT 2006-8 | $187,893,265.94 |
| MSAC 2007-NC2 | $223,000,204.60 |
| MSAC 2007-NC3 | $290,937,951.80 |
| MSIX 2006-1 | $332,447,888.88 |
| NHEL 2006-4 | $178,859,067.45 |
| SAST 2006-2 | $128,459,236.33 |
| SVHE 2007-NS1 | $103,113,181.66 |
| **Covered Trusts' Total Realized Losses:** | **$1,865,294,575.90** |

144. This was not lost on Deutsche Bank. Indeed, on October 8, 2010, Deutsche Bank sent a memo to all of its loan servicers, including all of the Covered Trusts' Master Servicers and Servicers. Deutsche Bank's memo stated:

> This Memorandum concerns an urgent issue requiring your immediate attention. A copy of this Memorandum and all attachments should be forwarded immediately to your Legal Department or General Counsel's office.
>
> We write to express the Trustee's serious concern regarding *allegations of potential defects in foreclosure practices, procedures and/or documentation* used by *certain* major loan servicers and their agents (collectively, the "*Alleged Foreclosure Deficiencies*") *that have been the subject of recent media reports*. This Memorandum reiterates to all Servicers the importance of their duties and obligations relating to such matters.
>
> The pooling and servicing agreements or other governing documents for the Trusts (collectively, the "Governing Documents") provide that the Servicer is solely responsible for the performance of all loan-level remedial collection activity on behalf of the beneficiaries of the Trusts, including, without limitation, all foreclosure activity and all maintenance and sales of resulting REO properties. The Governing

Documents typically require the Trustee to furnish the Servicer with powers of attorney that allow the Servicer to sign documents and institute legal actions, including foreclosure proceedings, in the name of the Trustee on behalf of the Trusts in connection with these servicing activities. . . .

As the Trustee has advised on more than one occasion, all Servicers and their agents (including any subservicers, subcontractors and professionals engaged by Servicers and/or by their agents) must conduct all servicing activities, including foreclosure proceedings, in accordance with the Governing Documents and all applicable laws. . . .

***Recent media reports suggest that Alleged Foreclosure Deficiencies may include*** the execution and filing by certain Servicers and/or their agents of potentially defective documents, ***possibly containing alleged untrue assertions of fact***, in connection with certain foreclosure proceedings. The reported scope of ***such alleged practices raises the possibility that such documents may have been filed in connection with foreclosure proceedings relating to mortgage loans owned by the Trusts and may have been executed under color of one or more powers of attorney granted to Servicers pursuant to the Governing Documents***. Any such actions by a Servicer or its agents would constitute a breach of that Servicer's obligations under the Governing Documents and applicable law.

In light of these recent developments, the Trustee demands that each Servicer (including its agents), immediately:

- Inform the Trustee of: (i) any ***Alleged Foreclosure Deficiencies*** relating to mortgage loans serviced by the Servicer on behalf of the Trusts; and (ii) any suspensions by the Servicer of foreclosure proceedings relating to mortgage loans serviced by the Servicer on behalf of the Trusts due to any such ***Alleged Foreclosure Deficiencies***.

- Cease and desist from taking any unlawful or improper action with respect to the servicing of Trust assets, including, but not limited to, making any false or misleading statements in any filing, notice, document or paper of any kind.

- Cease and desist from executing any document on behalf of the Trustee or on behalf of any Trust, under any power of attorney or otherwise, unless and until the Servicer and its agents have: (a) verified that all statements in such document are true, complete and correct; and (b) determined that the execution and filing of such document are in full compliance with all applicable laws, rules and regulations, including all applicable rules of court.

- Cease and desist from executing any document in a manner that indicates or suggests that the signatory is an officer or employee of the Trustee.

- Require each of its agents to comply with the foregoing demands and all legal requirements applicable to any services that they perform on behalf of the Trusts.

Please be advised the Trustee will require each Servicer to indemnify and hold harmless Deutsche Bank, individually and in its capacity as Trustee, the Trusts and the investors in the Trusts from all liability, loss, cost and expense of any kind (including attorneys' fees and costs) arising directly or indirectly from any ***Alleged Foreclosure Deficiencies or from any other alleged acts or omissions of the Servicer and/or its agents*** relating to any servicing activities in breach or violation of the Governing Documents and/or applicable law, including, without limitation, any liability, loss, cost or expense arising from any related legal proceedings and government or regulatory investigations.  The cost of any such indemnification and any remedial actions by a Servicer in respect of any ***Alleged Foreclosure Deficiencies*** or any other servicing activities in breach or violation of the Governing Documents and/or applicable law must be paid by the Servicer out of its own funds and should not be charged by any Servicer against any Trust.  The Trustee reserves, and does not waive, any other rights or remedies that it and/or the Trusts may have under the Governing Documents regarding these matters.

(Emphasis added and original emphasis omitted, footnote omitted.)

145.    Deutsche Bank's memo was extremely deceptive.  It misleadingly asserted that Deutsche Bank had heard of "alleged" or "potential" loan servicing misconduct "suggest[ed]" by "recent media reports" that "may have" "possibly" occurred with respect to only "certain" loan servicers reported in the news.  ***In fact, at the time of this memo, Deutsche Bank already <u>knew</u> such misconduct was occurring and knew that all or nearly all of the servicers it was working with, including all of the Covered Trusts' Master Servicers and Servicers, were engaged in such misconduct***.  Deutsche Bank was very careful not to accuse its servicers of any ***actual*** misconduct, or point out that they committed "***Events of Default***," because Deutsche Bank knew that would reveal that it had failed to act as a quasi-fiduciary (*i.e.*, prudently) to protect plaintiff and the class as required by the Governing Agreements.  For this reason, Deutsche Bank was very careful to avoid

even mentioning the term "Event of Default" in the memo. Deutsche Bank also did so because of what Deutsche Bank did next.

146.    Deutsche Bank then sent a memo to all of the investors in the RMBS trusts it administered on October 25, 2010, attaching the above October 8th memo to its servicers, and other memos, and misleadingly told investors that there were "***alleged deficiencies***" being "***reported in the news media***" concerning "***several***" loan servicers. Again, Deutsche Bank referred to these events as "***alleged,*" "*allegations,*"** and "***Alleged Deficiencies*"** "reported in the news media," concerning a few servicers, and did not accuse any of its servicers of actual misconduct, even though Deutsche Bank knew that this "alleged" misconduct was ***actually occurring***, ***that all or nearly all of its servicers – including the Covered Trusts' Master Servicers/Servicers – were involved, so much so that all of the Covered Trusts and many others were being adversely affected***, and that ***there were then Events of Default occurring under the Governing Agreements***. Deutsche Bank also did not disclose that, given its knowledge of these Events of Default, it was required by the Governing Agreements to act prudently, but had not done so. Instead, in an effort to conceal its knowledge of the Events of Default, Deutsche Bank called the undisclosed Events of Default "allegations" "reported in the news media" concerning a handful of servicers. Moreover, in an deceptive effort to falsely make itself appear diligent and concerned, while concealing that it had not acted as required by the Governing Agreements, Deutsche Bank pointed to the October 8th memo to the Servicers, telling investors that it had "demand[ed] that servicers comply with all applicable laws relating to foreclosures," and that it had requested information from some servicers. Finally, in a classic yet completely ineffectual attempt to avoid future liability, Deutsche Bank "remind[ed] investors that the governing documents . . . typically allow holders of a requisite percentage . . . of securities to direct . . . any remedial actions by" Deutsche Bank. In this way, Deutsche Bank could always later say to

investors "we told you that you could make us do something, but you didn't, so we're off the hook." The problem with that, however, is that Deutsche Bank never informed investors of the true state of affairs: (1) that there were rampant Events of Default then occurring of which Deutsche Bank was aware; (2) that Deutsche Bank should have already been proactively acting as a prudent person to protect investors, even without direction from the investors, since the Governing Agreements required it; and (3) that Deutsche Bank should have given investors notice of the ***Events of Default*** and not a memo discussing "***Alleged Deficiencies***."  In the memo, Deutsche Bank was again very careful not to mention the words "Event of Default," as it knew that it would expose itself to liability for breaches of the Governing Agreements by its multiple failures to act as a prudent person would. And, of course, Deutsche Bank never did anything to remedy the Events of Default.

147.    Nonetheless, even after October 2010, additional public events occurred which repeatedly re-confirmed for Deutsche Bank that the Master Servicers and Servicers were continuing to commit the same and new Events of Default as to the Mortgage Loans in the Covered Trusts.  *See* Appendix 4 hereto for a summary of such events.  By April 13, 2011, however, there was absolutely no doubt that Deutsche Bank had actual knowledge of Events of Default.

> **d.    By April 13, 2011, Deutsche Bank Absolutely Knew that the Covered Trusts' Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

148.    On April 13, 2011, major events transpired in the loan servicing industry that conclusively established that the Master Servicers and Servicers to the Covered Trusts were systematically engaging in the commission of Events of Default under the Governing Agreements, and that such misconduct extended to the Mortgage Loans in the Covered Trusts.  On April 13, 2011, the U.S. Government released a report entitled the "Interagency Review of Foreclosure Policies and Practices" (hereinafter the "Government Foreclosure Report") and also took sweeping

legal actions against 14 loan servicers, which together comprised nearly 70% of the loan servicing industry and nearly 36.7 million mortgage loans.  ***The Government found "foreclosure-processing weaknesses that [had] occurred <u>industrywide</u>***."  The Government stated that it was taking action against the 14 loan servicers because it had identified "***unsafe and unsound [foreclosure] practices and violations of applicable . . . law" by them***.  Among the offending 14 loan servicers were ***nearly all*** of the Master Servicers and Servicers to the Covered Trusts (and/or their parent or sister companies).  Each had entered into "consent cease and desist orders" or "consent orders" with the U.S. Treasury's Office of the Comptroller of the Currency ("OCC"), the Federal Reserve, the Office of the Thrift Supervisor ("OTS") and/or the Federal Deposit Insurance Corporation ("FDIC") wherein they all essentially admitted to (*i.e.*, they did not deny or contest) facts that conclusively established that they had systematically failed to service mortgage loans in accordance with the standards set forth in the Governing Agreements.  Acting Comptroller of the Currency, John Walsh, stated the following concerning the Government's actions: "***We found significant deficiencies*** . . . . ***This is a very serious problem that servicers are going to have to do substantial work . . . to fix***."

149.    The Master Servicers and Servicers to the Covered Trusts are set forth again in the chart below, and those that entered into consent orders with the Government appear in bold, italics and underline:

**Covered Trusts' Master Servicers and
Servicers Entering into Consent Orders**

| Covered Trust | Master Servicers | Original Servicers |
|---|---|---|
| FFML 2006-FF9 | ▪ ***<u>Wells Fargo</u>*** | ▪ ***<u>National City (through its parent company Bank of America)</u>*** |
| GSR 2007-AR2 | ▪ ***<u>Wells Fargo</u>*** | ▪ ***<u>Wells Fargo</u>***<br>▪ ***<u>CHLS/BACHLS (through its parent company Bank of America)</u>***<br>▪ ***<u>National City (also via Bank of America)</u>***<br>▪ PHH<br>▪ ***<u>IndyMac (through its successor OneWest Bank)</u>*** |

| Covered Trust | Master Servicers | Original Servicers |
|---|---|---|
| HASC 2007-WF1 | ▪ *Wells Fargo* | ▪ *Wells Fargo* |
| HVMLT 2006-8 | ▪ *Wells Fargo* | ▪ *GMAC*<br>▪ *IndyMac (via OneWest Bank)*<br>▪ *WaMu (through its parent company JPMorgan Chase & Co.)*<br>▪ Paul Financial |
| MSAC 2007-NC2 | ▪ *Wells Fargo* | ▪ Saxon Mortgage Services*<br>▪ *CHLS/BACHLS (via Bank of America)* |
| MSAC 2007-NC3 | ▪ *Wells Fargo* | ▪ Saxon Mortgage Services*<br>▪ *CHLS/BACHLS (via Bank of America)* |
| MSIX 2006-1 | ▪ *Wells Fargo* | ▪ *Wells Fargo*<br>▪ Saxon Mortgage Services*<br>▪ *JPMorgan Chase*<br>▪ HomEq |
| NHEL 2006-4 | ▪ None | ▪ NovaStar (replaced by Saxon Mortgage Services in 2007)* |
| SAST 2006-2 | ▪ Saxon | ▪ Saxon Mortgage Services* |
| SVHE 2007-NS1 | ▪ None | ▪ Nationstar |
| * In April 2012, Saxon Mortgage Services entered into a substantially identical consent order through its parent company Morgan Stanley. *See* Appendix 5, at 9 (first bullet point). | | |

150.    As the chart above shows, ***most of the Master Servicers and Servicers to the Covered Trusts entered into consent orders with the Government***.  In addition, the "***industrywide***" nature of the misconduct by these Master Servicers and Servicers made it clear that it reached the Mortgage Loans in the Covered Trusts.  Indeed, ***seven of the 10 Covered Trusts*** had one or more Master Servicer or Servicer that entered into the consent orders.  The admitted misconduct in the orders was an unequivocal Event of Default under the Governing Agreements.

151.    In the 14 consent orders, each consenting Master Servicer and Servicer did not dispute the Government's findings that they had engaged in the following illegal and improper loan servicing practices (or misconduct substantially similar to it):

- engaging in "unsafe or unsound practices in residential mortgage servicing and . . . foreclosure proceedings";

- filing false affidavits in foreclosure proceedings in "which the affiant represented that the assertions in the affidavit were made based on personal knowledge . . . when . . . they were not based on . . . personal knowledge";

- filing false affidavits in foreclosure proceedings which were "not properly notarized";

- "fail[ing] to devote to [their] foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training";

- "fail[ing] to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services"; and

- engaging in "unsafe or unsound banking practices." [36]

152.   It was stunning that **nearly 70% of the loan servicing industry had essentially admitted that they systematically engaged in widespread robo-signing, false affidavits, false foreclosure documents, improper notarizations, and other illegal conduct**.   It was even more stunning that the Master Servicers and Servicers to the Covered Trusts essentially admitted that they had committed Events of Defaults by agreeing with the Government to form action plans to "**ensure compliance with . . . [the loan] servicing guides of . . . investors," a direct admission that they had not previously been complying with their duties mandated by the Governing Agreements**.[37]

---

[36]   As alleged in Appendix 5, at 9 (first bullet point), Saxon Mortgage Services entered into a nearly identical consent order one year later through its parent company Morgan Stanley.  Saxon Mortgage Services was a Servicer for at least five Covered Trusts.

[37]   The Master Servicers'/Servicers' improper servicing practices were so widespread and so egregious that the Government required sweeping reforms.  The Master Servicers/Servicers (and their related companies) were required by the consent orders to:

- submit a plan to the Government to strengthen their board of directors' oversight of loan servicing;
- submit a "comprehensive action plan" describing how they would comply with the consent orders and properly service loans;
- submit a compliance program designed to ensure the proper servicing and foreclosure of mortgage loans;
- submit policies and procedures to ensure the proper supervision of third-party vendors and outside law firms;
- submit a plan to ensure proper controls over and supervision of the Mortgage Electronic Registration System used by the Master Servicers/Servicers in connection with loan servicing, foreclosures and title transfers;

153.     In light of the above information, Deutsche Bank absolutely had actual knowledge, no later than April 13, 2011, that Events of Default had been committed by the Master Servicers and Servicers with respect to Mortgage Loans within the Covered Trusts.

154.     The Government Foreclosure Report further confirmed that the Master Servicers and Servicers had committed Events of Default.  The Government Foreclosure Report, written by the Federal Reserve, OCC and OTS, and released at the same time as the consent orders, found that the loan servicing industry – including the Master Servicers and Servicers – had engaged in "***violations of applicable federal and state law requirements***" and "***notary practices which failed to conform to state legal requirements***."  These findings that the Master Servicers and Servicers violated the law were absolute Events of Default.

155.     The Government Foreclosure Report also specifically focused on facts that gave Deutsche Bank actual knowledge of numerous other Events of Default committed by the Master Servicers and Servicers with respect to the Mortgage Loans in the Covered Trusts.  For example, the Government Foreclosure Report revealed the following "industrywide" misconduct by the Master Servicers and Servicers to the Covered Trusts that amounted to Events of Default under the Governing Agreements:

---

- retain an independent outside consultant to conduct a review of the Master Servicers'/Servicers' past foreclosure practices and submit a report to the Government concerning such review;
- submit a plan to ensure the proper functioning of the Master Servicers'/Servicers' MIS systems and the accuracy of loan data;
- submit a plan to ensure proper, timely and effective communications with borrowers and to prevent the impedance or discouragement of loan modifications;
- submit a risk assessment and management plan concerning the Master Servicers'/Servicers' loan servicing operations; and
- submit a quarterly progress report detailing all actions taken to comply with the consent orders.

- "*violations of applicable federal and state law requirements*," such as violations of the Service Members Civil Relief Act, the bankruptcy laws, and "notary practices which failed to conform to state legal requirements";

- "*inadequate* organization and staffing of foreclosure units";

- "*inadequate* policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process";

- "*inadequate* monitoring and controls" over third-party vendors;

- "*lack of sufficient audit trails*" between information contained in affidavits and "the servicers' internal records";

- "*inadequate* quality control and audit reviews to ensure compliance with legal requirements";

- "*inadequate* identification of financial, reputational, and legal risks" by "boards of directors and senior management";

- *false affidavits*;

- *false mortgage documents*;

- *improper notarizations*; and

- "*weaknesses in quality-control procedures at all servicers, which resulted in servicers not . . . ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed*."

156.     **_The Government Foreclosure Report also specifically found that the Master Servicers' and Servicers" "industrywide" misconduct "pose[d] a variety of risks to [RMBS] investors_**," Government Foreclosure Report at 6, **because they had failed to satisfactorily "evaluat[e] and test[] compliance with applicable. . . _pooling and servicing agreements_**." *Id.* at 11. This finding unequivocally established that the Master Servicers and Servicers were engaging in Events of Default.

157.     Thus, between the consent orders entered into by most of the Master Servicers and Servicers to the Covered Trusts on April 13, 2011, consenting to conduct that amounted to Events of Default, and the Government Foreclosure Report's simultaneous finding that such Events of Default

- 101 -

"*occurred industrywide*," Deutsche Bank had actual knowledge of Events of Default committed by the Master Servicers and Servicers concerning the Mortgage Loans in the Covered Trusts *no later than April 13, 2011*.[38]   The Covered Trusts' ridiculously high Mortgage Loan default rates and astronomical losses by April 2011, *see supra* ¶96 (chart), further confirmed the existence of the Master Servicers' and Servicers' Events of Default.

158.   However, notwithstanding Deutsche Bank's actual knowledge of the Events of Default, Deutsche Bank never did any of the things required of it under the Governing Agreements. Deutsche Bank's failures to act breached the Governing Agreements and violated the TIA, and caused plaintiff and the class to suffer millions of dollars in damages, as foreclosures were stopped, withdrawn, dismissed, denied, delayed, or invalidated due to the Master Servicers' and Servicers' misconduct, and millions of dollars in bogus and excessive fees and costs were improperly charged to the Covered Trusts by the Master Servicers and Servicers during these delays caused by their misconduct.   Moreover, the Master Servicers' and Servicers' failures to notify Deutsche Bank of the Warrantors' breaches of their R&Ws, and the Master Servicers'/Servicers' practice of servicing the Mortgage Loans for their own financial benefit instead of plaintiff's and the class's were also Events of Default which Deutsche Bank was aware of and failed to act on, thereby also breaching the Governing Agreements and violating the TIA, and which caused plaintiff, the class and the Covered Trusts to suffer additional massive damages.

---

[38]   Later, it was announced that the consent orders had been amended, because many of the Master Servicers and Servicers agreed to pay $3.6 billion to borrowers in cash and further provide them with another $5.2 billion in relief through loan modifications and forgiveness, for a total of $8.8 billion in relief for their loan servicing abuses.   Some news outlets reported that the actual total relief equaled $10 billion.   Of course, the $5.2 billion in loan modifications and loan forgiveness came mainly out of RMBS investors' pockets and not the Master Servicers'/Servicers'.   *See* Appendix 5, at 9 (June 7, 2012 testimony by Adam Levitin) (second bullet point).   In any event, this agreement to pay such a huge penalty was further proof that the Covered Trusts' Master Servicers/Servicers committed pervasive Events of Default as to the Mortgage Loans.

**e.    After April 2011 Deutsche Bank Also Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit the Same and New Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

159.    Incredibly, even ***after*** the U.S. Government's sweeping actions on April 13, 2011 against the Master Servicers and Servicers to the Covered Trusts, and even ***after*** the Master Servicers/Servicers promised to stop engaging in Events of Default via the consent orders, ***the Master Servicers and Servicers thereafter continued to engage in the same Events of Default and also engaged in new Events of Default***.  And, even though Deutsche Bank had actual knowledge of these continuing and new Events of Default, it did nothing, and has continued to do nothing, allowing the Events of Default to go on unabated and uncured to the present.  Deutsche Bank thereby breached the Governing Agreements and violated the TIA numerous additional times after April 2011 to the present by failing to fulfill its continuing duties under the Governing Agreements and TIA to act when the new Events of Default occurred or the existing defaults continued.  News and public information concerning the Master Servicers'/Servicers' numerous continuing and new Events of Default after April 13, 2011 are summarized in Appendix 5 hereto.  Given the repeated, egregious, public nature of these numerous Events of Default, and the public outcry over them, Deutsche Bank was aware of them and thus had actual knowledge of the new and continuing Events of Default.  *See* Appendix 5 hereto.

**f.** **Deutsche Bank Also Knew that Successor Master Servicer/Servicer Ocwen Was Also Committing Events of Default**

160.     By the end of 2013, many of the Covered Trust Master Servicers and Servicers had sold their Mortgage Loan servicing rights to Ocwen,[39] and Ocwen had become a Master Servicer or Servicer to at least seven of the 10 Covered Trusts.  *See supra* ¶117 (chart of Master Servicers/Servicers).  Ocwen was a "non-bank" loan servicer – and was purchasing massive amounts of loan servicing rights from the much more heavily regulated "bank" Master Servicers and Servicers during 2012 and 2013.  Regulators were becoming increasingly concerned that non-bank servicers like Ocwen, which faced much less regulatory scrutiny and which already had a horrible track record of loan servicing misconduct, were growing too quickly to properly service the many loans they were acquiring.  Thus, in February 2014, New York Superintendent of Financial Services, Benjamin Lawsky, halted Ocwen's purchase of $39 billion in servicing rights from Master Servicer/Servicer Wells Fargo.  Lawsky put a halt to the sale until Ocwen could provide information sufficient to demonstrate that Ocwen could handle the increased servicing load, particularly in light of previous loan servicing misconduct Lawsky's office had taken Ocwen to task for and which required the appointment of a monitor to oversee Ocwen's conduct.  *See* Appendix 6, at 7 (December 5, 2012 actions by N.Y. Dept. Fin. Servs.).[40]

161.     In any event, well prior to Ocwen's acquisition of the servicing rights to the Mortgage Loans in the Covered Trusts, Deutsche Bank had actual knowledge that Ocwen was a loan servicer that had a long history of committing multiple Events of Default.  *See* Appendix 6 hereto.  As shown

---

[39]   "Ocwen," unless otherwise specified, refers to Ocwen Financial Corporation, and its affiliates, subsidiaries and predecessor companies, such as Ocwen Federal Bank FSB and Ocwen Loan Servicing LLC.

[40]   Shortly after Lawsky halted the sale and asked Ocwen for information, Ocwen announced that the Wells Fargo deal was on indefinite hold.

in Appendix 6, Ocwen was found by governmental entities, juries, courts and reporters to have engaged in numerous instances of egregious, illegal and sanctionable misconduct meriting punitive damages for its loan servicing practices, demonstrating that it routinely engaged in serial Events of Default.

162.     The repeated misconduct by Ocwen alone should have alerted Deutsche Bank to the fact that Ocwen had a pattern and practice of committing Events of Default.  However, if there was any doubt, it was erased by December 2013.  At that time, Ocwen entered into a consent order with the U.S. Government's Consumer Financial Protection Bureau ("CFPB"), 49 States and the District of Columbia.  Pursuant to the consent order, Ocwen did not dispute or contest any of the facts alleged against it by the multiple government agencies, and it agreed to provide borrowers with an astounding *$2 billion in principal reduction, and further refund $127.3 million to nearly 185,000 borrowers it had improperly foreclosed on*.  The misconduct covered by the consent order extended for an unlimited period of years, up to and including through December 2013, and covered every State in the nation except one, demonstrating that Ocwen had engaged in Events of Default involving the Mortgage Loans in the Covered Trusts for years, right up to the time it entered into the consent order.  Richard Cordray, the Director of the CFPB, stated in a conference call that "*[w]e believe that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process*," a clear Event of Default.  The huge size of the relief agreed to by Ocwen (over $2 billion), the comprehensive misconduct "at every stage," the broad geographic scope (49 of 50 States), the expansive temporal range of the misconduct ("years"), and the huge number of borrowers affected, confirmed that Ocwen's misconduct occurred nationwide and infected all of its loan servicing operations, including those provided to the Covered Trusts.  The CFPB stated that Ocwen had engaged in "*years of systemic*" misconduct amounting to Events of Default, including :

- ***Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;***

- ***Charging borrowers unauthorized fees for default-related services;***

- ***Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; . . .***

- ***Providing false or misleading information in response to consumer complaints.***

\*        \*        \*

- ***Failing to provide accurate information about loan modifications and other loss mitigation services;***

- ***Failing to properly process borrowers' applications and calculate their eligibility for loan modifications;***

- ***Providing false or misleading reasons for denying loan modifications;***

- ***Failing to honor previously agreed upon trial modifications with prior servicers; . . .***

- ***Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer.***

- ***Engaged in illegal foreclosure practices*** . . . .

- ***Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen***; and

- ***Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.***

163.    These "systemic" illegal and improper practices (which Ocwen did not deny), which

had gone on for "years" in all States except one and the District of Columbia, clearly imparted to

Deutsche Bank actual knowledge that Ocwen was engaging in Events of Default as to the Covered Trusts' Mortgage Loans.

164.    However, even after this massive settlement, Ocwen ***continued to commit Events of Default***.  For example, *see* Appendix 7 hereto, for a summary of such continuing Events of Default. These events caused Deutsche Bank to have actual knowledge of new and continuing Events of Default by Ocwen as to the Mortgage Loans in the Covered Trusts even after December 2013.  In fact, these Events of Default and other new ones continue through to the present.

165.    As the numerous foregoing events demonstrate, the Master Servicers and Servicers to the Covered Trusts and their successors engaged in, and have continued to engage in, numerous, repeated, systemic Events of Default as to the Mortgage Loans in the Covered Trusts.  Such misconduct is so ingrained in their cultures that they do not know of any other way to "service" mortgage loans.  Indeed, as recently as May 29, 2014, Ira Rheingold, Director of the National Association of Consumer Advocates in Washington, D.C. stated: "'***You've got a lot of people trying to clean up the servicing industry, but the truth is we are seeing the same servicing problems over and over*** . . . .'"  Given this widespread, repetitious and brazen misconduct, which shows no signs of stopping and which has caused long delays in foreclosures of the Mortgage Loans in the Covered Trusts, extremely long delinquencies, and excessive and improper fees and expenses added by the Master Servicers/Servicers, the Covered Trusts have experienced astronomical losses and persistently high Mortgage Loan default rates.  These huge losses and unprecedented default rates corroborate and confirm to Deutsche Bank that the Mortgage Loans have suffered and are continuing to suffer from pervasive Events of Default by the Master Servicers and Servicers.  The chart below sets forth the Mortgage Loan default rates and the Covered Trusts' cumulative realized losses, as reported in April 2014:

| Covered Trusts' Mortgage Loans Default Rates and Cumulative Realized Losses Reported in April 2014 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| FFML 2006-FF9 | 41.83% | $447,654,197.25 |
| GSR 2007-AR2 | 15.39% | $121,998,710.30 |
| HASC 2007-WF1 | 31.96% | $159,608,906.20 |
| HBMLT 2006-8 | 30.80% | $315,240,522.82 |
| MSAC 2007-NC2 | 43.57% | $432,233,897.41 |
| MSAC 2007-NC3 | 31.96% | $512,451,644.45 |
| MSIX 2006-1 | 31.21% | $466,305,431.75 |
| NHEL 2006-4 | 37.99% | $283,654,690.93 |
| SAST 2006-2 | 28.54% | $208,145,166.60 |
| SVHE 2007-NS1 | 38.70% | $177,505,929.30 |
| **Covered Trusts' Total Realized Losses:** | | **$3,124,799,097.01** |

**3.    Deutsche Bank Has Conflicts of Interest with Plaintiff and the Class and Has Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself**

166.    As previously alleged, Deutsche Bank also owes a duty of trust to plaintiff and the class.  As such, Deutsche Bank is required to avoid conflicts of interest with plaintiff and the class.  This means that Deutsche Bank is not permitted to put its interests ahead of plaintiff's and the class's, nor is Deutsche Bank permitted to benefit therefrom.

167.    Deutsche Bank provided RMBS trustee services to the RMBS industry and derived substantial income from RMBS trusts set up and "sponsored" by the Loan Sellers/Sponsors, Other Transferors, loan originators, and Master Servicers/Servicers to the Covered Trusts, and their related companies.  The Warrantors and loan originators to the Covered Trusts (and their related companies) handpicked Deutsche Bank for the RMBS trustee positions, as they knew that Deutsche Bank would not cause trouble for them by making significant R&W claims against them, to plaintiff's and the class's detriment.  Similarly, the Master Servicers and Servicers (and their related companies) also handpicked Deutsche Bank because they knew Deutsche Bank would not accuse them of committing Events of Default, or replace them, as they too provided substantial RMBS trustee business to

Deutsche Bank.  To make matters even worse and to ensure that Deutsche Bank would not declare Events of Default against the Master Servicers and Servicers, in eight of the 10 Covered Trusts, either the Master Servicers or Servicers *agreed in the Governing Agreements that they would pay for Deutsche Bank's Trustee fees, a clear conflict of interest that guaranteed Deutsche Bank would not act against those Master Servicers' and Servicers' interests or protect plaintiff's and the class's interests*.

168.    Because the Warrantors and Master Servicers/Servicers to the Covered Trusts and their related companies were the source of substantial income for Deutsche Bank, Deutsche Bank did not seek to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans in the Covered Trusts which breached their R&Ws, or declare Events of Default against the Master Servicers and Servicers or replace them.  By doing so, Deutsche Bank put its own interests ahead of plaintiff's and the class's and benefitted by doing so.

169.    Moreover, Deutsche Bank also deliberately refrained from pursuing the Warrantors, loan originators and Master Servicers/Servicers to the Covered Trusts because Deutsche Bank did not want these entities to make retaliatory R&W claims against Deutsche Bank's sister companies DBSP, DB Home, Chapel and MortgageIT.

170.    Finally, because Deutsche Bank was related to MortgageIT and Chapel – which had warranted and/or originated Mortgage Loans in the HVMLT-2006-8 and MSIX 2006-1 Covered Trusts – Deutsche Bank was hopelessly conflicted and would not pursue R&W claims against its sister companies.

171.    Because of the foregoing conflicts of interest, Deutsche Bank refused to perform its duties required by the Governing Agreements for the benefit of plaintiff and the class, and instead

put its own interests ahead of plaintiff's and the class's, which benefitted Deutsche Bank but injured plaintiff and the class.

### D. Deutsche Bank Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA, and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA and Common Law

172.    Despite its discovery, and actual knowledge, of information requiring Deutsche Bank to act to protect plaintiff and the class under the Governing Agreements and the TIA, Deutsche Bank failed to act as required, and thus breached the Governing Agreements and violated the TIA. Moreover, by failing to avoid conflicts of interest with plaintiff and the class, Deutsche Bank breached the duty of trust it owed to plaintiff and the class. Deutsche Bank's failures to act, and its breaches and violations alleged herein, were grossly negligent and were willful misconduct.

### 1. Deutsche Bank Failed to Enforce the Warrantors' Obligations to Cure, Substitute, or Repurchase Defective, Breaching Mortgage Loans as Required by the Governing Agreements and the TIA

173.    As alleged above, Deutsche Bank discovered breaches of the Warrantors' R&Ws concerning thousands of the Mortgage Loans, yet failed to enforce the Warrantors' obligations to cure, substitute or repurchase the defective Mortgage Loans, as it was required to by the Governing Agreements. Deutsche Bank discovered the breaches of the Warrantors' R&Ws concerning the Mortgage Loans through:

- The numerous news reports, congressional testimony and other information that indicated that the lending industry in general was engaging in widespread lending abuses during the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, thus making it highly likely that any R&Ws by the Warrantors concerning the Mortgage Loans were false;

- The numerous news stories, reports, lawsuits and governmental actions concerning most of the specific Warrantors to the Covered Trusts indicating that their R&Ws were systematically false;

- Deutsche Bank's participation in and monitoring of bankruptcy proceedings by borrowers of the Mortgage Loans in the Covered Trusts from which it learned of specific and systemic R&W breaches by the Warrantors as to the Mortgage Loans;

- Deutsche Bank's communications with its sister companies from which it learned that R&Ws were systemically false and that the Warrantors' R&Ws concerning the Mortgage Loans were similarly false;

- The many lawsuits filed by others against the Warrantors detailing their fraudulent lending practices and high numbers of defective loans that breached their R&Ws;

- The numerous specific lawsuits alleging misrepresentations concerning the specific Mortgage Loans in the specific Covered Trusts, which indicated that the Warrantors' R&Ws had been breached as to the Mortgage Loans;

- The Covered Trusts' historically unprecedented, extremely high, and prolonged Mortgage Loan default rates and huge realized losses;

- The OCC's "Worst Ten in the Worst Ten" report, identifying the areas of the United States with the highest foreclosure rates – rates that were from 13 to 22 times higher than historical averages – from loans originated by most of the Covered Trusts' Warrantors and loan originators;

- Numerous governmental investigations of and actions against the Warrantors for lending abuses which rendered their R&Ws false;

- The FCIC Report detailing: (1) the huge numbers of loans the Warrantors were being required to repurchase because of systemic breaches of their R&Ws; (2) the fact that the Covered Trusts' Warrantors *intentionally* put defective loans that breached their R&Ws into RMBS trusts just like the Covered Trusts as a matter of course; and (3) the routine practice of the Covered Trusts' Warrantors to engage in lending abuses and fraud that guaranteed their R&Ws would be false; and

- The Senate Report demonstrating that the lending industry in which the Covered Trusts' Warrantors participated was engaged in systematic lending abuses which rendered any R&Ws by those Warrantors false, and the specific case studies of WaMu, Goldman Sachs and Deutsche Bank which confirmed that they knew R&Ws were systematically false.

174.    Moreover, even after discovering the breaches of the R&Ws by the Covered Trusts' Warrantors, Deutsche Bank was grossly negligent and engaged in willful misconduct by failing to act, in breach of the Governing Agreements and the TIA.  Moreover, after learning of the breaches, as well as of new breaches of the Warrantor's R&Ws, Deutsche Bank has engaged in numerous new

and additional breaches of the Governing Agreements and TIA by failing to perform its continuing duties to enforce the Warrantor's R&Ws, thereby engaging in continuous breaches of the Governing Agreements and the TIA.  Deutsche Bank's failures to act caused the loss of the billions of dollars of meritorious R&W claims to the statutes of limitations, and thereby caused substantial damages to plaintiff, the class and the Covered Trusts.

> **2.     Deutsche Bank Failed to Perform Its Duties with Respect to Events of Default as Required by the Governing Agreements and the TIA**

175.     As previously alleged, Deutsche Bank obtained actual knowledge that the Master Servicers and Servicers committed Events of Default with respect to the Mortgage Loans in the Covered Trusts, yet failed to: (1) notify and demand that the Master Servicers and Servicers cure such Events of Default; (2) give notice of the Events of Default to plaintiff and the class; and (3) take other prudent actions to remedy the Events of Default, such as legal action or termination or replacement of the defaulting Master Servicers or Servicers.  All of these failures to act breached the Governing Agreements and the TIA.  As previously alleged, Deutsche Bank had actual knowledge of the Events of Default through:

- Numerous news reports, congressional testimony and governmental investigations indicating that there were systemic loan servicing abuses, including foreclosure fraud and robo-signing throughout the loan servicing industry and the nation that were Events of Default under the Governing Agreements and that the Master Servicers/Servicers were involved in such misconduct;

- Numerous news reports about and governmental investigations directed at most of the specific Master Servicers and Servicers to the Covered Trusts concerning their improper loan servicing practices that were Events of Default under the Governing Agreements;

- Deutsche Bank's firsthand experience with, observance of and/or participation in loan servicers' Events of Default through the many cases where Deutsche Bank was an RMBS trustee in foreclosure actions, wherein the loan servicers and/or Deutsche Bank made false statements, filed false affidavits or documents and engaged in other misconduct that delayed, invalidated or led to dismissals of Deutsche Bank's foreclosures;

- Deutsche Bank's firsthand experience with the Master Servicers'/Servicers' loan servicing Events of Default as to the specific Mortgage Loans in the specific Covered Trusts through its participation in the borrowers' bankruptcy proceedings;

- Deutsche Bank's discovery that the Master Servicers and Servicers were engaging in Events of Default by discovering but not reporting to Deutsche Bank breaches of the Warrantors' R&Ws, through their servicing of the Mortgage Loans and/or the borrowers' bankruptcy proceedings;

- Deutsche Bank's awareness that loan servicers' Events of Default were systemic and were similarly affecting many other RMBS trustees;

- Numerous governmental enforcement actions against most of the specific Master Servicers and Servicers to the Covered Trusts for company-wide loan servicing abuses that were Events of Default;

- The disclosure of deposition transcripts of employees of the Master Servicers and Servicers which indicated that they engaged in company-wide robo-signing and loan servicing abuses which were Events of Default;

- The huge reserves the Master Servicers and Servicers for the Covered Trusts were setting aside to deal with and pay for their Events of Default and other loan servicing abuses;

- The large number of Mortgage Loans in the Covered Trusts that were extremely delinquent because of delays caused by the Master Servicers' and Servicers' Events of Default;

- The huge losses being suffered by the Covered Trusts due to the Master Servicers' and Servicers' robo-signing, foreclosure frauds and delays (during which they improperly imposed additional excessive fees and costs on the Covered Trusts) which were Events of Default;

- The FCIC Report and Legal Services of New Jersey Report (*see* Appendix 4) confirming nationwide Events of Default by the Master Servicers and Servicers to the Covered Trusts;

- The fourteen April 13, 2011 consent orders entered into by most of the Master Servicers and Servicers to the Covered Trusts, in which they all essentially admitted that they committed Events of Default, and the Government Foreclosure Report which confirmed "***industrywide***" Events of Default by the Master Servicers and Servicers to the Covered Trusts throughout the nation;

- The billions of dollars paid by many of the Covered Trusts' Master Servicers and Servicers to settle private and government claims that they engaged in company-wide loan servicing misconduct amounting to Events of Default, and the billions of dollars

- 113 -

in principal reduction and other borrower relief they were required to provide for such Events of Default; and

- The numerous and continuing news reports and governmental actions after April 2011 indicating that the Master Servicers and Servicers to the Covered Trusts (including Ocwen) were and are continuing to engage in loan servicing misconduct amounting to Events of Default.

176.   Even after obtaining actual knowledge of the Events of Default, and even after obtaining actual knowledge that such Events of Default were continuing to the present and that new Events of Default were also occurring, Deutsche Bank was grossly negligent and engaged in willful misconduct by failing to do any of the things required of it by the Governing Agreements or TIA. Therefore, Deutsche Bank has breached the Governing Agreements and TIA numerous times by repeatedly failing to fulfill its continuing duties with respect to new and continuing Events of Default, as it has allowed the new and continuing Events of Default to continue unabated.

### 3.   Deutsche Bank Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements and the TIA

177.   As alleged above, when Deutsche Bank became aware of the Events of Default and the Warrantors' breaches of their R&Ws, it was required by the Governing Agreements and TIA to use all of its rights and powers under the Governing  Agreements to protect plaintiff's and the class's interests, as a prudent person would in protecting its own interests.  Deutsche Bank failed to act as required by the Governing Agreements by:

- Failing to enforce the Warrantors' obligations to cure, substitute, or repurchase Mortgage Loans that breached the Warrantors' R&Ws, as a reasonable prudent person trying to protect his/her own interests would; and

- Failing to discharge its duties upon the occurrence of an Event of Default, as a reasonable prudent person trying to protect his/her own interests would.

178.   Deutsche Bank has continued its failure to act prudently while the Events of Default have continued unabated, and after it learned of the Warrantors' R&W breaches, and thus Deutsche

Bank has engaged in numerous additional breaches of its continuing duties under the Governing

Agreements and the TIA.  Such failures were grossly negligent and amounted to willful misconduct.

> **4.      Deutsche Bank Failed to Discharge Its Common Law Duty of
> Trust Owed to Plaintiff and the Class**

179.    As alleged above, Deutsche Bank did not perform its duties required by the

Governing Agreements and TIA because Deutsche Bank: (1)  desired to economically benefit

currently and in the future from its ongoing business relationships with the Covered Trusts'

Warrantors, loan originators and Master Servicers/Servicers; (2) did not want the Warrantors, loan

originators and Master Servicers/Servicers to retaliate against its sister companies; (3) was being

paid its Trustee fees by the Master Servicers and Servicers in eight of the 10 Covered Trusts; and (4)

did not want to make R&W claims against, or claim that loans originated by, its sister companies

MortgageIT and Chapel were defective.  By doing so, Deutsche Bank failed to avoid conflicts of

interest with plaintiff and the class and benefitted thereby, breaching its duty of trust to plaintiff and

the class.   Deutsche Bank's failures to act were grossly negligent and amounted to willful

misconduct.  Deutsche Bank's continuing failures to properly discharge its continuing duty of trust

also resulted in repeated, new and additional breaches of its duty of trust and has caused it to engage

in a continuing breach of its duty up to and through the present.

> **E.      Plaintiff and the Class Have Suffered Significant Damages Due to
> Deutsche Bank's Breaches of the Governing Agreements and
> Common Law and Its Violations of the TIA**

180.    Because Deutsche Bank has failed to act as required by the Governing Agreements,

as alleged above, plaintiff, the class and the Covered Trusts have suffered billions of dollars in

damages.

181.    Deutsche Bank's failure to enforce the R&W claims against the Warrantors for the

thousands of breaching Mortgage Loans has caused plaintiff, the class and the Covered Trusts to

suffer significant damages in the form of billions of dollars in R&W claims that could have been asserted against the Warrantors but were not. Deutsche Bank's failure to assert these claims was a breach of the Governing Agreements and the TIA for which Deutsche Bank could foresee that plaintiff, the class and the Covered Trusts would be damaged. Moreover, Deutsche Bank's continuing failure to act on those R&W claims was a continuing breach of the Governing Agreements and the TIA, and Deutsche Bank's continuing breach has now caused the R&W claims against the Warrantors to be time barred, also causing plaintiff and the class to suffer foreseeable damages.

182. Deutsche Bank's failure to act as required by the Governing Agreements when Events of Default occurred, as alleged above, has caused plaintiff, the class and the Covered Trusts to suffer millions of dollars in additional damages. Deutsche Bank's continuing failures to act to remedy the Events of Default have caused plaintiff and the class to sustain millions of dollars in damages due to the improper and imprudent servicing of the Mortgage Loans, including damages caused by delayed, denied and invalidated foreclosures, increased loan servicing costs to foreclose due to the Master Servicers/Servicers needing to correct prior shoddy, fraudulent or robo-signed foreclosures, increased attorney fees to correct or redo the improper and fraudulent foreclosures, extremely long mortgage loan delinquencies causing extra "carrying" costs for the properties, excessive and improper fees charged by the Master Servicers and Servicers, and dispositions of the Mortgage Loans by the Master Servicers and Servicers that financially benefitted them but caused damages to plaintiff and the class. Deutsche Bank's continuing failures to act with respect to Master Servicer/Servicer Events of Default arising out of their failure to report Warrantor R&W breaches has also caused damages to plaintiff, the class and the Covered Trusts. The foregoing damages were

foreseeable to Deutsche Bank from its continuing failures to act as required by the Governing Agreements and the TIA.

183.    Deutsche Bank's continuous failures to act prudently during the Events of Default also caused plaintiff, the class and the Covered Trusts to suffer damages.  If Deutsche Bank had acted prudently, as required by the Governing Agreements and the TIA, most, if not all, of the damages to plaintiff, the class and the Covered Trusts alleged above could have been avoided.  It was foreseeable to Deutsche Bank therefore that plaintiff and the class would suffer such damages if it failed to act prudently as required by the Governing Agreements and the TIA.

184.    Similarly, Deutsche Bank's decision to continuously refuse to act and instead put its financial interests ahead of plaintiff's and the class's because of its conflicts of interest, caused plaintiff, the class and the Covered Trusts to suffer damages.  These damages were also very foreseeable to Deutsche Bank if it failed to act.

185.    By virtue of its breaches of the Governing Agreements and its common law duties, as well as its violations of the TIA, Deutsche Bank has caused massive damages to plaintiff, the class and the Covered Trusts for which Deutsche Bank is responsible.

### F.    Plaintiff May Sue Deutsche Bank as Trustee

186.    The Governing Agreements provide certain limitations on the rights of RMBS holders like plaintiff and the class which are not applicable to this lawsuit.  More specifically, the Governing Agreements may limit in part the rights of RMBS holders like plaintiff and the class to bring lawsuits relating to the Governing Agreements against the Depositor, the Securities Administrator, the Master Servicer or Servicer, or any successor to any such parties.

187.    However, the Governing Agreements do not so limit suit against Deutsche Bank.  In fact, the Governing Agreements provide that "[n]o provision of this Agreement shall be construed to

relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct." FFML 2006-FF9 PSA §8.01.

188.     Additionally, under the TIA and New York law, "no action" clauses do not apply to actions by RMBS holders like plaintiff and the class against trustees like Deutsche Bank for Deutsche Bank's own wrongdoing.  This is not a situation where plaintiff and the class are demanding that Deutsche Bank initiate a suit in its own name to enforce their rights and obligations under the Governing Agreements.  Rather, this is an instance where plaintiff and the class are bringing a direct action *against* Deutsche Bank for breaching its statutory, contractual, and common law obligations under the Governing Agreements and the TIA.  Because this is not an "action, suit or proceeding" that Deutsche Bank is capable of bringing in its own name as Trustee under the Governing Agreements, the "no action" clause of the Governing Agreements does not apply and does not bar plaintiff and the class from proceeding with this lawsuit.

## V.    CLASS ACTION ALLEGATIONS

189.     Plaintiff brings this action as a class action on behalf of a class consisting of all current and former investors who acquired RMBS certificates in the Covered Trusts (the "class") and held such certificates at or after the time when Deutsche Bank discovered breaches of the Warrantors' R&Ws or Deutsche Bank had actual knowledge of Events of Default by the Master Servicers and Servicers to the Covered Trusts, and suffered damages as a result of Deutsche Bank's breaches of the Governing Agreements and violations of the TIA.  Excluded from the class are Deutsche Bank, the loan originators, the Warrantors, the Master Servicers and the Servicers of the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

190.     The members of the class are so numerous that joinder of all members is impractical. While the exact number of class members is unknown to plaintiff at this time and can only be

ascertained though appropriate discovery, plaintiff believes that there are at least hundreds of members of the proposed class.  Record owners and other members of the class may be identified from records maintained by Deutsche Bank, Depository Trust Company or others and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

191.    Plaintiff's claims are typical of the claims of the members of the class as: they all acquired RMBS certificates in the Covered Trusts and held them at or after the time when Deutsche Bank discovered breaches of R&Ws concerning the Mortgage Loans by the Warrantors, or Deutsche Bank had actual knowledge of Master Servicer and Servicer Events of Default; all the claims are based upon the Governing Agreements substantially in the same form as the FFML 2006-FF9 PSA (*see* Ex. A), common law and the TIA; Deutsche Bank's alleged misconduct was substantially the same with respect to all class members; and all class members suffered similar harm as a result. Thus, all members of the class are similarly affected by Deutsche Bank's statutory, contractual, and common law breaches and violations that are alleged of herein.

192.    Plaintiff will fairly and adequately protect the interests of the members of the class and has retained counsel competent and experienced in class action and RMBS litigation.

193.    Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.  Among the questions of law and fact common to the class are:

- Whether Deutsche Bank breached its contractual duties under the Governing Agreements and common law duties owed to plaintiff and the class by:

    - failing to enforce R&W claims against the Covered Trusts' Warrantors when Deutsche Bank discovered breaches of the R&Ws;

    - failing to discharge its duties under the Governing Agreements when Deutsche Bank obtained actual knowledge of Events of Default;

- failing to exercise the rights and powers vested in Deutsche Bank by the Governing Agreements, and failing to use the same degree of care and skill a prudent person would under the circumstances and in the conduct of his or her own affairs after obtaining actual knowledge of Events of Default; and

- failing to avoid conflicts of interest with plaintiff and the class while advancing its own interests at the expense of plaintiff and the class, and benefitting therefrom.

- Whether Deutsche Bank violated the TIA by:

  - prior to default, failing to perform the duties specifically assigned to it under the Governing Agreements;

  - failing to inform the class of defaults under the Governing Agreements within 90 days after their occurrence; and

  - after an event of default, failing to exercise its rights and powers under the Governing Agreements as a prudent person would.

- Whether and to what extent that members of the class have suffered damages as a result of Deutsche Bank's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

194.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## VI.    DERIVATIVE ACTION ALLEGATIONS

195.    Alternatively, plaintiff brings this case as a derivative action against Deutsche Bank in the right and for the benefit of the Covered Trusts to redress losses suffered, and to be suffered, by the Covered Trusts as a direct result of Deutsche Bank's continuing breaches of the Governing Agreements, the TIA and common law.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

196.    Plaintiff will adequately and fairly represent the interests of the Covered Trusts in enforcing and prosecuting their rights.  Plaintiff is the owner of RMBS in each of the Covered Trusts during all or a large portion of Deutsche Bank's wrongful course of conduct alleged herein.

Moreover by operation of law, under New York General Obligations Law §13-107, RPI obtained all rights and causes of action of all prior holders of such RMBS.

197.    Plaintiff did not make a pre-suit demand on Deutsche Bank to pursue this action because such a demand would have been futile.  The wrongful acts alleged herein were committed by Deutsche Bank itself and Deutsche Bank would not agree to sue itself, particularly since it faces claims for losses by the Covered Trusts in excess of $3.1 billion.  In addition, since Deutsche Bank itself committed the wrongdoing complained of herein, and is accused of grossly negligent and willful misconduct, it therefore is not disinterested and lacks independence to exercise business judgment.  Moreover, Deutsche Bank has benefitted from, and continues to benefit from, its wrongdoing as alleged herein (*i.e.*, failures to act), as it has not enforced the Covered Trusts' rights against the Warrantors' for breaches of their R&Ws, or remedied or declared Events of Default against the Master Servicers and Servicers, and thus Deutsche Bank has maintained and preserved its business relationships with the Warrantors, Master Servicers and Servicers and has thereby continued to derive financial benefits from serving as Trustee to the Covered Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

198.    The Covered Trusts could only act through Deutsche Bank since Deutsche Bank was the Trustee of each Covered Trust.  When Deutsche Bank failed to act, as was required by the Governing Agreements, the TIA and common law, to protect the Covered Trusts and their assets – including the Mortgage Loans and the rights attendant to them – Deutsche Bank caused the Covered Trusts to suffer massive losses.  Deutsche Bank deliberately failed to perform the following duties required of it under the Governing Agreements, the TIA and common law, which injured the Covered Trusts: (1) enforce the Covered Trusts' rights to pursue and enforce breach of R&W claims against the Warrantors; (2) notify and demand that the Master Servicers and Servicers cure their

Events of Default, provide notice of the Events of Default to plaintiff and the class, and take further steps, such as legal action or terminating or replacing the Master Servicers and Servicers; (3) act as a prudent person would in the conduct of his or her own affairs during the defaults; and (4) discharge its duty of trust to plaintiff and the class.

199.    Deutsche Bank's failures to act amounted to gross negligence and willful misconduct on its part and caused the Covered Trusts to suffer losses in excess of $3.1 billion.  Plaintiff seeks to recover, for the benefit of the Covered Trusts: (i) the losses suffered by the Covered Trusts to date, totaling in excess of $3.1 billion; (ii) all future losses caused by Deutsche Bank's continuing failures to act as required by the Governing Agreements, the TIA and common law; and (iii) equitable relief preventing Deutsche Bank from continuing to breach the Governing Agreements, the TIA and common law.

## COUNT I
### Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq*.

200.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

201.    Congress enacted the TIA, 15 U.S.C. §77aaa, *et seq*., to ensure, among other things, that investors in RMBS, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. §77bbb.  The Covered Trusts' Governing Agreements are "indentures" and Deutsche Bank is an "indenture trustee" within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements, and the related RMBS.  15 U.S.C. §77ddd(a)(1). Deutsche Bank violated multiple provisions of the TIA.

202.    First, the TIA requires that, prior to default, the indenture trustee shall be liable for any duties specifically set out in the indenture. 15 U.S.C. §77ooo(a)(1).  As alleged above, Deutsche

Bank failed to comply, in good faith, with the following duties specifically assigned to it by the Governing Agreements, including the duties to:

(a)     enforce the Warrantors' obligations to cure, substitute, or repurchase Mortgage Loans when Deutsche Bank discovered breaches of the Warrantors' R&Ws concerning such Mortgage Loans;

(b)     notify and demand that the Master Servicers and Servicers cure their Events of Default;

(c)     notify plaintiff and the class of all Events of Default and of the Warrantors' breaches/defaults; and

(d)     exercise its rights and powers under the Governing Agreements to take further actions, including legal action, or terminating or replacing a Master Servicer or Servicer that continued engaging in an uncured Event of Default.

203.     In addition, the TIA requires that Deutsche Bank inform plaintiff and the class of all defaults under the Governing Agreements known to Deutsche Bank within 90 days after their occurrence. 15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)). As alleged herein, there were numerous Events of Default by the Master Servicers and Servicers under the Governing Agreements of which Deutsche Bank was aware. In addition, as alleged herein, Deutsche Bank had knowledge of massive breaches of the Warrantors' R&Ws, which were also defaults under the TIA. Deutsche Bank was required to provide notice of those defaults within 90 days. By failing to provide such notice, Deutsche Bank violated the TIA.

204.     Second, during a default, the TIA requires Deutsche Bank to exercise all of its rights and powers under the Governing Agreements as a prudent person would in the conduct of his or her own affairs. 15 U.S.C. §77ooo(c). Given the obvious negative impacts of the defaults alleged

herein, any prudent person under those circumstances would have exercised all of his or her rights and powers to, among other things, compel and enforce the cure, substitution, or repurchase of defective Mortgage Loans that breached the Warrantors' R&Ws, and taken actions to remedy the Master Servicer and Servicer Events of Default, and notify plaintiff and the class. Indeed, with the huge numbers of breaching and defaulting Mortgage Loans in the Covered Trusts, and the pervasive Events of Default that were and are occurring, plaintiff, the class and the Covered Trusts could have been protected in large part from the damages they suffered only through Deutsche Bank's prompt exercise of those rights. By failing to prudently exercise its rights in those circumstances, Deutsche Bank violated the TIA.

205.    Deutsche Bank is therefore liable to plaintiff, the class and the Covered Trusts for their actual losses and damages incurred as a result of Deutsche Bank's violations of the TIA.

## COUNT II
## Breach of Contract

206.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

207.    As set forth in detail above, the Governing Agreements are contracts setting forth the duties Deutsche Bank owed to plaintiff, the class and the Covered Trusts with respect to their RMBS and the Mortgage Loans in the Covered Trusts. As a matter of law, the Governing Agreements incorporate the provisions of the TIA. Under the Governing Agreements and the TIA, Deutsche Bank owed plaintiff, the class and the Covered Trusts a duty to perform certain duties, including, without limitation, the duties to:

(a)    enforce the Warrantors' breaches of R&Ws concerning the Mortgage Loans upon discovery, by seeking the cure, substitution, or repurchase of any and all defective Mortgage Loans;

(b)    notify and demand the cure of any Event of Default by any Master Servicer or Servicer within the period prescribed in the Governing Agreements upon obtaining knowledge of such default;

(c)    notify plaintiff and the class of Events of Default and the Warrantors' breaches/defaults;

(d)    take further prudent actions, including legal action, or the termination or replacement of Master Servicers and Servicers that failed to cure its Events of Default; and

(e)    exercise all of its rights and powers under the Governing Agreements during an Event of Default for the benefit of plaintiff and the class and as a reasonable, prudent person would in the conduct of his or her own affairs.

208.    As alleged herein, Deutsche Bank failed to perform the above duties required of it by the Governing Agreements and therefore breached the Governing Agreements.  Deutsche Bank's breach of its duties set forth in the Governing Agreements deprived plaintiff, the class and the Covered Trusts of the consideration they bargained for, *i.e.*, they did not receive RMBS that were collateralized by Mortgage Loans that were represented and warranted to be of a certain credit quality, and breaches of these R&Ws were not enforced as required by the Governing Agreements. These breaches of the Governing Agreements by Deutsche Bank caused plaintiff, the class and the Covered Trusts to suffer damages.

209.    In addition, plaintiff and the class did not receive the benefit of their bargain under the Governing Agreements when Deutsche Bank failed to perform the obligations required of it by the Governing Agreements when Deutsche Bank knew of uncured and ongoing Events of Default. Deutsche Bank's failure to act breached the Governing Agreements and caused plaintiff, the class and the Covered Trusts to suffer damages.

210.    Furthermore, plaintiff, the class and the Covered Trusts did not receive the consideration they bargained for, *i.e.*, that Deutsche Bank would act as a prudent person and exercise all of its rights and powers under the Governing Agreements to protect plaintiff and the class as though it were seeking to protect its own interests when Deutsche Bank knew of Events of Default. Deutsche Bank's failure to so act breached the Governing Agreements and caused plaintiff, the class and the Covered Trusts to suffer damages.

211.    Deutsche Bank and its responsible officers discovered and had actual knowledge of the Warrantors' breaches of their R&Ws and the Master Servicers' and Servicers' Events of Default, as they learned of them as alleged herein.

212.    As a result of Deutsche Bank's multiple breaches of the Governing Agreements alleged herein, Deutsche Bank is liable to plaintiff, the class and the Covered Trusts for the damages they suffered as a direct result of Deutsche Bank's failure to perform its contractual obligations under the Governing Agreements.

213.    In addition, Deutsche Bank has engaged in multiple, new and additional breaches of the Governing Agreements by failing to fulfill its continuing duty to act as alleged herein and has caused plaintiff, the class and the Covered Trusts to suffer damages.

## COUNT III
### Breach of Trust

214.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

215.    Under common law, Deutsche Bank had a duty to plaintiff and the class to affirmatively avoid conflicts of interest with them. Further, that duty also required Deutsche Bank to refrain from advancing its own interests at the expense of plaintiff and the class, or benefitting therefrom.

- 126 -

216.    Deutsche Bank breached its duty of trust owed to plaintiff and the class by advancing its own interests at the expense of plaintiff and the class, by failing to demand that the Warrantors cure, substitute, or repurchase Mortgage Loans that breached their R&Ws, and by failing to act and failing to act prudently as required when it became aware of Events of Defaults by the Master Servicers and Servicers.  Deutsche Bank failed to act because it had conflicts of interest with plaintiff and the class from which it benefitted at the expense of plaintiff and the class, as alleged herein.

217.    By doing so, Deutsche Bank breached its duty of trust to plaintiff and the class.

218.    In addition, Deutsche Bank has continued to fail to act as alleged above and thus has continued to fail to fulfill its duty of trust, and has thereby engaged in numerous, continuing additional breaches of its duty of trust to the present time.

219.    As a result of Deutsche Bank's breach of its duty of trust, defective Mortgage Loans were not remedied and Events of Default were not corrected and continued unabated, causing plaintiff and the class to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing the undersigned as class counsel;

B.    Alternatively, allowing this action to proceed as a derivative action in the right of and for the benefit of the Covered Trusts;

C.    Awarding damages and/or equitable relief in favor of plaintiff, the class and the Covered Trusts against Deutsche Bank for breaches of its statutory, contractual and common law duties, in an amount to be proven at trial, including interest thereon;

D.     Awarding plaintiff, the class and the Covered Trusts their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

E.     Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED: June 17, 2014                              ROBBINS GELLER RUDMAN
                                                       & DOWD LLP
                                                  SAMUEL H. RUDMAN


                                                  SAMUEL H. RUDMAN

                                                  58 South Service Road, Suite 200
                                                  Melville, NY  11747
                                                  Telephone:  631/367-7100
                                                  631/367-1173 (fax)

                                                  ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                  ARTHUR C. LEAHY
                                                  STEVEN W. PEPICH
                                                  655 West Broadway, Suite 1900
                                                  San Diego, CA  92101-8498
                                                  Telephone:  619/231-1058
                                                  619/231-7423 (fax)

                                                  Attorneys for Plaintiff

VERIFICATION

I, Thierry Buytaert, hereby declare as follows:

I am a Member of the Board of Directors of Royal Park Investments sa/nv ("RPI"), plaintiff in the within entitled action. RPI owns the RMBS in the Covered Trusts alleged herein and owned such RMBS at the time of most of the wrongdoing complained of herein. RPI further understands that it has acquired the rights and claims of the previous holders of the RMBS that held during the time of the wrongdoing complained of herein either contractually or by operation of New York General Obligations Law § 13-107. RPI has continuously held such RMBS since acquiring them. RPI has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of the Covered Trusts. I have read the Class Action Complaint and Verified Derivative Action for Breach of the Trust Indenture Act, Breach of Contract, and Breach of Trust. Based upon discussion with, and reliance upon, my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:

DATED: _17 June 2014_       ROYAL PARK INVESTMENTS/SA/NV

                            By: _____
                                 Thierry Buytaert
                                 Board Member

# APPENDIX 1

- **February and March 2007**:  Numerous securities fraud class actions were filed against the parent company of NovaStar, which was the sole Warrantor and loan originator for the NHEL 2006-4 Covered Trust.  The actions alleged that *NovaStar "routinely deviated from [its] underwriting guidelines so that overly risky loans were being approved in order to . . . fuel [RMBS] securitization[s]*."  The consolidated complaint cited numerous former NovaStar employees stating that:

  - *Novastar "'grant[ed] exceptions'" to NovaStar's underwriting guidelines "'for everything'"*;
  - *Novastar extended loans "regardless of whether it made sense to approve the loan[s]"*;
  - *Novastar "never checked [loan] applicants' credit histories"*;
  - *Novastar "pressured line auditors to overlook failures to comply with NovaStar's underwriting guidelines"*;
  - *Novastar issued loans that "ran counter to NovaStar's guidelines in 2006"*;
  - *Novastar "took advantage of its existing [borrowers] and 'raked them over the coals' by charging" excessive "points on the new loans they sought"*;
  - *Novastar put borrowers into "loans to which they had [not] agreed" by, unbeknownst to the borrowers, "chang[ing]" the loans' "terms"*;
  - *Novastar falsely "increased a borrower's income so that the borrower could qualify for a certain loan program"*;
  - *Novastar "audits showed that about 90% to 95% of the loans involved fraud such as misstatements of income, misrepresentations in the loan documents or an inflated appraisal"; and*
  - *"[M]ore than 20% of [NovaStar's] loans written in early to mid-2006," the same time period when many of the Mortgage Loans in the NHEL 2006-4 Covered Trust were originated and warranted by NovaStar, "turned out to have 'defects' that put [NovaStar] at risk of having to repurchase them*."

- **March 2007**:  The FDIC issued a "*cease and desist*" order against Fremont, a loan originator for the MSIX 2006-1 Covered Trust.  *The FDIC required Fremont to end its lending business, due to "unsafe or unsound banking practices," "violations of law," "unsatisfactory lending practices*," "*approving borrowers without . . . verification of their income . . . [and] making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms*."

- **June 8, 2007**:  The OTS disclosed the results of its examination of AIG Federal, another loan originator for the MSIX 2006-1 Covered Trust.  The OTS found that *AIG Federal had "failed to manage and control the mortgage lending activities outsourced to" its affiliate, "[from] July 2003 to May 2006*" (part of the same time period when many of the Mortgage Loans in the MSIX 2006-1 Covered Trust were originated) and *had not properly considered borrowers' creditworthiness and had also improperly charged many borrowers excessive broker and/or lender fees*.  AIG Federal established a reserve of $178 million to compensate aggrieved borrowers,

and paid an additional $15 million to nonprofit groups promoting financial literacy and credit counseling.

- **August 2007**: A lawsuit was filed against the parent company of Accredited, another loan originator for the MSIX 2006-1 Covered Trust.  The complaint cited to statements from at least 12 former Accredited employees and alleged that Accredited routinely "*approved risky loans that did not comply with its own underwriting guidelines," including loans to fake "'straw borrower[s],'" employment that could not be verified, falsely inflated incomes, inflated appraisals, and violations of Accredited's DTI, credit score, LTV and employment history underwriting guidelines*.

- **October 4, 2007**:  The Massachusetts Attorney General sued Fremont – a loan originator for the MSIX 2006-1 Covered Trust – for "*unfair and deceptive business conduct," including: (a) "approv[ing] borrowers without considering or verifying the . . . borrower's income"; (b) "approv[ing] borrowers for loans . . . that [did] not properly consider the borrowers' ability to meet their overall level of indebtedness"; (c) "approv[ing] borrowers for these ARM loans . . . without regard for borrowers' ability to pay"; and (d)"mak[ing] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores*."[1]

- **October 2007**:  Alan Hummel, Chair of the Appraisal Institute, testified to a U.S. House Committee *that appraisers "experience[d] <u>systemic problems</u> with coercion" and were "'ordered to doctor their reports' or else they would never 'see work . . . again' and/or would be placed on 'exclusionary appraiser lists*.'"

- **November 2007**:  The Attorney General of New York sued WaMu – a loan originator for the HVMLT 2006-8 Covered Trust – and another firm, alleging that *WaMu and the other firm "'collud[ed]' . . . to inflate the appraisal values of homes*."

- **December 30, 2007**: *The Kansas City Star* reported that Kurt Eggert, a law professor and member of the Federal Reserve's Consumer Advisory Panel, stated: "'*Originators were making loans based on quantity rather than quality . . . . They made loans even when they didn't make sense from an underwriting standpoint*.'" The article also stated: "Mark Duda, a research affiliate at Harvard University's Joint

---

[1]   On December 9, 2008, a Massachusetts appeals court affirmed the lower court's order enjoining Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  The appellate court found that the factual record supported the lower court's conclusions that "*Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow*."  *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556, 558 (Mass. 2008).

Center for Housing Studies, said that because **brokers were so intent to quickly sell off loans to investors, they had little incentive to make sure the loans were suitable for borrowers. 'They were setting people up to fail**,' Duda said."

- **Early 2008 (and 2009)**: Wells Fargo – a Warrantor and loan originator for the GSR 2007-AR2 and HASC 2007-WF1 Covered Trusts – was sued by the Cities of Baltimore and Memphis, alleging that Wells Fargo abandoned its underwriting guidelines and made fraudulent loans. The Cities alleged that **Wells Fargo extended loans without regard to "the borrower's ability to repay," that borrowers' incomes were falsified, and that Wells Fargo "fail[ed] to underwrite African-American borrowers properly**." **The allegations were supported by sworn declarations from former Wells Fargo employees**.

- **January 2008**: It was reported that Cleveland, Ohio had sued 21 mortgage lenders and investment banking firms, alleging that **they had caused "entire neighborhoods" in the city to become full of "abandoned and boarded up properties" because the lenders and investment bankers "routinely ma[de] loans to borrowers who had no ability to pay them back**." The defendants included Warrantors and/or loan originators for each of the Covered Trusts (or their related companies): **HSBC, First Franklin (through Merrill Lynch), Goldman Sachs, Countrywide, IndyMac, Wells Fargo, Greenwich, MortgageIT and Chapel (through "Deutsche Bank" entities), WaMu, Morgan Stanley (and Saxon since it was owned by Morgan Stanley), NovaStar, Fremont and Encore (through Bear Stearns and JPMorgan)**.

- **February 5, 2008**: *The Oregonian* published a news story on Encore, loan originator for the MSIX 2006-1 Covered Trust. **The news article documented that Encore ignored its stated underwriting guidelines, falsified incomes, did not determine whether borrowers could afford to repay their loans, forged documents, and put borrowers into loans they obviously could not afford to repay. The Oregonian recounted the story of borrower Paul Hoffhine Jr., a mentally disabled man who subsisted on Social Security payments of $624 per month**. *The Oregonian* reported that Hoffhine stated: "'**They forged my signature, [and] they inflated my income**.'"

- **February 2008**: The examiner in the bankruptcy of New Century – a loan originator for the MSAC 2007-NC2, MSAC 2007-NC3 and MSIX 2006-1 Covered Trusts – filed a detailed report concerning New Century's demise. The examiner "**conclude[d] that New Century engaged in a number of significant improper and imprudent practices related to its loan originations**," including:

  - "**[L]ayer[ing] the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers.**"
  - "**[M]ak[ing] frequent [unmerited] exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan.**"
  - **Approving loans with "defective appraisals, incorrect credit reports and missing documentation**."

- 3 -

- **May – December 2008**:  Numerous news articles reported that mortgage fraud was endemic at Warrantor First Franklin during the time period when it originated, warranted and transferred Mortgage Loans to the FFML 2006-FF9 Covered Trust.  In one May 2008 article in the *Mansfield News Journal,* it was reported that Ohioan Andrew Pfeifer pled guilty to fraudulently obtaining a mortgage loan from First Franklin in 2005, ***using falsified income and liabilities, and fake employment information***.

- **June 2008**:  WMC – a Warrantor and loan originator for the MSIX 2006-1 Covered Trust – was charged by the State of Washington with lending misconduct.  Washington filed a Statement of Charges against WMC for deceptive and unfair lending practices ***after finding that 88% of the reviewed loans extended by WMC were defective or otherwise violated Washington State law***.

- **June 30, 2008**: The Center for Responsible Lending issued a report on IndyMac –a Warrantor and loan originator for the GSR 2007-AR2 Covered Trust.  The report was based on information obtained from 19 former IndyMac employees and reported that ***IndyMac "engaged in unsound and abusive lending," "routinely [made] loans without regard to borrowers' ability to repay,***" and ***"push[ed] through . . . loans based on bogus appraisals and income data that exaggerated borrowers' finances***."

- **August 8, 2008:**  PHH, a Warrantor and loan originator for the GSR 2007-AR2 Covered Trust, filed its ***Securities and Exchange Commission Form 10-Q, in which it admitted to making "loans with origination flaws.***"

- **November 13, 2008**: The OCC released a report entitled the "Worst Ten in the Worst Ten," identifying the ten metropolitan areas in the United States with the highest foreclosure rates in the first half of 2008, and the lenders that made the loans.  The report studied loans originated between 2005 through 2007 – the same time period the Mortgage Loans in the Covered Trusts were originated, warranted and transferred to the Covered Trusts – and revealed that they had astoundingly high foreclosure rates:  ***from 13.9% to 22.9% of the loans were in foreclosure in the ten areas during the first half of 2008.  These foreclosure rates were far higher than the historical average because "[p]rior to 2007, the foreclosure rate was historically less than 1%***."  FCIC Report at 402.  ***The list of offending lenders identified in the OCC report included many of the Warrantors and loan originators to the Covered Trusts.  The lenders identified in the OCC's report included: Countrywide, Decision One (and therefore HSBC since it owned Decision One), First Franklin, Fremont, IndyMac, WaMu (through its subsidiary Long Beach), New Century, Wells Fargo and WMC –Warrantors or loan originators of Mortgage Loans in seven of the 10 Covered Trusts***.

- **November 2008**: *Business Week* published an exposé on the mortgage industry.  The *Business Week* article reported that industry "***[loan] wholesalers . . . offered bribes to fellow employees [to approve unacceptable loan applications], fabricated documents, and coached brokers on how to break the rules. . . . [Loan] [b]rokers, who work directly with borrowers, altered and shredded documents.  [In addition,***

- 4 -

loan] [u]nderwriters, the bank employees who actually approve mortgage loans, also skirted boundaries, demanding secret payments from wholesalers to green-light loans they knew to be fraudulent." The *Business Week* article quoted a former Wells Fargo loan wholesaler (Wells Fargo was a Warrantor and loan originator for the GSR 2007-AR2 and HASC 2007-WF1 Covered Trusts) that admitted "*he regularly used the copiers at a nearby Kinko's to alter borrowers' pay stubs and bank account statements. He would embellish job titles – turning a gardener, for instance, into the owner of a landscaping company – and inflate salaries.*" This former Wells Fargo employee stated: "'*I knew how to work the system.*'"

- **November 2008**: *The New York Times* published an article on WaMu, one of the loan originators for the HVMLT 2006-8 Covered Trust, entitled "Was There a Loan It Didn't Like?" Former WaMu senior mortgage underwriter Keysha Cooper, who worked at WaMu from 2003 until 2007, stated: "'*At WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify. Instead, it was how many loans did you guys close and fund?*'"

- **November 28, 2008**: The *Tampa Bay Times* reported on former First Franklin loan "closer" Inez Albury, who worked for First Franklin up until late 2007 processing loan applications. First Franklin was a Warrantor and loan originator for the FFML 2006-FF9 Covered Trust. **The Tampa Bay Times reported that First Franklin "[m]anagers made it clear [to Albury that] they needed to hit their numbers each month" and, as a result, Albury "reviewed as many as 20 loan applications a day. . . [yet] [s]he never rejected one." Albury stated: "'We had quotas we had to meet. . . . We didn't have time to look at them [the loan applications].*'"**

- **December 2008**: *The New York Times* published another article on WaMu, a loan originator for the HVMLT 2006-8 Covered Trust. Former WaMu employee John D. Parsons stated that he "*was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes." The news article further reported on the case of a borrower "claiming a six-figure income and an unusual profession: mariachi singer. Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.*"

## APPENDIX 2

- **January 2009**:  It was reported that Nationstar, a Warrantor and the loan originator for the SVHE 2007-NS1 Covered Trust, entered into a settlement agreement with the State of Kentucky over charges that *it used unlicensed loan officers and "faked borrowers' credit scores*."

- **February 26, 2009**: The Office of Inspector General issued a report on IndyMac, a Warrantor and lender for the GSR 2007-AR2 Covered Trust.  The report found that "*IndyMac often did not perform adequate underwriting," made loans with "little, if any, review of borrower qualifications, including income, assets, and employment*," and *"made [loans] to many borrowers who simply could not afford to make their payments*."

- **February-December 2009**:  Numerous additional news reports in 2009 continued to indicate that Warrantor First Franklin was involved in the origination of numerous questionable loans. For example, the *New York Post* reported on a mortgage fraud scheme involving First Franklin on properties in Long Island and Westchester County, New York, in 2006 and 2007.  *Inflated appraisals and falsified borrower information* were used to obtain loans from several lenders, including First Franklin. *The article quoted financial risk analyst Christopher Whalen: "Obviously, these people shouldn't have been qualified for loans if these [lenders] were doing their due diligence*."

- **May 13, 2009**: A False Claims Act lawsuit was brought by the U.S. Government against Countrywide and real estate appraisal firm Land Safe Appraisal Services, Inc., alleging that *Countrywide routinely and falsely inflated appraisals*. Countrywide was a Warrantor and loan originator for the GSR 2007-AR2 Covered Trust.  This action was ultimately settled, as part of a global $1 billion settlement with Countrywide's parent company, Bank of America.

- **June 2009**: The SEC sued former Countrywide executives for securities fraud.  The court overseeing the case denied the Countrywide executives' motions for summary judgment and held that there was *evidence that Countrywide "routinely ignored its official underwriting guidelines to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," and that "Countrywide all but abandoned managing credit risk through its underwriting guidelines*."  The executives subsequently paid over $73.1 million to settle the charges.

- **July 31, 2009**:  It was reported that Wells Fargo – a Warrantor and  loan originator for the GSR 2007-AR2 and HSAC 2007-WF1 Covered Trusts – was sued by the Attorney General of Illinois and charged with "'*engag[ing] in unfair and deceptive business practices by misleading Illinois borrowers about their mortgage terms*,'" and *placing borrowers into loans that were "'unaffordable and unsustainable*.'" Wells Fargo was also sued in a separate class action on behalf of RMBS purchasers

alleging that Wells Fargo had misrepresented that the loans in its RMBS trusts were originated in conformance with Wells Fargo's underwriting guidelines. Wells Fargo subsequently paid $125 million to settle the case.

- **August 24, 2009**: MBIA Insurance Corp. ("MBIA"), an insurer to numerous RMBS trusts, sued Countrywide and its parent Bank of America, alleging massive breaches of their R&Ws with respect to tens of thousands of loans in 15 different RMBS trusts. Bank of America subsequently paid MBIA $1.7 billion to settle the case.

- **September 2009**: National Public Radio interviewed former Morgan Stanley employee Mike Francis, who worked as an Executive Director on Morgan Stanley's residential mortgage trading desk. Morgan Stanley was a Loan Seller/Sponsor (through itself and its related company Saxon) for four Covered Trusts: the MSAC 2007-NC2, MSAC 2007-NC3, MSIX 2006-1 and SAST 2006-2 Covered Trusts. Francis stated: ***"No income no asset loans, that's a liar's loan. We are telling you to lie to us, effectively. I mean, we're hoping you don't lie, but – tell us what you make. Tell us what you have in the bank. But we're not going to actually verify it? We're setting you up to lie. Something about that transaction feels very wrong. It felt wrong way back when. And I wish we had never done it. Unfortunately what happened, we did it because everybody else was doing it." Francis further told the National Public Radio interviewer that Morgan Stanley "bought loans, lots of loans, from [lender WMC, that Francis] knew in his gut . . . were bad loans."*** WMC was a Warrantor and loan originator for the MSIX 2006-1 Covered Trust, which was co-sponsored by Morgan Stanley. In the same broadcast, Glen Pizzolorusso, a former manager for WMC, was interviewed and discussed the horrible loans WMC made to borrowers and sold to entities like Morgan Stanley: "***'We looked at loans, these people didn't have a pot to piss in. . . . [T]hey could barely make the car payment, and now we're giving them a $300,000 to $400,000 house***."

- **March 2010**: The parent company of First Horizon, a loan originator for the MSIX 2006-1 Covered Trust, reported that there were a stunning number of loan repurchase requests for First Horizon's loans, indicating pervasive breaches of First Horizon's R&Ws. The report stated: "***For repurchase requests . . . related to breach of contract . . . [a]s of December 31, 2009, [First Horizon] has observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 percent and 40 percent of the repurchase and make-whole requests***."

- **March 2010**: The U.S. Department of Justice charged AIG Federal, a loan originator for the MSIX 2006-1 Covered Trust, with "***engag[ing] in a pattern and practice" of discriminatory lending in violation of federal laws***. AIG Federal entered into a consent order with the government whereby it paid over $7 million and undertook numerous remedial measures.

- **April 28, 2010**: The *St. Petersburg Times* investigated a number of extremely risky loans made by First Franklin, a Warrantor and loan originator for the FFML 2006-

FF9 Covered Trust, revealing that ***First Franklin was not following its underwriting guidelines requiring it to evaluate whether a borrower could afford to repay his or her mortgage loan***.

- **June 2010**: The Attorney General of Massachusetts announced a $102 million settlement with Morgan Stanley concerning Morgan Stanley's misconduct in financing, purchasing and securitizing high-risk mortgage loans from Covered Trust loan originator New Century during the period from 2005 through 2007. New Century originated loans in the MSAC 2007-NC2, MSAC 2007-NC3 and MSIX 2006-1 Covered Trusts and Morgan Stanley was a Loan Seller/Sponsor for each of the three trusts. The Attorney General's investigation of Morgan Stanley and New Century included the following findings demonstrating that Morgan Stanley's R&Ws were false:

  - ***Morgan Stanley securitized New Century loans which were illegal and which were made to borrowers who were "unable to afford the[m]."***
  - ***By late 2005, New Century was engaging in "sloppy underwriting for many loans and stretching of underwriting guidelines to encompass or approve loans not written in accordance with the guidelines."***
  - ***New Century successfully pressured Morgan Stanley into buying and securitizing defective loans that breached Morgan Stanley's R&Ws.***
  - ***The majority of the loans Morgan Stanley purchased from New Century and securitized in 2006 and 2007 did not comply with the underwriting guides, and thus breached Morgan Stanley's R&Ws.***
  - ***"In addition, loans with certain exceptions such as high DTI ratios or high LTV or CLTV ratios that were in excess of underwriting guidelines but within a tolerance found acceptable to Morgan Stanley were purchased [and securitized] without a review by Clayton for compensating factors."***
  - ***New Century's loans had pervasive inflated appraisals that generated falsely understated LTV ratios but Morgan Stanley nonetheless purchased and securitized the loans.***
  - ***The "stated" incomes of borrowers for New Century's loans were inflated yet were purchased and securitized by Morgan Stanley.***
  - ***"Notwithstanding the problems identified above, Morgan Stanley continued to . . . purchase and securitize New Century's subprime mortgages through 2006 and the first half of 2007."***[1]

---

[1]   The Attorney General's investigatory findings are extremely relevant to the instant action because: (1) Morgan Stanley was New Century's largest customer, having purchased tens of thousands of loans from New Century during the relevant time period; (2) New Century originated Mortgage Loans in at least three Covered Trusts (the MSAC 2007-NC2, MSAC 2007-NC3 and MSIX 2006-1) and Morgan Stanley warranted the Mortgage Loans in those Covered Trusts originated by New Century; and (3) each of those three Covered Trusts contained Mortgage Loans to borrowers for properties located in Massachusetts. The foregoing indicated that any R&Ws concerning New Century loans by Morgan Stanley were false.

- **December 2010**:  It was reported that JPMorgan analysts estimated "that 'put-back risk,'" for loan warrantors, *i.e.*, loans subject to repurchase demands due to breaches of R&Ws, ranged ***from $60 to $110 billion for RMBS trusts like the Covered Trusts***.

**APPENDIX 3**

- **June 2010**:  The United States Trustee Program ("USTP"), a component of the U.S. Department of Justice, announced that it had conducted an investigation (with the FTC) of CHLS/BACHLS, a Servicer for the GSR 2007-AR2, MSAC 2007-NC2 and MSAC 2007-NC3 Covered Trusts.  The USTP revealed that it had started its investigation of CHLS/BACHLS "after receiving *complaints of chronic . . . irregularities by mortgage servicing companies*."  CHLS/BACHLS was charged with "*improper business practices" and "improper accounting and billing practices," including the filing of false and improper claims in bankruptcy proceedings against borrowers, inflating its mortgage claims, failing to credit borrowers with payments that they made, and failing to notify borrowers of extra and/or improper charges added to their bills*.[1]  CHLS/BACHLS entered into a consent order to reform its loan servicing practices, compensate wronged borrowers, establish internal controls to ensure that CHLS/BACHLS's bills and claims in bankruptcy were accurate and provided accurate and useful information to borrowers, and *paid $108 million to settle these charges*.

- **July 2010**:  Excerpts of the deposition transcript of Jeffrey Stephan, an employee of GMAC, were made publicly available.  GMAC was a Servicer for Mortgage Loans in the HVMLT 2006-8 Covered Trust.  The deposition excerpts established that GMAC had a pattern and practice of signing and filing hundreds of false foreclosure affidavits without confirming the truth of the facts within them, without checking them to ensure the correct exhibits were even attached to the affidavits, and without personal knowledge of the facts asserted in the affidavits, all Events of Default (this practice was known as "robo-signing").  Below are excerpts from Stephan's deposition:

  > *Q:  In your capacity as the team leader for the document execution team, do you have any role in the foreclosure process, other than the signing of documents?*
  >
  > *Stephan:  No.*

  *       *       *

---

[1]   The USTP also noted that, in 2009, U.S. bankruptcy trustees *had taken "more than 9,000 formal and informal consumer protection actions, including <u>a large number of actions against mortgage servicing companies</u>."*  This demonstrated the enormity and reach of the improper loan servicing practices engaged in by some in the loan servicing industry and the fact that such misconduct was being committed by some of the Covered Trusts' Master Servicers and Servicers. *The USTP also stated in its 2010 Annual Report that there were "<u>pervasive and longstanding problems regarding mortgage loan servicing</u>,"* again revealing that these improper loan servicing practices were widespread.

*Q:  When you sign a summary judgment affidavit, do you check to see if all of the exhibits are attached to it?*

*Stephan:  No.*

*Q:  Does anybody in your department check to see if all the exhibits are attached to it at the time that it is presented to you for your signature?*

*Stephan:  No.*

*Q:  When you sign a summary judgment affidavit, do you inspect any exhibits attached to it?*

*Stephan: No.*

                        \*         \*         \*

*Q:  Is it fair to say when you sign a summary judgment affidavit, you don't know what information it contains, other than the figures that are set forth within it?*

*Stephan:  Other than the borrower's name, and if I have signing authority for that entity, that is correct.*

                        \*         \*         \*

*Q:  Mr. Stephan, do you recall testifying in your Florida deposition in December with regard to your employees, and you said, quote, they do not go into the system and verify that the information is accurate?*

*Stephan: That is correct.*

- **October 4, 2010**:  California state assemblyman Ted Lieu, in discussing the rash of improper loan servicing and foreclosure issues, stated: "*[W]at we have here is massive fraud being perpetrated on the courts. . . .  We're talking about hundreds of thousands of foreclosures that are now at risk because of what these robo-signers are doing. . . .  [Credit rating agency] Fitch . . . has come out and stated that they believe that this is an <u>industry wide practice</u>. . . .  [Y]ou just had [a] basic level failure to follow existing laws.   And you have people that are falsifying documents in front of judges. . . .  [Just] [y]ou imagine what is going on in [the] 27 other [non-judicial foreclosure] states where you don't have <u>any</u> judicial oversight*."

- **October 2010**:  GMAC was sued for fraud by the Attorney General of Ohio.  The Ohio Attorney General **charged GMAC with routinely filing false affidavits in connection with foreclosure proceedings**.  The Ohio Attorney General stated: "***This is fraud being perpetrated against the courts*. . . .  *The most important thing that***

- 2 -

*lenders need to recognize is the seriousness of the situation.  They can't pretend this is a fourth-grade student not quite filling in the oval on a test.  This is fraud*."

- **October 2010**:  The Ohio Attorney General was also scrutinizing Covered Trust Master Servicers and Servicers CHLS/BACHLS and National City (through its parent Bank of America), JPMorgan Chase and WaMu (through their parent JPMorgan Chase & Co.) and Wells Fargo, and had sent letters to them seeking information about their robo-signing practices.  These Master Servicers/Servicers serviced Mortgage Loans in seven of the 10 Covered Trusts.

- **October 2010**: The U.S. House Judiciary Committee sent similar letters to most of the major loan servicers demanding the production of documents relating to their robo-signing and foreclosure practices.  The Master Servicers and Servicers to the Covered Trusts receiving letters from the House Judiciary Committee included JPMorgan Chase (and therefore WaMu as well), Wells Fargo, GMAC, and CHLS/BACHLS and National City (through their parent company Bank of America).  From this, Deutsche Bank learned that the Master Servicers and Servicers to most of the Covered Trusts were implicated in widespread robo-signing misconduct amounting to Events of Default in October 2010.

- **October 2010**: The *Miami Daily Business Review* reported on a Florida attorney who had 150 deposition transcripts from people who robo-signed foreclosure affidavits for loan servicers.  The attorney was quoted as saying that the 150 depositions "***prove flawed foreclosure documents are part of a fraudulent system***, not sloppy procedures" by loan servicers.  The attorney stated: "'***We are not talking about a mistake.  We are talking about perjury, crime . . . .  This is system-wide*** . . . .'"  The news article reported that the deposition transcripts included testimony from employees of JPMorgan Chase, Countrywide (*i.e.*, CHLS/BACHLS) and Wells Fargo – Master Servicers or Servicers to ***seven of the 10 Covered Trusts***.  The *Miami Daily Business Review* article reported the following information concerning Wells Fargo, a Master Servicer or Servicer to at least seven of the 10 Covered Trusts:

> In one of the depositions provided by [attorney] Tiktin, a Wells Fargo employee, Xee Moua, admitted signing 300 to 500 documents including affidavits, substitutions of plaintiff, deeds and judgment affidavits in a two hour period on any given day.

> Moua said she only attended six months of college before dropping out.  She then worked as an office clerk and customer service representative at a medical supplies firm and a blinds and shades company in North Carolina before she was hired by Wells Fargo as a document processor. ***According to the transcript of the deposition, asked if she checked the information on the documents she was signing, Moua said, "I do not.  That's not part of my job*.**"

> She said she only checked to see if her own information, such as her title, was correct.

Her understanding, she said, was that either the law firm handling the foreclosure or a Wells Fargo processor assigned to the loan had checked the information.  Yet, she was the person authorized by the bank to sign the documentation.

*The documents she signed identified her as vice president of loan documentation, according to the transcript, but that wasn't her actual title*.

*She said she was given that title to sign documents.  She said other employees were given the same title for signing court documents*.

- **October 2010**:  It was reported that **U.S. regulators were** "**conducting an intensive probe of reportedly false foreclosure affidavits used by major U.S. financial institutions to evict thousands of American homeowners.**"

- **October 2010**:  Multiple news reports surfaced about many of the Master Servicers or Servicers to the Covered Trusts, reporting that they were widely and routinely engaged in robo-signing and other improper loan servicing practices.  For example, IndyMac, a Servicer for at least two Covered Trusts, was reported to be **using false affidavits in foreclosure proceedings**.  In addition, a former IndyMac employee was reported to having admitted in a deposition to **signing about 6,000 documents a week which she did not read before signing**.  It was also reported that Wells Fargo, a Master Servicer and Servicer to at least seven  of the Covered Trusts, **admitted that its employees signed hundreds of foreclosure documents daily without reading them**.

- **October 2010**:   Covered Trust Servicers CHLS/BACHLS and National City (through their parent company Bank of America), JP Morgan Chase (which also included WaMu) and GMAC – which collectively serviced Mortgage Loans in 6 of the 10 Covered Trusts – were forced to halt their foreclosures on tens of thousands of mortgage loans.   JPMorgan Chase halted 56,000 foreclosures; Bank of America/CHLS/BACHLS/National City also froze foreclosure and re-submitted 102,000 affidavits in its foreclosure proceedings; Covered Trust Master Servicer/Servicer Wells Fargo submitted revised documents for approximately 55,000 of its foreclosures.

- **October 2010**:  The *Mortgage Daily* reported that Bank of America had released statistics indicating that "80 percent of its borrowers who faced foreclosure had not even made a payment in more than a year, while the average foreclosed loan was 560 days past due," or over 18 months past due, graphically illustrating the long delays caused by its servicing misconduct.  Similarly, Wells Fargo, a Master Servicer and/or Servicer for seven of the 10 Covered Trusts, reported that its average foreclosed loan

as of September 2010 was 16 months past due, obviously due to its servicing misconduct which caused long delays.[2]

**Late October 2010**: It was reported that ***the Attorney Generals of all 50 states were similarly investigating "whether mortgage lenders falsified affidavits attesting to their review and verification of foreclosure documents, as well as whether they failed to sign the affidavits in the presence of a notary public.***" Illinois Attorney General Lisa Madigan stated: "***The same mortgage giants and big banks that fraudulently put people into unfair loans are now fraudulently throwing people out of their homes. They should not be above the law. Illinois homeowners are legally entitled to a foreclosure process that is transparent, accurate and fair.***"

---

[2]   Subsequently, a report by Amherst Securities Group LP ("Amherst") in February 2012 noted that the average delinquency time for liquidated loans grew from 21 months in September 2010 to 26 months by February 2012, an increase in delays of nearly 25%. In addition, Amherst reported that the average delinquency time for non-performing (*i.e.*, non-liquidated) loans increased from 19 months in September 2010 to 24 months by February 2012, an increase in delays of over 26%. Amherst reported that these statistics ***demonstrated "the delay created by the [loan servicers'] robo-signing actions*****.**" The report further stated that "***we believe the remaining loans will stay in the [delinquency] pipeline for another 12-15 months***," further demonstrating the compounding effect of the delays caused by the Master Servicers'/Servicers' ongoing robo-signing.

**APPENDIX 4**

- **November 2010**:  U.S. Treasury Department Assistant Secretary Michael Barr provided an update on the investigation of loan servicers by U.S. banking regulators. Barr announced that they were uncovering "***widespread" and "inexcusable" breakdowns in loan servicing practices***.  Barr stated: "***These problems must be fixed."***

- **November 2010**:  Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation. The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents, and other evidence of fraud, ***concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings***."[1] ***The report specifically implicated many of the Master Servicers and Servicers to the Covered Trusts in the misconduct, including GMAC, CHLS/BACHLS and National City (through Bank of America), JPMorgan Chase (and therefore WaMu), Wells Fargo, IndyMac and PHH.***

- **December 20, 2010**:  New Jersey Administrative Director of the Courts, Judge Grant, issued an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  The order was directed at, among others, ***PHH and Nationstar, Servicers to two of the Covered Trusts***.  ***The order was also directed at Deutsche Bank***, because it had been involved in numerous questionable foreclosures. ***Judge Grant's order cited specific instances of improper foreclosures by Covered Trust Master Servicers/Servicers CHLS/BACHLS and National City (through Bank of America), JPMorgan Chase, WaMu (through JPMorgan Chase), GMAC, IndyMac (through OneWest Bank) and Wells Fargo.  Judge Grant's order identified Covered Trust Master Servicers and Servicers who collectively serviced Mortgage Loans in eight of the 10 Covered Trusts***.

- **December 20, 2010**:  Judge Jacobson of the Superior Court of New Jersey in Mercer County ***issued an order to show cause directed at GMAC, CHLS/BACHLS, National City (through Bank of America), JPMorgan Chase, WaMu (through JPMorgan Chase), Wells Fargo and IndyMac (through OneWest Bank)***, among

---

[1]    The report noted that the "***[c]ommon practices and characteristics***" that Legal Services of New Jersey found in its nationwide investigation include: (a) affiants claiming personal knowledge of facts that the affiant had no personal knowledge of; (b) failure to review documents and evidence on which certifications were based; (c) actual false statements about when and how a loan was transferred; (d) false identification of signatories (*e.g*., an employee of a servicer will be identified as a vice president, or similar title, of the foreclosing mortgagee); (e) forged signatures; and (f) improperly notarized documents.

others. *The order to show cause held that these Master Servicers and Servicers were selected for scrutiny because of their "public record of questionable practices," "deposition testimony provided by employees" of these Master Servicers and Servicers that "raised serious questions about the accuracy and reliability of documents submitted to courts," and "the execution of affidavits, certifications, assignments, and other documents in numerous residential mortgage foreclosure actions in New Jersey and elsewhere [that] may not have been based on personal knowledge in violation of the Rules of Court and may thus be unreliable*."

- **December 2010**: In testimony before the U.S. House Judiciary Committee, Thomas Cox, an attorney for the Maine Attorneys Saving Homes Project, presented compelling evidence against Covered Trust Servicer GMAC, revealing that it was engaged in systemic foreclosure fraud. *Cox revealed how GMAC used thousands of false foreclosure affidavits signed by the aforementioned "robo-signer" Jeffrey Stephan, which falsely attested under oath that he had personal knowledge of the facts in his affidavits, that he had custody and control of loan documents, and that the documents attached to his affidavits were "true and accurate" copies of notes or mortgages. Cox testified that GMAC "filed thousands of Stephan's [false] affidavits in foreclosure cases all over the country in cases involving its own loans as well in cases where it was servicing loans for Fannie Mae, Freddie Mac, and trustees of mortgage-backed securitized trusts*." This information confirmed that GMAC's standard loan servicing practices amounted to Events of Default and that the Mortgage Loans it was servicing were probably being similarly affected. Cox also testified to instances of blatant foreclosure fraud by JPMorgan Chase, a Servicer to the MSIX 2006-1 Covered Trust. Cox recounted several cases where "*JPMorgan Chase used 'fraudulently created facts' and attempted to commit 'fraud upon the court' in connection with its foreclosures*." Cox recounted a case where the U.S. Trustee was required to intervene into a bankruptcy case in New York to file a motion for sanctions against JPMorgan Chase, whereupon JPMorgan Chase admitted to submitting false facts to the court. Based on his observations of JPMorgan Chase's routine foreclosure practices, *Cox testified that "JPMorgan Chase has engaged in pattern of filings in the Bankruptcy Court for the Southern District of New York that is simply breathtaking in the scope of dishonest and deceptive practices it reveals*." This information established that JPMorgan Chase engaged in a pattern and practice of fraudulent loan servicing which was an Event of Default under the Governing Agreements, and that the Mortgage Loans in the Covered Trusts serviced by JPMorgan Chase were probably similarly misserviced. Cox also testified to the prevalence of foreclosure fraud by the loan servicing industry in general: "*I know from my personal experience over the past two and one half years that this kind of servicer fraud-on-the-court activity is not isolated to GMAC Mortgage. It has been the norm across the entire foreclosure industry, including the other servicers represented here today, JPMorgan Chase and Bank of America [Bank of America owned Covered Trust Servicers CHLS/BACHLS and National City]*." By this time, GMAC, JPMorgan Chase (which also included WaMu) and Bank of America (which included CHLS/BACHLS and National City) were Servicers to at least six of the Covered Trusts. Cox's testimony expressly stated that fraudulent foreclosure practices amounting to Events of Default were occurring "*across the*

*entire foreclosure industry*" and were thus not isolated or infrequent.  Indeed, over two years later, after the massive scope of this misconduct finally became known to those outside of the loan servicing and RMBS trustee industries, Yale Law School Professor Raymond Brescia stated: "'*I think it's difficult to find a fraud of this size on the U.S. court system in U.S. history . . . .  I can't think of one where  you have literally tens of thousands of fraudulent documents filed in tens of thousands of cases*.'"

- **December 2010**:  In an article published in the *Yale Journal on Regulation* written by law professor Adam Levitin and attorney Tara Twomey, they concluded:

  > [T]*he residential mortgage servicing business . . . suffers from an endemic principal-agent conflict between investors and servicers.  Securitization separates the ownership interest in a mortgage loan and the management of the loan.  Securitization structures incentivize servicers to act in ways that do not track investors' interests, and these structures limit investors' ability to monitor servicer behavior*.

  > \*        \*        \*

  > *As a result, servicers are frequently incentivized to foreclose on defaulted loans rather than restructure the loan, even when the restructuring would be in the investors' interest*.

- **December 2010**:  In a U.S. Senate Banking, Housing and Urban Affairs Committee hearing, law professor Kurt Eggert testified that loan servicers were incentivized to initiate foreclosures and then extend them for long periods of time since it allowed the servicers to add improper and excessive "junk fees" to the amount owed by borrowers.  Then, when the mortgages were finally foreclosed and the properties sold, the loan servicers' improper "junk fees" would be paid first, before the remaining amount, if any, was remitted to the RMBS trusts, thus generating substantial fees for the servicers but taking money away from RMBS investors like plaintiff and the class.

- **December 2010**:  Professor Eggert also testified that loan servicers were often also the originators and warrantors of the mortgage loans in the trusts, and therefore would have firsthand knowledge of any breaches of their R&Ws (similarly, many of the Warrantors to the Covered Trusts were also the Master Servicers or Servicers of the very same Mortgage Loans they warranted).  Under RMBS trust agreements, master servicers and servicers were required to notify the Trustee whenever they discovered breaches of even their own (or their related companies') R&Ws.  *See, e.g.*, FFML 2006-FF9 PSA §2.03(c) (Servicer National City required to inform Deutsche Bank of representation and warranty breaches by National City's sister company, First Franklin).  Eggert testified that master servicers and servicers of RMBS did not notify anyone of their own breaches because they would basically be turning themselves in, and therefore would have to pay for their breaches, by curing, substituting or repurchasing defective loans.

- **December 2010**: Professor Eggert further testified that loan servicers owned large numbers of second lien loans while the RMBS trusts owned the majority of first lien loans. This incentivized loan servicers to refuse to modify first lien loans in ways that benefitted RMBS investors because it would harm the servicers' interests in their second lien loans, which second liens were typically extinguished in a modification of a first lien loan, causing losses to the loan servicers. Thus, loans servicers would encourage borrowers of second lien loans owned by the servicers to make payments due on such second lien loans instead of the RMBS trusts' first lien loans. These perverse incentives, which caused loan servicers to service the mortgage loans in ways which hurt RMBS investors, instead of benefitting them as required by the Governing Agreements, were yet additional Events of Default under the Governing Agreements.

- **January 2011**: The FCIC Report further confirmed the existence of loan servicers' conflicts of interests with RMBS investors which led to Events of Default by the Covered Trusts' Master Servicers/Servicers. The FCIC reported that loan servicers were improperly denying borrowers loan modifications under the U.S. Government's "HAMP" program, a program which was created to assist borrowers with obtaining mortgage loan modifications and avoid foreclosures. FCIC Report at 405. Most of the Master Servicers and Servicers had joined the HAMP program and had agreed to modify qualifying loans and borrowers in exchange for monetary incentives from the government. The FCIC Report noted that Diane Thompson of the National Consumer Law Center testified before the U.S. Senate's Banking, Housing, and Urban Affairs Committee, and reported that "'[o]nly a very few of the potentially eligible borrowers have been able to obtain permanent modifications. ***Advocates continue to report that borrowers are denied improperly for HAMP . . . and that some servicers persistently disregard HAMP applications***.'" *Id.* The FCIC Report also noted that a Moody's Investors Service managing director "***learned that a survey of servicers indicated that very few troubled mortgages were being modified***." *Id.* at 223.

- **January 2011**: Loan modifications in many cases were beneficial to RMBS investors because a borrower which continued to make loan payments – even reduced modified payments – could be much more profitable to RMBS investors over time than a borrower who had ceased making payments and who was foreclosed on in a depressed real estate market with excessive loan servicing fees being deducted from the proceeds going to the RMBS trusts. The FCIC Report confirmed that loan servicers had incentives to push loans into foreclosure rather than to modify them in a manner that would benefit RMBS investors because the servicers collected these large fees from foreclosures.

- **January 2011**: The FCIC Report further re-confirmed the robo-signing scandal, and noted testimony given by New York State Supreme Court Justice F. Dana Winslow to the U.S. House Judiciary Committee. Justice Winslow testified that the loan servicing issues had become so prevalent in New York that an RMBS trustee's standing to foreclose had "'become . . . a pervasive issue.'" FCIC Report at 407.

- 4 -

The FCIC Report further documented numerous other improper loan servicing practices that Justice Winslow had observed in foreclosure cases, such as:

> *[T]he failure to produce the correct promissory notes in court during foreclosure proceedings; gaps in the chain of title, including printouts of the title that have differed substantially from information provided previously; retroactive assignments of notes and mortgages in an effort to clean up the paperwork problems from earlier years; questionable signatures on assignments and affidavits attesting to the ownership of the note and mortgage; and questionable notary stamps on assignments*.

*Id*. at 407-08.

- **January 26, 2011**:  The U.S. Inspector General released a report in which the following observations were made about the loan servicing industry:

  > *Anecdotal evidence of [loan servicers'] failures [have] been well chronicled. From the repeated loss of borrower paperwork, to blatant failure to follow program standards, to unnecessary delays that severely harm borrowers while benefiting servicers themselves, stories of servicer negligence and misconduct are legion, and . . . they too often have financial interests that don't align with those of either borrowers or investors*.

- **February 2011**:  Covered Trust Servicer Nationstar was sued in a class action by borrowers in West Virginia whose loans were serviced by Nationstar.  Nationstar was the Servicer for the SVHE 2007-NS1 Covered Trust.  ***Discovery in the case revealed thousands of violations of West Virginia law by Nationstar***.  Nationstar subsequently settled the case.

**APPENDIX 5**

- **April 14, 2011**:  Deutsche Bank and one of its servicers had an order to show cause issued against them *one day after the consent orders*, because of misconduct which mirrored that described in the consent orders.  *See In re Doble*, No. 10-11296, 2011 Bankr. LEXIS 1449 (Bankr. S.D. Cal. Apr. 14, 2011).  The bankruptcy court pointed out that in bankruptcy proceedings "*servicers routinely file inaccurate claims, some of which may not be lawful.*"  *Id*. at *21.

- **May 2011**:  Just one month after the April 2011 consent orders, Covered Trust Servicers CHLS/BACHLS and Saxon Mortgage Services entered into additional consent orders with the U.S. Department of Justice for additional loan servicing misconduct.  CHLS/BACHLS and Saxon Mortgage Services were Servicers for six of the 10 Covered Trusts at that time.  These Servicers were charged by the Department of Justice with wrongfully and ***intentionally foreclosing on active duty servicemembers in violation of federal law***, clearly Events of Default. CHLS/BACHLS paid $20 million to compensate and resolve claims that it illegally foreclosed on approximately 160 servicemembers between January 2006 and May 2009.  It also agreed to extensive loan servicing reforms, and also agreed to pay additional compensation to any other servicemembers it illegally foreclosed on between June 2009 through 2010.  Saxon Mortgage Services agreed to compensate servicemembers on which it also ***intentionally foreclosed in violation of law between 2006 and 2009, including many servicemembers "who . . . served honorably in Iraq, some of whom were severely injured in the line of duty or suffer[ing] from post-traumatic stress disorder*,**" according to the Department of Justice's press release.  Saxon Mortgage Services agreed to pay $2.35 million to aggrieved servicemembers for its misconduct, agreed to numerous corrective measures, and further agreed to provide additional compensation to additional servicemembers on which it illegally foreclosed between July 2009 and December 2010.[1]

---

[1]   The Justice Department's press release summed up the egregiousness of these Servicers' misconduct with the following quote from the U.S. Attorney for the Northern District of Texas, who filed the action against Saxon Mortgage Services:

> With the numerous sacrifices our servicemembers make while they are serving our country, the last thing they need to worry about is whether or not their families will be forced from their homes," said James T. Jacks, U.S. Attorney for the Northern District of Texas.  "*These lenders' callous disregard for the SCRA, a law which was designed to insulate these patriots from unlawful foreclosures and other civil and financial obligations while they are on active duty, is deplorable and I applaud the Department's Civil Rights Division's efforts in identifying and seeking remedies for these wronged service members*."

- **June 2011**: Bank of America entered into an ***$8.5 billion settlement concerning 530 RMBS trusts*** for loan servicing abuses by CHLS/BACHLS.  (A portion of the settlement was also for massive breaches of R&Ws.)

- **June 23, 2011**:  The Illinois Department of Financial and Professional Regulation fined PHH – a Servicer to the GSR 2007-AR2 Covered Trust – $240,000 for signing foreclosure affidavits that the company knew would later be altered by its attorneys and for signing affidavits using someone else's name.  The Illinois regulator found that "***at least four different people used one employee's name to sign . . . affidavits,***" and also "***discovered other evidence of improprieties on the part of PHH employees***."  It further found that PHH had violated Illinois law.[2]

- **July 2011**:  The *Associated Press* reported that "***[m]ortgage industry employees are still signing documents they haven't read and using fake signatures more than eight months after big banks and mortgage companies promised to stop the illegal practices that led to a nationwide halt of home foreclosures***."  The *Associated Press* article further reported:

    > *County officials in at least three states say they have received thousands of mortgage documents with questionable signatures since last fall, suggesting that the practices, known collectively as "robo-signing," remain widespread in the industry.*

    > \*          \*          \*

    > *Lenders say they are working with regulators to fix the problem but cannot explain why it has persisted.*

    > *Last fall, the nation's largest banks and mortgage lenders, including JPMorgan Chase, Wells Fargo, Bank of America and an arm of Goldman Sachs, suspended foreclosures as they investigated how corners were cut to keep pace with the crush of foreclosure paperwork.*

    > *Critics say the new findings point to a systemic problem with the paperwork involved in home mortgages and titles.  And they say it shows that banks and mortgage processors haven't acted aggressively enough to put an end to widespread document fraud in the mortgage industry.*

---

[2]   Later, in December 2013, PHH demonstrated that the Events of Default discussed above were not isolated events but rather a common course of conduct.  On December 4, 2013, *The Star-Ledger* reported that the New Jersey Attorney General had charged PHH with misleading borrowers and violating New Jersey law by "***not giving homeowners accurate information about how long it would take to process loan modifications, misleading them about foreclosure proceedings and imposing improper fees***."  PHH paid $6.35 million to settle the charges which involved misconduct affecting "***[a]t least 2,000 borrowers***," demonstrating a company-wide practice that also affected the Mortgage Loans in the Covered Trust serviced by PHH.

"*Robo-signing is not even close to over,*" says Curtis Hertel, the recorder of deeds in Ingham County, Mich., which includes Lansing. "*It's still an epidemic*."

- **July 2011**: Michael Calhoun, President of the Center for Responsible Lending, told the U.S. Senate Banking, Housing and Urban Affairs Committee that "*[a]busive [loan servicing] practices have become so ingrained in the servicing culture that they are now endemic to the industry*." He then testified concerning multiple ongoing servicing abuses he had observed, such as:

  - "dual track[ing]," an improper servicing practice where the borrower is foreclosed on in the middle of ongoing loan modification negotiations or after a trial modification was agreed to and being performed by the borrower;
  - "[f]oreclosing even when [RMBS] investors would receive more from a sustainable modification";
  - "[i]mproper denial and delay of loan modification requests . . . because fees, which eventually flow directly to servicers . . . continue to accrue";
  - "[f]orcing homeowners into multiple temporary modifications [which is] a best-of-both-worlds situation for servicers, who continue to charge fees";
  - "[f]orce-placed insurance [which is] very expensive . . . often driving an otherwise current borrower into delinquency and even foreclosure";
  - "[i]mproper fees";
  - "[m]isapplication of borrower payments";
  - "[m]ismanaged escrow accounts";
  - "[f]ailing or refusing to provide payoff quotations to borrowers";
  - "[a]buses in the default and delinquency process"; and
  - "*fail[ure] to adhere to loss mitigation requirements of [RMBS] investors,*" *i.e., failures to abide by the Governing Agreements*.

- **July 2011**: *Reuters* reported that Master Servicers and Servicers were continuing to engage in Events of Default on a grand scale. *Reuters*' investigation found that loan servicers "*continue[d] to file questionable foreclosure documents with courts and county clerks*," and that "*servicers have filed thousands of documents that appear to have been fabricated or improperly altered, or have sworn to false facts*." *Reuters* also reported that "*[o]ne of the industry's top representatives admits that the federal settlements [in April 2011] haven't put a stop to questionable practices,*" and that "*many [servicers] are still taking the same shortcuts they promised to shun, from sketchy paperwork to the use of 'robo-signers.'*" The *Reuters* investigative report cited multiple examples of continuing improper loan servicing by many of the Master Servicers and Servicers to the Covered Trusts, including *Bank of America (CHLS/BACHLS and National City), Wells Fargo, GMAC and IndyMac (through its successor OneWest Bank)*. Together, these Master Servicers/Servicers serviced Mortgage Loans in at least seven of the 10 Covered Trusts. *Reuters* reported that OneWest Bank (successor to *Servicer IndyMac*) "*recently filed a court document that appears riddled with discrepancies*." *Reuters* also reported that Master Servicers/Servicers Wells Fargo

- 3 -

and GMAC had assigned mortgages on behalf of New Century to others in 2011, four years *after* New Century ceased to exist, and that in "*court files of Florida foreclosure cases by Wells Fargo . . . none of the promissory notes filed as exhibits in 10 cases found by Reuters had any endorsements on them*."  Bank of America (which includes Covered Trust Servicers CHLS/BACHLS and National City) was also singled out by the *Reuters* article:

> *Bank of America, meanwhile, is coming under fire from a New York federal bankruptcy judge*.

> *Last Tuesday, Judge Robert Drain ordered an investigation involving a foreclosure case brought by the bank.  Two earlier copies of a promissory note filed in court had lacked any endorsement, but then one appeared on the note when bank lawyers produced the original*.

> *The judge said the sudden appearance of an endorsement, and his own close look at it, raised questions about whether it had been added illegally to make the note look legitimate*.

> *It "raises a sufficiently serious issue as to when and more importantly by whom this note was endorsed," the judge said*.

The *Reuters* article revealed that Deutsche Bank itself was continuing to use robo-signers.  The article focused on Bryan Bly, an employee of Nationwide Title Clearing, and reported the following:

> *Bly testified in a July 2010 foreclosure case in Florida that he signed up to 5,000 mortgage assignments per day at the loan-servicing company.  Although he is an employee of Nationwide, he signed the documents as a "vice president" of Option One Mortgage, Deutsche Bank, CitiBank and other institutions*.

> *In his deposition, Bly said Nationwide multiplied his output by electronically stamping his signature on additional mortgage assignments that Bly said he never saw.  He testified, too, that all the documents then were falsely notarized.  Nationwide's notaries were given stacks of the already-signed documents, he said, and attested falsely that Bly had signed the legal papers in front of them.  Bly said he didn't verify the information in the papers he signed, and that he didn't understand key words and expressions in them.*

> *Despite these disclosures, a Reuters search of county clerk records in Florida, New York and Massachusetts shows that Bly continued to sign thousands of mortgage assignments this year*.

The *Reuters* article reported on another instance where Deutsche Bank was continuing to use robo-signing:

*Robo-signing isn't limited to low-level employees at loan servicers.*

*Lawrence Buckley is a lawyer who manages the Dallas, Texas law firm Brice, Vander Linden and Wernick. In March, he testified that he had allowed his electronic signature to be affixed to sworn court documents that he had never seen. The documents, known as "proofs of claim," included one filed with the federal bankruptcy court in New York. It sought permission for Deutsche Bank to seize the Bronx, New York, house of 59-year –old Virginia Abasi.*

*Buckley said he had never seen the document, and that another lawyer at his firm had filed it using Buckley's electronic signature. The signature appears on the document as "/s/ Lawrence J. Buckley."*

*Buckley said that other lawyers at his firm were permitted to use his signature to file documents electronically with bankruptcy courts. He testified that it was standard practice at the firm not to review any of the original documents the claim was supposed to be based on, such as the original promissory note and mortgage.*

The *Reuters* article confirmed ongoing, rampant Events of Default:

Reuters reviewed records of individual county clerk offices in five states – Florida, Massachusetts, New York, and North and South Carolina – with searchable online databases. Reuters also examined hundreds of documents from court case files, some obtained online and others provided by attorneys.

*The searches found more than 1,000 mortgage assignments that for multiple reasons appear questionable: promissory notes missing required endorsements or bearing faulty ones; and "complaints" (the legal documents that launch foreclosure suits) that appear to contain multiple incorrect facts*.

- **August 2011**:  Covered Trust Servicers National City and BACHLS were again caught engaging in Events of Default. In states providing for non-judicial foreclosures, Bank of America (and thus National City and CHLS/BACHLS) utilized a subsidiary of Bank of America called ReconTrust Company, N.A. ("ReconTrust"), to foreclose on homeowners. On August 4, 2011, *the Attorney General for the State of Washington filed an action against ReconTrust alleging that the company "failed to comply with the procedures of [Washington state foreclosure laws] in each and every foreclosure it has conducted since at least June 12, 2008," and "systematically conceals, misrepresents or inaccurately divulges the true parties to the mortgage transaction," including misrepresenting the ownership of mortgage notes*.

- 5 -

- **August 2011**: *American Banker* reported that "***the largest mortgage servicers are still fabricating documents***" filed in foreclosure proceedings.  The article reported the following:

  > *Several dozen documents reviewed by American Banker show that as recently as August some of the largest U.S. banks, including Bank of America Corp. [National City and CHLS/BACHLS], Wells Fargo & Co., Ally Financial Inc. [GMAC], and OneWest Financial Inc. [IndyMac], were essentially backdating paperwork necessary to support their right to foreclose*.

  > *Some of documents reviewed by American Banker included signatures by current bank employees claiming to represent lenders that no longer exist*.

  > \*       \*       \*

  > "*It's one thing to not have the documents you're supposed to have even though you told investors and the SEC you had them,*" *says Lynn E. Szymoniak, a plaintiff's lawyer in West Palm Beach, Fla.* "*But they're making up new documents*."

  > \*       \*       \*

  > *North Carolina consumer bankruptcy lawyer O. Max Gardner III says servicers and trustees often submit promissory notes in court without proper endorsements, which show the chain of title from one lender to another. Then, after the fact, there will be* "*a magically appearing note with a stamped endorsement,*" *Gardner said*.

  > *When plaintiff's lawyers then try to depose the person whose name is stamped on the endorsement,* "*we're being told the person is no longer employed by the servicer or by the party for whom they signed,*" *Gardner says*.

  > *Linda Tirelli, a New York bankruptcy lawyer, calls such mortgage documents* "*Ta-Da!*" *assignments because they seem to appear out of nowhere*.

  > "*Why are they creating their own assignments to begin with?*" *asks Tirelli, who represents borrowers.* "*Why is this even an issue?*"

- **October 6, 2011**: Neil Barofsky, former Special Inspector General for the Troubled Asset Relief Program, or TARP, testified before a U.S. House Financial Services Subcommittee and stated that the Government Accountability Office ("GAO") "***confirmed . . . widespread anecdotal evidence of [loan] servicers' failures***" to properly service mortgage loans.  Barofsky also confirmed that "***the widespread abuse suffered . . . at the hands of the mortgage servicers . . . has gone largely***

*unaddressed . . . even though [the Government] has been aware of servicer misconduct since 2009,*" and further confirmed that "***rampant mortgage servicer abuse that has so strongly characterized the [financial] crisis . . . continues to go unpunished***."

- **November 11, 2011**:  New York's Department of Financial Services came to an agreement with Warrantor Morgan Stanley and its Servicer Saxon Mortgage Services to drastically reform their loan servicing practices.  Benjamin Lawsky, the Department's Superintendent of Financial Services stated: "***Today's agreements are an important step forward in cleaning up some of the mortgage industry's most troubling practices***," including robo-signing, the filing of false documents, improper refusals to modify loans, and the charging of improper fees.

- **December 2011**:  It was reported that an Alabama bankruptcy court judge ruled that Wells Fargo, a Master Servicer or Servicer to at least seven of the 10 Covered Trusts, had filed ***at least 630 sworn foreclosure affidavits containing false facts***, including claims that borrowers were in arrears for amounts not actually due.  Judge Margaret A. Mahoney had declared that "Wells Fargo 'took the law into its own hands'" and disregarded perjury laws.

- **January 2012**:  The *Chicago Tribune* reported:

    *Foreclosure-related case files in just one New York federal bankruptcy court, for example, hold at least a dozen mortgage documents known as promissory notes bearing evidence of recently forged signatures and illegal alterations, according to a judge's rulings and records reviewed by Reuters.  Similarly altered notes have appeared in courts around the country*.

    *Banks in the past two years have foreclosed on the houses of thousands of active-duty U.S. soldiers who are legally eligible to have foreclosures halted.  Refusing to grant foreclosure stays is a misdemeanor under federal law*.

    *The U.S. Treasury confirmed in November that it is conducting a civil investigation of 4,500 such foreclosures.  Attorneys representing service members estimate banks have foreclosed on up to 30,000 military personnel in potential violation of the law*.

    \*       \*       \*

    *And in thousands of cases, documents required to transfer ownership of mortgages have been falsified.  Lacking originals needed to foreclose, mortgage servicers drew up new ones, falsely signed by their own staff as employees of the original lenders – many of which no longer exist*.

- 7 -

- **February 9, 2012**: The U.S. Department of Justice and 49 states obtained "*a landmark $25 billion settlement," "the largest federal-state civil settlement ever obtained*," against the nation's five largest loan servicers for continuing "*mortgage loan servicing and foreclosure abuses*" (hereafter the "National Mortgage Settlement"). U.S. Attorney General Eric Holder called the servicers' misconduct "*reckless and abusive mortgage practices*." *The five loan servicers charged by the U.S. and 49 states were repeat offenders – they had previously entered into the April 2011 consent orders. Four of the five serial offenders were Bank of America (which includes Servicers CHLS/BACHLS and National City), JPMorgan (which includes Servicers JPMorgan Chase and WaMu), Wells Fargo and Ally Financial (which includes Servicer GMAC)* – Master Servicers or Servicers for *seven of the 10 Covered Trusts*. These repeat offenders were charged with

  > *violations of state and federal law[;] . . . [the] use of "robo-signed" affidavits in foreclosure proceedings; deceptive practices in the offering of loan modifications; failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages; and filing improper documentation in federal bankruptcy court*.

- **February 2012**: The New York Attorney General sued many of the Master Servicers and Servicers to the Covered Trusts – Wells Fargo, Bank of America (and therefore CHLS/BACHLS and National City), and JPMorgan Chase (and therefore WaMu), which collectively serviced Mortgage Loans for at least seven of the 10 Covered Trusts. The New York Attorney General also sued MERSCORP Inc. and its subsidiary Mortgage Electronic Registration Systems, Inc. (collectively, "MERS"). The lawsuit alleged that the Master Servicers and Servicers and MERS repeatedly submitted documents to courts in foreclosure proceedings that contained misleading and false information. The New York Attorney General stated: "'*Once the mortgages went sour, these same banks brought foreclosure proceedings en masse based on deceptive and fraudulent court submissions, seeking to take homes away from people with little regard for basic legal requirements or the rule of law*.'"

- **March 5, 2012**: U.S. Secretary of Housing and Urban Development, Shaun Donovan, stated in televised comments that "*as high as 60 percent of foreclosures were [still] being done wrong*."

- **March 30, 2012**: Jamie Dimon, CEO of JPMorgan Chase & Co., which owned and controlled Covered Trust Servicers JPMorgan Chase, a Servicer for the MSIX 2006-1 Covered Trust, and WaMu, a Servicer for the HVMLT 2006-8 Covered Trust, sent a letter to JPMorgan's shareholders admitting that JPMorgan Chase and WaMu engaged in robo-signing:

  > *Our servicing operations left a lot to be desired: There were too many paperwork errors, including affidavits that were improperly signed because the signers did not have personal knowledge about what was in the affidavits but, instead, relied on the company's processes*.

- **April 2, 2012**:  Morgan Stanley's parent company entered into a "Consent Order to Cease and Desist" with the Federal Reserve that was substantially identical to the April 2011 consent orders, regarding its subsidiary, Covered Trust Servicer Saxon Mortgage Services.  At various times, Saxon Mortgage Services was a Servicer for up to five of the 10 Covered Trusts.  Like the April 2011 consent orders, Morgan Stanley/Saxon Mortgage Services consented to the entry of an order charging them with "***unsafe and unsound***" loan servicing practices, which included the *filing of false affidavits in foreclosure proceedings that were also falsely sworn to be based on the personal knowledge of the affiants when in fact they were not, filing false affidavits which were also not properly notarized or signed in the presence of a notary, filing defective or false documents such as endorsed or assigned notes and mortgages, failing to properly staff, manage and supervise foreclosures, failing to properly communicate with borrowers prior to foreclosing, and failing to have adequate internal controls, policies, procedures, compliance risk management, audit, training, and oversight of their foreclosure processes, including failing to properly oversee third-party vendors and outside counsel prosecuting the foreclosures*.  In February 2013, Morgan Stanley/Saxon Mortgage Services agreed to an amendment to their consent order, whereby they paid $97 million to borrowers who were improperly foreclosed on by them.

- **June 7, 2012**:  Law professor Adam Levitin testified before a U.S. House Subcommittee, stating that *the National Mortgage Settlement would "not deter future consumer fraud by too-big-to-fail" master servicers/servicers*, calling their conduct "***one of the most pervasive violations of procedural rights in history*** *supported by "evidence of widespread fraud [which] was too great to ignore*."  Regarding the National Mortgage Settlement, Professor Levitin stated: "Critically for the purposes of this hearing, *the settlement permits the banks to receive credit under the settlement by reducing principal or refinancing on mortgages that they service, but do not own*," and therefore "*servicers have strong incentives not to engage in principal write-downs on loans they own*"; instead, "*it appears likely that most of the principal reductions will come from underlined investor-owned mortgages*," *i.e., Mortgage Loans like those in the Covered Trusts*.  Professor Levitin concluded: "*I would expect servicers to perform some [principal reductions] that violate PSAs in order to get . . . settlement credit*."

- **December 2012**:  An Ohio appeals court rendered a decision against Nationstar that revealed that Nationstar was engaging in the same Events of Default as the Covered Trusts' other Master Servicers and Servicers.  In *Nationstar Mortg., LLC v. Van Cott*, No. L-12-1002, 2012 Ohio App. LEXIS 4999, at *1 (App. Ct. Ohio Dec. 7, 2012), the appeals court reversed a summary judgment of foreclosure in favor of Nationstar, holding that while Nationstar alleged in its complaint that it was "'entitled to enforce the Note pursuant to Section 1303.31 of the Ohio Revised Code, and the Mortgage was given to secure the Note' . . . Nationstar did not attach a copy of either the note or mortgage to its complaint and alleged that the note had been misplaced and could not be located."  But, miraculously, a note and mortgage magically appeared at the time Nationstar filed its summary judgment motion.  However, the appeals court noted that the note "*show[ed] no evidence of an assignment to Nationstar" and in*

fact "do[es] not show an assignment of . . . the note to anyone," contrary to Nationstar's allegations and affidavits. *Id.* at *15, *18. The court also noted that "an assignment of the mortgage . . . to Nationstar . . . was executed on September 3, 2010," but that "[t]he complaint was filed on August 23, 2010." *Id.* at *18. This clearly indicated that Nationstar had misrepresented the fact that it owned the note and mortgage at the time it filed suit, as required by Ohio law.

- **January 2013**:  Bank of America was reported to still be committing Events of Default, as it had to pay Fannie Mae $1.3 billion "*to make up for dropping the ball on servicing mortgages . . . by delaying contacts with delinquent borrowers or failing to process foreclosures properly.*"

- **February 2013**:  In a lawsuit to approve an $8.5 billion settlement between Bank of America and the trustee of 530 RMBS trusts concerning, *inter alia*, improper loan servicing by Covered Trust Servicer CHLS/BACHLS, *objectors to the settlement provided evidence to the court establishing that CHLS/BACHLS breached the PSAs for 468 of the 530 trusts by improperly modifying first lien loans owned by the trusts, and thus causing losses to the investors, while simultaneously refusing to modify second lien loans it or Bank of America owned in order to avoid losses to themselves*.

- **March 4, 2013**: A class of nationwide borrowers sued Nationstar for improper loan servicing practices, alleging that Nationstar violated state and federal laws by making "*repeated misrepresentations*" and *engaging in "deceptive"* business practices in connection with improperly denying loan modifications required by it under the HAMP program.  *The borrowers alleged that Nationstar operated "a system designed to wrongfully" deny borrowers loan modifications*.

- **March 7, 2013**:  Nationstar was sued again, this time by an RMBS investor.  The *RMBS investor alleged that Nationstar was "not fulfill[ing] its duties as Master Servicer, but rather has engaged in practices to enrich itself at the expense of the . . . certificate holders*."  *The investor alleged that Nationstar was breaching its master servicing agreement with the RMBS trust and engaging in a "blatant abdication of its servicing duties under the governing contracts" by "auctioning off the trusts' mortgage loans in bulk . . . for amounts that are a fraction of the loans' unpaid balances or the value of the properties securing the loans*."  The investor alleged these actions profited Nationstar, which recouped the fees it advanced, but injured investors.  *The court immediately issued a temporary restraining order against Nationstar and ordered it to stop selling the loans*.  Nationstar thereafter quickly settled the case.

- **June 2013**: The *Charlotte Business Journal* reported that the monitor overseeing the administration of the National Mortgage Settlement found that Bank of America (and thus Covered Trust Servicers CHLS/BACHLS and National City) were not complying with the required servicing standards.  The article stated: "***These aren't***

*new allegations*."[3]   *The New York Times* reported that, in addition to Bank of America, Master Servicers/Servicers JPMorgan (and thus JPMorgan Chase and WaMu), Wells Fargo and GMAC (through Ally Financial) were also not complying with the settlement.  *The New York Times* reported that the servicers had received "***almost 60,000 complaints***" from borrowers about their servicing misconduct, while:

> *[S]tate officials have expressed deep disappointment with the banks' performance in other areas.  Last month, lawyers in the office of Martha Coakley, the attorney general of Massachusetts, detailed what they said were hundreds of violations of the settlement, including a failure to adhere to the required timetable or provide reasons for the denial of an application.*

> *They also pointed to cases where they said banks had improperly inflated the value of a loan before writing it down so as to claim a greater amount of relief, or where they had reverted to a higher interest rate while delaying, for months, the decision to make a trial loan modification permanent.*

> *Soon after, Eric T. Schneiderman, the attorney general of New York, announced plans to sue Bank of America and Wells Fargo, saying they were repeatedly violating the terms of the settlement.*

> *Lisa Madigan, the attorney general of Illinois, said there was an "alarming pattern" of violations of the servicing standards.  In a review of servicer handling of loan modification requests in Illinois, she found that in 60 percent, servicers failed to comply with the time frame for notifying borrowers of missing documents and in 45 percent they made multiple requests for the same documents.*

> *Pam Bondi, the attorney general of Florida, has written letters to Bank of America and Wells Fargo detailing similar complaints that are resolved only by the intervention of her office.*

- **June 2013**:  *CBC News* reported that former employees of Bank of America (which includes National City and CHLS/BACHLS) had filed sworn affidavits in cases against the bank revealing conduct amounting to Events of Default

> *Former Bank of America employees say in court documents that the bank routinely lies to customers about their mortgages, and denies their requests for modifications without even looking at the paperwork.*

> *In sworn affidavits, four former employees, for example, describe policies in place at the bank that they say are designed to subvert the Home*

---

[3]   In fact, Bank of America would subsequently be found to not be in compliance by the monitor several additional times.

*Affordable Modification Program (HAMP), 2009 government-sponsored initiative that was designed to keep distressed homeowners above water during the depths of the housing crises.*

*The affidavits are part of multiple court cases against the bank brought by homeowners who say they were unfairly foreclosed upon.*

\*       \*       \*

*The former workers allege there's a bank-wide policy that encourages mortgage officers to delay and avoid that process as much as possible, to foreclose on customers who shouldn't have been, and to generally lie and mislead.*

*According to one affidavit, a mortgage processor who put 10 or more houses into foreclosure in any given month was eligible for a $500 cash bonus, or gift cards at a major retailer.*

*The sworn affidavits were made public recently on the website of ProPublica, an independent, non-profit news service that produces investigative journalism in the public interest.*

*The employees say the bank also went out of its way to mislead, stall and delay paperwork so that customers would be denied changes to their mortgages, and forced into arrangements that were more profitable to the bank than HAMP arrangements were.*

*"We were told to lie to customers and claim that Bank of America had not received documents it had requested, and that it had not received trial payments [when in fact it had]," said Simone Gordon, a senior collector of loss mitigation at the bank for five years until early 2012.*

*Another ex-worker, Theresa Terrelonge, agreed that subverting HAMP to the bank's benefit was an overarching goal for the bank.*

*"Based on what I observed, Bank of America was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP," she said.*

\*       \*       \*

*"It was well known among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible."*

*She also said that Bank of America "collectors" who failed to meet their quotas were fired for not putting enough customers into foreclosure. "Several of my colleagues were terminated on that basis," she said.*

*Another former employee, William Wilson, said the bank would routinely delay filing appropriate paperwork after receiving it, in order to have certain penalties kick in. After waiting 60 days, the bank would automatically reject them all.*

*"During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than the documents were more than 60 days old," Wilson said.*

*"Once an applicant was finally rejected after a long delay, the bank would offer them an alternative. Bank of America would charge a higher interest rate . . . ."*

*Wilson alleges he was fired in August 2012 for refusing to go along with the scheme any longer.*

\*     \*     \*

*The employees allege the bank would routinely file false paperwork to [the] government suggesting it had far more HAMP-backed loans on its books than was the reality.*

*"It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true," Steven Cupples said. Cupples worked at the bank until June 2012. He previously worked at Countrywide, the lender at the center of America's subprime mortgage crisis that was subsequently taken over by Bank of America.*

- **September 2013**: Salon.com reported that Covered Trust Servicer Nationstar was engaging in an "*appalling new way to cheat homeowners*." The article stated:

  *A few months ago, Ceith and Louise Sinclair of Altadena, California, were told that their home had been sold. It was the first time they'd heard that it was for sale.*

  *Their mortgage servicer, Nationstar, foreclosed on them without their knowledge, and sold the house to an investment company. If it wasn't for the Sinclairs going to a local ABC affiliate and describing their horror story, they would have been thrown out on the street, despite never missing a mortgage payment. It's impossible to know how many homeowners who didn't get the media to pick up their tale have dealt with a similar catastrophe, and eventually lost their home.*

- 13 -

*     *     *

*Nationstar has racked up an impressively horrible customer service record in its short life, failing to honor prior agreements with borrowers and pursuing illegal foreclosures.  The fact that Nationstar and other corrupt companies like it are beginning to corner the market for mortgage servicing should trouble not only homeowners, but the regulators tasked with looking out for them.  It didn't seem possible that a broken mortgage servicing industry could get worse, but it has.*

*     *     *

*[But] Nationstar is no different. . . .  While the company promised California that it would adhere to all settlement obligations on the servicing rights it purchases, the Sinclairs were subjected to familiar abuse.  The family paid their mortgage on time since purchasing their home in 2003.  Last year, they received a loan modification.  But their servicer sold the rights to Nationstar, and Nationstar didn't honor the modification.  In June, the Sinclairs sent in their mortgage payment, and Nationstar sent it back in full.  Then it sold the home.  When questioned, Nationstar claimed the Sinclairs didn't notarize one page of their modification, which turned out to be untrue.*

*It was a clear attempt to find an excuse to deny the modification and push the Sinclairs into foreclosure.  Mortgage servicers actually make more money with foreclosures than with loan modifications, because of how their compensation structure works.  Servicers load up various foreclosure fees on homeowners that they get to keep, and they get paid off first in a foreclosure sale.  A loan modification simply cuts their percentage balance on the loan.*

- **November 2013**: JPMorgan Chase & Co. (owner of Servicers JPMorgan Chase and WaMu) announced that it had entered into a tentative settlement whereby it would pay *$4.5 billion* to settle R&W *and loan servicing claims for tens of thousands of loans in 330 RMBS trusts*.

- **November 2013**:  Standard & Poors estimated that the largest loan servicers' exposure for improper loan servicing was approximately *$30 billion*.

- **December 2, 2013**:  Covered Trust Servicer Nationstar had its foreclosure action dismissed because it engaged in of numerous instances of misconduct, as the court held:

  *[Nationstar] counsel conceded that there was no properly filed verified amended complaint and that they had been proceeding for more than a year as if there was.  It was further conceded that [the borrower's] counsel had inexplicably been left off the service list and did not receive notice of*

- 14 -

> *prior hearings and filings. . . . Instead, many of the pleadings were directed to the client and [borrower], Jennie Cassady without notice to her attorney. No plausible explanation was provided.*
>
> . . . [Nationstar] now seeks once again for permission to properly file an Amended Verified Complaint, almost two years from the date leave to amend was initially granted. Further, [Nationstar] was on notice since December of 2010 that it was delinquent in posting a non-resident cost bond in accordance with § 57.011, Fla. Stat. No bond has yet to be filed and the 20 day grace period under the statute has long since expired. . . . *[Nationstar] [has engaged in] years of delay and willful and deliberate inaction and inattention to court orders, as well as the questionable behavior of counsel in failing to ensure timely service of notices and pleadings to [the borrower's] attorney and not the client. [Nationstar's] repeated failure to file the cost bond even when put on notice to do so nearly three years ago in and of itself is a sufficient basis for dismissal of this action.[fn]*
>
> *       *       *
>
> *[fn] [Nationstar] was not just "tardy" but deliberately obstinate and recalcitrant in ignoring the "safe harbor" warning given in 2010 and other later notices by the [borrower].*

*Nationstar Mortgage LLC v. Cassady, et al.*, No. 502010CA28180AXXXXMB, slip op. at 2-3 & n.2 (Fla. Cir. Ct. Palm Bch. Cnty. Dec. 2, 2013).

- **January 2014**: A class action was filed against Covered Trust Servicer Nationstar in Nevada, alleging as a similar class action filed in February 2011 had, that Nationstar improperly refused to honor loan modification agreements, as well as "*assessed unwarranted penalties and costs*."

- **February 2014**: Steven Antonakes, Deputy Director of the CFPB, confirmed that the loan servicing industry as a whole was continuing its servicing abuses and Events of Default. At the Mortgage Bankers Association's National Mortgage Servicing Conference in February 2014, Antonakes gave a speech which took the industry to task, stating: "<u>***Nearly eight years have passed and I remain deeply disappointed by the lack of progress the mortgage servicing industry has made***</u>." Antonakes stated that ***the CFPB was still receiving "around 4,900 complaints per month" concerning mortgage servicing***, and "too many [borrowers] continue to receive *erratic and unacceptable treatment. . . . This kind of continued sloppiness is difficult to comprehend and not acceptable. It is time for the paper chase to end. . . . It has felt like 'Groundhog Day' with mortgage servicing for far too long*." Antonakes also said the pervasive practice of successor servicers failing to honor loan modification agreements with prior servicers "would not be tolerated," and that the servicing industry's continuing deceptive practices would not be allowed: "*There will be no more shell games where the first servicer says the transfer ended all of its responsibility . . . and the second servicer*" claims

- 15 -

*ignorance about the modification*.  Antonakes summed up his speech as follows, which clearly indicated that the industry still had not stopped committing Events of Default:

> *My message to you today is a tough one.  I don't expect a standing ovation when I leave.  But I do want you to understand our perspective. I would be remiss if I did not share it with you.*
>
> *In our view, the intense human suffering inflicted on American consumers by an all-too-frequently indifferent mortgage servicing system has required us to change the paradigm in mortgage servicing forever. Frankly, the notion that government intervention has been required to get the mortgage industry to perform basic functions correctly – like customer service and record keeping – is bizarre to me but, regrettably, necessary. . . .*
>
> *But please understand: if you choose to operate in this space, the fundamental rules have changed forever.  It's not just about collecting payments.  It's about recognizing that you must treat Americans who are struggling to pay their mortgages fairly before exercising your right to foreclose.  We have raised the bar in favor of American consumers and we are ready, willing and able to vigorously enforce that bar.*
>
> *Ultimately, these profound changes will be good for all Americans, including industry. But please understand, business as usual has ended in mortgage servicing. Groundhog Day is over.  Thank you.*

- **March 2014**: *The Washington Post* reported on a foreclosure lawsuit filed in federal court in New York in which an internal Wells Fargo "foreclosure manual" was filed. The borrower's attorney asserted that the internal manual instructed attorneys working for Master Servicer/Servicer Wells Fargo about how to essentially perform robo-signing and create false foreclosure documents.  The borrower's attorney was reported to have stated: "'***This is a blueprint for fraud. . . .  The idea that this bank is instructing people how to produce these documents is appalling***.'"  *The Washington Post* further reported that ***the borrower's attorney "has long suspected Wells Fargo of manufacturing documents.  A number of her past cases involving the bank featured mortgage notes that were not endorsed by anyone, but when she brought it to Wells Fargo's attention the bank would 'magically' produce[] the document."  It happened so frequently to this attorney and her colleagues "that they started to call paperwork 'ta-da' documents***."  This revealed unequivocal evidence that Wells Fargo – a Master Servicer/Servicer for at least seven of the 10 Covered Trusts – had an established, uniform ***and written practice manual*** that directed the company-wide manufacture of falsified, robo-signed documents, a clear Event of Default.

- **March 5, 2014**: New York State's Department of Financial Services Superintendent Benjamin Lawsky sent a letter to Nationstar stating: "***We have received hundreds of complaints from New York consumers about your company's mortgage***

*modifications, including problems related to mortgage modifications, improper fees, lost paperwork, and numerous other issues*."

- **May 23, 2014:**  Wells Fargo settles a derivative action by its shareholders against Wells Fargo executives alleging they allowed foreclosure abuses to occur, including improper robo-signing and the filing of false affidavits not based on personal knowledge.  Wells Fargo paid $67 million to settle the case.

- **May 29, 2014:**  News reports indicate that the U.S. Attorney's office in Manhattan is investigating five loan servicers, including Covered Trust Servicer PHH, for overcharging the Government for expenses incurred during foreclosures.

# APPENDIX 6

- **April 2004**: The OTS instituted an enforcement action against Ocwen Federal Bank. The OTS found that Ocwen had ***engaged in illegal, unsafe and unsound collection practices***. As a result, Ocwen entered into a written "supervisory agreement" with the OTS, in which it agreed to improve its compliance with numerous federal laws, including the Real Estate Settlement Procedures Act, the Fair Debt Collection Practices Act and the Fair Credit Reporting Act. The *Palm Beach Post* reported that Ocwen entered into the agreement with the OTS after being "[f]looded" with "hundreds" of complaints by borrowers, consumer advocates and class-action attorneys, and "several proposed class-action suits against Ocwen." [1]

- **November 29, 2005**: In a lawsuit in which Deutsche Bank, Ocwen and others were co-defendants, a jury rendered ***an $11.5 million verdict in favor of a borrower and against Ocwen arising out of Ocwen's misservicing of the loan***. *See Davis v. Ocwen Loan Servicing LLC, et al.*, No. 2004 CV 1469 (Tex. Dist. Ct. Galveston Cnty. Nov. 29, 2005) (Honorable Susan Criss). The jury award included $10 million in punitive damages because of the egregious misconduct engaged in by Ocwen (the jury award was later reduced to $1.8 million by agreement of the parties). According to borrower Davis's attorney, in February 2002, Ms. Davis, 64, took out a $31,000 home equity loan on the Texas City residence where she had lived since 1942. In 2003, Davis became ill and spent four days in the hospital, which forced her to miss one loan payment. Ocwen told her it would put her on a payment plan, but never did. Ocwen also failed to credit Davis for the money she paid, and began to foreclose on her house while continuing to assure her she was on a payment plan. Ocwen eventually foreclosed on Davis's home, and she filed for bankruptcy in the hopes of ending Ocwen's harassment. During the bankruptcy, however, Ocwen requested an additional $390 to cover its costs and fees related to the default she already cured. At trial, a former Ocwen employee provided uncontradicted testimony concerning Ocwen's unfair business practices, including ***paying incentives to its loan collectors for moving properties with equity into foreclosure. The former employee testified that Ocwen employees would review their records to identify loans on properties in which the borrowers had equity, and then prey on the borrowers by improperly manufacturing ways to falsely foreclose on them***. The former employee testified that they selected homes with equity because it ensured that there was money to pay the Ocwen employees their incentive payments once they wrongfully foreclosed. The evidence also showed that ***Ocwen engaged in predatory servicing by not informing borrowers of how to make their loans current and failing to give credit for payments when they were made, in order to artificially manufacture the foreclosures***. The jury found that Ocwen made fraudulent, deceptive and misleading

---

[1]     In order to escape further scrutiny from the OTS, and to avoid being held accountable under the supervisory agreement, Ocwen then quickly dissolved Ocwen Federal Bank, and created non-bank Ocwen Loan Servicing LLC, taking itself outside of the OTS's jurisdiction. In this way, Ocwen could continue to operate its fraudulent business model without OTS monitoring interference.

representations to Davis after she missed a loan payment while hospitalized in 2003. Davis's attorney, Robert Hilliard of Corpus Christi, said: "***The jury believed that Ocwen has a scheme of stealing homes" by classifying timely payments as late and then beginning a foreclosure proceeding***.

- **January 23, 2006**: The *South Florida Business Journal* reported:

  ***The Business Journal's review of court filings shows Ocwen and affiliates are defendants in more than 500 civil suits filed in federal courts since 2002.  Many of the cases have more than one customer among plaintiffs. About 100 of the cases are still pending***.

  \*      \*      \*

  ***Plaintiff lawyers are currently seeking class action status for 57 federal cases being consolidated in Chicago and the West Palm Beach company says it is facing 331 lawsuits altogether. . . .  The allegations are sometimes harsh - one plaintiff describes the company's actions as "naked fraud[.]"***

  \*      \*      \*

  ***Ocwen probably isn't done with [Attorney] Hilliard.  The attorney said he is preparing to file about 100 suits for Texas residents who claim Ocwen falsified mortgage payments and began foreclosure proceedings***.

- **March 2009**:  *ProPublica* published an article examining Ocwen, stating:

  ***[Ocwen's] business practices have also drawn a wide array of criticism from customers, consumer advocates and the federal government itself***.

  \*      \*      \*

  Ocwen got a lucrative contract in 2003 to manage and sell thousands of foreclosed properties owned by the Department of Veterans Affairs, but a report from the Government Accountability Office in 2007 panned Ocwen's performance and said the "***VA also has not been satisfied with Ocwen's performance***":  Ocwen racked up $1.3 million in penalties from the VA in the last three quarters of 2005 (at the height of the housing boom) for failing to meet sales targets.

  There were other problems too: ***Ocwen charged the VA for home-upkeep repairs that were never made, the GAO reported. Houses fell into disrepair and were covered in "trash and debris," which the GAO suspects might have lowered property values***.

  \*      \*      \*

- 2 -

But that wasn't Ocwen's only run-in with the federal government.

> *In 2000, Ocwen Federal Bank, a now-defunct subsidiary, paid $50,000 to settle . . . charges from HUD concerning various rule violations on its loan servicing.  Four years later, the Office of Thrift Supervision forced Ocwen Federal Bank to sign an agreement . . . promising to improve its compliance with fair-lending laws.*

> *John Taylor, president of the National Community Reinvestment Coalition, cited those regulatory actions when criticizing the VA's choice of Ocwen in 2003.  "Why would you want, when you have a repeated history of problems, to expose VA housing to a potential predator?" he asked in* American Banker.

> *  *  *

> *Ocwen has ranked last in J.D. Power and Associates' survey of customer service at mortgage servicers for the last three years in a row.  Frustrated customers point specifically to its tortuous and unhelpful phone services.*

> *  *  *

> *Ocwen didn't fare much better with the Better Business Bureau of Central Florida, which has received 520 complaints about Ocwen in the last 36 months and slapped it with an F, its lowest rating.*

> *  *  *

> *Ocwen has in fact been accused of predatory practices in a slew of lawsuits in the last few years. Frequent allegations include that Ocwen falsely classifies timely payments as late, charges unwarranted fees and improperly starts foreclosure proceedings.*

- **May 2009**:  A Louisiana bankruptcy court judge blasted Ocwen, after being subjected to its repeated violations of the bankruptcy code for which the court had repeatedly sanctioned it.  *See In re McKain*, No. 08-10411, 2009 Bankr. LEXIS 2519, at *5-*8, *10-*11 (Bankr. E.D. La. May 1, 2009), *rev'd on other grounds*, *Ocwen Loan Servicing, LLC v. McKain*, No. 09-3662, slip op. (E.D. La. Aug. 15, 2011).  The court held:

> <u>*Ocwen's History*</u>

> *This is not the first time Ocwen has appeared before the Court for improperly administering a loan or attempting to collect fees and costs to which it was not entitled.  The Court has been involved with six other cases [fn] in the last four years where Ocwen either included improper fees in its claim; attempted to collect, post-discharge, fees and costs that were*

- 3 -

*undisclosed but assessed during a bankruptcy; or attempted to foreclose on disallowed or discharged debt.*

\*      \*      \*

*Ocwen has consistently shown an inability or refusal to comply with the[] basic statutory tenets [of the bankruptcy code].  As a result, discharged debtors have continued to incur the threat of foreclosure and collection of debts that have been discharged or disallowed.  Ocwen has failed to disclose the assessment of postpetition charges to others, misleading them into a false sense that a fresh start was theirs to enjoy.*

\*      \*      \*

*Ocwen has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts.  The Court finds that this practice is in bad faith. . . .  The record reflects that this is an ongoing pattern . . . .  The Court has repeatedly struck improper charges and has issued monetary sanctions against Ocwen.  Ocwen's continuing disregard for bankruptcy law and procedure is a clear indication that monetary sanctions are simply ineffective.*

\*      \*      \*

*[fn]It is likely that there are many additional cases where this activity has occurred, but not all debtors' counsel carefully monitor creditors' proof of claims.*

- **August 2009**:  The *Southeast Texas Record* reported on a lawsuit filed against Ocwen for wrongfully foreclosing on a borrower even though she was current on her payments.  The complaint alleged that Ocwen did not properly apply loan payments that were made in order to improperly manufacture a foreclosure, fraudulently assessed improper fees, costs, interest and charges, and violated state laws.

- **December 2010**: The Florida Attorney General's office compiled a presentation titled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases."  The Attorney General's presentation contained "copies of allegedly forged signatures, false notarizations, bogus witnesses and improper mortgage assignments," including ***documents signed by Ocwen employee "Scott Anderson."  Anderson's signatures had been signed by at least four different persons, an obvious act of robo-signing***.

- **January 2011**:  The United States District Court for the Eastern District of North Carolina entered an order affirming a bankruptcy court order ***holding Ocwen in contempt of court for violating a discharge injunction and a bankruptcy court order***.  *See In Re Adams*, No. 5:10-CV-340-BR, 2011 U.S. Dist. LEXIS 158090, at \*13 (E.D.N.C. Jan. 24, 2011).  The District Court held that "***Ocwen's conduct was***

*. . . reprehensible*" and that Ocwen "transmitted an inaccurate payoff quote and loan history; . . . assessed discharged principal, fees, and costs; reported inaccurate information to credit reporting agencies; *and, most importantly, after the inaccurate information had been brought to its attention a number of times, failed to correct the information." The District Court found that the foregoing misconduct by Ocwen was "willful and intentional," id. at \*21, and thus merited punitive damages*.

- **March 2011**: The FTC began investigating Ocwen's foreclosure practices and demanded the production of documents relating to Ocwen's loan servicing activities.

- **June 2011**: The U.S. Treasury Department found that Ocwen's loan servicing practices were in need of "substantial improvement."

- **July 2011**: A foreclosure action by an RMBS trustee was dismissed with prejudice by a New York State court judge, in large part because *three Ocwen employees had improperly "robo-signed" foreclosure documents in the case*. *See HSBC Bank USA, N.A. v. Taher*, 932 N.Y.S.2d 760 (N.Y. Sup. Ct. Kings Cnty. 2011). *The court specifically singled out the aforementioned Ocwen robo-signer, Scott Anderson, and noted that it too had observed that there were at least four different variations of his signatures in the cases before the court*.

- **July 2011**: *Reuters* reported that Ocwen was still engaging in widespread robo-signing:

    > *Reuters . . . identified at least six "robo-signers," individuals who in recent months have each signed thousands of mortgage assignments – legal documents which pinpoint ownership of a property. These same individuals have been identified – in depositions, court testimony or court rulings – as previously having signed vast numbers of foreclosure documents that they never read or checked*.

    > *Among them: Christina Carter, an employee of Ocwen. . . . Her signature – just two "C"s – has appeared on thousands of mortgage assignments and other documents this year*.

    > *In a case involving a foreclosure [the HSBC discussed above], a New York state court judge called Carter a "known robo-signer" and said he'd found multiple variations of her two-letter signature on documents, raising questions about whether others were using her name*.

*Reuters* also reported that it had found that "in recent months," Ocwen "filed foreclosure documents of questionable validity."

- **September 1, 2011**: The New York Department of Financial Services required Ocwen to enter into an agreement reforming its robo-signing practices by, among other things, ensuring that foreclosure affidavits were true, accurate, and correct,

were based on personal knowledge, and were properly notarized, and by withdrawing any of its pending foreclosure proceedings that used false affidavits, as well as agreeing to a host of other reforms designed to stop its improper loan servicing activities.

- **September 2011**: Ocwen was held in contempt of court in *In re Phillips*, No. 02-66299, 2011 Bankr. LEXIS 3780 (Bankr. N.D. Ohio Sept. 29, 2011) (Ocwen and Deutsche Bank both held in contempt for Ocwen's violations of bankruptcy discharge injunction).  *See also In re Englert*, 495 B.R. 266, 269 (Bankr. W.D. Pa. 2013) ("[T]he Court . . . found Ocwen in further contempt for which further sanctions would be addressed at the Rule to Show Cause hearing.").

- **April 30, 2012**:  The Sixth Circuit Court of Appeals reversed an order dismissing the borrowers' complaint alleging that co-defendants Deutsche Bank and Ocwen were violating the Fair Debt Collection Practices Act.  *See Bridge v. Ocwen Fed. Bank*, 681 F.3d 355, 356-57 (6th Cir. 2012).  The Court of Appeals held:

  > *The Fair Debt Collection Practices Act was passed to protect consumers against both abusive and mistaken collection activity.  This case reveals why.  It began with seemingly innocuous accounting errors on the part of a bank that were corrected.  Despite repeated proof of that correction, unremitting collection activity was undertaken, foreclosure proceedings were instituted, and the credit of two consumers was seriously impaired*.

  > \*       \*       \*

  > *Ocwen . . . began dunning Bridge and her husband, who is not a co-borrower on the mortgage loan, for the May payment claimed to be overdue, despite proof [that is was not overdue because] of the double payment submitted by Bridge to Ocwen and Aames.  Since then Ocwen has: made endless collection calls by phone to Mr. and Mrs. Bridge, despite cease and desist requests and registry on the federal "Do Not Call" directory; threatened foreclosure; assessed monthly late fees; and reported derogatory information to the credit reporting agencies. Additionally, the law firm . . . allegedly retained by Ocwen, sent a collection letter to Bridge threatening foreclosure*.

- **July 19, 2012**: A bankruptcy court in Kentucky issued its decision, findings of fact and conclusions of law after a trial in an adversary proceeding involving Ocwen and a borrower.  *See In re Tolliver*, No. 09-21742, 2012 Bankr. LEXIS 3333, at \*3, \*6-\*7 (Bankr. E.D. Ky. July 19, 2012).  The court blasted Ocwen for its misconduct:

  > *Defendants [Ocwen and the co-defendant RMBS trustee] breached the terms of the Note and Mortgage by applying unauthorized late charges, costs and fees to [the Plaintiff borrower's] account and breached an implied contractual duty of good faith and fair dealing. . . .  Ocwen*

- 6 -

*misrepresented the status of the Plaintiff's Loan to fraudulently induce her to enter into [improper forbearance] agreements when, but for Ocwen's unauthorized acts, the Plaintiff had paid her Loan in full. The Plaintiff, having overpaid her Loan, is entitled to compensatory and punitive damages for the Defendants' breach of contract and implied covenant of good faith and fair dealing, fraud, and conversion.*

\* \* \*

*Ocwen proceeded to mishandle the servicing of the Plaintiff's Loan by misapplying her payments contrary to the terms of the Note and Mortgage and assessing unauthorized fees and charges. This forced the Plaintiff into a constant state of default, allowing Ocwen to profit by continuing to assess more fees and charges based on her default status. Ocwen knew or should have known that it could not charge these fees and charges, yet Ocwen misrepresented to the Plaintiff that her Loan was in default thereby forcing the Plaintiff to enter into a series of meaningless oral and written forbearance agreements, none of which allowed her to cure her alleged default and two of which contained provisions that Ocwen ultimately argues excuses its misbehavior. These provisions, found in the 2004 and 2005 written forbearance agreements, allowed Ocwen to charge these unauthorized fees to the Plaintiff's account and required the Plaintiff to waive any claims it had against Ocwen. But for Ocwen's misapplication of her payments, and contrary to Ocwen's representations, the Plaintiff had actually paid her Loan in full by October 2004. As a result of Ocwen's actions, the Plaintiff has overpaid her Loan by thousands of dollars.*

- **December 5, 2012**: The New York Department of Financial Services announced that Ocwen was violating its prior agreement with the Department to refrain from engaging in misconduct. The Department's press release stated:

  *"[W]e conducted a targeted exam of Ocwen's performance and discovered gaps in the company's compliance. The Department is requiring the company to hire a monitor so that we can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure."*

  \* \* \*

  *The Department's examination of Ocwen's mortgage servicing practices found that, in some instances, the company failed to demonstrate that it had sent out required 90-day notices before commending foreclosure proceedings or even that it had standing to bring the foreclosure actions. The exam also revealed gaps in Ocwen's Servicing Practices, including indications that in some instances it failed to provide the single point of contact for borrowers; pursued foreclosure against borrowers seeking a loan modification; failed to conduct an independent review of denials of*

- 7 -

*loan modifications; and failed to ensure that borrower and loan information was accurate and up-to-date*.

## APPENDIX 7

- **February 2014**: Large institutional investors Pimco and BlackRock were considering legal action against Ocwen concerning its misconduct relating to loan modifications.

- **February 12, 2014**: National Mortgage News reported that New York banking Superintendent Lawsky "unleashed a verbal assault on nonbank servicer Ocwen" in a speech to the New York Bankers Association.  The article reported:

   > *Lawsky said Ocwen's public documents make "for startling reading."  He sees "corners being cut," by nonbank servicers that have touted their ability to help distressed borrowers.*

   > *"We have serious concerns that some of these nonbank mortgage servicers are getting too big, too fast," Lawsky told New York bankers…. "We see far too many struggling homeowners getting caught in a vortex of lost paperwork, unexplained fees and avoidable foreclosures."*

   > \*       \*       \*

   > *But he took particular umbrage by Ocwen's assertions that it can service delinquent loans at a cost that is 70% lower than the rest of the industry, calling into question its entire servicing model.*

   > *"Those kinds of cost-saving claims bear special scrutiny," Lawsky said.  "Regulators have to ask whether the purported efficiencies at nonbank mortgage servicers are too good to be true."*

   > \*       \*       \*

   > Lawsky made specific references to servicers' difficulty in handling the transfer of documents and dealing with distressed borrowers.

   > *"We see electronic loan files strewn around the globe with no one who knows how to pull them together," Lawsky said.  "We see a virtual potpourri of computer systems containing critical borrower information, but no one who knows how to extract that information at the right time and for the right purpose*."

- **February 26, 2014**: Lawsky's office then sent a letter to Ocwen.  As reported by *HousingWire*, Lawsky was very concerned about a

   > "*number of potential conflicts of interest" [Ocwen had] with other public companies it's dealing with, and he wants his questions answered.*

   > \*       \*       \*

- 1 -

Lawsky's letter demands that Ocwen more specifically detail the relationship and financial connection between the companies' executives and employees, and for information regarding any other agreements between Ocwen and other companies.

"Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."

In addition to information on Ocwen's officers, directors and employees, Lawsky's office wants all documents sufficient to show the nature and extent of services provided to Ocwen by each of the affiliated companies, including all agreements for such services, and copies of all agreements between Ocwen and the affiliated companies concerning procurement of third party services. Ocwen is also being probed about its agreements concerning the outsourcing of information management to the affiliated companies.

- **February 27, 2014**: *Bloomberg BusinessWeek* reported:

  *As of mid-February, American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen – the highest number of any non-bank servicer, according to data from the Consumer Financial Protection Bureau in Washington.*

  \*       \*       \*

  *"Ocwen is one of the most complained about servicers when we ask housing counselors and lawyers what they are seeing," said Kevin Stein, associate director of the California Reinvestment Coalition, a San Francisco-based consumer advocacy group. "We're hearing a lot about foreclosing because of bad servicing practices."*

- **March 2014**: A New York federal court denied Ocwen's motion to dismiss and allowed a class action to proceed against it and others alleging that Ocwen misled borrowers about loan modifications. *See Dumont v. Litton Loan Servicing, LP*, No. 12-cv-2677-ER-LMS, 2014 U.S. Dist. LEXIS 26880 (S.D.N.Y. Mar. 3, 2014).

- **April 2014**: *Reuters* reported that Superintendent Lawsky was going after Ocwen again and demanding information. The *Reuters* article stated:

  *New York's banking regulator is probing Ocwen Financial Corp, which collects mortgage payments, for potentially over charging borrowers and investors to auction off foreclosed properties it services.*

Benjamin Lawsky, superintendent of New York's Department of Financial Services, sent a letter to Ocwen saying he was concerned the company and an affiliate, Altisource Portfolio Solutions SA, were engaged in so-called self-dealing through an online auction site called Hubzu.

Self-dealing is when a company represents its own interests in a transaction, rather than those of a client.

Ocwen uses Hubzu, an Altisource Portfolio subsidiary, to auction off borrower homes facing foreclosure and foreclosed investor-owned properties. When Ocwen selects Hubzu to host foreclosure or short sale auctions, the letter said, the Hubzu auction fee is 4.5 percent; when Hubzu is competing for business on the open market, its fee is as low as 1.5 percent.

*"The relationship between Ocwen, Altisource Portfolio and Hubzu raises significant concerns regarding self-dealing," the letter said, adding that it raises questions about whether the companies are charging inflated fees through conflicted business relationships that may hurt homeowners and investors.*

- **May 2014**: Superintendent Lawsky spoke at the Mortgage Bankers Association Secondary Market Conference on May 20, 2014.  *HousingWire* reported the following:

  *Lawsky says that part of the DFS's focus on Ocwen is because his office's review of nonbank servicers has also turned up another enormous profit center associated with these MSRs that could put homeowners and mortgage investors at risk: the provision of what they call ancillary services.*

  *"Now, in most circumstances, there's nothing inherently wrong with companies and their affiliates providing a range of ancillary services," Lawsky said.   "This is the extraordinary circumstance where there effectively is no customer to select its vendor for ancillary services. Nonbank servicers have a captive and often confused consumer in the homeowner.*

  *"So who makes the decision about where to procure these ancillary services, and how much of the investor's or the borrower's money to pay for them?   It's usually the servicer, seemingly with no oversight whatsoever.   The very same servicer that benefits – either directly or indirectly – from the profitability of the affiliated companies that provide these services," Lawsky said.*

  *Specifically, Lawsky is referring to the latest move DFS made against Ocwen, when it sent a letter to Ocwen's general counsel demanding*

*answers to questions about Ocwen and how it operates in relation to its subsidiaries, Hubzu and Altisource.*

"*The potential for conflicts of interest and self-dealing here are perfectly clear.  Servicers have every incentive to use these affiliated companies exclusively for their ancillary services, and they often do.  The affiliated companies have every incentive to provide low-quality services for high fees, and they appear in some cases to be doing so,*" *Lawsky said.  "In the context of the nonbank mortgage servicing market, homeowners and investors are at risk of becoming fee factories.*"

- **May 2014**: Ocwen was sued again by another class of borrowers, alleging Ocwen failed to timely file notices of satisfaction of the loans in violation of federal and state laws.  Complaint, *Dempsey v. Ocwen Loan Servicing LLC*, No. 14-CV-2824 (E.D. Pa. May 15, 2014).

C:\Users\dgonzales\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\14MXMFT7\Cpt Deutsche Bank National Trust-RPI.docx