UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: APR 1 1 2018

---

Royal Park Investments SA/NV,
Individually and on Behalf of All Others Similarly
Situated,

        Plaintiff,

        —v—

Deutsche Bank National Trust Company, as
Trustee,

        Defendant.

---

14-CV-4394 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

In April 2017, the Court denied Plaintiff Royal Park Investments SA/NV's ("Royal Park") motion to certify this matter as a class action. The Court concluded that the proposed class, as defined at that time, was insufficiently ascertainable, but granted Royal Park leave to renew its motion with a redefined class. *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) [hereafter, "Original Opinion"].

Now before the Court is Royal Park's renewed motion to certify a class action against Defendant Deutsche Bank National Trust Company ("Deutsche Bank"), asserting claims for breach of contract and breach of trust in connection with Deutsche Bank's service as trustee of ten residential mortgage-backed securities ("RMBS") trusts of which Royal Park and the putative

1

class members are or were beneficiaries (the "Trusts").[1] Dkt. No. 372. Royal Park also moves the Court to appoint Plaintiff as Class Representative and to appoint Robbins Geller Rudman & Dowd LLP as Class Counsel. Both parties make sealing applications as part of their briefing of this renewed motion.[2]

Relatedly, Deutsche Bank moves to preclude the expert report of W. Scott Dalrymple, Royal Park's damages expert. Dkt. No. 379. Finally, and largely unrelated to the class certification question, the Court now considers the Report and Recommendation of Magistrate Judge Barbara Moses granting Royal Park's motion to strike the affirmative defense of reliance on the advice of counsel from Deutsche Bank's Answer. *See* Dkt. No. 471.

As further set forth below, because the Court finds that Royal Park has not established that common issues predominate over individualized ones, nor that the class action would be a superior method of adjudicating its claims, Royal Park's renewed motion is DENIED. Deutsche Bank's motion to exclude Scott Dalrymple's expert report is DENIED. Royal Park's motion to strike is GRANTED and Judge Moses's Report and Recommendation is adopted in its entirety. Finally, the parties' sealing applications are GRANTED.

## I. Factual Background

The Court assumes familiarity with the factual background in this matter as set forth in its previous Orders. Additionally, as the operative facts have not changed from Royal Park's initial motion for class certification, the Court reprints here its summary from its April 2017 Memorandum & Order:

---

[1] The Court's February 3, 2016 Memorandum and Order provides additional background on Royal Park's original claims. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 14-CV-4394 (AJN), 2016 WL 439020, at *10-11 (S.D.N.Y. Feb. 3, 2016).

[2] Deutsche Bank also filed evidentiary objections in connection with its opposition to Royal Park's renewed motion for class certification. The Court does not directly address the objections in this opinion, but they are mooted by the Court's denial of class certification.

Briefly, the ten subject Trusts,[3] formed between 2006 and 2007, issued bond-like instruments referred to as RMBS certificates (the "Certificates"), in which Royal Park and other investors acquired beneficial interests. Comp. ¶¶ 4, 30, 33-35, 40-42. The Certificates are collateralized by thousands of mortgage loans held in the Trusts, and Certificate holders are entitled to the cash flows generated by those loans. *Id.* ¶¶ 4 & n.1, 42. As is typical in this context, the loans were transferred to the Trusts by institutional entities known as "Depositors," which had in turn acquired them in large pools from entities – often referred to as "Sponsors" or "Sellers" – that had either purchased the loans directly or indirectly from originating lenders and aggregated them or originated the loans themselves. *Id.* ¶¶ 36-37, 39-40.

The Trusts are governed by Pooling and Servicing Agreements (the "PSAs") running between, as applicable, the Trustee, relevant Depositors, Sponsors and/or Sellers, and other interested parties, as well as by certain related agreements. *Id.* ¶¶ 5; 37-38, 44; *see also id.* Ex. A. (exemplar Pooling and Service Agreement governing First Franklin Mortgage Loan Trust 2006-FF9). Among other things, the PSAs set forth or incorporate by reference certain representations and warranties (the "R&Ws") made by the relevant Sponsors/Sellers (or, as applicable, by other loan-originating or transferring entities) as to the credit quality and characteristics of the loans held by the Trusts and as to the accuracy of the data conveyed about such loans, and require the warranting entities to cure, substitute and/or repurchase any loans failing to conform to the R&Ws. *See, e.g., id.* ¶¶ 7-8 & n.3, 38, 47-48. The PSAs also establish certain rights and duties of Deutsche Bank as Trustee, to be discharged for the benefit of Certificate holders. *See, e.g., id.* ¶¶ 8-13, 44, 46. Deutsche Bank's responsibilities include:

(i) the duty to provide prompt notice to the contracting parties of breaches of R&Ws discovered by the Trustee and, if such breaches are not timely cured, to enforce the breaching warrantors' obligations to repurchase or substitute the defective loans; and

(ii) the obligation to take certain actions upon discovery of a so-called "Event of Default" by a "Master Servicer" or "Servicer" (an entity designated by the relevant PSA to service mortgage loans held in Trust), including notifying the relevant Master Servicer or Servicer and demanding timely cure, giving notice to Trust beneficiaries of uncured Events of Default, taking further remedial steps as necessary (such as termination of the Servicer or institution of litigation), and, more broadly, exercising the Trustees' rights and powers to protect

---

[3] The Trusts are First Franklin Mortgage Loan Trust 2006-FF9; GSR Mortgage Loan Trust 2007-AR2; HSI Asset Securitization Corporation Trust 2007-WF1; HarborView Mortgage Loan Trust 2006-8; Morgan Stanley ABS Capital I Inc. Trust 2007-NC2; Morgan Stanley ABS Capital I Trust 2007-NC3; Morgan Stanley IXIS Real Estate Capital Trust 2006-1; NovaStar Mortgage Funding Trust, Series 2006-4; Saxon Asset Securities Trust 2006-2; and Soundview Home Loan Trust 2007-NS1. *See* Complaint, Dkt. No. 1 ("Comp."), ¶ 2.

investors' interests as a "reasonably prudent person" would to protect its own.
*Id.* ¶¶ 8-13, 41, 44-60

Following the Court's February 23, 2016 resolution of Deutsche Bank's motion to dismiss, Royal Park is left with two operative claims. One asserts that Deutsche Bank breached the express contractual obligations set forth above. The other avers that Deutsche Bank breached its common law duty of trust to avoid conflicts of interest with the Trust beneficiaries by, among other things, maintaining "ongoing and prospective business relationships" with many of the Sponsors/Sellers, Master Servicers/Servicers, and others, whose own contractual obligations it was required to enforce. *Id.* ¶¶ 19-24, 61, 206-219.

*See* Original Opinion, at *1-2.

## II. Procedural Background and the Court's April 2017 Decision

In its initial motion for class certification, Royal Park sought to certify the following class to prosecute its claims:

> All persons and entities who held Certificates in the [Trusts] and were damaged thereby. Excluded from the class are defendant, the loan originators, the Warrantors, the Master Servicers and the Servicers to the [Trusts], and their officers and directors, their legal representatives, successors, or assigns, and any entity in which they have or had a controlling interest.

*See* Plaintiff Royal Park's Memorandum of Law in Support of Its Motion for Class Certification and Appointment of Class Representative and Class Counsel ("Orig. Br."), Dkt. No. 185, at 1.

Deutsche Bank argued (i) that the membership of the putative class was insufficiently ascertainable; and (ii) that the proposed definition was impermissibly overbroad as it included putative class members who would lack standing to assert the claims at issue. *See* Original Opinion, at *4. While rejecting Deutsche Bank's overbreadth argument, the Court held that "Royal Park has failed to carry its burden to demonstrate that the proposed class is sufficiently ascertainable." *Id.* at *4, 11.

4

Analogizing to the Second Circuit's opinion in *Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015), the Court found a few specific infirmities with the proposed class definition. First, the proposed class lacked "any meaningful temporal limitation," as it included all persons and entities who held Certificates in the Trusts, "without reference to a fixed date, a window of acquisition, or length or continuity of ownership." Original Opinion, at *5.

Second, the nature of the Certificates and claims at issue would make it very difficult to identify the individual investors who would be members of the putative class. The Certificates lack unique identifiers corresponding to individual investors' ownership interests, the Certificates have been actively traded over the counter, were sometimes included within collateralized debt obligations later sold at public auction, and are only beneficially owned and held in "book entry" form by the Depository Trust Company ("DTC"). *Id.* at *6. As a result, the Court noted the challenges of determining who "held Certificates" without having to resort to individualized inquiries. *Id.*

Third, compounding the problems of tracing ownership raised above, the Court discussed the issues of determining members' standing to litigate. In the context of an active secondary market, the Court would face the dual issues of determining the nature and terms of the assignments of the Certificates – namely, whether any given assignment included an assignment of litigation rights – as well as of determining the particular jurisdiction whose law governs those assignments – which would involve a choice of law analysis. *Id.* at *6-7.

Given these three key concerns, the Court concluded that "Royal Park has not met its burden of demonstrating that the [ascertainability] requirement can be satisfied in an

administratively feasible manner that does not require[] individualized hearings."[4] *Id.* at *8.

Summarizing the problem, the Court found that "the particular combination of factors present

here – Royal Park's failure to include a temporal limit in its proposed class definition, the

difficulties in identifying holders of indirect beneficial interests in actively traded RMBS

identifiable only by tranche-wide CUSIP, and the need to trace the ownership history of these

interests to determine the transfer (or lack thereof) of breach of contract claims – renders the

proposed class insufficiently ascertainable on the current record." *Id.* at *9.

Despite these numerous deficiencies, the Court found that denial with prejudice was

unwarranted, instead giving Royal Park the "opportunity to modify the proposed class

definition" to identify a sufficiently ascertainable class. *Id.*

On May 1, 2017, roughly one month following the Court's first opinion denying class

certification, Royal Park renewed its motion to certify the following revised class:

> All persons and entities who held Certificates in the [Trusts] at any time between the date
> of issuance to no later than 60 days after notice of class certification and opportunity to
> opt-out is issued and were damaged as a result of Deutsche Bank National Trust
> Company's conduct alleged in the Complaint. Excluded from the class are defendant, the
> loan originators, the Warrantors, the Master Servicers and the Servicers to the [Trusts],
> and their officers and directors, their legal representatives, successors, or assigns, and any
> entity in which they have or had a controlling interest.

*See* Plaintiff Royal Park's Memorandum of Law in Support of Its Renewed Motion for Class

Certification and Appointment of Class Representative and Class Counsel ("Br."), at 1.

The proposed class definition was revised in two main ways. First, by adding "any time

between the date of issuance to no later than 60 days after notice of class certification and

opportunity to opt-out is issued," Royal Park purports to have added a temporal limitation to the

---

[4] The Court analyzed and rejected Deutsche Bank's related challenge to the proposed class as overbroad for including certain categories of investors who would lack standing to sue. The Court held that there was "no independent basis to deny certification on grounds of overbreadth." *Id.* at *10-11.

definition. Second by exchanging "damaged thereby" for "damaged as a result of Deutsche Bank National Trust Company's conduct alleged in the Complaint," Plaintiff builds an explicit link between the injuries and alleged misconduct into the class definition.

Additionally, Royal Park claims to have submitted additional evidence – both testimonial and documentary – it claims demonstrates the ascertainability of the proposed class. Br. at 2. One piece of this added evidence is the revised expert report of W. Scott Dalrymple, CFA ("Dalrymple Report"), which seeks to prove that damages can be calculated on a class-wide basis. *Id.*; *see generally* Declaration of Lucas F. Olts in Support of Plaintiff Royal Park Investments SA/NV's Renewed Motion for Class Certification and Appointment of Class Representative and Class Counsel ("Olts Decl."), Ex. G (Expert Report of W. Scott Dalrymple, CFA ("Dalrymple Rep.")). On May 22, 2017, in conjunction with its opposition to Royal Park's renewed motion for class certification, Deutsche Bank also filed its motion to preclude the Dalrymple Report. Dkt. No. 379. Deutsche Bank argues that Dalrymple's proposed methodologies are unreliable and inadmissible under Federal Rules of Evidence 702 & 703 and the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509. U.S. 579 (1993). Deutsche Bank National Trust Company, as Trustee's Memorandum of Law in Support of Its Motion to Exclude the Expert Report of W. Scott Dalrymple ("Daubert Br."), at 2-4.

In addition to Royal Park's reply brief, *see* Dkt. No. 383, the parties have also filed numerous letters with the Court debating the import of supplemental authority. First, the parties argue about the impact of the Second Circuit's decision in *In re Petrobras Securities*, as discussed below. *See* Dkt. Nos. 415, 418. Then, in September 2017, the parties submitted competing interpretations of Judge Woods's decision denying class certification in *Royal Park Invs. SA/NV v. Bank of New York Mellon. See* Dkt. Nos. 448, 454 (debating No. 14-CV-6502

7

(GHW), 2017 WL 3835339 (S.D.N.Y. Aug. 30, 2017)). Finally, the parties debate the merits of

Judge Netburn's Report and Recommendation to Judge Katherine Polk Failla to deny class

certification in a similar case. Dkt. Nos. 538 & 540 (discussing *Royal Park Invs. SA/NV v. Wells

Fargo Bank, N.A.*, No. 14-CV-9764 (KPF)(SN), 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018)).

## III. Legal Framework for Class Certification

As with the factual recitation set forth above, the Court's April 2017 Memorandum &

Order laid out the legal standard for class certification, which remains largely unchanged in the

intervening year. Given this, the Court reprints this standard below for context:

> In order to qualify for class certification, a plaintiff must first demonstrate
> that the class it proposes satisfies the four prerequisites of Federal Rule of Civil
> Procedure 23(a). Those requirements are:
>
> (1)    the class is so numerous that joinder of all members is impracticable;
> (2)    there are questions of law or fact common to the class;
> (3)    the claims or defenses of the representative parties are typical of the
>        claims or defenses of the class; and
> (4)    the representative parties will fairly and adequately protect the interests of
>        the class.
> Fed. R. Civ. P. 23(a).
>
> These "four requirements – numerosity, commonality, typicality, and
> adequate representation – effectively limit the class claims to those fairly
> encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*,
> 564 U.S. 338, 349 (2011) (internal quotation marks omitted). "A class may be
> certified only if, 'after a rigorous analysis,' the . . . court is satisfied that the
> prerequisites of [Rule 23(a)] are met." *Roach v. T.L. Cannon Corp.*, 778 F.3d
> 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, __ U.S. __, 133 S.
> Ct. 1426, 1432 (2013)).
>
> Assuming the requirements of Rule 23(a) are met, a plaintiff must then
> establish that certification is appropriate for one of the three reasons set forth in
> Rule 23(b). Here, Royal Park seeks certification pursuant to Rule 23(b)(3), under
> which a court must "find[] that the questions of law or fact common to class
> members predominate over any questions affecting only individual members, and
> that a class action is superior to other available methods for fairly and efficiently
> adjudicating the controversy." Fed. R. Civ. P. 23(b). "The matters pertinent to
> these findings include: (A) the class members' interests in individually controlling
> the prosecution or defense of separate actions; (B) the extent and nature of any

litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

Of particular importance here, independent of the express requirements of Rule 23, the Court of Appeals has recognized that the Rule includes "'an implied requirement of ascertainability.'" *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006) ("*In re IPO*")). As discussed further below, that implied requirement mandates that the class be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher*, 806 F.3d at 24 (internal quotation marks omitted).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *see also Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common question of law or fact, etc.") (emphasis in original). Accordingly, although a Rule 23 inquiry should not "extend into a protracted mini-trial of substantial portions of the underlying litigation," the "district judge must receive enough evidence, by affidavits, documents, or testimony," including expert evidence as appropriate, to "be satisfied" that the necessary elements of class certification have been established. *In re IPO*, 471 F.3d at 41; *see also Comcast* 133 S. Ct. at 1432-1434 (directing courts to, for example, "conduct a rigorous analysis" of damages model proffered by certification proponent's expert) (internal quotation marks omitted).

A determination that class certification is appropriate "can be made only if," among other things, "the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met." *In re IPO*, 471 F.3d at 41. The court's "obligation to make such [a] determination[] is not lessened by overlap between a Rule 23 requirement and a merits issue," *id.*, and, indeed, the court's analysis at the certification stage "[f]requently" will "entail some overlap with the merits of the plaintiff's underlying claim" – "[t]hat cannot be helped," *Dukes*, 564 U.S. at 351; *see also Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action") (internal quotation marks omitted). Still, at this stage of the litigation, the court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re IPO*, 471 F.3d at 41.

*See* Original Opinion, at \*2-3.

In the time since the Court previously summarized the legal standard governing class certification, there has been one relevant change. The Court discusses this change – the impact of the Second Circuit's decision in *In re Petrobras Securities* – in much greater depth in a later section. *See infra* Part V.A.

## IV. Deutsche Bank's Motion to Exclude

In conjunction with its brief in opposition to Royal Park's class certification motion, Deutsche Bank moved to exclude the testimony and opinions proffered by W. Scott Dalrymple, Royal Park's damages expert, pursuant to Federal Rules of Evidence 702 and 703 and the standard expressed in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In summary, Dalrymple offers four main opinions in this case: "(1) the Certificates in [the Trusts] are interrelated because they derive their cash flows from common underlying mortgages; (2) given the interrelatedness of the Certificates, Defendant's alleged failure to fulfill its duties affected the securities in the [Trusts] similarly; (3) there are at least 856 investors in the proposed class [or 580 unique investors after accounting for investors with holdings in multiple Trusts]; and (4) damages for all class members are calculable on a class-wide basis." Dalrymple Rep. ¶ 4. Deutsche Bank specifically challenges Dalrymple's fourth conclusion, arguing that he offers "no basis for his vague conclusion that [a class-wide damages] calculation 'can be done'" nor "describes any reliable methodology by which damages caused <u>by</u> the Trustee <u>to</u> putative class members can be determined by common proof." Daubert Br. at 1 (quoting Dalrymple Rep. ¶ 51) (emphasis in original).

## A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule imposes "a special obligation upon a trial judge to 'ensure that any and all scientific testimony...is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). The court should "focus on the principles and methodology employed by the expert" and exclude the expert's testimony if those principles and methodology are unreliable. *In re Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016) (citation omitted).

Although it establishes a "gatekeeper" function for expert testimony, the *Daubert* test is nonetheless "a liberal" and "permissive" standard of admissibility. *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005). Any contentions that the expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Although the Supreme Court and Second Circuit have "not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," *In re U.S. FoodServ. Pricing Litig.*, 729 F.3d 108, 129-30 (2d Cir. 2013), courts in this

Circuit have applied its standard but found that the "scope of the *Daubert* analysis is cabined by its purposes at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirement of Rule 23." *Chen-Oster v. Goldman Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (internal citation and quotation marks omitted) (emphasis added). Specifically, as the Plaintiff would have to show that "the damages resulting from [the alleged injury] were measurable on a class-wide basis through use of a common methodology" in order to meet the predominance requirement under Rule 23(b)(3), *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013), an expert must "provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand." *Weiner v. Snapple Beverage Corp.*, No. 07-CV-8742 (DLC), 2010 WL 3119452, at *9 (S.D.N.Y. Aug. 5, 2010). In other words, "[t]he question is not ... whether a jury at trial should be permitted to rely on [the expert's] report to find facts ... but rather whether [the Court] may utilize it in deciding whether the requisites of Rule 23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (E.D.N.Y. 2000).

## B. Dalrymple's Report Is Admissible, as Its Flaws Speak to the Weight It Should Be Afforded

Deutsche Bank does not argue that Dalrymple is not qualified as an expert, nor that his first three opinions described above are unreliable. *See* Plaintiff's Memorandum of Law in Opposition to Deutsche Bank's Motion to Preclude the Expert Report of W. Scott Dalyrmple, CFA ("Daubert Opp."), Dkt. No. 389, at 1-2, 8. Instead, Defendant solely challenges the reliability of his fourth conclusion – that damages can be calculated on a class-wide basis.

Dalrymple's report purports to explain how these calculations can be made through a two-step process. First, Dalrymple relies on a comparison between cash flow to the Certificates in the "actual world" and cash flow to the Certificates in the "but for" world in which the Trustee

12

had performed its alleged obligations to enforce discovered breaches of R&Ws and had properly serviced the loans. Dalrymple Rep. ¶¶ 52-55 (explaining this comparative analysis).

Dalrymple provides the following example to further explain how this first step would work. If Plaintiff were to allege that the Trustee had knowledge in 2011 that certain loans representing a principal balance of $30 million were in breach and would have been subject to a repurchase demand at that time, then assuming that the Trustee fulfilled its obligation, and applying an assumption of a 50 percent repurchase acceptance rate, its fulfillment of its obligation would have resulted in proceeds of $15 million to the Trust. *Id.* ¶ 56.

Second, Dalrymple's proposed methodology then uses the comparative difference identified at the first step, or so-called "counterfactual collateral cash flows and losses," and purports to apportion damages among each Trust's investors by using each Trust's "waterfall structure." *Id.* ¶¶ 58-59. "Waterfall structure" refers to each Trust's distribution structure, which is governed by certain documents, such as the PSAs described above, that establish how distributions and losses are allocated to the Certificates, with distributions allocated last to and losses absorbed first by the most junior or subordinated certificates. *Id.* ¶¶ 14-16. According to Dalrymple, because of the waterfall structure, it is "formulaic to apportion collateral losses that would have been avoided and additional cash flows that would have been realized, assuming the Trustee had fulfilled its obligations, among the Investors." *Id.* ¶ 60.

Deutsche Bank lodges a number of criticisms of Dalrymple's report in its effort to exclude it as unreliable. First, Deutsche Bank rejects Dalrymple's opinion that damages can be measured on a class-wide basis because his methodology focuses on determining damages at the Certificate level. *See* Daubert Br. at 7-10. As a result of his methodology of aggregating losses to all Certificates instead of losses to class members, Deutsche Bank claims that Dalrymple is not

accounting for "any of the class members' differing circumstances" or determining whether these differences are "even relevant to determining class members' damages." *Id.* at 10.

Second, Deutsche Bank challenges Dalrymple's disengagement with any connection between the alleged breaches and the damages, insisting that causation would be an "input" provided to him. *Id.* at 11. Essentially, Dalrymple assumes that the information required to create the "but for" world against which he could compare the actual world in order to measure damages *caused* by the Trustee – including information about whether repurchase would have occurred and how – may be reliably calculated and provided to him. *Id.* at 11-12.

Third, Dalrymple, while presenting techniques that *could* be used to determine damages, does not actually propose a specific method. *Id.* at 17-21.

This third criticism is easily dispatched. At the class certification stage, Dalrymple need not implement his methodology (or even stick to one particular methodology); he simply needs to show that his methods are reliably applied to a class. *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015) (finding that *Comcast* and Rule 23 do not require "an expert to *perform* his analyses at the class certification stage" (emphasis in original)).

By contrast, Deutsche Bank's first two criticisms are well-taken, but largely irrelevant to the *Daubert* analysis. They both impact the *weight* the Court should afford Dalrymple's conclusions more than *admissibility* of his report. "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks and citations omitted). The Court cannot conclude that Dalrymple is using junk science or that his assumptions are so

unrealistic as to suggest bad faith. Rather, the flaws identified by Deutsche Bank can (and here, do) undermine how much weight the Court can place on his expert opinions when it comes to Royal Park's ability to meet its burden of establishing predominance and superiority under Rule 23(b)(3).

## V. Royal Park's Renewed Motion for Class Certification

As briefly referenced above, while the standard governing class certification writ large remains unchanged since last year, one Second Circuit case decided after the Court issued its initial opinion denying class certification does significantly add to the Circuit's understanding of the proper standard for "ascertainability."

### A. *Petrobras* and the Threshold Test of Ascertainability

On July 7, 2017, the Second Circuit decided *In re Petrobras Securities* and explicitly took the opportunity "to clarify the ascertainability doctrine's substance and purpose," holding that it requires that "a class be defined using objective criteria that establish a membership with definite boundaries" and declining to adopt "a freestanding administrative feasibility requirement." 862 F.3d 250, 264 (2d Cir. 2017), *petition for cert. docketed sub nom. Petroleo Brasileiro S.A. – Petrobras v. Univs. Superannuation Scheme Ltd.*, No. 17-664 (Nov. 3, 2017) [hereafter, "Petrobras"]. *Brecher*, upon which this Court relied heavily in its previous opinion, had defined the elements of ascertainability as requiring that a class be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member" and "defined by objective criteria that are administratively feasible," such that "identifying its members would not require a mini-hearing on the merits of each case." 806 F.3d 22, 24-25 (2d Cir. 2015) (internal quotation marks and citation omitted). The Circuit clarified that *Brecher*'s repeated references to administrative feasibility were "not strictly part of the

holding" but simply "conveyed the *purpose* underlying the operative requirements of definiteness and objectivity." *Petrobras*, 862 F.3d at 266. The *Petrobras* Court was urged by the Appellants to endorse the heightened ascertainability test articulated by the Third Circuit in *Byrd v. Aaron's Inc.*, 784 F.3d 154 (2015), but expressed a concern that "[t]he proposed administrative feasibility test...risks encroaching on territory belonging to the predominance requirement, such as classes that require highly individualized determinations of member eligibility." *Id.* at 265-68. Instead, the Second Circuit joined the "growing consensus" in sister circuits that declined to adopt an administrative feasibility requirement. *Id.* at 265 (collecting cites). Administrative feasibility remains a central component of superiority analysis and of predominance analysis, which are both "comparative in nature," as opposed to ascertainability's "absolute standard." *Id.*

With further clarification provided by the Circuit, and a revised description of the proposed class provided by the Plaintiff, the Court now revisits and continues its prior analysis.

Both Plaintiff and Defendant interpret *Petrobras* as mandating "that ascertainability should be considered in connection with predominance," Dkt. No. 415 at 1, or, similarly, that the "individualized issues that this Court previously considered under the implied requirement of ascertainability must be considered under the predominance requirement of Rule 23(b)(3)." Dkt. No. 418 at 1 (emphasis removed). The Court agrees that *Petrobras*, in "clarifying" the scope of the ascertainability doctrine, has stepped away from the heightened threshold that *Brecher*, if not endorsing, at least flirted with. In so doing, *Petrobras* shifted much of the same analysis to the question of predominance. *See Petrobras*, 862 F.3d at 269, n.20 ("[T]he ascertainability requirement merely gives name to a particularly vexing type of class defect that would cause a proposed class to founder on the shoals of predominance, superiority, or both.").

Applying the pared back ascertainability analysis mandated by *Petrobras*, then, the Court simply analyzes the proposed class definition to ensure that it is "defined using objective criteria that establish a membership with definite boundaries," and *not* that it is also "administratively feasible." *Petrobras*, 862 F.3d at 264. Royal Park contends that the revised class definition meets the "modest threshold [ascertainability] requirement" of *Petrobras*. Dkt. No. 415 at 2 (quoting *Petrobras*, 862 F.3d at 269). The Court agrees.

In denying Royal Park's first motion for class certification, the Court found that the proposed class lacked "any meaningful temporal limitation," which would "exacerbate the administrative obstacles to class member identification" given that its ambiguity made it nearly impossible to determine who was included and who was excluded from the proposed class. Original Opinion, at *5. The revised class definition creates the temporal limitation of "any time between the date of issuance to no later than 60 days after notice of class certification and opportunity to opt-out is issued," which means that at some point the make-up of the class will be fixed. *See Brecher*, 806 F.3d at 25 n.2 ("'[I]dentifiable' does not mean 'identified'; ascertainability does not require a complete list of class members at the certification stage."). This limitation is sufficient, as Deutsche Bank appears to concede, arguing that "whether the issues are analyzed under the mantle of predominance or ascertainability makes no difference," instead of renewing its arguments regarding ascertainability in its post-*Petrobras* letter to the Court. *See* Dkt. No. 418 at 3.

The other concerns the Court expressed in denying the first motion for certification for lack of ascertainability remain salient, but have more purchase after *Petrobras* within the context of analyzing predominance under Rule 23(b). *Accord Wells Fargo*, 2018 WL 739580 at *8. For the purposes of ensuring a "membership with definite boundaries" can be determined, Royal

Park places much stock in the power of a claims filing procedure by which parties self-identify following notice. Br. at 4-6. It is true that at "the claims administration stage, parties have long relied on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (internal quotation marks and citation omitted). Deutsche Bank argues that class membership *cannot* be determined that way here, but raises challenges – tracing ownership and litigation claims – that more clearly weigh on the *burden* of identification, not the *possibility*. Memorandum of Law of Defendant Deutsche Bank National Trust Company, as Trustee, in Opposition to Motion for Class Certification and Appointment of Class Representative and Class Counsel of Royal Park Investments SA/NV ("Opp. Br."), at 6. "Ascertainability does not directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition, an issue that is already accounted for in Rule 23." *Petrobras*, 862 F.3d at 269 (emphasis in original).

Deutsche Bank does raise one new argument with respect to the revised class definition that would be best considered at the threshold step: that by defining the class, in part, as those that "were damaged as a result of Deutsche Bank National Trust Company's conduct alleged in the Complaint," Royal Park has created an impermissible "fail-safe" class. *See* Opp. Br. 11-12. A "fail-safe" class is one where "either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012), *aff'd*, 656 F. App'x 558 (2d Cir. 2016). As Royal Park correctly notes in its reply, "[t]he proposed class here does not contain any language presupposing liability, but merely links putative class members' alleged injuries to the particular misconduct ascribed to

18

[Deutsche Bank] in the Complaint." *See* Plaintiff's Reply Memorandum of Law in Further Support of Its Renewed Motion for Class Certification and Appointment of Class Representative and Class Counsel ("Reply Br."), Dkt. No. 383, at 5. In fact, the Court expressly approved such language in its previous opinion. Original Opinion, at *11 (endorsing Royal Park's proposed modification).

In short, while many of the Court's concerns from its previous order remain, the revised class definition is now ascertainable because of the temporal limitations and because other deficiencies are best analyzed under Rule 23(b)(3)'s "comparative" analysis instead of ascertainability's "absolute standard." *Petrobras*, 862 F.3d at 268. The revised definition uses "objective criteria" and has "definite boundaries." *Id.* at 264.

## B. The Requirements of Rule 23(a)

The renewed class definition having satisfied the threshold test of ascertainability, the Court then proceeds to consider the four prerequisites set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.

### 1. Numerosity

To meet the requirements of Rule 23(a)(1), the proposed class must be "so numerous that joinder of all members would be impracticable." Fed. R. Civ. P. 23(a)(1). In this Circuit, numerosity is presumed when there are more than 40 class members. *See, e.g.*, *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (citation omitted).

Here, according to Dalrymple's expert report, there are a minimum of 580 investors in the Trusts. *See* Dalrymple Rep. ¶¶ 40-47. Deutsche Bank criticizes Royal Park's reliance on Dalrymple's opinion, arguing that Dalrymple has no way of excluding individuals who sold their investments years before the Trustee's alleged breaches or who had assigned away their claims.

Opp. Br. at 10-11. Yet, "[c]ourts have not required evidence of exact class size...to satisfy the numerosity requirement," *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993), and common sense dictates that in a class of over 580 unique investors defined from 2006 or 2007 until a point of time shortly in the future, at least 40 investors would have been affected by the alleged breaches beginning in 2009. *See German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 552 (S.D.N.Y. 1995) ("Precise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity." (internal quotation marks and citation omitted)). Plaintiff's proposed class meets the numerosity requirement.

### 2. Commonality

"Commonality" requires Plaintiff to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). It poses a "low hurdle," *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 267 (S.D.N.Y. 2014), as it demands only that the class members' claims share a common question that will yield a common answer resolving a relevant issue on a class-wide basis "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, Plaintiff alleges that Deutsche Bank breached identical or nearly identical contractual terms to which all class members were beneficiaries, giving rise to contractual and common law claims. Consequently, common questions such as – (1) did Deutsche Bank discover loans in breach of R&W?; (2) did Deutsche Bank know about the Events of Default?; (3) did Deutsche Bank violate its contractual duties by failing to enforce R&W rights or by failing to declare Events of Default?; and (4) were class members damaged by Defendant's

conduct and, if so, to what extent? – are all central to establishing liability and damages for each class member. *See* Orig. Br. at 9-10.

Deutsche Bank focuses its opposition on arguing that individual questions *predominate* over common ones and does not explicitly argue that Royal Park has failed to establish commonality under Rule 23(a). Regardless, even if the Defendant had made that argument, the Court agrees that Royal Park has established common questions capable of yielding common answers for both breach of contract and breach of duty claims, and has met the requirement.

### 3. Typicality and Adequacy of Representation

Typicality and adequacy are often analyzed together because of their similarities. *See Wallace v. IntraLinks*, 302 F.R.D. 310, 316 (S.D.N.Y. 2014) ("The adequacy inquiry overlaps with the typicality inquiry...."). Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). It requires that these claims "arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Marisol A. v. Giuliani*, 929 F. Supp. 662, 691 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997). Rule 23(a)(4) requires plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This showing requires that plaintiffs demonstrate that the proposed class representatives, first, have no "interests [that] are antagonistic to the interest of other members of the class," and second, that plaintiffs' attorneys "are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Accordingly, both typicality and adequacy focus on the relationship between the putative Class Representative and other class members. One bar to certification – the so-called "unique defense rule" – states that certification "is inappropriate where a putative class

representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (internal quotation marks and citation omitted). Royal Park argues that it is both typical and adequate as its claims arise from the same course of conduct, such as Deutsche Bank's failure to give notice of breaches and Events of Default and failure to enforce R&W rights, equally applicable to all class members' claims. Br. at 14-15; *see also* Orig. Br. at 11.

Deutsche Bank raises a number of concerns as to Royal Park's typicality and adequacy, but they are either more germane to predominance analysis under Rule 23(b)(3), or otherwise insufficient to defeat certification.

First, Deutsche Bank retorts that Royal Park, in asserting that it obtained litigation rights by operation of New York's General Obligation Law Section 13-107, is at conflict with those putative class members who are former owners who relinquished their claims by operation of the same provision. *See* Opp. Br. at 25; Memorandum of Law of Defendant Deutsche Bank National Trust Company, as Trustee, in Opposition to Motion for Class Certification and Appointment of Class Representative and Class Counsel of Royal Park Investments SA/NV ("Orig. Opp."), Dkt. No. 347, at 23. But the presence of standing defenses does not render Royal Park atypical. As discussed below with respect to the Court's predominance analysis, and as Judge Netburn described in her Report and Recommendation in *Wells Fargo*, "because of the nature of the RMBS at issue and the problem of assigned claims, many of the putative class members will need to prove standing and ownership." 2018 WL 739580, at *10. While this is problematic, it is also "an issue better addressed under a predominance analysis." *Id.*

Next, Deutsche Bank suggests Royal Park's position may be antagonistic to other class members. The Defendant claims that when Royal Park gave up its rights to seek further

documents from Fortis (now "BNPFF") – the bank from which it was assigned its own rights asserted here – when it settled an action in Belgium, this "self-inflicted inability to participate in discovery…renders it an inadequate class representative." Orig. Opp. at 24-25. As a result, Deutsche Bank continues, Royal Park's "discovery failures" may subject it to unique defenses not relevant for other class members. *Id.* at 25.

The parties dispute the extent to which these documents are relevant to the present litigation.[5] *Compare* Orig. Opp. at 24 *with* Plaintiff Royal Park Investments SA/NV's Reply Memorandum of Law in Further Support of Its Motion for Class Certification and Appointment of Class Representative and Class Counsel ("Orig. Reply"), Dkt. No. 283, at 8-9. Regardless, Deutsche Bank's vague discussion of "unique defenses" is insufficient to destroy typicality or adequacy here. There is no evidence to support that the unique defense would "threaten to become the focus of the litigation," *see* Orig. Opp. at 25 (quoting *Baffa*, 222 F.3d at 59), and Defendant's one citation in support of its claim that Royal Park's discovery failures render it inadequate is inapposite. In *McDaniel v. Cty. of Schenectady*, upon which Defendant relies, the putative class representative refused court orders to participate in a deposition three times and counsel could not locate her. *See* Orig. Opp. at 25 (citing No. 04-CV-757 (GLS)(RFT), 2005 WL 1745566, at *3 (N.D.N.Y. July 21, 2005)). By contrast, Royal Park, which was formed as a special purpose vehicle specifically to take over certain distressed assets like the RMBS at issue here, has been a zealous and active participant in this litigation.

Further, this Court, like many others within this Circuit, finds Robbins Geller could adequately and fairly represent the class. *See, e.g., Fort Worth Emps.' Ret. Fund v. J.P. Morgan*

---

[5] For more background on the documents in the possession of Fortis and their relevance to the present litigation, see Magistrate Judge Moses's August 31, 2016 Memorandum and Order. *Royal Park Investments SA/NV v. Deutsche Bank National Trust Company*, No. 14-CV-4394 (AJN)(BCM), 2016 WL 4613390 (S.D.N.Y.).

*Chase & Co.*, 301 F.R.D. 116, 135 (S.D.N.Y. 2014); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 157-58 (S.D.N.Y. 2012); *Sgalambo v. McKenzie*, 268 F.R.D. 170, 177 (S.D.N.Y. 2010).

Royal Park has met both the typicality and adequacy requirements of Rule 23(a), and were this Court to certify the class, it would appoint Royal Park as Class Representative and Robbins Geller as Class Counsel.

## C. The Requirements of Rule 23(b)(3)

Despite Plaintiff's ability to meet the requirements of Rule 23(a), the Court will not certify a class under Rule 23(b)(3) because of its failure to establish that common issues predominate over individualized issues.

### 1. Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The "predominance" requirement is satisfied if resolution of material legal or factual questions "can be achieved through generalized proof" and if the common issues "are more substantial than the issues subject only to individualized proof." *Mazzei*, 829 F.3d at 272 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citation omitted)). Individual questions are those where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (alteration omitted) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:50, at 196-97 (5th ed. 2012) (internal quotation marks omitted)). The inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 623 (1997). "Like the commonality inquiry, a court examining predominance must assess (1) the 'elements of the claims and defenses to be litigated'; and (2) 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting McLaughlin on Class Actions § 5:23).

As Plaintiff attempts to certify a (b)(3) class, the Court must give careful scrutiny to the relation between common and individual questions in this case. *Comcast Corp.*, 569 U.S. 27 (calling on district courts to take a "close look" at whether common questions predominate) (citation omitted). The predominance inquiry "is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Petrobras*, 862 F.3d at 270. After all, as the Supreme Court has noted, "any competently crafted class complaint literally raises common questions." *Wal-Mart Stores*, 564 U.S. at 349 (alteration and internal quotation marks omitted). The "predominance criterion is far more demanding" than the commonality requirement under Rule 23(a). *Amchem*, 521 U.S. at 623-24.

Predominance does not require a plaintiff to show "that there are no individual issues," *In re IndyMac Mortg.-Backed Secs. Litig.*, 286 F.R.D. 226, 236 (S.D.N.Y. 2012), and an "action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-24 (3d ed. 2005) (footnotes omitted)); *accord Johnson*, 780 F.3d at 138. However, as the *Petrobras* Court explained, "[w]here individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among putative

25

class members 'make use of the class-action device inefficient or unfair," and the predominance inquiry attempts to mitigate this risk by asking whether "the common aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." 862 F.3d at 270 (internal quotations and citations omitted; alterations in original). The requirement's purpose is to ensure certification "only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).

Here, under Royal Park's revised class definition, individual inquiries predominate over issues common to the putative class. Accordingly, the Court cannot certify the class under Rule 23(b)(3).

The key to predominance is whether "generalized evidence could be offered" to prove "the elements of the claims and defenses to be litigated," or whether "individualized proof will be needed to establish each class member's entitlement to relief." *Johnson*, 780 F.3d at 138 (internal quotation marks and citation omitted). To prevail on its breach of contract claims under New York law, the Class would have to demonstrate "(1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21-22 (2d Cir. 2011) (summary order). Before an Event of Default, Plaintiff alleges that Defendant has an obligation to enforce breaches of R&Ws by requiring the Seller to substitute or repurchase defective or noncompliant loans. Compl. ¶ 207(a). After an Event of Default, Plaintiff alleges that Defendant has a broader obligation to act as a "reasonable, prudent person" would to protect

the interests of the Plaintiff. *Id.* ¶ 207(e). Neither party suggests that the first or second elements are in dispute here, and so the crucial question is whether the third and fourth elements – Defendant's breach of the PSAs and the subsequent damages to Plaintiff – could be proved by generalized, class-wide evidence.

Similarly, for the breach of trust claim, the Court previously denied the motion to dismiss the claim as duplicative of the contract claim because "the duty to avoid conflicts of interests is independent of contractual obligations under the terms of the PSA." *See Royal Park*, 2016 WL 439020, at *9. It is this element – that Defendant's relationships with Master Servicers, Servicers, and/or Warrantors prevented it from taking actions necessary to protect Plaintiff – that would need to be proved by generalized, class-wide evidence.

Plaintiff identifies numerous questions common to the entire Class for which common answers are necessary to establish their claims, including "whether Deutsche Bank: (1) failed to enforce R&W breaches, upon discovering them; (2) failed to notify Master Servicers and Servicers of their failures to fulfill their obligations after learning of Events of Default; (3) failed to declare Events of Default when it learned of them; and (4) failed to act as a reasonable person would to protect its own assets after learning of Events of Default." Br. at 16; Orig. Br. at 14-15. Defendant does not contend that provisions in the PSAs differ greatly between the Trusts, and so it is plausible that answers to these questions would be common to all. Moreover, as Plaintiff credibly alleges, Deutsche Bank employs the same policies, practices, and procedures with respect to each RMBS Trust, administered and monitored by the same trust administration group. Orig. Br. at 16. According to Royal Park, these administrators were supposed to have applied the same internal controls and followed the same set of policies and procedures governing Deutsche Bank's response to a breach of R&W, to a default or Event of Default, or to a potential

Event of Default related to the loans in the Trusts. *Id.* Plaintiff argues that "the predominant question will be whether Deutsche Bank put its own interests ahead of the Class when it learned of Events of Default and R&W breaches and failed to act." Orig. Br. at 15.

Plaintiff contends that common proof or evidence could answer these questions and establish the elements of the claim on a class-wide basis. For its breach of trust claim, Royal Park alleges that "a single group of individuals at Deutsche Bank was responsible for … developing relationships with deal parties to each [Trust]," and so Plaintiff would "rely on common proof" that Deutsche Bank's "ongoing relationships with the Master Servicers, Servicers and/or Warrantors…prevented it from taking the actions against such entities necessary to fulfill its obligations under the Governing Agreements…." Orig. Br. at 17-18. Plaintiff suggests that liability can be established through common proof with respect to Deutsche Bank's discovery of R&W violations, through loan sampling and re-underwriting the prove that loans breached the R&Ws, through "[c]ommon evidence of the Trusts' massive economic losses, widely disseminated investigative reports of origination and servicing failures and predatory schemes at issue." Orig. Br. at 17. Finally, as noted above, Plaintiff purports to offer a common methodology that can establish class-wide damages through Dalrymple.

Nonetheless, despite the many common questions and some potential common proof identified above, class certification is not warranted because of the numerous individualized inquiries the Court and parties would have to conduct. Ultimately, these individualized issues – some of which were identified in this Court's previous analysis of ascertainability, and some of which are presaged above – predominate over the common ones. First, the nature of the Trusts creates obstacles to the identification of who exactly has standing in this litigation, obstacles that would require numerous individualized determinations. Second, resolving Deutsche Bank's

potential statute of limitations defense would require individualized determinations of which statute of limitations applied to each plaintiff's cause of action. Third, Royal Park's failure to establish that damages may be determined on a class-wide basis militates against certification. The Court addresses these key individualized issues in turn.

### a) Tracing Ownership and Article III Standing

As the Court discussed at length in its previous opinion denying certification, the nature of the RMBS Trusts create many obstacles to the identification of beneficial owners who also have standing to sue as members of this proposed class. *See* Original Opinion at *6-7. To summarize, identification of these class members is the first major hurdle, and, while not sufficient to defeat the threshold question of ascertainability, still suggests that individual issues predominate. The Certificates lack unique identifiers corresponding to individual investors' ownership interest, but rather carry a CUSIP number universal to all interests in a given tranche. Declaration of Tera M. Heintz ("Heintz Decl."), Dkt. No. 348, Expert Report of John H. Dolan ("Dolan Rep."), Ex. A, ¶ 24. Then, many of these Certificates have been actively traded on the secondary market with ownership interests potentially sold off in pieces to multiple investors or having been purchased by holdings previously acquired from multiple sources. Some Certificates were also included within collateralized debt obligations that collapsed and were sold at public auction.[6] Dolan Rep. ¶ 28. Adding to the difficulty of tracing the beneficial owner is the fact that the Certificates are not held by investors, but rather are held in "book entry" form by the Depository Trust Company, often only in the name of DTC's nominee, Cede & Co., and not in the name of the ultimate beneficial owners. Dolan Rep. ¶ 31. These many obstacles to identification of a beneficial owner led the Court to question the administrative feasibility of

---

[6] As is the case with some of Royal Park's own Certificates.

certifying such a class, a concern that, while not central to ascertainability, remains central to the predominance analysis. *See Mazzei*, 829 F.3d at 272 (failure to show privity in breach of contract case through class-wide evidence resulted in decertification).

Royal Park attempts to address these concerns in its renewed motion, arguing that between records from DTC and records maintained by Deutsche Bank, each and every Certificate holder can be identified. Br. at 6-7. However, the "participants" listed in DTC's records are not necessarily the beneficial owners. As Royal Park's own expert explains, "most securities registered in DTC participants' names will be registered on behalf of other persons or entities who are the actual beneficial owners of the securities." Dalrymple Rep. ¶ 44. Royal Park suggests that it would be able to subpoena any DTC participant for their records of the identities of the beneficial owners. Br. at 8. Assuming the baseline feasibility of this tracing exercise, it is still likely that it would require individualized inquiries. *Accord Wells Fargo*, 2018 WL 739580 at *14 ("Tracing transactions in securities that are not traded on an exchange and are recorded as indirect electronic entries in a depository would require 'evidence that varies from member to member' and is 'not obviously susceptible to [] class-wide proof.'" (quoting *Petrobras*, 862 F.3d at 272)).

Plaintiff suggests that a claims or administration process would be sufficient to ensure that "all potential Class members are notified of the action and ascertained," relying on the testimony of Peter L. Crudo, Executive Vice-President of Gilardi & Company, an administrator of class action settlements. *See* Br. at 9 (citing Olts Decl., Ex. H, Declaration of Peter L. Crudo ("Crudo Decl.")). While Mr. Crudo does not expressly estimate how much time this process would take, if the hurdles to identifying of beneficial owners ended there, the Court would certify the proposed class. In fact, however, the true salience of these tracing and identification

difficulties, and one of the core reasons why the Court denies Plaintiff's renewed application for certification, is revealed when analyzing how the Court would ensure that members of the putative class have Article III standing to assert their breach of contract and breach of trust claims.

As the Court summarized previously, the standing of investors who "assigned or acquired Certificates via the secondary market...to assert, for example, breach of contract claims, may well turn on both the nature and terms of the assignments themselves (as well as any predecessor assignments) and on the particular jurisdiction whose law governs those assignments." Original Opinion at *6. Without litigation rights, a current or former holder of a Certificate would not have Article III standing to pursue the class claims. The difficulty of determining these rights assignments remains a serious deficiency of Plaintiff's motion for certification.

In renewing its motion, Royal Park argues, first, that issues around the assignment of litigation rights are merely hypothetical and speculative, and second, that a notice and claims process could account for those assignments, negating any need for the adjudication of assignment disputes, especially on a scale that would defeat the efficiencies of class certification. Br. at 12. But the issue is hardly speculative; available records reflect that hundreds of investors sold interests in their Certificates after January 2009. Dolan Rep. ¶ 51. And while Royal Park puts much stock in the ability of a notice and claims process to determine "the circumstances surrounding [the] assignments," Br. at 12, Crudo only contends that the claims process could avoid duplication of claims and root out fraud, not that the process would be able to determine the transfer of litigation rights. Crudo Decl. ¶¶ 22-24.

In fact, as the Court previously noted, to determine whether a class member holds litigation rights would involve two individualized inquiries. First, the Court would have to apply

New York's fact-intensive "grouping of contacts" choice-of-law framework to determine which jurisdiction's law governs the relevant assignment. Original Opinion at *7. Then, the Court would have to apply that law to determine whether the claims were assigned along with the Certificates or retained by the seller. A claims process is unable to mitigate the need for individualized legal determinations when disputes regarding assignments arise, and variation among assignments undermines Plaintiff's claim that common issues predominate. *See, e.g., Commerzbank, A.G. v. Wells Fargo Bank, N.A.*, 15-CV-10033, Dkt. No. 1, ¶¶ 17-20 (exemplifying how assignments of litigation rights may be governed by separate agreements). Without class-wide evidence of litigation rights, "the fact-finder would have to look at every class member's documents to determine who did and who did not have a valid claim." *Mazzei*, 829 F.3d at 272. "The predominance analysis must account for such individual questions, particularly when they go to the viability of each class member's claims." *Petrobras*, 862 F.3d at 274 (footnote omitted).

### b) Choice of Law and Statute of Limitations Defenses

A similar issue of individualized inquiries arises when considering Deutsche Bank's affirmative statute of limitations defense. "[W]hile it is well established that the existence of a defense potentially implicating different class members differently does not *necessarily* defeat class certification, it is equally well established that courts must consider potential defenses in assessing the predominance requirement." *Myers*, 624 F.3d at 551 (citations omitted). Moreover, certification is improper if "plaintiffs have offered no reliable means of collectively determining how many class members' claims are time-barred." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233-34 (2d Cir. 2008).

Determining the applicable statute of limitations is no simple task, and is not capable of common resolution. "Where plaintiffs' claims rest on state law, we apply the choice-of-law rules of the state in which the federal district court sits." *Johnson*, 780 F.3d at 141 (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Deutsche Bank argues that under New York's borrowing statute, N.Y. C.P.L.R. § 202, if claimed injuries are purely economic, "assigned claims are governed by the statute of limitations of the *assignor's* residence." Opp. Br. at 14. Given this, to determine the applicable statute of limitations, the Court would have to identify the owner of the claim at the time *each* breach occurred and trace the assignment of litigation rights since that time, potentially requiring the same choice-of-law analysis described above. *Id.* at 14, 16. Moreover, it may be difficult to determine the "residence" of the original assignor to begin with. *Id.* at 14. Deutsche Bank points to *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462 (S.D.N.Y. 2017) as an exemplar of how complex this analysis may get. *Id.* at 15. Judge Koetl, in considering a statute of limitations defense brought by one defendant, had to determine where the claims accrued, had to interpret and apply the German statute of limitations, and had to consider tolling rules and raised exceptions to statutes of limitations. *Id.*

Royal Park argues that because class members' ownership interests are legally held through DTC, the applicable statute of limitations for the entire class is that which applies to DTC, a New York corporation. Reply Br. at 6. Royal Park misstates the law. The cause of action accrues to the class members, not to DTC, which, while holding the Certificates, is not a beneficial owner. Consequently, the applicable statutes of limitations are those that would properly apply to the class members, or in the case in which litigation rights were assigned, to the assignor. The investors likely reside in many different jurisdictions, Dolan Rep. ¶¶ 26, 47,

and the statute of limitations may be different for the breach of trust claim. *See, e.g., Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 1212573, at 4 n.2, 14 (S.D.N.Y. Mar. 28, 2016) (finding that a conflict of interest claim is subject to a three-year statute of limitations under New York law).[7]

In its original reply brief, Royal Park also briefly asserted that provisions in the PSAs "mandate that New York substantive law applies, including statute of limitations." Orig. Reply at 5. This also misstates the law. Under New York law, "a choice of law clause is construed as choosing only the applicable substantive law, not the applicable limitation period," which is considered procedural. *Mohsen v. Morgan Stanley & Co.*, 2014 WL 4593919, at *5 (S.D.N.Y. Sept. 15, 2014) (quoting *Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193, 203 (S.D.N.Y. 1997)).

Alternatively, Royal Park simply attempts to minimize the proper effect of potential affirmative defenses on the predominance analysis. Reply Br. at 6-7. It is true that, as Plaintiff quotes, "the mere fact that [an affirmative statute of limitations defense] may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Id.* (quoting *In re WorldCom, Inc. Secs. Litig.*, 219 F.R.D. 267, 303 (S.D.N.Y. 2003). However, the quotation – actually lifted from a First Circuit case – continued: "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose certification under Rule 23(b)(3)." *WorldCom*, 219 F.R.D. at 303 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)). Unlike in *WorldCom*,

---

[7] For breach of contract claims, *see, e.g.*, Fla. Stat. § 95.11 (5 years); Cal. Civ. Proc. Code § 337 (4 years); N.C. Gen. Stat. § 1-52 (3 years). For tort breach of trust claims, *see, e.g.*, 42 Pa. Cons. Stat. § 5524 (2 years).

consideration of the affirmative defense here would require a complicated application of New York's borrowing statute, only adding to the individualized issues necessitated by the other deficiencies of class-wide treatment recognized in this section. There is no "sufficient constellation of common issues" present in this case. *Waste Mgmt.*, 208 F.3d at 296; *see also Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (noting that application of "individualized choice of law analysis to each plaintiff's claims" may cause "the proliferation of disparate factual and legal issues [to be] compounded exponentially"), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591.[8]

### c) Damages Determinations and Causation

The individualized issues identified with respect to liability are sufficient for the Court to deny certification, but flaws with Royal Park's proposed damages determinations only further support the Court's conclusion. The fourth element of establishing a breach of contract is "damages suffered as a result of the breach" and these deficiencies undermine Plaintiff's ability to do so with class-wide proof. *Beautiful Jewellers*, 438 F. App'x at 21-22.

As addressed above with respect to the motion to preclude Dalrymple's report, Deutsche Bank argues that Royal Park cannot establish that damages can be assessed on a class-wide basis. Dalrymple suggests that damages can be measured by using class-wide liability determinations that are then incorporated into his damages model and allotted to the Certificates. Br. at 7; Declaration of Lucas F. Olts, Dkt. No. 384, Ex. A ("Dalrymple Rebuttal"), ¶¶ 37-38. As a result, Deutsche Bank criticizes this methodology for not accounting for class members' differing circumstances, including "when they bought Certificates, the prices they paid, whether they

---

[8] Comparison to the facts of *Petrobras* are warranted here too. In *Petrobras*, the Second Circuit noted that "the predominance analysis must account" for the District Court's need to individually consider which class members did and did not have a valid claim. 862 F.3d at 274. In *Petrobras*, the Court would have to undertake domesticity analysis under *Morrison*, but the concern is the same.

bought or sold before or after the alleged breaches, how long they held the Certificates, whether they are asserting assigned claims, the seniority of their Certificates, or whether there would have been any cash recovery in the but-for world while the investors held their Certificates." Daubert Br. at 10.

Royal Park repeatedly defends Dalrymple's testimony by saying that his model *could* accommodate a certain factor or *could* account for specific issues by using inputs. *See* Daubert Opp. at 14 (accommodating the possibility of litigation); *id.* (inputing servicing failures); Reply Br. at 8 ("his methodology allows for consideration of ***all relevant inputs***, including the incorporation of any 'factors' if established by legal or factual determinations, on the question of damages" (emphasis in original)). The Court is unpersuaded by this defense. Essentially Royal Park contends that even though Dalrymple is unable to answer what would be relevant to apportioning damages, Deutsche Bank National Trust Company, as Trustee's Reply in Support of Its Motion to Exclude the Expert Report of W. Scott Dalrymple, at 6-8, and even though his methodology calculates damages at the certificate level and "does not contemplate a specific allocation to investors," *id.* at 7, his methodology somehow simultaneously accounts for all relevant differences between class members without requiring individualized determinations.

There is no problem in Dalrymple starting from the assumption that the court would make a finding of class-wide liability when setting forth his damages methodology. *See* Reply Br. at 9 n.16 (citing Deutsche Bank's own expert, Dr. Andrew S. Carron, as concurring). However, because of the problems of establishing liability using class-wide proof, as Judge Netburn put it, Dalrymple's testimony "does little to resolve this conundrum." *Wells Fargo*, 2018 WL 739580, at *15. "[T]he 'inputs' needed for his damages methodology require individualized determinations." *Id.*

Dalrymple's proposed methodology, comparing the "actual" world with the "but for" world in which the alleged breaches did not occur, elides key differences between class members that would be required to establish proper damages calculations. Orig. Opp. Br. at 15-17, 20; Heintz Decl., Carron Rep. ¶ 7(b)-(c). Unlike in traditional securities classes, there is no one discrete loss-causing event at issue here. Rather, individualized factors impacting damages here would include, among others, 1) when investors bought Certificates relative to the timing of the breaches (and the discovery of each breach); 2) the seniority of each investor's Certificates; 3) the price each investor paid for its Certificates and 4) when and at what rates repurchase would have occurred. Carron Rep. ¶¶ 27-60.

Royal Park's response is essentially to say "RPI's proposed damages methodology would measure *only* those class-wide damages arising from breaches for which DB is found liable and then apportion them to the damaged certificate holders." Reply Br. at 9 (emphasis in original). And Dalrymple's Report repeatedly states his model "could account for" a number of the factors Deutsche Bank emphasizes. *See* Dalrymple Rep. ¶ 57. But the bare-bones nature of his explanation is insufficient to allay serious concerns that the exercise of connecting Defendant's actions to damages would devolve into myriad individual determinations.

The claims here involve many alleged breaches, arising out of ownership of often-transferred securities over many years, between investors in many geographic locales, and without one uniform law. Put simply, Dalrymple's reliance on various inputs for his model – inputs which will not easily determined through class-wide proof – renders his outputs likely individualized as well.

\* \* \*

It is probable that none of these individualized issues would be sufficient on its own to defeat predominance in light of the common questions described above.[9] Royal Park leans heavily on statements by courts finding that standing issues alone, or statute of limitations issues alone, or damages issues alone, are insufficient to defeat predominance where there are liability issues subject to classwide proof. *See, e.g.*, Dkt. No. 540 at 1-2 (quoting *Tyson Foods*, 136 S. Ct. at 1045 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." (internal quotation marks and citation omitted)).

However, the cumulative prospect that each beneficial owner would have to be identified from the records of potentially 147 different "Participants," would have to establish its Article III standing in the wake of various assignments, would have to respond to a statute of limitations defense potentially unique to its particular circumstances, and would have to establish causation and damages that may vary across members, is too much for the class vehicle to bear. This is especially the case where, as here, and as the Court has previously stated, "Plaintiff must demonstrate breach on a 'loan-by-loan and trust-by-trust' basis." *See Royal Park*, 2016 WL 439020, at *6 (quoting *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014). Under Rule 23, the Plaintiff bears the burden of proving each element of class certification by a preponderance of the evidence, and Royal Park has failed to establish that common issues predominate.

---

[9] The Second Circuit held that the Supreme Court's decision in *Comcast Corp v. Behrend* does not change the Circuit's Rule 23(b)(3) predominance inquiry – namely, that individual damages calculations are insufficient alone to defeat predominance. *See Johnson*, 780 F.3d at 138-39, n. 11 (citing *Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015)).

## 2. Superiority

Rule 23(b)(3) analysis also requires the Court to consider whether the class action device is "superior to other methods available for a fair and efficient adjudication of the controversy." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968). Class treatment is most appropriate when plaintiffs advance "claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Superiority analysis takes into account the following four factors:

> (A) the class members' interests in individually controlled the prosecution...of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by...class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Given the Plaintiff's failure to establish predominance, by operation of subsection (D), its failure to establish superiority largely follows. While there is nearly always *some* efficiency that would stem from consolidating the litigation of the common questions presented here, the prospect of applying a choice of law analysis that may well yield the further application of various state laws to the same liability issue does not promote judicial economy nor make the case more manageable. *Johnson*, 780 F.3d at 147. The *Johnson* Court, facing a similar specter of individualized trials, concluded that "bellwether trial[s] that establish[ Defendant's] role [in the alleged breach] would have the same consequence as trying common issues on a classwide basis through [the] collateral estoppel effect on subsequent cases." *Id.* The Court endorses no specific mode for trying this case outside of the class mechanism; it simply notes that the denial of certification is not necessarily the end of the road. Unlike in the context of the classic class

action in which each putative class member's claim may be worth pennies, there likely exists some individual beneficial owner in this putative class whose potential damages award militates in favor of continued litigation.

### D. Liability/Issue Class under Rule 23(c)(4)

Royal Park suggests, in the alternative, that the Court certify a so-called liability or issue class under Rule 23(c)(4). District courts may certify an issue class "even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (citation omitted).

If the sole issue with Plaintiff's motion were the deficiencies with its ability to prove *damages* class-wide, it would be proper to certify a liability class under (c)(4). *See, e.g., Fort Worth Emps.' Ret. Fund*, 301 F.R.D. at 142. However, this case presents myriad individualized issues with respect to liability as well. Rule 23(c)(4) cannot act to "lessen the rigor of a traditional 23(b)(3) analysis," and "may be applied only 'where it is appropriate,' meaning courts will decline to employ it to certify discrete issues where, 'despite the presence of a common issue, certification would not make the case more manageable.'" *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 593-94 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) (quoting *Brenner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 169 (S.D.N.Y. 2003) (quotation marks and citation omitted)). For the reasons discussed above, this is not a case in which certifying an issue class resolves the many problems with class treatment.

In denying certification without prejudice in its previous opinion, the Court acknowledged that it is "plaintiff's burden to show how the action may be subclassed to avoid certification problems." Original Opinion at *9 (quoting *Lundquist v. Sec. Pac. Automotive Fin.*

*Servs. Corp.*, 993 F.2d 11, 14-15 (2d Cir. 1993) (internal quotation marks and citation omitted)).

Plaintiff has offered no such proposal here, and the Court denies certification with prejudice.

## VI. Sealing

Finally, both parties seek to redact parts of their memoranda of law and to redact or entirely seal certain exhibits. First, on the class certification motion, Royal Park moves this Court to allow redactions in its brief, redactions in the declaration of Lucas Olts, and the wholesale sealing of Exhibits B, C, D, I, J, and K. Letter of May 1, 2017 from Lucas F. Olts to the Court (sent by email). The redactions concern references to discovery materials produced by Deutsche Bank and by non-parties – namely, DTC – which were designated "confidential" under the protective order. Deutsche Bank, in opposing class certification, seeks leave to file its brief with certain redactions, to file evidentiary objections to the Olts Declaration with redactions, and to file Exhibits 1, 3, 4, and 5 with redactions. Letter of May 22, 2017 from Tera M. Heintz to the Court (sent by email).

Second, in conjunction with Deutsche Bank's motion to exclude the expert report of W. Scott Dalrymple, both parties seek leave to file their memoranda with certain parts redacted, and to file exhibits with redactions or entirely under seal. *See* May 22, 2017 Letter; Letter of June 5, 2017 from Lucas F. Olts to the Court (sent by email); Letter of June 12, 2017 from Ashley A.H. Krupski to the Court (sent by email).

The basis for all of the applications is that public disclosure of matters reflected in the relevant evidentiary materials would harm the business and/or financial interests of non-parties to this litigation that have produced documents pursuant to confidentiality agreements.

As stated in the Court's prior opinion, the documents at issue are "judicial documents" for purposes of the framework for evaluating sealing requests set forth by the Court of Appeals

in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). *See* Original Opinion at *11 (collecting cites). There is a significant presumption of public access to the subject information. *Lugosch*, 435 F.3d at 121 ("[D]ocuments submitted to a court for its consideration in a summary judgment motion are – as a matter of law – judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment."). The Court does generally find, however, that the privacy interests of those affected are sufficient to overcome the presumption of access and that the requested sealing and proposed redactions, which are limited in absolute scope and "narrowly tailed to serve [such] interest[s]," are "essential to preserve higher values." *United States v. Erie Cty.*, 763 F.3d 235, 239 (2d Cir. 2014) (internal quotation marks omitted).

While "the mere existence of a confidentiality agreement covering judicial documents is insufficient to overcome the First Amendment presumption of access," *Aioi Nissay Dowa Ins. Co. v. Prosight Specialty Mgmt. Co., Inc.*, 12-cv-3274, 2012 WL 3583176, at *6 (S.D.N.Y. Aug. 21, 2012) (internal quotation marks omitted), the nature of the information at issue – which discloses, among other things, non-parties' confidential information and the terms of private securities transactions involving non-parties – is sufficiently sensitive to merit protection at this stage of the proceedings. *See, e.g., Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152, 156-57 (S.D.N.Y. 2015) (finding information identifying third-parties' customers and disclosing their "information concerning their trading strategies, objectives, and transactions" to overcome presumption of public access).

Accordingly, the parties' sealing applications are GRANTED.

**VII. Report & Recommendation on Motion to Strike**

Finally, on September 15, 2017, Judge Moses issued a Report and Recommendation ("R&R") recommending that the Court grant Royal Park's motion to strike Deutsche Bank's affirmative defense of reliance on the advice of counsel from its Answer. Dkt. No. 471. Under 28 U.S.C. § 636(b)(1), the Defendant had until September 29, 2017 to file any objections to Judge Moses's R&R. When a magistrate judge issues findings or recommendations, the district court "may accept, reject, or modify [them] in whole or in part." 28 U.S.C. § 636(b)(1). When no party has filed objections to the R&R, the Court reviews it only for clear error. *See Gomez v. Brown*, 655 F. Supp. 2d 332, 341 (S.D.N.Y. 2009). "A decision is 'clearly erroneous' when the reviewing Court is left with the definite and firm conviction that a mistake has been committed." *Courtney v. Colvin*, No. 13-CV-2884 (AJN), 2014 WL 129051, at *1 (S.D.N.Y. Jan. 14, 2014) (citation and internal quotation marks omitted).

Having received no objections to the R&R and finding no clear error therein, the Court adopts the R&R in its entirety. To the extent Deutsche Bank wishes to assert a reliance on counsel defense or to interpret its Twenty-Fifth Affirmative Defense in its Answer as raising such a defense, it is precluded from so doing.

## VIII. Conclusion

For the reasons set forth above, Royal Park's motion to certify this matter as a class action is DENIED.[10]

Royal Park's application to seal documents submitted to the Court in connection with Deutsche Bank's opposition papers is GRANTED. Both parties shall, within ten business days of this Order, ensure that there are appropriately redacted copies of any memorandum or exhibit

---

[10] Given this, Deutsche Bank's evidentiary objections are overruled as moot.

not previously filed on the public docket, including slip sheets to reflect sealed exhibits as appropriate.  The Court will file unredacted copies under SEAL forthwith.

Royal Park's motion to strike Deutsche Bank's affirmative defense is GRANTED and the Report and Recommendation of Judge Moses is adopted in its entirety.

Because it arguably contains reference to information that Royal Park has requested be maintained under seal, this Order will be filed under TEMPORARY SEAL.  The parties are directed to meet and confer and to advise the Court in writing within ten business days of this Order whether they believe that any portion should be redacted prior to its public docketing.  The Court will publicly docket an Order indicating the Court's resolution of the motions.

This resolves Dkt. Nos. 372, 379, and 399.

SO ORDERED.

Dated: March ___, 2018
      New York, New York

ALISON J. NATHAN
United States District Judge