UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/28/18

ROYAL PARK INVESTMENTS SA/NV,

         Plaintiff,

-against-

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,

         Defendant.

14-CV-04394 (AJN) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Royal Park Investments SA/NV (RPI) is the holder of thirteen residential mortgage-backed securities (RMBS) certificates (Certificates) that derive their value from pools of mortgage loans held in ten RMBS trusts (Trusts) for which defendant Deutsche Bank National Trust Company (Deutsche Bank) serves as the trustee (Trustee). *See* Compl. (Dkt. No. 1) ¶ 2.[1] In the aggregate, the Trusts hold approximately 50,000 loans. *See* Chippey Decl. dated July 17, 2017 (Dkt. No. 425), ¶ 16; Transcript of April 3, 2018 Oral Argument (Tr.) (Dkt. No. 617) at 24:15. Each Trust is governed by a multi-party contract, typically called a Pooling and Service Agreement (PSA), which outlines the Trustee's obligations with respect to that Trust and its constituent loans.[2]

---

[1] The ten Trusts are: the First Franklin Mortgage Loan Trust 2006-FF9 (hereafter FFML 2006-FF9); the GSR Mortgage Loan Trust 2007-AR2 (GSR 2007-AR2); the HSI Asset Securitization Corporation Trust 2007-WF1(HASC 2007-WF1); the HarborView Mortgage Loan Trust 2006-8 (HVMLT 2006-8); the Morgan Stanley ABS Capital I Inc. Trust 2007-NC2 (MSAC 2007-NC2); the Morgan Stanley ABS Capital I Inc. Trust 2007-NC3 (MSAC 2007-NC3); the Morgan Stanley IXIS Real Estate Capital Trust 2006-1 (MSIX 2006-1); the NovaStar Mortgage Funding Trust Series 2006-4 (NHEL 2006-4); the Saxon Asset Securities Trust 2006-2 (SAST 2006-02); and the Soundview Home Loan Trust 2007-NS1 (SVHE 2007-NS1).

[2] The FFML 2006-FF9 PSA is attached as Exhibit A to the Complaint (Dkt. No. 1-1). Select portions of all ten PSAs are attached as Exhibits A-J (Dkt. Nos. 491-1 through 491-10) to the Declaration of Kevin J. Biron dated October 16, 2017 (Biron Decl.) (Dkt. No. 491). In addition, the full text of each PSA is publicly available online via the Security and Exchange Commission's EDGAR website. *See* Biron Decl. ¶¶ 3-11. According to RPI, the PSAs are all "substantially similar," Compl. ¶ 5, and for the most part that is correct. In this Memorandum and Order, I cite

In this action, RPI alleges that Deutsche Bank breached its contractual obligations under the PSAs – principally by failing to insist that other parties to the PSAs honor their own contractual obligations – thereby diminishing the value of RPI's Certificates. Certificates are "bond-like instruments," Compl. ¶ 35, entitling the holder to a portion of the cash flows generated by the mortgage loans underlying the issuing Trust. *Id.* ¶ 42.

Now before the Court is plaintiff's Motion Regarding Sampling-Related Expert Discovery, (Dkt. No. 453), in which RPI seeks an order "allowing the parties to conduct sampling-related expert discovery." Pl. Mot. at 1. In its accompanying memorandum of law (Pl. Mem.) (Dkt. No. 474), RPI explains that it wishes to engage one or more as-yet unidentified experts to use "reliable statistical sampling and extrapolation methods as part of its proof of liability and damages across the thousands of loans backing the . . . Trusts." Pl. Mem. at 1. For the reasons that follow, the motion is DENIED.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff filed this action on June 18, 2014, asserting direct claims on behalf of itself and a putative class of "all RMBS investors" in the Trusts, as well as derivative claims on behalf of the Trusts themselves. Compl. ¶¶ 2-3, 189-99. On February 3, 2016, the Honorable Alison J. Nathan, United States District Judge, dismissed the derivative claims, and RPI withdrew its claims under the Trust Indenture Act. *See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016) (2/3/16 Mem. & Order) (Dkt. No. 100).[3] Plaintiff's surviving

---

to specific provisions of Trusts other than FFML 2006-FF9 only to the extent necessary to highlight variations among the PSAs.

[3] For consistency and ease of reference, all prior orders and opinions issued in this action (whether or not published) are cited herein by the date of the order. Page citations are to the page numbers found in the original order as issued by the Court.

claims allege that Deutsche Bank breached its contractual obligations under the PSAs and its common-law duty to avoid conflicts of interest. *See* Compl. ¶¶ 206-219.

On August 18, 2017 – shortly before the then-scheduled close of fact discovery – the parties advised me that they "may wish to litigate whether and/or to what extent sampling will be permitted in this case," and jointly requested a schedule under which they would brief that question, and the Court would decide it, prior to the preparation of expert reports and the completion of expert discovery. *See* Joint Ltr. dated Aug. 18, 2017 (Dkt. No. 440), at 1. By Order dated August 25, 2017 (Dkt. No. 443), I directed "the party seeking a ruling" on sampling to "file the appropriate motion" by September 8, 2017. *Id.* at 3.

As it turned out, the moving party was plaintiff RPI, which styled its motion as one seeking permission to conduct "sampling related expert discovery." RPI's moving brief, and the accompanying Declaration of Lucas Olts, dated September 8, 2017 (Olts Decl.) (Dkt. No. 475), were filed (in redacted form) on September 18, 2017. Deutsche Bank filed its opposition memorandum (Def. Opp. Mem.) (Dkt. No. 490), accompanied by the Biron Declaration, on October 16, 2017. Plaintiff filed its reply memorandum (Pl. Reply Mem.) (Dkt. 496) on October 30, 2017. Thereafter, from November 17, 2017 through March 12, 2018, the parties filed a series of follow-up letter-briefs concerning supplemental authority and related matters. (Dkt. Nos. 509, 516, 542, 559.) Throughout this period (and beyond) the parties also filed a variety of other discovery motions, most of which have now been resolved. (*See* Dkt. Nos. 462, 478, 524, 526, 544, 551, 621, 626, 630, 644, and 645.)

On March 29, 2018, the District Judge denied plaintiff's motion for class certification. *See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1750595 (S.D.N.Y. Apr.

11, 2018) (3/29/18 Op. & Order) (Dkt. No. 607).[4] On April 3, 2018, I heard oral argument on the sampling motion. *See* Tr. at 8-61.

## B. The PSAs

The Court assumes familiarity with the factual background in this matter,[5] but briefly reviews the relevant terms of the governing PSAs.

### 1. R&W Breaches

All of the PSAs required the originators, sponsors, sellers, and/or other warrantors of the loans collateralizing the Certificates (collectively the Warrantors) to make detailed representations and warranties (R&Ws) regarding the credit quality and other characteristics of those loans and the accuracy of the information they provided concerning each loan. Compl. ¶¶ 7, 38, 47; *see also*, *e.g.*, FFML 2006-FF9 PSA § 2.03 & Sched. IV.[6] "[O]ver fifty different Warrantors" made such R&Ws concerning the 50,000 loans in the Trusts. Chippey Decl. ¶ 16.

---

[4] The 3/29/18 Op. & Order was temporarily sealed until April 11, 2018. On August 7, 2018, the Second Circuit denied plaintiff's petition for leave to pursue an immediate appeal from the denial of class certification. (Dkt. No. 634.)

[5] That background is set forth in detail in my prior orders and those of the District Judge. *See, e.g.*, 2/3/16 Mem. & Order, at 2-3; *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 314 F.R.D. 341 (S.D.N.Y. 2016) (2/5/16 Mem. & Order) (Dkt. No. 104), at 1-3; *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 4613390 (S.D.N.Y. Aug. 31, 2016) (8/31/16 Mem. & Order) (Dkt. No. 261), at 2-6; *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) (4/4/17 Mem. & Order) (Dkt. No. 350), at 2-3; *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1088020 (S.D.N.Y. Feb. 12, 2018) (2/12/18 Mem. & Op.) (Dkt. No. 551), at 4-7; 3/29/18 Op. & Order at 2-3.

[6] In the FFML 2006-FF9 trust, the mortgage loan seller (FFFC) made 82 separate R&Ws as to each loan, warranting – among other things – the lack of any delinquent taxes, rents, water or sewer charges, or insurance premium payments affecting the underlying property (R&W No. 4); the existence of adequate hazard insurance on the property and title insurance on the loan (R&W Nos. 7, 16); compliance with all applicable usury and truth-in-lending laws (R&W No. 8); the absence of any event of default, breach, or event likely to constitute a default or breach of the loan (R&W No. 17); the propriety and legality of all "origination, servicing and collection practices" used (R&W No. 21); the soundness of the underwriting methodology utilized to make the loan (R&W Nos. 24, 56); a loan-to-value ratio of 100% or less and a borrower debt-to-income ratio of 55% or

Under the PSAs, the Trustee is ordinarily entitled to rely "conclusively" on the R&Ws, and is not required to investigate their accuracy or reliability. *See* FFML 2006-FF9 PSA §§ 8.01(a), 8.02(d). Nor is the Trustee required to undertake any duties other than those "specifically set forth" in the contract. *Id.* § 8.01; *see also id.* § 8.01(a) ("no implied covenants or obligations shall be read into this Agreement against the Trustee").

However, the Trustee must take certain measures upon "discovery" or receipt of written notice of an R&W breach that "materially and adversely affects the value" of the relevant mortgage loan or the interests of the Certificate-holders in that loan. *See* FFML 2006-FF9 PSA §§ 2.03(c)-(d). In some Trusts, breaches of certain specified R&Ws, as well as breaches that cause the loan not to constitute a "qualified mortgage" under § 860G(a)(3) of the Internal Revenue Code, will be "deemed automatically to materially and adversely affect the value of such Mortgage Loan and the interests of the Trustee and Certificate-holders in such Mortgage Loan, thus requiring the repurchase or substitution of such Mortgage Loan by the Mortgage Loan Seller." FFML 2006-FF9 PSA § 2.03(d).[7] In the GSR 2007-AR2 Trust, it is "understood" that a breach "shall be deemed to have materially and adversely affected the value of the related Mortgage Loan . . . if the Trust incurs a loss as a result of such defect or breach." GSR 2007-AR2 PSA § 2.03(b), (c), (d). Otherwise, however, the PSAs do not appear to contain any guidelines for determining whether an

---

less at origination of each loan (R&W Nos. 32, 44); the absence of any "error, omission, misrepresentation, negligence, fraud or similar occurrence by FFFC or, to the best of FFFC's knowledge, any other person" (R&W No. 34); verification by the originator of the source of the down payment for each loan (R&W No. 37); compliance with environmental laws (R&W No. 39); proper disclosure of all points and fees to the borrower (R&W No. 58); the lawfulness of the sale or transfer of the loan by FFFC (R&W No. 74); and the solvency of FFFC itself . (R&W No. 82.) The seller also warranted that none of the mortgage loans was a "high cost" or "high risk" loan as those terms were defined in various state laws designed to protect against predatory lending practices. (R&W Nos. 60-72.) *See* FFML 2006-FF9 PSA Sched. IV (Dkt. No. 1-1, at ECF pages 134-142.)

[7] *See also* HASC 2007-WF1 PSA § 2.03(d).

R&W breach may be deemed to have "materially and adversely affect[ed]" the value of the relevant loan or the interests of the Trustee and Certificate-holders therein.

When the Trustee discovers or receives written notice of a breach meeting the "material and adverse" standard, it must "promptly provide notice of the breach to the offending Warrantor and the other parties" to the PSA. Compl. ¶ 8; *see also* FFML 2006-FF9 PSA § 2.03(c). Thereafter, if the breach is not timely cured, the Trustee must "enforce the breaching Warrantor's obligation to either substitute or repurchase" the defective loan, sometimes known as a "put-back" remedy. Compl. ¶ 8; *see also* FFML 2006-FF9 PSA § 2.03(d). The "Repurchase Price" for a put-back loan is calculated based on the unpaid principal balance of the defective loan, "as of the date of repurchase," together with other factors specific to that loan, including the Trustee's expenses incurred in enforcing the repurchase obligation as to that loan. FFML 2006-FF9 PSA at 44.

In addition, some of the PSAs require the Trustee to act upon "discovery" or receipt of written notice of a "materially defective" document in – or a document missing from – the mortgage file delivered to the Trustee as to each loan. *See, e.g.*, HVMLT 2006-8 PSA §§ 2.03(a)-(b). As in the case of an R&W breach, if the defect (known as a Document Exception) "materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificate-holders," the Trustee must "promptly notify" the responsible party of the defective or missing document and thereafter – if the deficiency is not timely cured – must "enforce such Originator's obligation . . . and cause such [originator or seller] to repurchase that Mortgage Loan from the Trust . . ." *Id.*[8]

The PSAs also contain "sole remedy" provisions, typically stating that the breaching Warrantor's obligation to "cure, repurchase, or substitute any Mortgage Loan as to which a breach of a representation and warranty has occurred and is continuing . . . shall constitute the sole

_____

[8] *See also, e.g.*, GSR 2007-AR2 PSA § 2.03(b); SVHE 2007-NS1 PSA §§ 2.03(a)-(b).

remedies against such Person respecting such breach available to Certificate-holders . . . or the Trustee on their behalf." FFML 2006-FF9 PSA §§ 2.03(j), (k).

### 2. Events of Default

The PSAs further require the Trustee to take certain steps when it acquires actual knowledge of an event of default (EOD) by a Master Servicer or (in some Trusts) any Servicer; that is, misconduct by the entities responsible for "ensur[ing] the legal and proper servicing of the Mortgage Loans." Compl. ¶ 11; *see also id.* ¶¶ 52-58. Among other things, the Trustee must notify the offending Servicer or Master Servicer of the EOD, demand that it cure the default, and then – if the EOD remains uncured – "act as a quasi-fiduciary for [the Certificate-holders] and protect them as if Deutsche Bank is protecting its own interests." *Id.* ¶ 13; *see* FFML 2006-FF9 PSA § 8.01 ("In case a Master Servicer Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.").

### C. Plaintiff's Claims

In this action, RPI alleges that Deutsche Bank breached its contractual obligations to the Certificate-holders in that it failed to "enforce the Warrantors' breaches of R&Ws . . . by seeking the cure, substitution, or repurchase of any and all defective Mortgage Loans," Compl. ¶ 207(a); failed to provide the required notifications of Servicer EODs; and failed thereafter to exercise its heightened "prudent person" obligations when it "knew of uncured and ongoing Events of Default," such as by "terminating the offending . . . Servicer" or taking over its duties. *Id.* ¶¶ 12,

207(b)-(e), 209.[9] As a result, RPI alleges, thousands of mortgage loans that should have been replaced or repurchased were not, causing damages in the form of "billions of dollars in R&W claims that could have been asserted against the Warrantors but were not." *Id.* ¶ 181. In addition, plaintiff alleges, "numerous Mortgage Loan delinquencies [were] allowed to stretch on interminably without payments being remitted to the . . . Trusts," due to Servicer inattention, and foreclosure actions, when they were filed, were "denied, invalidated and/or improperly delayed," due to other  misconduct by the Servicers, which in turn "substantially [drove] up the Covered Trusts' expenses and losses." *Id.* ¶¶ 15-16, 182-83.

### D. Governing Principles

#### 1. Loan-by-Loan, Trust-by-Trust

The District Judge has consistently held that in order to prevail against Deutsche Bank at trial for failing to enforce the Warrantors' cure, substitution and/or repurchase obligations with respect to R&W breaches, RPI must demonstrate those breaches "on a 'loan-by-loan and trust-by-trust' basis." *See, e.g.*, 2/3/16 Mem. & Order at 11 (quoting *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of NY. Mellon,* 775 F.3d 154, 162 (2d Cir. 2014) (hereafter *PABF*)); 3/29/18 Op. & Order at 38.[10]

---

[9]Although not specifically alleged in the Complaint, RPI also contends that Deutsche Bank breached its contractual obligations by failing to demand the substitution or repurchase of loans subject to uncured Document Exceptions. *See, e.g*., Pl. Mem. at 8-9.

[10] The 2/3/16 Mem. & Order recognized that an RMBS plaintiff could not be expected – at the pleading stage – to identify each specific R&W breach with respect to each individual nonconforming loan in the Trusts. "[S]uch information, at this stage, is uniquely in the possession of defendants." 2/3/16 Mem. & Order at 11-12 (quoting *Fixed Income Shares: Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 853 (S.D.N.Y. 2015)) (Furman, D.J.). Thus, for pleading purposes, it was sufficient that RPI alleged "widespread lending misconduct," "historically unprecedented default rates," and "staggering economic losses" in the Trusts. 2/3/16 Mem. & Order at 12. These allegations were sufficient "to 'allow[] the court to draw the reasonable inference' that R&Ws were breached on a loan-by-loan basis." *Id.* at 13 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To prevail at trial, however, the District Judge held that RPI would be required to

Loan-by-loan proof is required to establish the Trustee's liability to the Certificate-holders because, under § 2.03 of the PSAs, the Trustee has neither the obligation nor the ability to demand cure, substitution, or repurchase of a nonconforming loan unless – among other things – it can identify an R&W breach (or a Document Exception) that "materially and adversely" affects the value of that particular loan. *See* FFML 2006-FF9 PSA §§ 2.03(c)-(d).

Moreover, as recently reconfirmed by the New York Court of Appeals, the cure/substitute/repurchase mechanism set forth in each PSA is the enforcing party's "sole remedy" against a breaching Warrantor. *See Ambac Ass. Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 584-85, -- N.E.3d -- (2018) ("the remedy for Ambac's contract claims is limited to the repurchase protocol provided for in the contract's sole remedy provision"); *Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 584, 69 N.Y.S.3d 520 (2017) ("the Sole Remedy Provision applies, precluding HSBC from seeking general contract damages" for a sponsor's breach of its R&Ws).[11]

---

"demonstrate such breach" as to each individual loan at issue. *Id.* at 11. The same distinction has been drawn in numerous cases in this District. *See, e.g.*, *Commerzbank AG v. U.S. Bank Nat'l Ass'n.*, 277 F. Supp. 3d 483, 494 (S.D.N.Y. 2017) (Pauley, D.J.) (collecting cases and explaining that while the plaintiff "must ultimately show breaches of representations and warranties on a loan-by-loan and trust-by-trust basis to prevail on its claims," to survive a pre-discovery motion to dismiss it "need only plead factual content that allows the court to draw the reasonable inference that the Sponsors and Originators breached their representations and warranties with respect to the trusts at issue"); *Fixed Income Shares*, 130 F. Supp. 3d at 854 (allegations that the trustee "learned about widespread breaches of representations and warranties" did not demonstrate its "knowledge of deficiencies with respect to any particular loan," but were "sufficient" at the "motion-to-dismiss stage").

[11] RPI is correct that the sole remedy provision does not restrict a trustee to the equitable remedies of substitution or repurchase. If a breaching loan has been liquidated, the trustee may seek "the money damages equivalent of repurchase" with respect to that loan. *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (Castel, D.J.) (hereafter *UBS III*); *see also Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 107, 19 N.Y.S.3d 1, 9 (1st Dep't 2015) ("plaintiffs may pursue monetary damages with respect to any defective mortgage loan in those instances where cure or repurchase is impossible"); *aff'd as modified sub nom. Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l*

Thus, "whether [a Warrantor] was obligated to repurchase a given loan requires examining which loans, in which trusts, were in breach of the representations and warranties." *PABF*, 775 F.3d at 162. Similarly, "whether a loan's documentation was deficient requires looking at individual loans and documents." *Id*. As Judge Schofield explained in *Royal Park Investments SA/NV v. HSBC Bank USA Nat'l Ass'n*, 2018 U.S. Dist. LEXIS 31157 (S.D.N.Y. Feb. 23, 2018) (hereafter *RPI v. HSBC II*):

> The requirement that [the trustee] have information on a loan-by-loan basis to trigger its duties comports with the structure of § 2.03 of the PSAs and the limited duties it imposes on [the] trustee. When the trustee identifies a defective document or R&W breach, it must request that the seller cure the defect or breach, and if the seller does not, the trustee must require the seller to repurchase the loan. The trustee cannot fulfill either of these duties without loan-specific information. The trustee cannot provide notice to the seller without knowing the specific defective document or the specific R&W breach. The trustee cannot evaluate any cure and cannot enforce the seller's obligation to repurchase a specific loan without information about that loan. Given the limited and loan-specific nature of the trustee's duties under § 2.03, the "discovery or receipt of notice" requirement must require [the trustee] to have information about a specific loan, rather than generalized knowledge or notice extrapolated from other loans.

2018 U.S. Dist. LEXIS 31157, at *35-36. *Accord Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 2018 WL 3350323, at *2 (S.D.N.Y. July 9, 2018) (Lehrburger, M.J.) (hereafter *RPI v. US Bank*) ("whether and to what extent a trustee can obtain repurchase of breaching loans must be determined separately for each specific loan"); *BlackRock Allocation Target Shares v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 953550, at *5 (S.D.N.Y. Mar. 10, 2017) (Netburn, M.J.) (hereafter *Blackrock v. Wells Fargo I*) (liability must be proven "loan-by-loan"), *order clarified sub nom. BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*,

---

*Ass'n v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 92 N.E.3d 743 (2017). However, the sole remedy provision – and hence, the obligation to prove R&W breaches on a "loan by loan" basis – cannot "be avoided by alleging 'broader' or numerous violations of representations and warranties contained in the governing contract." *Ambac*, 31 N.Y.3d at 581.

2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) (Failla, D.J.) (hereafter *Blackrock v. Wells Fargo II*).

Loan-by-loan proof is also required to establish damages. Even assuming the existence of a material and adverse R&W breach or Document Exception, calculating the quantum of damages flowing from the Trustee's failure to enforce its remedies against the breaching Warrantor with respect to a particular loan is a highly fact-specific undertaking requiring consideration of – among other things – when the Trustee had sufficient knowledge to made a demand; whether the relevant Warrantor would have been asked to cure, substitute,[12] or repurchase the defective loan; whether the Warrantor was solvent[13] and otherwise capable of meeting the Trustee's hypothetical demand when made; how long the process would have taken[14]; and when the statute of limitations expired on the Trustee's ability to enforce its demand through litigation.[15] Additionally, any calculation of damages resulting from the failure to demand substitution would have to take into account the nonperformance risk associated with the hypothetical substituted loan.[16]

---

[12] The PSAs typically limited the option of substituting a conforming loan for a nonconforming loan to the first two years after the R&Ws were made. *See* FFML 2006-FF9 PSA § 2.03(d). Thereafter, only the repurchase remedy was available. *Id.*

[13] *See RPI v. US Bank*, 2018 WL 3350323, at *5 ("with respect to each breaching loan, Royal Park would need to establish which entity originated the loan and whether that entity was solvent at the time that [the trustee] would have demanded that the originator repurchase the loan").

[14] Plaintiff's proposed damages expert has confirmed that, in order to estimate damages flowing from the Trustee's failure to make a repurchase demand, he will have to make assumptions about the "repurchase acceptance rate" (that is, the likelihood that the relevant Warrantor would agree to repurchase the loan), estimate the length of time it would have taken to "resolve the demand," and "account for the financial condition or other relevant characteristics" of the relevant Warrantor. Expert Report of Scott Dalrymple, CFA (Dkt. No. 608-8), ¶¶ 56-57.

[15] *See ACE Sec. Corp. v. DB Structured Prod., Inc.*, 25 N.Y.3d 581, 36 N.E.3d 623 (2015) (holding that under New York law the 6-year limitations period governing claims against a RMBS sponsor for breach of its R&Ws accrued when the R&Ws were made, regardless of when the breaches were discovered or when the demand for cure and repurchase was made).

[16] Even properly underwritten mortgage loans can go into default or otherwise fail to perform. This is especially true when housing prices fall sharply, as they did in the United States from mid-2006

Thus, in suits by RMBS certificate-holders against RMBS trustees, it is the uniform view of judges in this District that "[p]laintiffs need to prove liability *and* damages on a trust-by-trust and loan-by-loan basis." *Blackrock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 3120971, at *2 (S.D.N.Y. May 17, 2018) (Furman, D.J.) (hereafter *Blackrock v. Deutsche Bank*) (emphasis added).

### 2. Actual Knowledge of R&W Breaches

As noted above, the Trustee's duty to remedy an R&W breach or Document Exception is triggered by its "discovery" or receipt of notice of the breach or exception. The PSAs do not further define the term "discovery." However, the District Judge has held that the Trustee's duty to enforce the R&Ws arises upon its "actual knowledge" of breaching loans, *see* 2/3/16 Mem. & Order at 13-14, and I have consistently applied that standard throughout the fact discovery period. *See, e.g.*, 2/12/18 Mem. & Order at 4-11.[17]

_____

to mid-2009, and when the unemployment rate rises sharply, as it did in the United States from late 2007 to late 2009, peaking at 10.2%. *See generally* Federal Reserve Bank of St. Louis, "Average Sales Price of Houses Sold for the United States" (chart), available at https://fred.stlouisfed.org/series/ASPUS (last visited September 28, 2018); U.S. Bureau of Labor Statistics, "The Employment Situation – October 2009" (news release, Nov. 6, 2009), available at www.bls.gov/news.release/archives/empsit_11062009.pdf (last visited September 28, 2018).

[17] *Accord Blackrock v. Wells Fargo I*, 2017 WL 953550, at *6 ("The Court . . . reads 'discovery' as used in Section 2.03 to mean actual knowledge"); *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon*, 180 F. Supp. 3d 246, 259 (S.D.N.Y. 2016) (Daniels, D.J.) (citing the 2/3/16 Mem. and Order and holding that plaintiff's allegations were sufficient at the pleading stage, because they "raise a plausible inference of BNYM's actual knowledge of breaches of representations and warranties"); *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 603 (S.D.N.Y. 2015) (Scheindlin, D.J.) (after discovery, plaintiffs will be required to "prove that [the trustee] had actual knowledge regarding the loans at issue here"); *Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of Am., NA*, 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013) (Forrest, D.J.) (holding that plaintiffs' allegations of widespread R&W breaches passed the "plausibility pleading threshold," but cautioning that "a viable breach of contract claim depends on the Trustee's actual notice of a breach of the PSA and failure to take appropriate action in response thereto," and therefore that "the existence of even pervasive practices" may not be "sufficient evidence of actual knowledge at trial"), *abrogated in part on other grounds by PABF*, 775 F.3d 154.

RPI proposes a different standard. Citing cases that involve the duties of parties other than trustees, arising from contracts other than the PSAs at issue here, plaintiff argues that "[a] party 'discovers' a breach when it knows or *should know* that the breach has occurred." Pl. Mem. at 3 (quoting *Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, 2013 WL 3146824, at *19 (S.D.N.Y. June 19, 2013), *vacated and remanded sub nom. Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297 (2d Cir. 2016) (hereafter *BNY Mellon*). Therefore, RPI contends, the Trustee acquired an obligation to enforce the R&Ws as to "*all* breaching loans in the . . . Trusts," Reply Mem. at 1 (emphasis added), as soon as it obtained "constructive knowledge" (or was placed on "inquiry notice," *see* Tr. at 29:22) that such breaches likely existed (for example, because it knew of "pervasive" problems in the RMBS industry), even though it could not identify the specific loans as to which cure, substitution or repurchase was required. Pl. Mem. at 3-5.

I cannot adopt plaintiff's view. *BNY Mellon* does not bear the weight that RPI places upon it.[18] Moreover, nothing in the PSAs requires the Trustee to "take action" on a wholesale basis to

---

[18] The question in *BNY Mellon* was whether a loan originator, Morgan Stanley, was contractually obligated under a different contract, known as a Mortgage Loan Purchase Agreement (MLPA), to repurchase a specific nonconforming loan in response to a demand made by the RMBS trustee, BNY Mellon. The district court (McMahon, D.J.) held that the trustee had an obligation under the MLPA to provide "prompt" notice of breach to the originator before suing it, and went on to state that "[i]n order to satisfy a 'prompt' notice requirement," a party must act "promptly and diligently once it has notice of the facts suggesting a breach" of that particular loan. 2013 WL 3146824, at *19 (internal quotations and citations omitted). On appeal, the Second Circuit agreed to the extent that "the law charges a party with discovery of breach *only* after it has had a reasonable opportunity to investigate and confirm its suspicions – *in short, when it effectively becomes aware, rather than simply suspicious, of breach.*" 821 F.3d 297 at 310 (emphasis added). Since *BNY Mellon* addressed the trustee's notice obligations under an MLPA to a single originator, with respect to a single allegedly breaching loan, it is of no assistance in determining the trustee's enforcement obligations under the PSAs to the Certificate-holders with respect to the loan pool as a whole. Moreover, even under the MLPAs, the trustee was not required to act until it became "aware, rather than simply suspicious, of breach." *Id. See RPI v. HSBC*, 2018 U.S. Dist. LEXIS 31157, at *40 (*BNY Mellon*

remedy potential R&W breaches that it cannot specifically identify. On the contrary: as noted above, the contractual repurchase mechanism "is targeted to a specific loan, and not to a group or category of loans." *MASTR Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, 2015 WL 764665, at *11 (S.D.N.Y. Jan. 9, 2015) (Castel, D.J.) (hereafter *UBS I*), *reconsideration denied*, 2015 WL 797972 (S.D.N.Y. Feb. 25, 2015) (hereafter *UBS II*). *See, e.g.*, HVMLT 2006-8 PSA § 2.03(b) (upon discovery of a materially adverse R&W breach or Document Exception, the Trustee must notify the relevant Warrantor of "such" defect or breach, request that the Warrantor cure "such" defect or breach within 90 days, and then – if a cure is not timely effected – cause the Warrantor to repurchase "that" loan). "The structure of these provisions – and the nature of the defined terms therein – leads to the conclusion that the parties agreed upon a remedial process that generally calls for proof of breach on a loan-by-loan basis." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2017 WL 5256760, at *7 (S.D.N.Y. Nov. 13, 2017) (Keenan, D.J.) (hereafter *Homeward v. Sand Canyon*), *reconsideration denied sub nom. Homeward Residential, Inc. for Option One Mortg. Loan Tr. 2006-2 v. Sand Canyon Corp.*, 2018 WL 2323227 (S.D.N.Y. May 22, 2018). Thus, as discussed above, a trustee cannot invoke the repurchase mechanism absent sufficient knowledge – actual knowledge – to identify the specific loans as to which it claims repurchase is required. *See RPI v. HSBC II*, 2018 U.S. Dist. LEXIS 31157 at *36 ("The trustee cannot provide notice to the seller without knowing the specific defective document or the specific R&W breach."); *Blackrock v. Wells Fargo II*, 2017 WL 3610511, at *9 ("a trustee cannot undertake the contractually required measures without knowing of a specific defect, in a specific loan, in a specific trust").

---

"does not imply that the mere opportunity to investigate constitutes discovery or that indenture trustees have a general duty to investigate in the first place").

Moreover, the PSAs typically state that "no implied covenants or obligations shall be read into this Agreement against the Trustee," *see, e.g.*, HVMLT 2006-8 PSA § 8.01(i); that "the right of the Trustee . . . to perform any discretionary act enumerated in this Agreement shall not be construed as a duty," *id*. § 8.02(viii); and that the Trustee is not required to "expend or risk its own funds . . . in the performance of any of its duties hereunder" unless it has been offered "reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby." *Id*. §§ 8.01(iv), 8.02(iii). Thus, even if the "sole remedy provision" does not *prohibit* "pervasive breach" suits by trustees against warrantors (as some judges in this District have held, *see* Part II.B. of this Memorandum and Opinion, *infra*), I cannot find any support in the language or structure of the PSAs for RPI's theory that a trustee could be *required* to bring such a suit.

Several recent cases within this District have questioned whether the obligation of an RMBS trustee to enforce R&Ws can be triggered by something less than actual knowledge of specific R&W breaches.[19] But no such case has interpreted the term "discovery," as used in the PSAs, to mean either "constructive knowledge" or "inquiry notice," as RPI urges here. To the contrary: it appears to be the uniform view of judges in this District that, in cases brought by RMBS investors against RMBS trustees, "discovery' requires more than inquiry notice." *Blackrock v.*

---

[19] *See, e.g.*, *Phoenix Light SF Ltd. v. Bank of New York Mellon*, 2017 WL 3973951, at *7 & n.12 (S.D.N.Y. Sept. 7, 2017) (Caproni, D.J.); *Blackrock v. Wells Fargo II*, 2017 WL 3610511, at *9-10 (suggesting, in *dicta*, that investors "could demonstrate 'discovery' through a showing of conscious avoidance or implied actual knowledge, either of which would impose a higher burden than 'constructive knowledge,' but both of which are different than 'actual knowledge'"). Both *Phoenix Light* and *Blackrock v. Wells Fargo II* expressly declined to resolve this issue in the context of a discovery motion. *See also RPI v. HSBC*, 2018 U.S. Dist. LEXIS 31157, at *36 ("For now, it is unnecessary to decide what level of loan-specific knowledge or notice is required to satisfy § 2.03" of the PSAs.)

*Wells Fargo II*, 2017 WL 3610511, at *9. I therefore have no reason to depart from the law of the case, and will continue to apply the District Judge's determination that the question for trial will be whether the Trustee had "actual knowledge" of the alleged R&W breaches. *See* 2/3/16 Mem. & Order at 13.

### 3.     Actual Knowledge of EODs

There is no controversy concerning the degree of knowledge required to trigger the Trustee's obligations after an EOD. The PSAs themselves make clear – and RPI acknowledges – that the Trustee is required to act upon an EOD only when it has "actual knowledge" or "written notice thereof." *See* FFML 2006-FF9 PSA § 8.02(h) (the "Trustee shall not be deemed to have knowledge of a Master Servicer Event of Default or an Event of Default" unless the Trustee has "actual knowledge" of the occurrence of an EOD or "written notice thereof"); *see also* Compl. ¶¶15, 211; Pl. Mem. at 2, 24.

### E.     The Trustee Sampling Opinions

In *PABF*, the Second Circuit left open the question presented here, namely, whether an RMBS certificate-holder can use statistical sampling to establish liability, damages, or both in a case against an RMBS trustee. 775 F.3d at 162. However, that question is no longer novel in this District. Since *PABF* was decided, two Magistrate Judges and three District Judges have carefully analyzed it and uniformly answered in the negative – in each case reasoning principally that because statistical sampling "cannot provide loan-specific information as to any loan outside the sample," *RPI v. HSBC II*, 2018 U.S. Dist. LEXIS 31157 at *36, it is of "limited benefit," *id.*, in a case where both liability and damages must be established "loan by loan," such that the effort "is not justified under the proportionality standard of Rule 26." *Id.* at *37.[20]

---

[20] *See also RPI v. US Bank*, 2018 WL 3350323, at *2 ("Sampling . . . cannot identify which specific loans were in breach (other than those in the sample itself), cannot determine what would have

In reaching this conclusion, every judge has distinguished cases brought against trustees (for failing to enforce R&W breaches against originators, sponsors, and other warrantors), from cases brought directly against such warrantors; that is, against the entities that made the R&Ws, were responsible for their accuracy, and were required to cure, substitute or repurchase them in the event of a breach. In these cases, sampling has been permitted by some judges in this District[21] and denied by others.[22] However, as Judge Schofield explained:

> These cases are inapposite because the duty of an originator or sponsor to underwrite each loan before issuing or purchasing it is not comparable to the limited and loan-specific nature of the trustee's duties under the PSAs. Originators and sponsors review each loan file and make R&Ws as to each loan. Therefore, if any loan turns out to be defective, it is fair to assume that the originator or sponsor is liable. Thus, sampling to determine breach rates and average harm per breach can be a cost-effective way to establish liability and damages in a lawsuit against one of these entities.

*RPI v. HSBC II*, 2018 U.S. Dist. LEXIS 31157, at *37-38.

---

happened had the trustee attempted to seek repurchase of the loans, and cannot determine the damages associated with any specific loan."); *BlackRock v. Deutsche Bank*, 2018 WL 3120971, at *2 ("Because Plaintiffs need to prove liability and damages on a trust-by-trust and loan-by-loan basis, there is no benefit to sampling beyond what it reveals about the loans within the sample."); *BlackRock v. Wells Fargo II*, 2017 WL 3610511, at *10 (accepting Judge Netburn's ruling that "sampling could not help [plaintiffs] identify the loans in breach, demonstrate that any breaches materially adversely affected particular loans, or ascertain the loan-specific cure and repurchase remedy"); *BlackRock v. Wells Fargo I*, 2017 WL 953550, at *8 ("Generalized information indicating the *trusts* with loan defaults or R&W breaches cannot substitute for proof that servicers had actual knowledge of loan-specific R&W breaches and that Wells Fargo actually knew of the servicers' failure to report those breaches."); *Royal Park Investments SA/NV v. HSBC Bank USA Nat'l Assoc.*, 2017 WL 945099, at *9 (S.D.N.Y. Mar. 10, 2017) (hereafter *RPI v. HSBC I*) (Netburn, M.J.) (same), *report and recommendation adopted*, *RPI v. HSBC II*, 2018 U.S. Dist. LEXIS 31157 (S.D.N.Y. Feb. 23, 2018).

[21] *See Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Capital Holdings LLC*, 289 F. Supp. 3d 484, 504 (S.D.N.Y. 2018) (Forrest, D.J.) (hereafter *Deutsche Bank v. Morgan Stanley*); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 504-06 (S.D.N.Y. 2013) (Rakoff, D.J.) (hereafter *Flagstar*).

[22] *See Homeward v. Sand Canyon,* 2017 WL 5256760, at *7; *UBS I*, 2015 WL 764665, at *11; *UBS II*, 2015 WL 797972, at *2-4; *UBS III*, 205 F. Supp. 3d at *476.

## II.     ANALYSIS

In this case, RPI seeks to use statistical sampling to show "(i) the existence of underlying R&W breaches in the loan pools; (ii) what Deutsche Bank would have found had it reasonably investigated upon 'discovery' of such breaches; (iii) what a prudent person would have found had it investigated upon gaining 'actual knowledge' of events of default in proceeding as a prudent person; and (iv) the amount of damages resulting from such misconduct." Pl. Mem. at 2, 23-24.[23] At oral argument, counsel clarified that RPI does not propose to sample all of the loans, in all of the trusts, for all of these purposes.[24] Rather, it proposes to use sampling in slightly different ways with respect to "three different buckets," or categories, of loans. *See* Tr. at 28:8-10. I address each category in turn.

### A.     The 5,000 Loans

Plaintiff asserts that it has evidence, obtained through fact discovery, that Deutsche Bank had "actual knowledge" of approximately 5,000 specific breaching loans in the ten Trusts, Pl. Mem. at 5, including 2,500 loans that the Trustee recorded in a "repurchase log" after receiving written breach notices from other parties, another 500 loans that the Trustee failed to record in any repurchase log even though it received written breach notices about them, and an unspecified number of "specific breaching loans" that the Trustee learned about through other means, such as

---

[23] Plaintiff did not submit any expert declaration or other material describing its proposed sampling methodology. In its briefs, RPI asserts that separate samples would be drawn from each Trust. *See*, *e.g.*, Pl. Reply Mem. at 9. Beyond that, however, it says next to nothing about the techniques it would use to select appropriate samples, identify breaching loans within those samples, analyze the materiality of the breaches, determine which of them could or would have been cured, substituted, or repurchased – and when – calculate the damages flowing from the Trustee's failure to demand such remedies, and extrapolate the results to loans outside of the samples.

[24] *See* Tr. at 24:9-12 ("And certainly, it's not our intention to re-underwrite or do samples of every loan. There are loans that haven't gone bad, for example. There are . . . loans that didn't have damages to the trust.").

borrower complaints and reports that coverage was rescinded and premiums repaid by primary mortgage insurers. *Id*. at 5-7; *see also* Tr. at 31:2-5 (there is a "bucket of 5,000 loans which does meet the actual knowledge standard").[25]

RPI stresses that it does not propose to use sampling to establish the Trustee's knowledge of these 5,000 allegedly breaching loans. *See* Tr. at 28:13-21 ("The sampling evidence would not be used to prove knowledge."). Rather, RPI wishes to avoid the expense and burden of "re-underwriting" all of the loans in this category to determine liability (that is, which of them actually had "material" and "adverse" R&W breaches or Document Exceptions, such that the Trustee was obligated to demand cure, substitution, or repurchase) and damages (that is, the impact on RPI resulting from the Trustee's failure to do so). As to this category, therefore, RPI proposes to sample some subset of the 5,000 loans. Tr. at 32:2-9; 37:14-22. As explained in RPI's moving brief, this would require the combined efforts of three experts, beginning with a "sampling expert," who draws a sample "capable of yielding statistically significant conclusions" regarding the larger pool (in this case, the 5,000-loan pool). Pl. Mem. at 20-21. Next:

> A reunderwriting expert . . . determines how many loans in the sample materially breach R&Ws. The sampling expert extrapolates the breach rate to the entire loan pool based on statistically accepted methodologies providing a confidence level of 95% and a defined margin of error. Plaintiff's damages experts then use the extrapolated breach rate together with loan values as components for calculating damages.

*Id*. at 21.

For purposes of the pending discovery motion I assume, without deciding, that plaintiff can in fact show, using non-sampling evidence obtained in the ordinary course of discovery, that

---

[25] In addition, RPI states that it can now identify thousands of specific loans as to which Deutsche Bank knew of (and logged) material Document Exceptions, but "abdicated its duty to enforce loan repurchase obligations after warrantors failed to cure [the] material Document Exceptions." Pl. Mem. at 8.

Deutsche Bank had actual knowledge of thousands of loans as to which there were R&W breaches or Document Exceptions (or as to which it received written notices claiming that there were such defects).[26] I also accept, as a general proposition, that sampling, when done correctly, can "conserve[] resources by providing reliable and objective extrapolation to a population without having to examine every single transaction." Pl. Mem. at 20. *See generally Deutsche Bank v. Morgan Stanley*, 289 F. Supp. 3d at 496 ("Properly done, statistical sampling is not guesswork – it is a scientific method of making accurate inferences (to varying degrees of statistical certainty depending on the methodology employed) about a large population based on careful analysis of a representative subset of that population.") Thus, a well-constructed sampling protocol could provide a reliable estimate of the breach rate within the larger pool; that is, what *proportion* of loans in that pool that had R&W breaches (or Document Exceptions). In theory, sampling could also provide an estimate of the proportion of such breaches that were "material and adverse." *See* Pl. Reply Mem. at 9-10 (arguing that a "proper sampling protocol" could "accurately assess," among other things, "materiality of the breach").[27]

---

[26] Notwithstanding the confidence it has expressed on this point in its motion papers, RPI has yet to answer Deutsche Bank's contention interrogatory asking it to identify the breaching loans in the Trusts. By order of even date (Dkt. No. 644), I have directed RPI to answer that interrogatory by November 1, 2018.

[27] In several prior RMBS cases (both those brought against trustees and those brought directly against warrantors), the plaintiff's bid to use sampling evidence foundered – in part – on this point. *See, e.g.*, *Homeward v. Sand Canyon*, 2017 WL 5256760, at *8 ("the sampling evidence that Homeward aims to introduce would not be probative of other contractual terms that give rise to Sand Canyon's repurchase obligation: namely, whether . . . the breach 'materially' and 'adversely' affected the loan's value"); *RPI v. HSBC I*, 2017 WL 945099, at *5 ("Sampling may fail to capture whether the nature of the breach had a material and adverse effect."); *UBS I*, 2015 WL 764665, at *10 ("the proposed statistical sampling does not adequately distinguish between breaches that are material and adverse as to a particular loan and those that are not"). *See also UBS III*, 205 F. Supp. 3d 386, 470-75 (describing the many ways in which plaintiff's re-underwriting expert struggled to identify which of the defects he uncovered were material). However, it is not inconceivable that a properly-designed re-underwriting program could reliably estimate the rate at which loans in the relevant pool had "material" and "adverse" R&W breaches. *See, e.g.*, *Flagstar*, 920 F. Supp. 2d at

The problem is not what sampling *can* do; it is what sampling *cannot* do: it cannot tell the fact-finder *which* loans in the larger pool had material and adverse R&W breaches or Document Exceptions. Nor can it establish the damages, if any, flowing from the Trustee's failure to put back any specific loan outside of the sample set. *See RPI v. HSBC II*, 2018 U.S. Dist. LEXIS 31157, at *36 ("Sampling cannot provide loan-specific information as to any loan outside the sample[.]"). Where, as here, the sole remedy available to the Trustee under the express terms of the PSAs is inherently loan-specific, both liability and damages must be established "loan by loan," making sampling unhelpful. *See Blackrock v. Deutsche Bank*, 2018 WL 3120971, at *2 ("Because plaintiffs need to prove liability and damages on a trust-by-trust and loan-by-loan basis, there is no benefit to sampling beyond what it reveals about the loans within the sample."). As Judge Netburn explained in *Blackrock v. Wells Fargo I*, 2017 WL 953550, at *5:

> To prevail on their § 2.03 breach of contract claims, plaintiffs must establish that [the trustee] failed to act as required under the PSA. The elements of such a claim require establishing loan-specific proof related to a particular defect, that defect was material to the value of the loan, that [the trustee] failed to act with respect to the loan-specific remedies available for a particular defect, and that such failure caused the plaintiff[ ] harm. . . . [R]eplacing loan-specific proof with extrapolated pool- or trust-wide breach rates ignores the Court of Appeals' requirement that breaches be proven on a loan-by-loan basis.

*Accord Blackrock v. Wells Fargo II*, 2017 WL 3610511, at *10-11 (finding "no error in Judge Netburn's thorough reasoning" that "sampling could not help [plaintiffs] identify the loans in breach, demonstrate that any breaches materially affected particular loans, or ascertain the loan-specific cure and repurchase remedy"); *RPI v. US Bank*, 2018 WL 3350323, at *3 (the "contractual

---

504-06 (accepting expert testimony, in case by insurer against RMBS originator, as to the rate at which the loans in the sample set showed material breaches). As noted above, RPI has made no showing as to how its experts will manage this complex task, particularly given that the PSAs show some variation in what constitutes a material and adverse breach. For purposes of the pending discovery motion, however, I assume, without deciding, that it could be done.

language dictates a 'loan-by-loan' analysis, a standard that cannot be met with sampling"). Therefore, even though I have given RPI the benefit of multiple favorable assumptions as to what it may be able to show (both through non-sampling evidence and through its as-yet-unidentified sampling and re-underwriting experts), I cannot conclude that sampling will help it prove any aspect of its case outside of the sample set, even as to loans that meet the "actual knowledge" standard.

### B.     All "Bad" Loans In The Trusts

In RPI's view, the Trustee's duty to enforce the R&Ws was not limited to the specific loans as to which it received notice, or obtained actual knowledge, of R&W breaches. Rather, RPI seeks to pursue "globalized claims for pervasive breaches of R&W obligations." Pl. Ltr. dated Nov. 17, 2017, at 1. That is, RPI proposes to hold the Trustee liable for each and every materially breaching loan in the Trusts. It can do this, it says, because Deutsche Bank had enough information about "pervasive R&W breaches existent throughout the mortgage industry" generally, Pl. Mem. at 9 n.10, and the "high probability of breaches" within the Trusts in particular, *id*. at 10, to put it on "inquiry notice" of additional R&W breaches, which in turn "required" it to "take enforcement action for all breaching loans in the . . . Trusts." Pl. Reply Mem. at 1.

Moreover, RPI contends, Deutsche Bank could and should have taken such enforcement action (presumably against all of the "over fifty Warrantors," Chippey Decl. ¶ 16, who made R&Ws with respect to the Trusts) "without having to investigate or know the specific identity of each individual breaching loan." Pl. Reply Mem. at 2. Indeed, according to RPI, Deutsche Bank could and should have used sampling as part of its own "globalized" actions against the Warrantors. *See id*. (defendant "had the contractual right, ability, knowledge and power to do

so").[28] By the same token, RPI reasons, it may now use sampling (a) to retrace the steps that Deutsche Bank should have taken; (b) to determine what proportion of *all* of the loans in each Trust (or at least all of the loans that have "gone bad," Tr. at 24: 9-11) had material R&W breaches; and (c) to calculate its damages on that basis. *See* Pl. Reply Mem. at 2 ("RPI is entitled to utilize statistical sampling to prove liability and damages by showing what DB should have done to protect the . . . Trusts from losses arising from breaching loans."); Tr. at 38:17-39:3.

Even if sampling could properly be used to establish liability and damages as to loans in the "actual knowledge" pool, RPI could not rely on it to support a globalized claim, based on a "pervasive breach" theory, that substitutes "inquiry notice" for actual knowledge as the trigger for the Trustee's enforcement obligations. *See* 2/3/16 Mem. & Order at 13-14. As noted above, the inquiry notice standard is fundamentally inconsistent with the language and structure of the PSAs and for that reason not been accepted by any judge in this District for use against an RMBS trustee. *See, e.g.*, *RPI v. HSBC I*, 2017 WL 945099, at *6 ("discovery," as used in § 2.03 of the PSAs, means "actual knowledge"); *Blackrock v. Wells Fargo II*, 2017 WL 3610511, at *9 ("'discovery' requires more than inquiry notice"). It therefore cannot furnish a sound basis for the ambitious and expensive expert sampling program that RPI wishes to commence.

RPI's bid to use sampling in support of its pervasive breach theory rests on two additional problematic assumptions. First, RPI presumes that Deutsche Bank *could have* pursued multiple globalized claims against the Warrantors, using sampling, "without having to investigate or know the specific identity of each individual breaching loan." Pl. Reply Mem. at 2. But two judges in

---

[28] More specifically, RPI explained at oral argument, Deutsche Bank should have done the same thing in this case that it did in *Deutsche Bank v. Morgan Stanley*. "They brought claims against Morgan Stanley and what did they do to prove their case there? They used sampling. And that's all we're saying they should have done." Tr. at 17:16-21.

this District have held pervasive breach suits impermissible even when brought directly against warrantors. *Homeward v. Sand Canyon*, 2017 WL 5256760, at *10; *UBS I*, 2015 WL 764665, at *11; *USB II*, 2015 WL 797972, at *2; *UBS III*, 205 F. Supp. 3d at 401, 424, 476. Two others have permitted "pervasive breach" suits against warrantors, based on sampling evidence, but under circumstances quite different from any that the Trustee could have presented with respect to the Trusts at issue here.

In *Deutsche Bank v. Morgan Stanley*, Judge Forrest permitted the trustee to proceed against the sponsor on a pervasive breach theory, using sampling, but only after the trustee first sent the sponsor a breach letter which "specifically identified 1,620 loans, which amounted to more than *one-third* of the underlying loan pool," and which was sufficient to "trigger[ ] the Repurchase Protocol as to all potentially breaching loans." 289 F. Supp. 3d at 506 (emphasis in the original). In addition, the trustee alleged that the sponsor "knowingly and intentionally transferred thousands of breaching loans into the Trust," *id.* at 502, which was a significant basis for Judge Forrest's holding that the sole remedy provision in the parties' contract "may be voidable." *Id.* at 501. Similarly, in *Flagstar*, 920 F. Supp. 2d at 486, 513, the plaintiff monoline insurer first sent formal letters to the sponsor, identifying specific breaching loans, and then – when the sponsor refused to cure – was permitted to use sampling to show that the loans underlying the two RMBS trusts at issue were "materially fraudulent." *Id.* at 477, 502-508. Here, in contrast, RPI apparently presumes that Deutsche Bank could have successfully sued all 50 Warrantors without first specifically identifying *any* breaching loans – or alleging the kind of intentional misconduct at issue in *Deutsche Bank v. Morgan Stanley* or *Flagstar*. I cannot share RPI's confidence, and for this reason as well I am reluctant to authorize it to pursue expert sampling evidence that would become relevant and probative only if, among other things, it can convince the trier of fact that Deutsche

Bank would have succeeded, in a series of hypothetical lawsuits, in using similar evidence against the Warrantors.

Second, RPI assumes that what the Trustee *could* do and what the Trustee *must* do are one and the same. As explained above, however, some of the PSAs expressly say otherwise: "the right of the Trustee . . . to perform any discretionary act enumerated in this Agreement shall not be construed as a duty." HVMLT 2006-8 PSA §§ 8.02 (iii), (viii).[29] Moreover, all of the PSAs assure the Trustee that prior to an EOD it is not required to "make any investigation" into the R&Ws unless it is formally requested to do so by one or more Certificate-holders. *Id.* § 8.02(v).[30] They also state that the Trustee need not "expend or risk its own funds . . . in the performance of any of its duties hereunder" unless it has been offered "reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby." HVMLT 2006-8 PSA §§ 8.01(iv), 8.02(iii).[31] In *Deutsche Bank v. Morgan Stanley*, the trustee sued the sponsor after being directed to do so (and presumably indemnified) by Certificate-holders. 289 F. Supp. 3d at 491-93. Here, RPI makes no showing that it (or any other investor) offered either direction or assurances to Deutsche Bank. Nor is RPI entitled, with the benefit of 20-20 hindsight,

---

[29] *See also* GSR 2007-AR2 PSA § 9.02(a)(ix); SAST 2006-02 PSA § 8.2(xi); SVHE 2007-NS1 PSA § 8.02(a)(iii), (viii).

[30] *See also* FFML 2006-FF9 PSA § 8.02(d) (action by Trustee must be requested in writing by the holders of Certificates evidencing 25% of the voting rights in the Trust); GSR 2007-AR2 PSA § 9.02(a)(vi) (25%); HASC 2007-WF1 PSA § 8.02(d) (25%); HVMLT 2006-8 PSA, § 8.02(v) (any NIMS insurer or the Majority Certificate holder); MSAC 2007-NC2 PSA, § 8.02(d) (25%); MSAC 2007-NC3 PSA § 8.02(d) (25%); MSIX 2006-1 PSA § 8.02(d) (25%); NHEL 2006-4 PSA, § 8.02 (Majority Certificate-holders); SAST 2006-02 PSA § 8.2(iv) (25%); SVHE 2007-NS1 PSA § 8.02(v) (the Majority Certificate-holder).

[31] *See also* FFML 2006-FF9 PSA § 8.02(f); GSR 2007-AR2 PSA § 9.02(a)(xi); HASC 2007-WF1 PSA § 8.02(f); HVMLT 2006-8 PSA §§ 8.01(iv), 8.02(iii); MSAC 2007-NC2 PSA, § 8.02(f); MSAC 2007-NC3 PSA § 8.02(f); MSIX 2006-1 PSA, § 8.02(f); NHEL 2006-4 PSA, §§ 8.01(b), 8.02; SAST 2006-02 PSA §§ 8.1(iv), 8.2(vi); SVHE 2007-NS1 PSA § 8.01(iv).

to read these provisions out of the PSAs entirely. For this reason as well, RPI's pervasive breach theory is unlikely to succeed and cannot justify an order permitting the parties to engage in expert sampling discovery.

### C. Post-EOD Loans

The third category of loans for which RPI proposes to use statistical sampling to prove liability and damages consists of loans serviced by Servicers or Master Servicers as to which there was an EOD. Plaintiff asserts that it has uncovered through ordinary discovery, and will present at trial, evidence showing that multiple Servicer or Master Servicer EODs occurred and remained uncured, and that the Trustee had actual knowledge of those EODs, thus stripping it of the contractual protections discussed above and triggering its heightened obligation to:

> . . . exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

FFML 2006-FF9 PSA § 8.01.[32] According to RPI, "this hefty 'prudent person' standard compelled [the Trustee] to investigate the quality of the loans to determine whether or not [it] could make valid repurchase claims," Pl. Mem. at 17, even if the EOD arose out of an unrelated issue. RPI's theory is that if Deutsche Bank had properly investigated – for example, by sampling – it would have discovered many breaching loans, which it could and should have put back to the relevant Warrantors. *Id*. at 19. Further, RPI contends, "what Deutsche Bank would have found following those required investigations can be proven here through sampling." *Id*.; *see also* Pl. Reply Mem. at 10 (sampling will "show the breaches a reasonable trustee would have found upon properly executing its duties").

---

[32] Substantially the same provision appears in § 8.01 of every PSA except the GSR 2007-AR2 PSA, where the "prudent person" provision appears at § 9.01.

RPI's motion papers do not estimate the number of loans in the post-EOD "bucket," nor the number of EODs they believe they can prove at trial.[33] Once again, however, for purposes of the pending motion I give plaintiff the benefit of the doubt, in this case assuming, without deciding, that RPI can in fact show that Deutsche Bank had actual knowledge of one or more EODs sufficient to trigger its prudent person obligation as to loans affected by that EOD. Where RPI's argument falls short is at the next step: its assertion that a prudent Trustee, faced with a Master Servicer that has defaulted (by, for example, failing to promptly deposit certain payments received from the Servicers it monitors, *see* FFML 2006-FF9 PSA § 9.06(a)), is obligated by this event to "investigate the quality of the loans" throughout the relevant Trust "to determine whether or not [it] could make valid repurchase claims." Pl. Mem. at 17.

Plaintiff cites no legal authority for this proposition. Nor does it point to any "industry standards or customs at the time, showing that performing some kind of sampling review, identifying and investigating loan breaches, and subsequently enforcing repurchase was what a prudent person would have done following an EOD." *RPI v. HSBC I*, 2017 WL 945099, at *9 (internal quotation marks omitted).[34] Additionally, as Judge Netburn pointed out, the structure of the PSAs undercuts RPI's theory. "[E]ven in the post-EOD context, '[t]he trustee is not required to act beyond his contractually conferred rights and powers.'" *Id.* (quoting *Royal Park Investments SA/NV v. HSBC Bank USA*, 109 F. Supp. 3d at 597). Thus, for example, the Trustee is still entitled,

---

[33] Although plaintiff's motion papers suggest, at times, that any and every EOD would trigger the Trustee's heightened "prudent person standard," most of the PSAs require the Trustee to exercise its prudent-person rights and powers only when it has actual knowledge of a "Master Servicer" EOD. FFML 2006-FF9 PSA § 8.01. *See also* GSR 2007-AR2 MSTA § 9.01; HASC 2007-WF1 PSA §§ 8.01, 8.02(h); HVMLT 2006-8 § 8.01; MSAC 2007-NC2 PSA §§ 8.01, 8.02(h); MSAC 2007-NC3 PSA §§ 8.01, 8.02(h); MSIX 2006-1 PSA §§ 8.01, 8.02(h).

[34] Instead, RPI points to the testimony of a single Deutsche Bank representative regarding Deutsche Bank's use of sampling to prepare a proof of claim in Bankruptcy Court against defaulted originator/servicer New Century. Pl. Mem. at 17.

after a Master Servicer EOD, to refrain from spending its own funds on an investigation without satisfactory indemnification. *RPI v. HSBC I*, 2017 WL 945099, at *9; *see also* FFML 2006-FF9 PSA § 8.02(f).

Absent a firmer foundation for RPI's claim that a prudent person was required to hunt for R&W breaches after a Master Servicer EOD, I am reluctant to authorize the use of sampling, years later, to approximate "what [that] prudent person would have found" had it done its own sampling at the time. Pl. Mem. at 23-24.

## D.    Proportionality

Fed. R. Civ. P. 26(b)(1) permits the parties to obtain discovery, including expert discovery, regarding any nonprivileged matter that is "relevant to a party's claim or defense and proportional to the needs of the case, considering," among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit." Proportionality "focuses on the marginal utility of the discovery sought." 2/12/18 Mem. & Order at 16 (quoting *Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *13-14 (S.D.N.Y. Feb. 16, 2016)). Thus, "[p]roportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate," and *vice versa. Vaigasi*, 2016 WL 616386, at *14.

By making a motion for permission to conduct sampling-related discovery, RPI has asked the Court to consider the marginal utility of that discovery before it commits itself (and, as a practical matter, commits its opponent as well) to the development, execution, and defense of an expensive expert sampling protocol.[35] For the reasons discussed above, I have determined that "the

---

[35] Defendant asserts, and plaintiff does not deny, that expert sampling discovery would be expensive and time-consuming. *See* Def. Opp. Mem. at 22 ("it is likely that the requested sampling-related expert discovery 'will cost hundreds of thousands, if not millions, of dollars, will require months to conduct, and will [undoubtedly] result in challenges to the admissibility of evidence.'") (quoting *Blackrock v. Wells Fargo I*, 2017 WL 953550, at *4). Neither party,

relevance of sampling evidence to prove [RPI's] claims against the trustee is slim to none, while the burdens remain high," *RPI v. US Bank*, 2018 WL 3350323, at *4, and therefore I conclude – like every other judge in this District who has ruled on a similar motion – that "it is not proportionate to the needs of the case for Royal Park to pursue sampling-related discovery." *Id.* at *6. *See also Blackrock v. Deutsche Bank*, 2018 WL 3120971, at *2 ("there is nothing to be gained from allowing statistical sampling per se and much to be lost, in time if not money"); *RPI v. HSBC*, 2018 U.S. Dist. LEXIS 31157, at *37 ("sampling would provide slight benefit at great cost"); *Blackrock v. Wells Fargo II*, 2017 WL 3610511, at *11 ("the minimal benefits that sampling could provide to the [plaintiffs] are outweighed by the discovery's burden and expense").

In connection with the proportionality issue I have considered RPI's argument that sampling, while burdensome and costly, is less expensive than the alternative, which is to require it to prove liability and damages individually with respect to all actionable breaching loans in the Trusts. *See, e.g.*, Pl. Reply Mem. at 10 ("the alternative would be re-underwriting thousands more loans across the ten Covered Trusts, and would cost far more and still likely result in evidentiary challenges"). The short answer to this point is that a shortcut is not a shortcut if it terminates in a dead end. Time and money spent on sampling is wasted if – as appears likely – the results will not assist the parties in resolving this action. The longer answer is the answer Judge Castel gave in *UBS II*:

> It is a core function of a district court to manage cases. But that function does not give the judge the prerogative of overriding the parties' agreements in order to provide an efficient and economical remedy in the name of a just and fair resolution.

---

however, has provided the Court with any more precise estimate of what it will cost them to conduct sampling in this case.

2015 WL 797972, at *4. As Judge Castel pointed out, the parties have other "powerful tools available to them to streamline the presentation of large volumes of data to the fact finder." *Id*. (citing, e.g., Fed. R. Evid. 1006).

I have also considered RPI's contention, advanced at oral argument, that since it can develop the expert statistical analyses it envisions based on data it already possesses, *see* Tr. at 20:10-11 ("we're not seeking any more fact discovery from Deutsche Bank"), it should be permitted to do so on its own nickel and at its own risk, without judicial interference. *See id*. at 26:9-10 ("give us enough rope to hang ourselves"). As a practical matter, however, "[i]n a litigation with as much at stake as this one, no responsible defense attorney would move forward without at least analyzing plaintiff's sampling expert report, deposing the expert, preparing to cross-examine the expert at trial, and retaining an expert to potentially rebut the plaintiff's expert." *RPI v. US Bank*, 2018 WL 3350323, at *3. *See also* Tr. at 45:1-46:22 (Deutsche Bank's counsel, arguing that "the rope" is not "free for us," because "they're going to conduct sampling. And then the trustee is going to have to spend money and time and put in its own ex[pert] report showing why their ex[pert] report is incorrect."). Thus, if I permit plaintiff to conduct sampling-related discovery, I effectively require defendant to do so as well.

**III.    CONCLUSION**

For the reasons stated above, plaintiff's motion to permit sampling-related expert discovery

is DENIED. The parties shall submit a proposed revised expert discovery schedule within 10 days

of this Order. *See* Dkt. No. 443, at 3.

Dated:  New York, New York
            September 28, 2018

                            **SO ORDERED**.

                            _____
                            **BARBARA MOSES**
                            **United States Magistrate Judge**