UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

ROYAL PARK INVESTMENTS SA/NV,
Individually and on Behalf of All Others
Similarly Situated,

                             Plaintiff,

        vs.

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,

                       Defendant.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:14-cv-04394-AJN-BCM

CLASS ACTION

PLAINTIFF ROYAL PARK INVESTMENTS
SA/NV'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION REGARDING
SAMPLING-RELATED EXPERT
DISCOVERY

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.    ARGUMENT ......................................................................................................3

    A.    "Discovery" as Used in the PSAs Means "Knows or Should Have Known" ..........3

        1.    The Second Circuit Has Confirmed that "Discovery" Means Constructive Knowledge ................................................................3

        2.    Illustrative Evidence Demonstrates Deutsche Bank's "Discovery" of Breaching Loans ......................................................................5

            a.    Deutsche Bank Failed to Enforce Repurchase Obligations Where It Received Notice of R&W Violations ..............................5

            b.    Deutsche Bank Consciously Avoided Enforcing Repurchase Obligations for Specific Loans with Document Deficiencies ......................................................................8

            c.    Deutsche Bank "Discovered" There Were Many More Breaching Loans that Should Have Been Repurchased or Replaced ......................................................................9

        3.    Conflicts of Interest Caused Deutsche Bank to Ignore Its Obligation to Enforce Loan Repurchases from Its Revenue Clients Who Were Warrantors of the Loans ........................................................12

        4.    After Events of Default, Deutsche Bank Had a Heightened Duty to Investigate Breaches ................................................................13

            a.    The Covered Trusts Suffered Events of Defaults ..........................14

            b.    Deutsche Bank Had an Obligation to Act as a "Prudent Person" After Any EoD, but Failed to Do so ..............................16

    B.    Sampling Is Permissible as Part of Plaintiff's Liability and Damages Presentations, and Should Be Allowed Here ......................................................19

        1.    Courts Have Long Recognized the Admissibility of Sampling ................19

        2.    Deutsche Bank and Other Trustees Have Advocated for the Use of Sampling to Prove Liability and Damages ..................................22

        3.    Sampling Should Be Permitted in This Action to Support Plaintiff's Liability and Damages Case ....................................23

1305113_2

**Page**

III.      CONCLUSION...............................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Assured Guar. Mun. Corp. v. DB Structured Prods.*,
   2014 WL 3282310 (N.Y. Sup. Ct. July 3, 2014) .............................................................20, 23

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
   920 F. Supp. 2d 475 (S.D.N.Y. 2013)............................................................................ *passim*

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*,
   2013 WL 3146824 (S.D.N.Y. June 19, 2013),
   *aff'd in relevant part*, 821 F.3d 297 (2d Cir. 2016) .............................................................3, 4

*BCS Servs. Inc. v. Heartwood 88 LLC*,
   637 F.3d 750 (7th Cir. 2011) .........................................................................................20, 22

*Beck v. Manufacturers Hanover Trust Co.*,
   218 A.D.2d 1 (1st Dep't 1995) ......................................................................................16, 17

*BlackRock v. Wells Fargo*,
   2017 WL 1194683 (S.D.N.Y. Mar. 30, 2017) ................................................................ *passim*

*Deutsche Alt-A Secs. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*,
   958 F. Supp. 2d 488 (S.D.N.Y. 2013)......................................................................................4

*Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*,
   2014 WL 3824333 (D. Conn. Aug 4, 2014) .............................................................19, 20, 22

*Doe v. American Nat'l Red Cross*,
   923 F. Supp. 753 (D. Md. 1996) ............................................................................................3

*Enercomp, Inc. v. McCorhill Pub., Inc.*,
   873 F.2d 536 (2d Cir. 1989).................................................................................................19

*FHFA v. JPMorgan Chase*,
   2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ........................................................................20

*FHFA v. Nomura Holding America Inc.*,
   104 F. Supp. 3d 441, 494 (S.D.N.Y. 2015)..........................................................................21

*FMS Bonds, Inc. v. Bank of N.Y. Mellon*,
   2016 WL 4059155 (S.D.N.Y. July 28, 2016) .......................................................................16

*Jeandron v. Board of Regents*,
   510 F. App'x 223 (4th Cir. 2013) ..........................................................................................3

- iii -

**Page**

*LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*,
  2003 WL 22047891 (S.D.N.Y. Aug. 29, 2003) .......................................................4

*Law Debenture Trust Co. v. WMC Mortgage, LLC*,
  2015 WL 9581729 (D. Conn. Dec. 30, 2015) ...............................................20, 23

*LNC Inv., Inc. v. First Fidelity Bank, N.A.*,
  935 F. Supp. 1333 (S.D.N.Y. 1996) ......................................................................17

*MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*,
  2012 WL 4511065 (D. Minn. Oct. 1, 2012) .............................................................4

*MBIA Ins. v. Countrywide*,
  2010 WL 5186702 (N.Y. Sup. Ct. Dec. 22, 2010) ................................................20

*Morgan Guar. Trust Co. v. Bay View Franchise Mortg.*,
  2002 WL 818082 (S.D.N.Y. Apr. 30, 2002) ............................................................4

*NCUA v. Morgan Stanley*,
  No. 13-6705, ECF No. 196-6 (S.D.N.Y. Dec. 3, 2014) .........................................20

*Nomura Asset Acceptance Corp. Alternative Loan Trust v. Nomura Credit &*
  *Capital, Inc.*,
  2014 WL 2890341 (N.Y. Sup. Ct. June 26, 2014) .................................................23

*Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of Am., N.A.*,
  907 F. Supp. 2d 536 (S.D.N.Y. 2012) .....................................................................4

*Process Am. v. Cynergy Holdings*,
  839 F.3d 125 (2d Cir. 2016) ..................................................................................21

*RCN Telecom v. 202 Centre Street Realty LLC*,
  156 F. App'x 349 (2d Cir. 2005) ...........................................................................19

*Ret. Bd. of the Policemen's Annuity and the Ben. Funded City of Chicago v. Bank*
  *of N.Y. Mellon*,
  775 F.3d 154 (2d Cir. 2014) ..................................................................................22

*Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*,
  109 F. Supp. 3d 587 (S.D.N.Y. 2015) ...................................................................16

*SACO I v. EMC*,
  No. 651820/2012, ECF No. 196-4
  (N.Y. Sup. Ct. Nov. 4, 2015) .................................................................................20

- iv -

**Page**

*Syncora Guarantee v. EMC Mort. Corp.*,
    2011 WL 1135007 (S.D.N.Y. 2011)........................................................................20

*Tyson Foods v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)..........................................................................................20

## I.      INTRODUCTION

Defendant Deutsche Bank National Trust Company ("Deutsche Bank" or the "Trustee") failed to carry out its duties as trustee for the Covered Trusts by ignoring evidence of both specific and pervasive mortgage loan defects and failing to require sellers to repurchase breaching loans they sold to those trusts.[1]  As in numerous other RMBS cases, plaintiff Royal Park Investments SA/NV ("Royal Park") intends to use reliable statistical sampling and extrapolation methods as part of its proof of liability and damages across the thousands of loans backing the Covered Trusts.

Under the terms of the pooling and servicing agreements governing the Covered Trusts ("PSAs"), Deutsche Bank had a contractual duty to both give notice and enforce seller obligations to repurchase loans upon the trustee's "discovery" of breaches of seller representations and warranties ("R&W") related to those loans.  Courts have construed the term "discovery" in this context to require RMBS trustees to investigate upon learning facts constituting inquiry notice of breaching loans, and that "'upon receipt of such notice, it becomes incumbent upon the [Trustee] to pick up the scent and nose to the source.'"  *BlackRock v. Wells Fargo*, 2017 WL 1194683, at *10 (S.D.N.Y. Mar. 30, 2017).[2]  The evidence here, which plaintiff will present at summary judgment and trial, will show that Deutsche Bank disregarded both direct notices and glaring warnings that the loans in the Covered Trusts contained breaches of R&W, were defectively underwritten, and were failing at alarming rates.  Moreover, upon an event of default, Deutsche Bank had a heightened fiduciary duty to act as a "prudent person" in managing her own affairs, and a prudent person would have investigated and enforced R&W breaches, as Deutsche Bank itself has done in separate litigation and

---

[1]    Exhibit 1 is a chart of the pertinent contractual provisions for the ten trusts as issue (the  "Covered Trusts").  Unless noted otherwise, all exhibits referenced throughout are attached to the Declaration of Lucas F. Olts, filed herewith.

[2]    Unless noted otherwise, all emphasis is added and citations omitted.

bankruptcy proceedings – by sampling the underlying loans to determine the percentage of loans underlying a trust suffering breaches.

"Sampling" is a scientifically valid and legally accepted method of using a subset of a population to estimate with a high degree of certainty characteristics of that population, such as a loan breach rate, without having to examine each element of the population.[3]  The Supreme Court and numerous courts within this District have endorsed sampling to prove liability and damages, including in RMBS cases, and Deutsche Bank itself has repeatedly and successfully argued that statistical sampling, like that proposed by Royal Park here, is an appropriate method of establishing liability and damages in RMBS cases involving large pools of loans.

Sampling on a statistically significant basis for each Covered Trust, together with loan re-underwriting and extrapolation of the breach rates, will show with reliable statistical probability the breach rates Deutsche Bank would have found had it reasonably investigated following "discovery" of breaches, thus proving liability by a preponderance of the evidence.  As detailed below, Royal Park will use scientifically valid sampling to (i) establish the existence of underlying R&W breaches in the loan pools; (ii) prove liability based on what Deutsche Bank would have found had it reasonably investigated upon "discovery" of such breaches; (iii) prove liability based on what a prudent person would have found had it investigated upon gaining "actual knowledge" of events of default in proceeding as a prudent person; and (iv) establish and prove damages.  The Court should allow expert related discovery on sampling and re-underwriting to proceed.

---

[3]    Levy & Lemeshow, Sampling of Populations: Methods and Applications, at 22 (4th ed. 2008); Marsden & Wright, Handbook of Survey Research at 3 (2d ed. 2010); Manual for Complex Litigation §11.493 (4th ed. 2004).

## II.     ARGUMENT

### A.     "Discovery" as Used in the PSAs Means "Knows or Should Have Known"

At trial, Royal Park will establish Deutsche Bank's "discovery" of breaching loans by showing (through direct, non-sampling evidence) that it had both actual knowledge of numerous R&W breaches, as well as constructive knowledge regarding other R&W breaches, yet failed to investigate in light of that knowledge.  Sampling will then show what Deutsche Bank would have found upon proper investigation, in order to prove liability and establish damages.

#### 1.     The Second Circuit Has Confirmed that "Discovery" Means Constructive Knowledge

"As several courts have observed in cases involving securitized mortgage loans, 'A party "discovers" a breach when it knows or *should know* that the breach has occurred.'"  *Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, 2013 WL 3146824, at *19 (S.D.N.Y. June 19, 2013) (emphasis in original), *aff'd in relevant part*, 821 F.3d 297 (2d Cir. 2016) ("*BNYM*").  Indeed, the term "discovery" as used in a PSA means that, "once a party becomes aware of the relevant facts, a duty arises . . . 'to pick up the scent and nose to the source.  If the quest confirms this suspicion, then [it] must'" act on its rights "'with reasonable dispatch.'"  *Id.*  The Second Circuit affirmed the district court's  interpretation, holding that "the district court correctly observed [that] the law charges a party with discovery of [an R&W] breach . . . after it has had a reasonable opportunity to investigate and confirm its suspicions [of the breach]."  821 F.3d at 310; *see also Doe v. American Nat'l Red Cross*, 923 F. Supp. 753, 756 (D. Md. 1996) ("'[I]mplied actual knowledge [is] that knowledge that would in all probability have resulted from a diligent investigation pursued upon awareness of circumstances that would cause a reasonable person to investigate.'"); *Jeandron v. Board of Regents*, 510 F. App'x 223, 227 (4th Cir. 2013) (per curiam) (holding that "implied

actual knowledge" is established when a party "is on inquiry notice," which "notice arises 'when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further'"); *Deutsche Alt-A Secs. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 494 (S.D.N.Y. 2013) (construing "discovery" in a PSA to mean "knew, or should have been aware" of R&W breaches); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512-13 (S.D.N.Y. 2013) (interpreting similar PSA language to mean "constructively 'aware'" or "inquiry notice"); *Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of Am., N.A.*, 907 F. Supp. 2d 536, 553-54 (S.D.N.Y. 2012) (holding that a trustee aware of "facts 'suggestive of a breach' . . . was required to 'pick up the scent and nose to the source' – *i.e.*, to investigate any suspicions about the loans . . . in the Trusts," and "had no right to" proceed as though "living under a rock . . . given its role and responsibilities").[4]

Following the Second Circuit's *BNYM* decision, Judge Failla recently held in the *Blackrock v. Wells Fargo* action that "[it] is inconsistent with the bargained-for terms of the PSAs [to] treat[] . . . 'discovery' and 'actual knowledge' as synonymous, when the use of two different terms to address two different subjects in two different sections of the PSAs must be given meaning. . . . Plaintiffs *are correct in their identification* of relevant contract-interpretation principles." 2017 WL 3610511, at *9 (S.D.N.Y. Aug. 21, 2017) ("*Wells Fargo*") ("[a]llowing that 'discovery' and 'actual knowledge' are different terms that must be given different meanings"). *Id.* Judge Failla concluded that "[i]t is . . . plausible . . . that the Consolidated Plaintiffs could demonstrate 'discovery' through a

---

[4]     *See also MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*, 2012 WL 4511065, at *6-*7 (D. Minn. Oct. 1, 2012) (upon "[l]earning of facts . . . suggestive of a breach . . . it becomes incumbent [upon a party subject to obligations triggered by discovery] to pick up the scent and nose to the source"; holding that the Trustee "was duty-bound to investigate its suspicions" and was "constructively aware of the breaches"); *LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*, 2003 WL 22047891, at *6 (S.D.N.Y. Aug. 29, 2003) ("'[a] party "discovers" a breach when it knows or should know [based on awareness of 'red flags'] that the breach has occurred'"); *Morgan Guar. Trust Co. v. Bay View Franchise Mortg.*, 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002).

showing of conscious avoidance or implied actual knowledge," the latter term being "defined as '[k]nowledge of information that would lead a reasonable person to inquire further.'"  *Id*. at *10 (quoting Black's Law Dictionary (10th ed. 2014)).

Other similarly-situated RMBS trustees have themselves repeatedly argued that a party "discovers" a breach pursuant to a PSA "when it knew or should have known that a breach had occurred."  Indeed, in a repurchase action between trustees Deutsche Bank and HSBC, HSBC argued that Deutsche Bank's claim should be dismissed for failure to provide "prompt written notice" "[u]pon discovery" once it "knew or should have known of those alleged breaches." Ex. 2 at 21-22.

### 2.    Illustrative Evidence Demonstrates Deutsche Bank's "Discovery" of Breaching Loans

Documents and testimony obtained in discovery illustrate how Royal Park will meet its burden to show Deutsche Bank's "discovery" of breaching loans at summary judgment or trial, triggering its obligation to investigate, and how sampling will thereafter be used to prove what Deutsche Bank would have discovered had it conducted the required investigation.

### a.    Deutsche Bank Failed to Enforce Repurchase Obligations Where It Received Notice of R&W Violations

Deutsche Bank discovered and obtained actual knowledge that thousands of loans in the Covered Trusts breached their R&Ws, notwithstanding its extensive efforts to deliberately avoid such facts.

Deutsche Bank received and reviewed written notices for more than ***2,500 loans*** in the Covered Trusts that were identified as having breaches of R&Ws.  Deutsche Bank logged these 2,500 breaching loans in a spreadsheet it referred to as the repurchase log. Dkt. No. 345, Ex. E (repurchase log excerpt).  The repurchase log was woefully inadequate, however, and it did not even

- 5 -

contain all the breach notices that Deutsche Bank received.  *See* Ex. 63 (HSBC noticing more than 500 additional breaches not recorded in the repurchase log).[5]

Despite receiving thousands of breach notices, Deutsche Bank implemented a system designed to shirk its duty to enforce the replacement or repurchase obligations.  After receiving written notice of a breach, Deutsche Bank let warrantors – the party who would otherwise be liable for the repurchase – decide whether they would repurchase the loan.  The first step in this veritable non-enforcement was Deutsche Bank's repurchase correspondence to the responsible party that – as a matter of course – disclaimed any knowledge of an actual breach.[6]  Then, if the responsible party did not respond to the first letter, Deutsche Bank would send a second letter inviting the responsible parties to ignore the first letter, as Deutsche Bank would "consider th[e] matter closed" if there was no further response.[7]  *See* Ex. 7 (Deutsche Bank refused to acknowledge a breach despite extensive evidence provided by Wells Fargo).  Critically, Deutsche Bank never notified certificate holders of the fact that responsible parties were failing to respond or that Deutsche Bank was considering the matter closed and taking no action to enforce repurchase rights.  Ex. 8 at 150:20-151:11 (Deutsche

---

[5]   The repurchase log was maintained by a temporary contract worker, who was in charge of keeping track of Deutsche Bank's loan repurchase correspondence, which was the primary if not the sole procedure by which Deutsche Bank purportedly enforced repurchase obligations.  Ex. 3 at 13:11-14:14, 45:12-47:9.  The repurchase log shows few if any loans were ever repurchased.  The person at Deutsche Bank who supervised this contract worker spent little or no time working on repurchase issues.  Ex. 4 at 169:21-172:1.

[6]   While Deutsche Bank suggests it did not know if breaches actually existed, it learned of the existence of a multitude of specific breaches of R&Ws based on breach notices that it received from other parties.  *See, e.g.*, Ex. 5 at 5 (describing a "Post Purchase Due Diligence review" which uncovered a gross misrepresentation of borrower income of $9,450 a month, but in reality ranging between $1,000-2,000 a month ); Ex. 6 (eleven additional loans with breaches such as misrepresentation of occupancy or income from the "Post Purchase Diligence Review"); Ex. 10 (investor informing Deutsche Bank of 396 loans with breaches in MSAC 2007-NC3); Ex. 11 (Deutsche Bank noting that it received a notification of a rescission of Primary Mortgage Insurance and determining that the rescission constituted a "material breach of the Seller's representations and warranties"); Ex. 12 at 818-19 (describing certain MSAC 2007-NC2 loans being originated as part of "one of the region's largest foreclosure rescue scams").

[7]   In one circumstance, Deutsche Bank failed to obtain the Governing Agreement titled "Seller's Master Mortgage Loan Purchase and Servicing Agreement" for the SVHE 2007-NS1 that enumerated the R&Ws.  It is no wonder why Deutsche Bank never sent letters for that trust, since it turned a blind eye to the provisions it had the responsibility to enforce.

- 6 -

Bank was "seeking . . . closure" of matters, rather than repurchases). Deutsche Bank originally recognized its obligation to notify holders if a warrantor did not repurchase the loan or establish ***with evidence*** that it was not liable for a repurchase, and made hollow threats that it would do so. *See e,g.*, Ex 9 at 835. Since Deutsche Bank never once sent such a notice, it replaced its approach with a false presumption that a warrantor could not be liable for a repurchase unless the warrantor agreed it was. Unsurprisingly, Deutsche Bank's strategy and procedure inevitably led to an utter failure to enforce repurchase obligations. Deutsche Bank's inaction resulted in few, if any, loans ever being repurchased by warrantors. *See* Ex. 8 at 156:5-12; Ex. 3 at 69:11-20.

In addition to loans where Deutsche Bank received formal written notice of a breach, Deutsche Bank discovered additional specific breaching loans through a variety of other means – but took no action to effectuate a repurchase. For example, Deutsche Bank received borrower complaints alleging specific predatory lending practices in violation of the R&W's. *See, e.g.*, Ex. 13. Similarly, Deutsche Bank knew when Primary Mortgage Insurers rescinded coverage on particular loans when premiums were refunded. Ex. 14 at 529 ("the breach of such representations, warranties or covenants . . . may result in rescission or cancellation of Coverage on the affected Insured Loan, with a refund of all premiums paid with respect thereto"); Ex. 62 at 7 ("PMI Refund" reflects refunded insurance premiums reported by Deutsche Bank).

For all of these loans, Deutsche Bank had information in its files that revealed the existence of the breaches, but it failed to take the required steps to enforce replacement or repurchase obligations. Indeed, Deutsche Bank was well aware that its conduct may have violated the PSAs, and that it ran the risk of being sued for its failures to enforce its repurchase obligations. Ex. 15 at 074-077 (acknowledging that █████████████████████████

██████████████████████████████████████████

████████████████████████████████

       **b.**       **Deutsche Bank Consciously Avoided Enforcing**
                **Repurchase Obligations for Specific Loans with**
                **Document Deficiencies**

Deutsche Bank also failed to enforce repurchase obligations for breaches of R&Ws relating to missing or deficient documents that were required to be in the collateral files/loan files per the Governing Agreements ("Document Exceptions"). Deutsche Bank generated or received, at deal closing and on an annual basis, exception reports itemizing and listing all Document Exceptions for loans in each of the Covered Trusts. Ex. 64 (2006 HVMLT 2006-8 exception report); *See* Dkt. No. 445, Ex. G at §2.01. Due in large part to sloppy and improper loan origination practices, these exception reports identified thousands of loans with Document Exceptions in the Covered Trusts. Ex. 64. Deutsche Bank completely abdicated its duty to enforce loan repurchase obligations after warrantors failed to cure material Document Exceptions. Dkt. No. 445, Ex. G at §2.03(a)-(b) (identifying repurchase obligation). For example, there were **2,262** Document Deficiencies in the HVMLT 2006-8 trust, yet nearly four years later in 2010, only **47** of those had been remedied. *Compare* Ex. 64 *with* Ex. 65 (20010 HVMLT 2006-8 exception report).

Although Deutsche Bank's **original** policy and procedure manual instructed its trust administrators to ███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

- 8 -

████████████████████████████████████████████████████████████

████████.[8]

The GA's are clear that Deutsche Bank could "discover" on its own the existence of a material breach relating to Document Exceptions. Dkt. No. 445, Ex. G at §2.03(a)-(b). Upon such "discovery" Deutsche Bank had a duty to enforce the corresponding repurchase obligations. Notwithstanding such discovery, Deutsche Bank pretended not to know if a Document Exception was material. The record will show, however, that as trustee and document custodian, Deutsche Bank knew or could determine whether a Document Exception was material, and that those exceptions should have been cleared or loans put back to the warrantors.[9]

### c. Deutsche Bank "Discovered" There Were Many More Breaching Loans that Should Have Been Repurchased or Replaced

In addition to the specific breach notices, additional evidence demonstrates that Deutsche Bank "discovered" that numerous additional breaches of R&Ws existed in the Covered Trusts.[10] To

---

[8]     Like its repurchase letter, Deutsche Bank's letters requesting others to determine materiality invited a non-response by stating: "If you do not respond, we will assume that you do not believe that the noted exceptions have the effects described above." Exs. 17-18. Deutsche Bank did not follow up with responsible parties after receiving no response. Ex. 19 at 116:5-23. Predictably, responsible parties did not respond, as it would be an admission of potential repurchase liability. Ex. 20 at 367:5-68:14. Deutsche Bank never once received a response with respect to any of Document Exception in the Covered Trusts. Because this procedure was such a pointless act, Deutsche Bank ultimately stopped sending annual letters asking others to identify what it already knew – or should have known – about the materiality of Document Exception. *Id.*; Ex. 21 at 194:19-197:7.

[9]     Wells Fargo confirmed it was the trustee's duty to make this materiality determination. Ex. 22 at 215:5-217:1. Deutsche Bank identified the test for materiality in letters it sent to other deal parties. Ex. 17 at 774. As document custodian and trustee Deutsche Bank clearly had visibility into the factors determining materiality. Deutsche Bank filed claims in various bankruptcy proceedings acknowledging it could and would make materiality determinations relating to Document Exceptions. Ex. 23 at 7 ("trustee will require additional time to assess the materiality of the remaining missing defective documents"). Deutsche Bank's policy and procedures manual ███████████████████████
████████████████████████████████████████████████████████

[10]    As described in the complaint and confirmed in discovery, Deutsche Bank already had knowledge of pervasive R&W breaches existent throughout the mortgage industry. *See* Complaint ¶¶ 69-99;119-128; Ex. 26; Exs. 66-67 (Deutsche Bank obtained subprime market trending reports and news highlighting widespread defects in the loan original process).

begin with, Deutsche Bank gained firsthand knowledge of these breaches (as well as breach rates for certain loan originators) based upon the receipt of breach notices reflecting widespread deficient loan origination practices.[11]

In addition, through its regular review of media reports, Deutsche Bank discovered originators used predatory lending practices (issuing high cost loans, violating the Truth in Lending Act, and disobeying fair housing laws), which constituted breaches of R&Ws per the Governing Agreements.  *See*, *e.g.*, FFML 2006-FF9, PSA Schedule IV, subd. 8.  In one review, Deutsche Bank learned that a Covered Trust originator, Novastar, had been accused of discriminatory lending practices, and originators New Century, Countrywide, IndyMac and WaMu had all been accused of engaging in predatory lending practices.  *See* Exs. 25-26.

Furthermore, Deutsche Bank and its affiliates were involved in warehouse funding of loans in the Covered Trusts, providing clear visibility into the poor loan quality and high probability of breaches.  As part of Deutsche Bank's warehouse funding operations, it not only held custody of pre-securitization warehoused loans and reviewed documentation of those loans for warehouse lenders to decide whether to fund them, but also acted as escrow/transfer agent for the warehouse funds, thereby gaining clear visibility into quality of loans and what warehouse lenders would pay for them.  Ex. 27 at 112:3-20.  Critically, Deutsche Bank Securities Inc., a Deutsche Bank affiliate, was a warehouse lender that funded, transferred and provided more than 1,500 loans into the NovaStar

---

[11]   As part of the breach notices, Deutsche Bank received information suggesting breaches were concentrated in specific categories of loans. Ex. 28 at 675 (an investor confirming that a quality control review found "a ton of fraud in the [FFML 2006-FF9 loan] pool"); Ex. 29 (noting a concentration in delinquencies in owner occupied 2-4 family residencies and California and Florida).

trust.  Despite the 38% default rate for loans in the NovaStar trust, Deutsche Bank did nothing to enforce the applicable repurchase obligations.[12]

Based on its involvement with origination and servicing of RMBS loans, Deutsche Bank knew the Covered Trusts contained thousands of breaching loans beyond those formally noticed.  In its February 2008 claim in the Aegis bankruptcy, Deutsche Bank admitted it knew this critical information:  "Notwithstanding the unmatured, unliquidated and/or contingent nature of the Repurchase Claims, the Trustee asserts that, ***based on its information and belief regarding the mortgage loan securitization market, such claims will exist with respect to 2% to 30% of the aggregate original principal balance of the loans in the Trusts*** . . . ."  Ex. 30 at 464.

In connection with New Century's bankruptcy, Deutsche Bank conducted statistical sampling of New Century loans, finding ***more than 28% of the subject loans had at least one breach of a representation of warranty***.  *See* Ex. 23 at 8.  Deutsche Bank failed to take necessary steps to protect trust assets despite knowing these breaches existed.  Specifically, Morgan Stanley also warranted New Century loans.  However, Deutsche Bank did not take timely steps to enforce those available repurchase remedies.

Based on this and other evidence, a jury could easily conclude that Deutsche Bank consciously avoided enforcing repurchase obligations for loans in the Covered Trusts that it knew and/or "discovered" suffered breaches of R&Ws.

---

[12]   Ex. 31.  These loan origination practices were so deficient it led one of Deutsche Bank Securities' employees to opine during the NHEL 2006-4 due diligence, "I feel like rejecting [the loans] as I truly believe [Novastar] intentionally is placing loans in this trade they know don't belong."  Ex. 32.  As described in the FCIC report, Deutsche Bank Securities' waived 50% of defective loans into securitizations. Ex. 33; *see also* DOJ Settlement Press Release dated Jan. 17, 2017, available at https://www.justice.gov/opa/pr/deutsche-bank-agrees-pay-72-billion-misleading-investors-its-sale-residential-mortgage-backed.

1305113_2

**3.     Conflicts of Interest Caused Deutsche Bank to Ignore Its Obligation to Enforce Loan Repurchases from Its Revenue Clients Who Were Warrantors of the Loans**

Deutsche Bank's revenue clients were sponsors and arrangers of the RMBS who hired and paid it to serve as trustee, including the very same warrantors who were responsible for repurchasing breaching loans in the Covered Trusts.[13]   Complaint, ¶67.   Many of Deutsche Bank's Top 20 revenue clients were warrantors for the Covered Trusts, including Morgan Stanley, Goldman Sachs, Greenwich/First Franklin, Saxon, and Accredited.[14]   Deutsche Bank did extensive business with these revenue clients both before, during, and after the origination of the Covered Trusts, and therefore, had a conflict of interest that prevented it from taking or threatening legal action against those entities.[15]

The record shows Deutsche Bank actively avoided enforcing R&W obligations against revenue clients.   Instead, it offered to close the file if there was no response to repurchase demands. *See, e.g.*, Ex. 7.   Deutsche Bank would not take legal action to enforce R&Ws (nor threaten action against a revenue client) until the conflict of interest was removed – *e.g.*, the client was bankrupt – or unless Deutsche Bank was forced to take action by a certificate holder who held the requisite percentage of interest needed to force the trustee to act.[16]   To avoid being forced into action,

---

[13]   Ex. 34 at 580 (policy and procedure manual identifying RMBS sponsor as "[t]he revenue client or obligor that is to be billed for the deal"); Ex. 35 at 120:2-10 (confirming sponsor is party that pays Deutsche Bank).

[14]   Ex. 36 at 4022; Ex. 37 at 100:18-101:21.

[15]   Ex. 38 at 667 (September 2007 New Business Report); Ex. 39 at 850 (September 2008 New Business Report); Ex. 40 at 200 (June 2010 New Business Report).

[16]   Ex. 21 at 248:13-17; While Deutsche Bank may have sued a client over indemnity for legal costs, this sole incident appears unrelated to enforcement of R&Ws.  *Id.* at 249:5-251:21.  Even where certificate holders demanded action, Deutsche Bank often refused to act.  Ex. 42; Ex. 28 at 675 (certificate holder email noting conflict of interest as reason for no follow-up on repurchase demands).

Deutsche Bank failed to notify certificate holders that responsible parties were failing to respond to repurchase demands.

Deutsche Bank's own records acknowledge and document the conflict of interest with respect to threatening legal action against a revenue client to enforce repurchase obligations. Deutsche Bank's policy and procedure manual expressly explains in the section entitled "Conflicts of Interest within TSS [Trust and Security Services]" that a conflict of interest will exist: "In any situation where TSS is providing services to a client who brings or threatens legal actions against another TSS business line." Ex. 41 at 839; Ex. 21 at 245:12-246:20. It was a clear conflict of interest where a revenue client threatened legal action against Deutsche Bank (or its affiliates), and it was obviously an equal conflict of interest in the reverse situation – *i.e.*, if Deutsche Bank were to threaten legal action against a client.

Given Deutsche Bank's strong incentive to avoid jeopardizing its business relationships with revenue clients, a jury could easily find Deutsche Bank had a blatant conflict of interest that stood in the way of enforcing R&W obligations against its revenue clients. Use of statistical sampling is appropriate to quantify damages for Deutsche Bank's conscious avoidance of repurchase obligations caused in part by its conflicts of interest.

### 4.      After Events of Default, Deutsche Bank Had a Heightened Duty to Investigate Breaches

Separate from its baseline duty upon the "discovery" of R&W breaches, Deutsche Bank had a heightened obligation to act as a "prudent person" after a Servicer or Master Servicer Event of Default ("EoD"). *See* Ex. 1. Deutsche Bank breached this obligation and did not act as "prudent person" because it failed to investigate and enforce repurchases of beaching loans in the Covered Trusts after Servicer EoDs.

- 13 -

### a.    The Covered Trusts Suffered Events of Defaults

Pursuant to the PSAs, a Servicer EoD arises when a servicer goes bankrupt or fails to fulfill its duties under the agreement. *See,* Complaint, ¶56; Ex. A at 92. PSAs typically obligate servicers to act in accordance with servicing regulations and perform particular functions, like collecting mortgage payments, foreclosing on borrowers who fail to pay, and maintaining REO properties. Ex. 22 at 21:10-13, 127:4-9. Similarly, a Master Servicer EoD occurs when the master servicer fails to perform its duties under the PSA. PSA §9.06, Dkt No. 1-1, at 110-111 of 223. The PSAs obligate the master servicer to, among other things, monitor servicers and "use its reasonable good faith efforts to cause the Servicer to duly and punctually perform its duties and obligations." Complaint, ¶¶52, 55; Ex. A at 108; Ex. 22 at 125:19-126:4. Accordingly, master servicer breaches derive from the failure to monitor and mitigate servicer breaches, among other things.

Deutsche Bank cannot dispute that several EoDs occurred during the class period. Deutsche Bank itself declared servicer EoDs on multiple occasions. *See, e.g*., Ex. 45 (worksheet identifying Saxon EoD derived from "calculated cumulative losses" in 2009); Ex. 46 (worksheet identifying Novastar EoD derived from "cumulative loss percentage" in 2010). Deutsche Bank tracked EoDs on its "Event of Default Log," which it distributed to executives on the Corporate Trust Committee. Ex. 47 at 56:15-25; Ex. 21 at 66:9-11. Thus, at a very minimum, where these undisputed EoDs occurred, Deutsche Bank carried a heightened duty to act as a "prudent person."

In addition, while Deutsche Bank acknowledged some EoDs, it willfully ignored the vast majority in an effort to protect its business relationships and avoid its heightened duties. For example, in its 2008 Management's Assertion of Compliance, Deutsche Bank admitted that "policies and procedures were not instituted to monitor certain events of default." Ex. 48 at 086. Even after this admission, Deutsche Bank eschewed its obligation to recognize EoDs. For example, in February

of 2010, Deutsche Bank failed to report a Novastar EoD to investors and later had to revise its investor report to include the disclosure.  Ex. 35 at 254:5-18; Ex. 49.

The record will also show that Deutsche Bank was utterly unwilling to recognize EoDs against large clients that could provide business in the future.  Wells Fargo – a major player in the RMBS market with a prominent, multifaceted role in the Covered Trusts –  repeatedly breached its contractual servicer obligations, but Deutsche Bank simply allowed the misconduct to continue.  For instance, on three separate occasions Wells Fargo admitted it failed to comply with Reg AB servicing requirements – irrefutable grounds for an EoD.  Ex. 50; Ex. 51; Ex. 52.  Deutsche Bank received letters from Fannie Mae and investors' counsel detailing Wells Fargo's misconduct.  Ex. 53 at 984 (Fannie Mae email to Deutsche Bank providing a list of loans that had been "reported in Bankruptcy for an extended period with no recent record of borrower payment or resolution"); Ex. 42 at 839-47 (Gibbs & Bruns letter with several enumerated instances of Wells Fargo's misconduct as both servicer and master servicer).  Deutsche Bank also received notices from municipalities indicating that Wells Fargo had not maintained REO properties as the PSAs required.  *See, e.g.*, Ex. 54 at 981 (Chicago suspending Deutsche Bank's right to do business due to "outstanding administrative, water, and cost recovery debts").  At the same time, Wells Fargo's servicing misconduct, including its use of robo-signing, was well-covered in the media.[17]  This misconduct clearly violated Reg AB and constituted a Servicer EoD.

Wells Fargo's servicing deficiencies also gave rise to a Master Servicer EoD.  Indeed, Wells Fargo acted as master servicer for Covered Trusts where it also acted as servicer.  *See* Complaint, ¶117.  Despite the servicer's repeated failure to perform its duties, Wells Fargo refused to take any

---

[17]   *See Wells Adds to Crisis Over Home Seizures*, FT.com (Oct. 13, 2010), *available at* https://www.ft.com/content/ed4aa856-d70b11df-9cd5-00144feabdc0; *Inside the Foreclosure Factory, They're Working Overtime*, MSNBC.com (Apr. 19, 2012), *available at* https://www.nbcnews.com/business/inside-foreclosure-factory-theyre-working-overtime-723653.

corrective action as required by the PSAs.  Ex. 22 at 250:12-17.  Deutsche Bank acknowledged the inherent conflict of interest that arose from Wells Fargo's dual role, but refused to fix the problem or acknowledge the obvious Master Servicer EoD.  Ex. 55.[18]

> **b.    Deutsche Bank Had an Obligation to Act as a "Prudent Person" After Any EoD, but Failed to Do so**

The "prudent person" standard significantly increases the trustee's responsibilities to investors.  Indeed, after an EoD a trustee's "obligations 'come more closely to resemble those of an ordinary fiduciary, regardless of any limitation or exculpatory provisions contained in the indenture,'" and "it now 'must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any indenture, the repayment of the underlying obligation.'" *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015); *see also FMS Bonds, Inc. v. Bank of N.Y. Mellon*, 2016 WL 4059155, at *14 (S.D.N.Y. July 28, 2016) ("'After an event of default, the indenture trustee's fiduciary duties expand by operation of New York common law . . . and the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary.'").  In general terms, post-EoD, a trustee must "secure the trust." *HSBC*, 109 F. Supp. 3d at 609; *see also Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 13 (1st Dep't 1995) (finding trustee has "a fiduciary duty of undivided loyalty" and a "post-default obligation of prudence in the exercise of the rights and powers accorded by the indenture").

Any contractual limitations on Deutsche Bank's duty to investigate apply only "before the occurrence" of an EoD.  Complaint, Ex. A at 95.  After an EoD, "the trustee will become a frontline

---

[18]    Although these examples focus on Wells Fargo, the record will also show that Deutsche Bank knew about rampant misconduct from other servicers.  *See, e.g.*, Ex. 56 at 913 (OneWest certificate of compliance conceding that "[c]ertain instances were identified where foreclosure timelines exceeded investor and agency timeline standards"); Ex. 57 at 987 (Deloitte report finding that Saxon "failed to establish and maintain a Custodial account for the Master Servicer on behalf of the note holders"); Ex. 58 at 584 (Nationstar compliance report admitting that "reconciling items were not resolved" and "mortgage payments were not deposited" within the requisite time periods); Ex. 59 (New York City Environmental Control Board referencing 126 fire and building code violations with fines totaling $1,256,585.43).

player and the stakeholder in enforcing agreements and the rights of investors." Securitization of Financial Assets, §9.03 (3d ed.). This heightened duty to protect certificate holders applies broadly to all of the trustee's obligations: "*Beck* requires an indenture trustee to perform prudently even the more general obligations in the indenture, and applies to any conduct not specifically prohibited by the indenture which would enable the investors to secure repayment of the trust certificates." *LNC Inv., Inc. v. First Fidelity Bank, N.A.*, 935 F. Supp. 1333, 1348 (S.D.N.Y. 1996). The obligation arises because of the trustee's unique ability to protect the rights of the certificate holders. *Id.* at 1347 ("After an event of default, 'it is . . . only the trustee who is able to act swiftly and effectively to assure . . . that the rights of the bondholders to recover what they are owed will ultimately be vindicated.'").

Deutsche Bank acknowledged that this hefty "prudent person" standard compelled it to investigate the quality of the loans to determine whether or not the Trustee could make valid repurchase claims:

> Q.      [] Is it your position that the events of default of the company declaring bankruptcy elevated the standard of care for Deutsche Bank?
>
> A.      Yes.
>
> Q.      Was it a result of that heightened standard of care that required you to do a deeper analysis as to whether or not you had valid repurchase claims?
>
> A.      Sure. Under that event of default and bankruptcy, we're under what I believe to be a prudent person's standard of care. And we engaged with our legal teams and took the appropriate steps we needed to reserve those rights.
>
> Prior to that, the standard of care is – is different. We're following the terms of the pooling and servicing agreements and the duties outlined under that agreement.
>
> Q.      So part of the New Century bankruptcy, you guys did sampling of the loans that had been underwritten by New Century; is that correct?
>
> A.      I have a recollection of that, yes.

Ex. 8 at 172:9-173:3.

- 17 -

Despite its obligation to investigate and defend the certificate holders' rights after an EoD, the record will show that Deutsche Bank *only* acted when it did not risk harming its ongoing business relationships. For instance, with regard to New Century, Deutsche Bank waited until New Century declared bankruptcy before making any repurchase claims, and only then did the Trustee perform sampling of the loan pools to establish the trust's losses as a result of New Century's misconduct. *See* Ex. 23. Deutsche Bank knew New Century would not likely provide business in the future because it had become insolvent.

Despite its undisputed duty to act prudently after an EoD, Deutsche Bank disclaims any obligation to recognize when an EoD occurs, no matter how flagrant. *See* Ex. 47 at 51:11-15 ("I don't understand the trustees having the duty to monitor the servicer as to whether or not it's performed its duties according to this language in any material respect. We don't have that duty to monitor the servicer."); Ex. 21 at 270:24-271:6 ("Q. Do you think if a loan was delinquent for 20 payment cycles . . . that that could indicate the servicer hadn't taken the appropriate steps to foreclose? [] THE WITNESS: No, we don't monitor. We are a pass-through. We get information from the servicer and pass it through to the investors."); Ex. 4 at 175:5-13 ("Q. Did you ever make any assessment of whether or not the master servicer was – or the master – the master servicer was properly monitoring the servicer? A. No. Q. Do you know if anybody else inside Deutsche Bank ever looked at that issue? A. No. I don't believe that was one of our obligations under the governing documents.").

In reliance on this contradictory stance, Deutsche Bank actively avoided inculpatory information. For example, in response to a letter from investors identifying servicer misconduct, Deutsche Bank declined to intervene. It said:

> the Trustee believes that the allegations in the Letter, as stated and if true, do not provide sufficient information to give the Trustee actual knowledge of facts

> sufficient to warrant:  (i) the Trustee's furnishing the Servicer or Master Servicer with notice of a failure to perform, in any material respect, its obligations under the PSA, or (ii) the declaration of an Event of Default (as defined under the governing agreements) on the basis of such notice having been given to the Servicer or Master Servicer by the requisite Certificateholders.

Ex. 60 at 065.  Deutsche Bank admitted that it did not perform any investigation into the alleged servicer misconduct before sending this response.  *See* Ex. 47 at 77:6-15 (testifying that "Deutsche Bank National Trust as trustee doesn't have an obligation to monitor or investigate servicers" before sending the response).  Deutsche Bank further evidenced its intention to avoid knowledge in 2011, when it made a "business decision" to discontinue its practice of calculating trusts' realized losses to determine whether an EoD had occurred.  Ex. 61 at 137:9-140:21.

> **B.**     **Sampling Is Permissible as Part of Plaintiff's Liability and Damages Presentations, and Should Be Allowed Here**

With respect to each type of contractual violation and conflict of interest described above, the use of statistical sampling is both a permissible and efficient means of presenting plaintiff's case at trial.  Had Deutsche Bank performed the required investigations or analyses, it would have discovered the extent to which loans underlying the Covered Trusts suffered breaches and losses.  What Deutsche Bank would have found following those required investigations can be proven here through sampling.  As a result, and as Deutsche Bank itself has argued, "'sampling [] would streamline both discovery and trial.'"  *Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*, 2014 WL 3824333, at *6 (D. Conn. Aug 4, 2014).

> **1.**     **Courts Have Long Recognized the Admissibility of Sampling**

Plaintiff's burden of proof is by a "preponderance of the evidence."  *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 542 (2d Cir. 1989).  "'[C]ausation in fact is established if the defendant's breach of duty was a substantial factor in producing the damage.'"  *RCN Telecom v. 202 Centre Street Realty LLC*, 156 F. App'x 349, 351 (2d Cir. 2005).  "Once a plaintiff presents evidence

- 19 -

that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation . . . . The causal relation between a defendant's act and a plaintiff's injury . . . need only be probable." *BCS Servs. Inc. v. Heartwood 88 LLC*, 637 F.3d 750, 758-59 (7th Cir. 2011) (Posner, J.).

As the Supreme Court recently explained, "[a] representative or statistical sample, like all evidence, is a means to establish or defend against liability. . . .  In many cases, a representative sample is 'the only practicable means to collect and present relevant data' establishing a defendant's liability." *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016) (quoting Manual for Complex Litigation §11.493).  Sampling conserves resources by providing reliable and objective extrapolation to a population without having to examine every single transaction.

Sampling has been widely accepted in New York (and elsewhere) as part of the proof that a defendant was probably liable and caused the asserted quantum of damages in RMBS cases.  *See, e.g.*, *Flagstar*, 920 F. Supp. 2d at 512 ("Sampling is a widely accepted method of proof in cases brought under New York law, including in cases relating to RMBS and involving repurchase claims.").[19]  As demonstrated by the record in these RMBS cases, a sampling expert draws a loan

---

[19]  *See, e.g.*, (all RMBS cases) *Assured Guar. Mun. Corp. v. DB Structured Prods.* ("*DBSP*"), 2014 WL 3282310, at *6, *8 (N.Y. Sup. Ct. July 3, 2014) ("sampling and expert evidence may be used" at trial; forcing parties "to re-underwrite all of the loans is commercially unreasonable;" "sampling may be used to compute damages"); *SACO I v. EMC*, No. 651820/2012, ECF No. 196-4, at 16-17 (N.Y. Sup. Ct.  Nov. 4, 2015) ("use of statistical sampling to prove liability and damages on their claims is consistent with the terms of the contract governing the transactions, including but not limited to the PSAs"); *MBIA Ins. v. Countrywide*, 2010 WL 5186702, at *4 (N.Y. Sup. Ct. Dec. 22, 2010) ("[s]tatistical sampling is a widely used method to present evidence from a large population of data" and "[i]t is undisputed that the use of statistical sampling is generally accepted in the scientific community"); *Home Equity 2006-1 v. DLJ*, No. 156016/2012, ECF No. 196-5, at 1 (N.Y. Sup. Ct. Nov. 19, 2013) ("ORDERED that plaintiffs may use a statistical sampling to prove liability and damages on all of their claims"); *FHFA v. JPMorgan Chase*, 2012 WL 6000885, at *1 (S.D.N.Y. Dec. 3, 2012); *NCUA v. Morgan Stanley*, No. 13-6705, ECF No. 196-6, at 1-2 (S.D.N.Y. Dec. 3, 2014); *Syncora Guarantee v. EMC Mort. Corp.*, 2011 WL 1135007, at *6 n.4 (S.D.N.Y. 2011) (approving sampling and explaining that defendant "cannot reasonably expect the Court to examine each of the 9,871 transactions to determine whether there has been a breach, with the sole remedy of putting them back one by one"); *Law Debenture Trust Co. v. WMC Mortgage, LLC*, 2015 WL 9581729, at *7 (D. Conn. Dec. 30, 2015); *Deutsche Bank Nat'l Trust Co. v. WMC Mortg. LLC*, 2014 WL 3824333, at *9 (D. Conn. Aug. 4, 2014) ("statistical evidence is an accepted and useful way of proving liability (and by extension, damages) in an RMBS case").

1305113_2

sample capable of yielding statistically significant conclusions regarding a loan pool.  A re-underwriting expert next determines how many loans in the sample materially breach R&Ws.  The sampling expert extrapolates the breach rate to the entire loan pool based on statistically accepted methodologies providing a confidence level of 95% and a defined margin of error.[20]  Plaintiff's damages experts then use the extrapolated breach rate together with loan values as components for calculating damages.  Where a plaintiff "has proven the fact of damages by a preponderance of the evidence, 'the burden of uncertainty as to the amount of damage is upon the wrongdoer'. . . . Therefore, a plaintiff need only show a 'stable foundation for a reasonable estimate' of the damages incurred as a result of the breach . . . [, and] the burden of any uncertainty as to the amount of damages is on the breaching party." *Process Am. v. Cynergy Holdings*, 839 F.3d 125, 141 (2d Cir. 2016).

Judge Rakoff, presiding over a bench trial in *Flagstar*, "accept[ed] sampling as an appropriate method of proof" and found "that the loans underlying the Trusts here at issue pervasively breached Flagstar's contractual representations and warranties."  920 F. Supp. 2d at 512.[21]  The court held "the evidence proffered by [plaintiff's sampling and damages experts wa]s clear, credible, and convincing"; the sampling expert's "sample size . . . provided an adequate basis for assessing whether the Trusts as a whole complied with or breached Flagstar's representations and warranties"; and the damages expert "provided a solid basis for calculating the damages occasioned

---

[20]   *See FHFA v. Nomura Holding America Inc.*, 104 F. Supp. 3d 441, 494 (S.D.N.Y. 2015) (Cote, J., presiding over an RMBS bench trial) ("A sample of 100 loans . . . permits results to be stated with a 95% confidence level, *i.e.*, with maximum margins of error of +/10 percent.").

[21]   Judge Rakoff interpreted the "discovery" standard at issue to impose liability upon the seller, holding that plaintiff "Assured, by informing Flagstar 'of pervasive breaches affecting the charged off loans with its January 2009 repurchase demand, rendered Flagstar constructively 'aware' – or, at a minimum, put Flagstar on inquiry notice – of the substantial likelihood that these breaches extended beyond the charged off loan population and into the broader loan portfolio." *Id.* at 512-13; *see id*. at 480 (MLPA: "discovers a breach of any of the foregoing [R&Ws]").  *See* §II.A.1, *supra*.

by any such breaches."  *Id.* at 501.  The clear majority of courts is in accord with that approach in

RMBS cases.[22]

### 2. Deutsche Bank and Other Trustees Have Advocated for the Use of Sampling to Prove Liability and Damages

Consistent with the above authority, Deutsche Bank and other RMBS trustees have

themselves repeatedly advocated for the use of and utilized sampling as evidence in RMBS matters.

For example, in *Deutsche Bank v. WMC*, 2014 WL 3824333, at *9, Deutsche Bank argued for the

use of sampling to prove liability and damages, and the court agreed, holding, "I am satisfied that

statistical sampling is, in principle, an acceptable way of proving liability and damages in an RMBS

case such as this one."  Deutsche Bank also argued for the use of sampling to prove liability and

damages in the *Deutsche Bank v. Morgan Stanley*, No. 14-cv-3020 (S.D.N.Y.) (language from DB's

MSJ) (Dkt. 120), citing much of the same authority in §II.B.1, *supra*, stating:

> Sampling is a scientific method of identifying the number of breaching loans
> in the Trust and calculating damages for those breaches.  Court after court has
> embraced that approach in RMBS cases against sponsors, sellers, and originators
> who made representations and warranties or originated the loans at issue,

---

[22]   Magistrate Judge Netburn's Opinion and Order in both *Blackrock Allocation Target Shares v. Wells Fargo Bank, N.A.*, No. 14 Civ. 9371 ("*Wells Fargo*") and *Royal Park Investments SA/NV v. HSBC Bank USA National Association*, No. 14 Civ. 1875 ("*HSBC*") (the "Netburn Opinion"), which concluded that the plaintiffs in those cases should proceed loan-by-loan in a way that precluded sampling, and that the term "discovery" in the PSAs means "actual knowledge" (*id.* at 8-12, 13-16), was in direct contrast to the above authority, and was, respectfully, in error.

In precluding sampling, the Netburn Opinion relied on a single inapposite case and ignored the established principle that a plaintiff may use reliable methods of sampling and extrapolation to prove its claims. Judge Netburn's reliance upon *Ret. Bd. of the Policemen's Annuity and the Ben. Funded City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014), where the Second Circuit rejected class plaintiffs' use of "a single sample of loans taken from hundreds of trusts . . . to prove a defendant's liability with respect to each of those trusts" (*id.* at 162 n.6), does not support disallowing sampling here, as the Second Circuit did not prohibit more targeted sampling and in fact noted – without a hint of disapproval – that other courts have "permitted plaintiffs to use statistical sampling to prove the incidence of defects within individual trusts."  *Id.* (citing *Flagstar*, 920 F. Supp. at 486-87).  Contrary to the Netburn Opinion, the Second Circuit did not establish a rule that plaintiffs must submit proof showing discrete trails of evidence for every individual loan. *Wells Fargo*, ECF No. 263, at 8-9.  Rather, courts routinely allow plaintiffs to establish their claims with "statistical, probabilistic" evidence. *BCS*, 637 F.3d at 758.  Here, in accordance with this principle, plaintiff will submit evidence based on sampling and re-underwriting for each trust separately – that is, on a "loan-by-loan and trust-by-trust" basis – showing that a certain percentage of the loans, more likely than not, violated the R&Ws made by the sellers to the trusts.

notwithstanding clauses purporting to limit the available remedies to repurchase. . . .
Numerous other courts have agreed that sampling "is an accepted and useful way of
proving liability (and by extension, damages) in an RMBS case." . . .

*Because specific performance of the repurchase remedy is not feasible, the Trustee
can seek damages – a remedy for which sampling is indisputably appropriate in
this context*. . . .  There is no "plain language" that limits the Trustee to any specific
method of proving breaches or damages.  [ ]  *And that is what sampling is: a method
of proving breaches throughout the Trust and the damages attributable to those
breaches*.

Dkt. 120 at 13, 16.

Wells Fargo's separate trustee, Law Debenture, also received permission to use sampling in

an RMBS case in which Judge Haight explained that "Law Debenture collected a number of federal

and state cases in support of its assertion that 'the overwhelming majority of courts' in the Second

Circuit and elsewhere considering the question 'have accepted statistical sampling as an appropriate

method of establishing liability and damages in RMBS cases.'"  *Law Debenture*, 2015 WL 9581729,

at *7.  Law Debenture has advocated that "New York courts routinely accept 'sampling' as a basis

for extrapolating breach rates across mortgage loan pools" and "there is no requirement that a

plaintiff specifically identify each defective mortgage loan to assert a claim for damages."[23]

**3.     Sampling Should Be Permitted in This Action to Support
        Plaintiff's Liability and Damages Case**

Sampling evidence will reliably and cost-effectively show, *inter alia*, (i) the existence and

extent of underlying R&W breaches in the loan pools; (ii) what Deutsche Bank would have found

had it reasonably investigated upon "discovery" of such breaches; (iii) what a prudent person would

---

[23]   *See also Nomura Asset Acceptance Corp. Alternative Loan Trust v. Nomura Credit & Capital, Inc.*, 2014 WL
2890341, at *16 (N.Y. Sup. Ct. June 26, 2014) (collecting numerous cases); *see also Flagstar*, 920 F. Supp. 2d at 513
(Rakoff, J., issuing bench-trial findings) ("the Court finds that Flagstar was made aware of Assured's claim of pervasive
and material breaches of the representations and warranties"); *Assured Guaranty*, 2014 WL 3282310, at *6 (holding at
summary judgment that "Assured's notification to Deutsche Bank of 'pervasive breaches' affecting the loans was
sufficient to render the defendant constructively aware – or, at minimum put [defendant] on inquiry notice of the
substantial likelihood that these breaches extended beyond the specified loans into the broader loan portfolio").

- 23 -

have found had it investigated upon gaining "actual knowledge" of events of default in proceeding as a prudent person; and (iv) the amount of damages resulting from such misconduct.

Judge Failla's holding in *BlackRock v. Wells Fargo*, should not preclude sampling here. *Wells Fargo*, 2017 WL 3610511.  In overruling plaintiffs' objections in that case, Judge Failla relied on Judge Netburn's observation "that sampling could not help the Consolidated Plaintiffs to demonstrate that any 'discovery' had occurred."  *Id*. at *10.  Importantly, here plaintiff will ***not*** use sampling to prove "discovery" of breaches by Deutsche Bank, but rather the quantum of breaches Deutsche Bank would have found had it complied with its contractual obligations, as set forth above. *See* §§II.A.2-4, *supra*.  In precluding sampling, neither *Wells Fargo* nor Magistrate Judge Netburn's opinions have delineated this fundamental distinction between proof of the trustee's discovery of breaching loans and failure to investigate  (using non-sampling evidence) and proving the breaches Deutsche Bank would have found upon reasonable investigation and the damages resulting therefrom (using sampling evidence).

III.   **CONCLUSION**

Royal Park respectfully requests that the Court allow the parties to conduct sampling-related expert discovery.

DATED:  September 8, 2017          Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
ARTHUR C. LEAHY
STEVEN W. PEPICH
LUCAS F. OLTS
DARRYL J. ALVARADO

LUCAS F. OLTS

- 24 -

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com
stevep@rgrdlaw.com
lolts@rgrdlaw.com
dalvarado@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

Attorneys for Plaintiff

- 25 -